**FILED**

**FEBRUARY 29, 2008**
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

**08 C 1251**

|  |  |  |
|---|---|---|
| Konstantinos Vadevoulis, Jim | ) | |
| Vadevoulis, and Paul Vadevoulis, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.: |
| | ) | |
| Deutsche Bank AG; Deutsche Bank | ) | Jury Trial Demanded |
| Securities, Inc., d/b/a/ Deutsche Bank | ) | |
| Alex. Brown, and American Express Tax | ) | |
| and Business Services, Inc., n/k/a RSM | ) | |
| McGladrey LLC | ) | |
| | ) | |
| Defendants. | ) | |

**JUDGE LEFKOW
MAGISTRATE JUDGE KEYS**

**COMPLAINT**

Plaintiffs Konstantinos Vadevoulis, Jim Vadevoulis, and Paul Vadevoulis

(collectively the "Vadevoulises") hereby complain against Deutsche Bank AG

("Deutsche Bank AG"), and Deutsche Bank Securities, Inc., d/b/a Deutsche Bank Alex.

Brown, a division of Deutsche Bank Securities, Inc. ("DBSI") (collectively "Deutsche

Bank"), and American Express Tax and Business Services, Inc., now known as RSM

McGladrey LLC ("Amex"), and in support state as follows:

<u>**NATURE OF THE CASE**</u>

1.       This case arises out of defendants' participation, in concert with the now

defunct law firm Jenkens & Gilchrist ("Jenkens"), in a conspiracy to create, market, sell,

and implement an illegal "Son of BOSS" tax shelter to plaintiffs during 2000.

Ultimately, defendants and the other co-conspirators stated and acted as though the tax

shelter was a legitimate transaction that took advantage of a valid "loophole" in the

federal tax code.  Each of the defendants and co-conspirators played a role in the

creation, marketing, sale, and/or implementation of the Son of BOSS shelter. All

committed wrongful acts in furtherance of the conspiracy.

2.      The Deutsche Bank defendants at all times gave plaintiffs the impression

that the trading and other financial machinations underlying the tax shelter were valid and

legitimate. They did this, in part, by preparing and circulating to plaintiffs certain

documents, including account statements and trade confirmations. In reality, however,

Son of BOSS lacked economic substance and was not a legitimate investment—it was

not even a legitimate tax strategy—and defendants knew it. Defendants and the other co-

conspirators nonetheless participated in the Son of BOSS conspiracy and reaped tens of

millions of dollars in illicit profits at the expense of plaintiffs and other participants.

3.      As part of the scheme, defendants and their co-conspirators made or

endorsed representations that:

      (a)     The capital and/or ordinary losses created by the shelters were legitimate, proper and in accordance with all applicable tax laws, rules, and regulations;

      (b)     The design of the transaction made economic and investment sense, could generate a profit and therefore had business purpose and economic substance, and was a suitable investment for plaintiffs;

      (c)     The legitimacy of the shelters would be verified by a legal opinion provided by a respected and purportedly independent law firm; and

      (d)     A respected and purportedly independent tax preparation firm would prepare plaintiff's tax returns that included Son of BOSS deductions.

4.      In fact, the transaction in which defendants encouraged the Vadevoulises

to engage was nothing more than an illegitimate tax shelter. In direct contravention of

established rules, regulations and laws governing tax shelters, the shelter involved the establishment of entities to engage in transactions that were economically valueless.

5. Defendants developed (or were at least aware of the development of) Son of BOSS with Jenkens for the express purpose of generating fees. Indeed, defendants, along with Jenkens, developed a fee sharing arrangement that remained undisclosed to the Vadevoulises throughout the transactions. Indeed, one of the Vadevoulises' trusted business advisors received secret, undisclosed referral fees from Jenkens for recommending that the Vadevoulises work with Jenkens and engage in Son of BOSS. Upon information and belief, some or all of the defendants may have received undisclosed payments as well.

6. As arranged by Jenkens, Amex prepared tax returns for plaintiffs for the year 2000. These returns included the Son of BOSS tax shelter. But Amex knew or should have known that Son of BOSS was invalid, illegitimate, and illegal. Amex nonetheless prepared plaintiffs returns (as well as the returns of many other Son of BOSS participants referred by Jenkens) in order to generate substantial fees. This was an essential part of the conspiracy.

7. Plaintiffs reasonably relied on the advice and actions of the co-conspirators, who were widely considered to be some of the most well respected firms in their respective fields, and agreed to participate in Son of BOSS. Defendants and their co-conspirators artificially generated substantial tax losses for the Vadevoulises, though no real losses ever occurred and though there was never any real economic risk involved in the transactions. This loss was deducted from the Vadevoulises' taxable income and generated significant tax savings.

8.    Defendants knew that in light of the well-established legal doctrine disallowing the recognition of losses from transactions that lacked "economic substance," the tax shelter would not withstand an audit by the IRS.  Not only was this "economic substance doctrine" established in case law, it was also confirmed in several IRS Notices, including IRS Notice 99-59 and 2000-44, both having been published prior to the filing of the Vadevoulises' 2000 tax returns.  In December 2001, just months after the tax returns were filed, the IRS announced an amnesty program that would have allowed the Vadevoulises to amend their tax returns and avoid the assessment of accuracy-related penalties by the IRS.  The co-conspirators were well aware of this program.  Plaintiffs believe that none of the co-conspirators ever told plaintiffs about the amnesty program. In any event, none of the co-conspirators ever recommended to plaintiffs that they participate in the program.  As a result, when the Vadevoulises were audited by the IRS, the IRS found that the Vadevoulises had entered into illegal tax shelters for the years 2000.  (This also impacted Paul Vadevoulis' 2001 tax returns.)  The IRS and State of Illinois assessed taxes, interest, and penalties on the Vadevoulises for their 2000 returns (and for Paul's 2001 return), and a settlement for those amounts was offered in late 2004, but not finalized until April 15, 2005.

9.    In March 2007, the U.S. Department of Justice entered into a non-prosecution cooperation agreement with Jenkens, which has now closed its doors as a result of its illicit tax shelter practice.  In connection with this agreement, Jenkens admitted to developing and marketing fraudulent tax shelters, as well as to issuing fraudulent opinion letters.  Specifically, Jenkens admitted that "certain J&G attorneys developed and marketed fraudulent tax shelters, with fraudulent tax opinions."  The

defendants knowingly and intentionally participated in this very misconduct.  Also in

March 2007, the IRS reached a deal with Jenkens pursuant to which Jenkens agreed to

pay a $76 million penalty for its tax shelter work.  Finally, a class of plaintiffs sued

Jenkens & Gilchrist for Jenkens improper marketing of tax shelters.  Eventually, Jenkens

agreed to settle the *Denney v. Jenkens & Gilchrist* litigation for $70 million and in

January 2007 a final judgment was entered.  (Plaintiffs are members of that class, but

have not yet received any class payments.)

10.     As a result of the conspiracy, and as more fully detailed below, plaintiffs

seek recovery for back taxes, penalties, interest, fees, and costs against defendants for

conspiracy, common law fraud, negligent misrepresentation, violation of the Illinois

Consumer Fraud & Deceptive Trade Practices Act, breach of fiduciary duty, assisting in

Jenkens and Amex's breaches of fiduciary duty, breach of contract, and accounting

malpractice.

## PARTIES AND OTHER RELEVANT PERSONS

11.     Konstantinos ("Dino") Vadevoulis is a resident of Greece.

12.     Jim Vadevoulis is a resident of Riverwoods, Lake County, Illinois.

13.     Paul Vadevoulis is a resident of Glenview, Cook County, Illinois.

14.     Defendant Deutsche Bank AG is a German corporation with its principal

place of business at Taunusanlage 12, 60325 Frankfurt am Main, Germany.  Deutsche

Bank AG is the largest bank in Germany and one of the largest banks in the world with

2006 profits of $5.9 billion Euros ($8.6 billion) on revenues of 18.7 billion Euros ($27.4

billion).  Deutsche Bank AG offers various investment, financial, and related products

and services to consumer and corporate clients worldwide.  Deutsche Bank AG has some

82,000 employees and more than 12 million customers in 75 countries worldwide. Deutsche Bank AG has a leading position in international foreign exchange, fixed-income and equities trading, and is a recognized leader in all aspects of foreign exchange. Deutsche Bank AG is one of the top global foreign exchange providers. Its only branch in the United States is located in New York City. Deutsche Bank AG has conducted business in Illinois sufficient to establish minimum contacts within the forum that support the exercise of jurisdiction over it by this Court. Notably, Deutsche Bank AG was involved in the creation and implementation of Son of BOSS that forms the basis for the claims alleged herein. Deutsche Bank AG can be served via its counsel, Lawrence Hill, Dewey & LeBoeuf, 1301 Avenue of the Americas, New York, NY, 10019-6092.

15.     Upon information and belief, DBSI is a wholly-owned subsidiary of Deutsche Bank and a member firm of the New York Stock Exchange. DBSI was formed as the result of Deutsche Bank's acquisition of BT Alex. Brown, Inc., the United States' oldest brokerage firm. On information and belief, defendant DBSI is a Delaware corporation with its principal place of business at 31 West 52nd Street, New York, New York, 10019. DBSI is licensed to do business in this state and has conducted business in Illinois sufficient to establish minimum contacts within the State that support the exercise of jurisdiction over it by this Court. Notably, DBSI was involved in the creation and implementation of Son of BOSS that forms the basis for the claims alleged herein. DBSI has offices in Cook County, Illinois and may be served via its counsel, Lawrence Hill, Dewey & LeBoeuf, 1301 Avenue of the Americas, New York, NY, 10019-6092.

16.     Defendant Amex is a Minnesota corporation with its principal place of business in Minneapolis, Minnesota. Amex is licensed to do business in this state and

has conducted business in Illinois sufficient to establish minimum contacts within the State that support the exercise of jurisdiction over it by this Court. Amex was involved in the creation and implementation of Son of BOSS that forms the basis for the claims alleged herein. Among other things, Jenkens arranged for Amex to prepare the Vadevoulises 2000 tax returns. Amex has offices in Cook County, Illinois and may be served through its counsel, Lynne Uniman, Andrew Kurth LLP, 450 Lexington Avenue, New York, NY 10017. In August 2005, RSM McGladrey acquired Amex. Amex is now known as RSM McGladrey LLC.

17.     PDJ Inc., formerly known as LaFrancaise Bakery, Inc., is an Illinois corporation. PDJ is owned by Dino, Jim, and Paul Vadevoulis and is an S corporation for federal tax purposes.

18.     The Dino Vadevoulis Descendants Trust dated October 28, 2000 is an Illinois trust created on or about October 28, 2000.

19.     The Jim Vadevoulis Descendants Trust dated October 28, 2000 is an Illinois trust created on or about October 28, 2000.

20.     The Paul Vadevoulis Descendants Trust dated October 28, 2000 is an Illinois trust created on or about October 28, 2000.

21.     V1 Investments LLC is a Delaware limited liability corporation that was formed on or about October 20, 2000. Dino Vadevoulis was a member of V1.

22.     V2 Investments LLC is a Delaware limited liability corporation that was formed on or about October 20, 2000. Paul Vadevoulis was a member of V2.

23.     V3 Investments LLC is a Delaware limited liability corporation that was formed on or about October 20, 2000. Jim Vadevoulis was a member of V3.

24.    TR1 Investments LLC is a Delaware limited liability corporation that was formed on or about November 2, 2000.  The Dino Vadevoulis Descendants Trust dated October 28, 2000 was a member of TR1.

25.    TR2 Investments LLC is a Delaware limited liability corporation that was formed on or about November 2, 2000.  The Paul Vadevoulis Descendants Trust dated October 28, 2000 was a member of TR2.

26.    TR3 Investments LLC is a Delaware limited liability corporation that was formed on or about November 2, 2000.  The Jim Vadevoulis Descendants Trust dated October 28, 2000 was a member of TR3.

27.    Trinity Investment Partnership is an Illinois general partnership that was formed on or about October 28, 2000.  V1, V2, V3, TR1, TR2, and TR3 were partners in Trinity.

### Non Party Co-Conspirators

28.    In 2000, Jenkens was a large law firm with hundreds of attorneys and offices in nine major U.S. cities, including in Chicago.  It claimed expertise in a variety of industries and market segments, including antitrust, bankruptcy, construction, securities, financial institutions, financial services, environmental, franchise and distribution, health, immigration, intellectual property, international tax, litigation, technology, and real estate law.  At its peak in 2001, the firm's gross revenue was $312 million.  Since the mid-1990s, Jenkens has earned as much as $267 million in fees from its work involving tax shelters, including Son of BOSS.

29.    Paul Daugerdas was a Jenkens partner.  He is a resident of Illinois. Between 1999 and 2003, Daugerdas earned at least $93 million—largely from his work

involving tax shelters like the Son of BOSS shelter sold to plaintiffs.  Daugerdas has been

under investigation by a grand jury in the Southern District of New York.  Upon

information and belief, that investigation is ongoing.

30.    William Tsourapas is a resident of Chicago, Cook County, Illinois.

Tsourapas is not a lawyer.  In 2000, Tsourapas was a financial advisor to plaintiffs.  In

that capacity, he recommended that plaintiffs retain Jenkens to provide tax advice, which

led to plaintiffs' participation in Son of BOSS.  For sending plaintiffs to Jenkens,

Tsourapas received a secret, undisclosed referral fee.

### JURISDICTION AND VENUE

31.    The Vadevoulises are citizens of Greece and Illinois, Deutsche Bank AG

is a citizen of Germany, DBSI is a citizen of New York or Delaware, and Amex is a

citizen of Minnesota, and there are millions of dollars at issue in this case.  Thus,

pursuant to 28 U.S.C. §1332, this Court has jurisdiction over this matter because there is

complete diversity between the parties and the amount in controversy is in excess of

$75,000.

32.    This Court has personal jurisdiction over defendants, which either (a) have

offices in Illinois and are continuously and systematically engaged in business here;

and/or (b) traveled to Illinois and/or communicated with the Vadevoulises (who were

living in Illinois) with respect to this transaction such that they could reasonably expect

that personal jurisdiction would be appropriate in this Court.

33.    Pursuant to 28 U.S.C. §1391, venue is appropriate in this district because

a substantial part of the events or omissions giving rise to the claims occurred in the

Northern District of Illinois.

<u>**BACKGROUND**</u>

I.    **THE FRAUDULENT TAX SHELTER SCHEME**

A.    <u>Tax Shelters in General</u>

34.    A tax shelter is a method or device used to reduce or eliminate tax liability.  Some tax shelters advance a legitimate endeavor and are therefore lawful.  Illegitimate or abusive tax shelters are those in which a significant purpose is the avoidance or evasion of taxes in a manner not intended by law.  The IRS deems a shelter unlawful if its economic purpose is tax avoidance.

35.    Economic substance is synonymous with risk—a deal has economic substance if there's a chance that the taxpayer could lose their investment.  If the outcome of a tax shelter is preordained, however, there is no risk.  Under such circumstances, the shelter is unlawful.

36.    Abusive tax shelters can be custom-designed for a single user or prepared as a generic tax product sold to multiple clients.  The Son of BOSS tax shelter complained of herein was sold to multiple clients, including plaintiffs.  Astonishing amounts of money can be made from such a shelter.  Once a "template" or "cookie cutter" opinion is written, additional deals can be done as fast as they can be sold.

37.    The essence of the co-conspirators' fraudulent scheme was that they claimed that they had developed an "investment strategy" that had a reasonable likelihood of generating profits, but if not, any losses generated could be used to legally offset other taxable gains.  The co-conspirators aggressively marketed this "investment strategy" to plaintiff and others who generally lacked the sophistication to understand the enormously complex transactions that were required to consummate the strategy.  A

typical target for sale of a Son of BOSS (or similar) transaction was someone who had sold a business or a substantial position in a business, realizing a substantial capital gain on the sale. Generally, when a taxpayer suffers a loss in a particular investment, the taxpayer can use that loss to reduce any taxable gains made from separate investments. Thus, as explained by the co-conspirators, if the tax strategy generated losses, those losses could be used to offset gains that plaintiffs had otherwise realized.

B.    <u>Terminology</u>

38.    There are a number of different ways one can invest in securities. In one of the simplest types of transactions, an individual or an entity can purchase a security outright. In this instance, the purchaser is considered "long," and can only profit by an increase in the price of the purchased security. Alternatively, the investor can borrow the security, sell it immediately, expecting the price of the stock to drop, and then buy it back to repay the loan. In this case, the purchaser is considered "short," and can only profit by a decline in the market price of the borrowed security.

39.    An option, on the other hand, is not an outright purchase. Instead, it gives a buyer the right to buy or sell a security at a definite price for a definite period of time, regardless of that item's future market price on the open market. That security may be stocks, bonds, commodities, or intangible market valuations such as the Standard & Poors' Index. Options are said to be "in the money" if the market price of the underlying security makes exercising the option profitable. Similarly, options are said to be "out of the money" when exercising the option would result in no gain or loss.

40. An option position is "long" if the holder's profit is dependent on a rise in the value of an underlying item, while an option position is "short" if the holder's profit is dependent on a decrease in the value of any underlying item.

41. Options are said to be "covered" when the seller of the option owns the item against which the option is made. Correspondingly, an option is "naked" when the seller does not own the item against which the option is made.

42. Options may also be either "American" or "European." The key difference between American and European options relates to when the options can be exercised. A European option may be exercised only at the expiration date of the option, *i.e.*, at a single pre-defined point in time. An American option, on the other hand, may be exercised at any time before the expiration date.

43. For example, an investor buys a "call" option on 1,000 shares of ABC stock with a "strike price" of $100 and an expiration date of July 16, 2003. This option gives the investor the right to purchase 1,000 shares of ABC for $100. Under the American option, the option holder can exercise the option by purchasing the shares at any time he chooses prior to July 16, 2003. Under a European option, the option holder can only elect to exercise the option on July 16, 2003.

44. European option contracts are "digital" in the sense that the investor wins or loses a pre-determined amount in full, but only if the strike price is met. Thus, the option is either "on" or "off," like a digital (binary) 1 or 0. As a result, European digital options contracts provide an investor with the same payout no matter how far the value of the underlying item rises above the strike price of the option. For example, a digital option may state that an investor will receive $1,000 if ABC Corp. closes at or above $12

per share on a certain date.  If the price of ABC Corp is at or above $12 per share on the closing date, the investor is paid $1,000.  If ABC does not close at or above $12 per share, the investor gets nothing and loses what he originally paid for the option. European digital options contracts are thus essentially wagers that a certain commodity or equity price will be above or beneath a given price on a certain date.

45.     European or digital options contracts are ordinarily less expensive to purchase than American or standard options, as the exposure of the seller and potential profit by the buyer are limited to a pre-set amount that does not vary, regardless of the degree of fluctuation in the value of the underlying item.  An American option, by contrast, gives the holder a wider range of risk and profit potential.

46.     A "straddle" involves the use of offsetting positions in options contracts wherein the value of one position generally varies inversely with the value of the other position.

C.     Development of the Son of BOSS Tax Strategy

47.     Traditionally, legitimate financial services firms provided tax advice to individual clients based on the client's specific circumstances, normally charging by the hour.  Respected firms did not encourage their clients to participate in tax shelters, even though such shelters can be legal.

48.     In the mid-1990s, the situation changed.  Key financial services firms began developing "cookie cutter" tax "products" that were really tax shelters.  Rather than responding to client needs, the sellers of these products would first create a scheme to avoid tax liability, and then induce clients to enter into the necessary transactions, on the representation that the product was a legitimate means of reducing taxes.  The

transactions executed in the course of implementing a particular tax product were essentially identical. The investor would provide the required fee and would then have little or no further involvement in the product beyond claiming the tax benefits the product's promoters asserted they were entitled to.

49.     The financial services firms had a strong incentive to sell such products. Because a single product could be resold to multiple clients, they were far more profitable than traditional tax consulting. Moreover, there was a widespread perception that the promoters of abusive or illegal shelters faced little risk of meaningful punishment. IRS penalties for tax shelter promoters and those who assisted them were weak and ineffective.

50.     Each defendant and co-conspirator played a role in creating, marketing, selling, and implementing Son of BOSS, including the transaction in which plaintiff participated. All committed wrongful acts in furtherance of the conspiracy. In the late 1990s, for example, several of the Deutsche Bank defendants' employees, along with several lawyers from Jenkens, developed and began marketing various tax shelters, including Son of BOSS. Amex was involved in Son of BOSS as well. At a minimum, Amex was the go to firm for Jenkens' clients engaging in Son of BOSS. Amex saw lots of Son of BOSS transactions and prepared all of the tax returns in accordance with Jenkens' view that Son of BOSS was a valid, legitimate, and legal tax strategy.

51.     Upon information and belief, in the fall of 1999, Dan Brooks of Deutsche Bank visited Daugerdas in Chicago to present the idea of a tax shelter using foreign currency digital options. Brooks informed Daugerdas that the Deutsche Bank defendants had substantial experience in designing and implementing foreign currency options for

tax shelters. Brooks expressed a strong interest in the Deutsche Bank defendants working with Jenkens in foreign options transactions and explained the types of options defendants would design and execute, the contract, and the pricing. Around the same time, Deutsche Bank defendant employee Craig Brubaker met with Erwin Mayer at Jenkens to discuss the use of foreign option contracts as part of tax shelters. Jenkens and the Deutsche Bank defendants collaborated in the development of numerous tax shelters, including Son of Boss. Eventually, Jenkens and the Deutsche Bank defendants marketed these shelters to hundreds of people, including plaintiffs.

52.    In reality, Son of BOSS and other tax shelters marketed and implemented by defendants involved little or no risk. Contrary to what they were told, the Vadevoulises couldn't lose money (other than the substantial fees) because the underlying investments were perfectly hedged. Moreover, although the co-conspirators told the Vadevoulises that they could make money, this possibility was so remote it was like winning the lottery—particularly given the fees the Vadevoulises paid to participate in Son of BOSS.

53.    Defendants knew or should have known that the IRS would disallow Son of BOSS because it was, at its core, a means to generate artificial deductible tax losses. Despite the co-conspirators' knowledge of the scheme's illegality, however, they sought out and convinced the Vadevoulises' to enter into and implement Son of BOSS, and in the process collected substantial fees from the Vadevoulises.

54.    Eventually, the IRS deemed Son of BOSS to be a potentially abusive tax shelter. Potentially abusive tax shelters are those that are the same or similar to "listed transactions," that is, a transaction the IRS has formally determined as "having a potential

for tax avoidance or evasion." The IRS requires that such tax shelters must be disclosed and registered with the IRS.

55.　　But Son of BOSS was never registered with the IRS as a potentially abusive tax shelters. Son of BOSS was not even marketed to plaintiffs as a tax shelter—it was an "investment strategy" with potential, material tax benefits, according to the co-conspirators—and the co-conspirators concealed from plaintiffs their own concerns that these products were abusive tax shelters that would not be approved by the IRS.

D.　　Marketing and Implementation of Son of BOSS

56.　　Both before and after plaintiffs and others purchased Son of BOSS, the co-conspirators represented to the participants that Son of BOSS was a legitimate tax avoidance mechanism and that it was not a fraudulent tax shelter. These representations were false and the co-conspirators knew them to be false (or were reckless in not knowing them to be false).

57.　　A key objective of co-conspirators' marketing was to convince the potential Son of BOSS purchasers that the tax product was legitimate. The sales pitch relied heavily on Jenkens, Deutsche Bank, and Amex's reputations for integrity and expertise and included explanations of how the tax laws purportedly allowed the benefits supposedly provided. The presentations also included promises that the legality of Son of BOSS would be affirmed in a legal opinion by Jenkens. Certain writings, oral statements and visual presentations constituted an affirmative representation that Son of BOSS was legitimate and legal and not a fraudulent tax shelter. In other words, the words and conduct of the co-conspirators intentionally caused plaintiffs and other Son of BOSS

purchasers to believe that, at the very least, there was a reasonable, good faith legal basis to claim the advertised and promised tax benefits.

58.    At all times, however, the co-conspirators had a duty to disclose to plaintiffs and others the truth about the fraudulent nature of Son of BOSS.  Such a disclosure was necessary so that their representations about the tax products would not be false and misleading.  It was also required because, as each defendant and co-conspirator knew, Jenkens and Amex had fiduciary relationships with plaintiffs.  Nevertheless, no co-conspirator made such a disclosure.

59.    Included among the materially false and misleading representations and omissions co-conspirators made to plaintiff were the following:

(a)    Representing to plaintiffs that Son of BOSS was valid, legitimate, and legal under federal and state laws;

(b)    Representing to plaintiffs that Son of BOSS was a legitimate investment strategy that had a real chance of success; and

(c)    Representing to plaintiffs that Son of BOSS was more likely than not to be upheld by the IRS and other relevant tax authorities.

60.    These representations and omissions were materially false and misleading because, as each co-conspirator knew, or was reckless in not knowing, SON of BOSS was an illegal tax strategy, as described herein.

61.    The false and misleading representations and omissions made to plaintiff are attributable to each of the co-conspirators because they were made by persons or entities acting as agents of, and in furtherance of, the conspiracy.  Moreover, each defendant committed wrongful acts in furtherance of the conspiracy.

62.    Plaintiffs reasonably relied upon the misrepresentations and omissions of co-conspirators, and was fraudulently induced to purchase Son of BOSS. Absent these

misrepresentations and omissions, plaintiffs would not have entered into the Son of

BOSS transactions and, consequently, would not have suffered a loss.

## II.    THE ESSENTIAL ROLE OF THE DEFENDANTS

63.    The co-conspirators closely coordinated and cooperated in designing and

implementing Son of BOSS.  The defendants and the other co-conspirators each had their

own primary roles.  Jenkens was principally responsible for developing and selling Son

of BOSS.  Jenkens attracted clients by using its respected brand and its reputation for tax

and legal expertise.  It also produced opinion letters, relied upon by the plaintiffs, falsely

describing the transactions comprising the tax strategy and falsely asserting that the

strategy was legitimate.

64.    Moreover, a 2005 U.S. Senate Subcommittee Report, described more fully

below, found that the tax shelters could not have been executed without the active and

willing participation of major banks.  Specifically, the report found that Deutsche Bank

and other banks "provided billions of dollars in lending critical to transactions which the

banks knew were tax motivated, involved little or no credit risk, and facilitated

potentially abusive or illegal tax shelters."  According to the report, Deutsche Bank

provided billions in lines of credit for tax shelters.

65.    The involvement of the Deutsche Bank defendants was critical to the

success of the fraudulent scheme.  Deutsche Bank was among a small number of

financial institutions capable of providing the needed banking and trading services.  Son

of BOSS ostensibly required exotic financial transactions that few, if any, other financial

institutions would undertake in the ordinary course of business.  Consequently, Son of

BOSS could not be sold unless an entity like Deutsche Bank agreed to participate.  To

ensure that Deutsche Bank would participate, the co-conspirators worked together to structure Son of BOSS to minimize or eliminate any credit risk. Plaintiffs were told about Deutsche Bank's role prior to entering into the transaction.

66.    As major international financial institutions with considerable tax expertise, the Deutsche Bank defendants were well aware that Son of BOSS was fraudulent. They were concerned that their role would attract unfavorable publicity and the attention of bank regulators, especially since "know your customer" rules imposed on banks an affirmative duty to investigate their customers and their possible involvement in illegal activities. In the end, Deutsche Bank's participation constituted an affirmative representation that Son of BOSS was valid, legitimate, purposeful, and suitable for plaintiffs. Each time Deutsche Bank sent out a trade confirmation or account statement, Deutsche Bank reinforced this false statement. Moreover, upon information and belief, the Deutsche Bank defendants created false paper trails to minimize their role in Son of BOSS and other illegal tax shelters.

67.    Because officials at Deutsche Bank knew of the fraudulent nature of tax strategies, like Son of BOSS, and were concerned about potential liability, the bank's participation in the scheme had to be approved at a high level. According to the Senate report, final approval for the bank's participation in at least one tax shelter (BLIPS) came from John Ross, Chief Executive Officer of Deutsche Bank Americas. According to the minutes of the meeting at which Ross gave his approval, Ross insisted that the bank should participate in a limited number of the tax strategies, should not participate in any transaction where the taxpayer was "involved in litigation" (presumably with third parties on issues unrelated to the tax strategies), and should maintain a "low profile." Ross

insisted that he be kept fully informed on future developments with respect to the tax strategies.

68.    Upon information and belief, Amex was also involved in the development and creation of tax shelters, including Son of BOSS.  Amex fully understood how Son of BOSS worked, and knew or should have known it was illegal.  Nonetheless, Amex agreed to take all taxpayers Jenkens referred for preparation of the requisite tax returns. In the end, Amex always prepared the Son of BOSS returns in accordance with Jenkens' views as to how the transactions should work.  This constituted an affirmative representation that Son of BOSS was valid and legal.  Prior to entering into the transaction, plaintiffs were told that Amex would prepare plaintiffs' 2000 tax returns in accordance with Jenkens' views as to how Son of BOSS should be treated under federal and state tax codes.  Amex never alerted participants, including plaintiffs, that Son of BOSS was invalid and illegal.

III.    **DEFENDANTS' MARKETING OF SON OF BOSS TO PLAINTIFFS**

69.    During 1999 and 2000, the Vadevoulises decided to sell LaFrancaise.  In December 2000, LaFrancaise was sold to SCIS Food Services, Inc.  This transaction closed on December 22, 2000

70.    Plaintiffs, therefore, anticipating incurring large capital gains for the tax year 2000, requested tax planning advice from Jenkens.  Plaintiffs knew nothing about tax shelters at the time, and were not seeking to participate in a tax shelter.

71.    Actually, plaintiffs were referred to Jenkens by Tsourapas, for which Tsourapas received secret, undisclosed referral fees.  During 2001, Jenkens paid Tsourapas (a) $137,687.80 as a result of the Vadevoulises participation in Son of BOSS;

and (b) $15,000 as a result of estate planning work Jenkens performed for the

Vadevoulises.  Neither Tsourapas nor Jenkens ever told plaintiffs about these referral

fees.

72.    At the recommendation of Jenkens, the Vadevoulises entered into a "Son

of Boss" tax strategy in 2000.

73.    Jenkens informed the Vadevoulises that the tax strategy was a valid and

legitimate means of minimizing taxes with respect to the Vadevoulises' capital gains in

connection with the LaFrancaise transaction.  To add further legitimacy to the

transaction, plaintiffs were told that Jenkens would be setting up the required entities and

providing a legal opinion, Deutsche Bank would be handling the underlying financial

transactions, and Amex would prepare the tax returns.  Plaintiffs understood that

defendants would receive certain compensation in connection with Son of BOSS.  Upon

information and belief, defendants received compensation above and beyond what was

disclosed to plaintiffs.

74.    Had the Vadevoulises known that Jenkens was paying secret, undisclosed

referral fees to Tsourapas (and other co-conspirators), plaintiffs would not have followed

the tax and estate planning advice Jenkens gave, including Jenkens' advice to engage in

the "Son of BOSS" tax strategy.

75.    Jenkens' payment of fees to Tsourapas (and other co-conspirators) meant

that Jenkens split the fees it charged the Vadevoulises.  In so doing, Jenkens shared legal

fees with a non-lawyer in violation of Rule 5.4 of the Illinois Rules of Professional

Conduct.  In addition, the arrangement violated Rule 7.2(b) of the Illinois Rules of

Professional Conduct, which precludes a lawyer from giving "anything of value to a

person for recommending or having recommended the lawyer's services." By this arrangement, Tsourapas (and other co-conspirators) engaged in the unauthorized practice of law in violation of Illinois law.

## IV.    DEFENDANTS' IMPLEMENTATION OF PLAINTIFFS' SON OF BOSS TRANSACTIONS

76.    Jenkens recommended the formation of a number of entities in order for the Vadevoulises to effectuate the tax strategy. Jenkens orchestrated the formation of these entities.

77.    Although complicated, the tax strategy Jenkens recommended with respect to the Vadevoulises was supposed to work as follows. On November 27, 2000, TR1, TR2, and TR3 each entered into separate options contracts with Deutsche Bank to purchase Japanese Yen at a strike price of 96.40 Yen per 1.00 Euro with a settlement date of December 15, 2000 (the "Long Options"). At the same time, these entities each entered into separate options contracts with Deutsche Bank to sell Japanese Yen with a strike price of 96.42 Yen per 1.00 Euro with a settlement date of December 15, 2000 (the "Short Options"). The entities paid about the same amount for the Long Options as they received for the Short Options.

78.    On November 28, 2000, TR1, TR2, and TR3 each contributed the options to Trinity as a contribution to capital. At the time, the options were "out of the money" and on December 1, 2000, the entities reached agreements with Deutsche Bank to terminate the options contracts.

79.    On various dates in December 2000, Trinity purchased shares of various common stock. On December 12, 2000, Trinity purchased Canadian dollars.

80.    On December 26, 2000, TR1, TR2, and TR3 contributed their interest in Trinity to LaFrancaise.  That same day, Trinity was dissolved and liquidated.  In liquidation, all of the currency and stock were distributed to LaFrancaise.

81.    On December 27, 2000, LaFrancaise sold all of its interest in the foreign currency and stock, which it received on liquidation from Trinity.

82.    According to Jenkens, this series of events would lead to, among other things, the following tax treatment: (a) TR1, TR2, and TR3 should be disregarded as entities for federal tax purposes; (b) the Options investments should be treated as non-taxable and separate for tax purposes; and (c) the basis for TR1, TR2, and TR3's contribution to Trinity should include the Long Option (*i.e.*, a loss), but not the Short Option (*i.e.*, a gain).  In sum, the strategy was supposed to generate a legitimate tax loss that the Vadevoulises could offset against capital gains realized in connection with the LaFrancaise transaction.

83.    The Deutsche Bank defendants were well aware of this structure, and of Jenkens' proposed tax treatment for the transaction.  At all times, however, they gave plaintiffs the impression that the transaction was legitimate and had a real chance of making money—even though they knew this was not the case.  Deutsche Bank knew or should have known that the purpose of the Son of BOSS transaction was to generate losses and not for a legitimate business purpose; knew or should have known that the transactions did not arise from bona fide business transactions and therefore would not generate valid and legal tax benefits to participants such as plaintiffs; and that Jenkens was marketing Son of BOSS by giving participants false assurances as to the validity of the tax benefits that were to be obtained.

84. Amex rubber stamped Jenkens' proposed tax treatment as well, even though it knew or should have known better. Amex did not file plaintiffs' 2000 tax return until after April 15, 2001, yet did not warn or advise plaintiffs to revise their returns to eliminate the Son of BOSS related deductions or to amend their returns.

## V.    THE IRS INVALIDATES PLAINTIFFS' SON OF BOSS TRANSACTIONS

85. Amex filed the Vadevoulises 2000 tax returns that including Son of BOSS on April 16, 2001. Notably, these returns were finalized after the issuance of IRS Notices 99-59 and 2000-44. These tax returns improperly included the Son of BOSS deductions.

86. In December 2001, the IRS announced a "tax amnesty program" in Announcement 2002-2. The program allowed taxpayers who voluntarily disclosed their involvement in tax shelter strategies, such as Son of BOSS, before April 23, 2002 to avoid liability for penalties for underpayment of taxes without conceding liability for back taxes or interest. The program was an initiative aimed at using taxpayers to aid the IRS in identifying tax shelter promoters, such as the co-conspirators, who had failed to properly register tax shelters, like Son of BOSS, with the IRS.

87. Plaintiffs believe that the co-conspirators, however, never told them about the tax amnesty program. In any event, none of the co-conspirators advised plaintiffs to participate in the program. Thus, the co-conspirators again withheld material information from the Vadevoulises about the legality of Son of BOSS and its likelihood of being upheld by the IRS. As a result, the Vadevoulises did not participate in the amnesty program. This failure resulted in plaintiffs being subject to penalties, which would have been waived had plaintiffs participated in the program.

88.    Upon information and belief, individuals at Jenkens and at defendants who had personally engaged in Son of BOSS (or a similar tax shelter) participated in the amnesty program and avoided IRS penalties.  Thus, it appears that employees of the co-conspirators may have participated in the same amnesty program the co-conspirators failed to tell plaintiffs about.  None of the co-conspirators told the Vadevoulises these material facts.

89.    In June of 2003, the IRS formalized its position regarding certain tax strategies, including the tax strategies in which plaintiffs participated, by issuing new regulations (the "Regulations") retroactive to October 18, 1999, and through Office of Chief Counsel Notice CC-2003-020 (the "OCC Notice").  The Regulations invalidated tax strategies, including Son of BOSS and the OCC Notice explained the IRS' position why.

90.    In early 2004, the IRS notified the Vadevoulises that there may be a problem with respect to their tax strategies.

91.    On or about May 5, 2004, in Notice 2004-46, the IRS, in furtherance of its previous pronouncements, offered to settle the audits of Son of BOSS participants by those parties paying to the IRS (a) all of the taxes avoided by use of these transactions; (b) all interest due; (c) a 10% penalty; and (d) a loss of 50% of the fees and other "out of pocket" costs deducted.  If taxpayers did not accept the offer, the IRS indicated it would assess all tax due and interest, lose all deductions, and impose a 40% penalty.

92.    Ultimately, plaintiffs participated in IRS settlement initiative 2004-46 and had to file amended tax returns with federal and state tax authorities.  As a result of the settlement, plaintiffs had to pay millions of dollars in more taxes.  They also had to pay

over a million dollars in penalties and interest that they would not have had to pay had they not employed the tax strategy. Plaintiffs' settlement with the IRS wasn't finalized until April 15, 2005.

## VI. GOVERNMENT INVESTIGATIONS INTO ILLEGAL TAX SHELTERS

93.     In October 2002, the U.S. Senate Permanent Subcommittee on Investigations of the Committee on Homeland Security and Governmental Affairs ("Senate Subcommittee") began an investigation into the development, marketing, and implementation of abusive tax shelters. In November 2003, the Senate Subcommittee held public hearings and in February 2005, it issued a report entitled "The Role of Professional Firms in the U.S. Tax Shelter Industry," (the "Senate Report"). The report was based on information gathered during two public hearings, numerous interviews and depositions, and the review of over 250 boxes of documents and electronic data.

94.     According to the Senate Report, the U.S. tax shelter industry "aggressively marketed" generic "tax products," and that the implementation of those tax shelters required close collaboration between accounting firms, law firms, investment advisory firms, and banks.

95.     Among other things, the Senate Report contained the following findings:

(a)     "[t]he sale of potentially abusive and illegal tax shelters has become a lucrative business in the United States, and some professional firms such as accounting firms, banks, investment advisory firms, and law firms are major participants in the mass marketing of generic "tax products" to multiple clients."

(b)     Some major banks, including Deutsche Bank, have provided critical lending or investment services or participated as essential counter parties in potentially abusive or illegal tax shelters. Moreover, Deutsche Bank knew the strategies were "tax motivated, involved little or no credit risk, and facilitated potentially abusive or illegal tax shelters." The tax shelters

examined by the Senate Committee "could not have been executed without the active and willing participation of major banks."

96.    As described above, Jenkens has admitted that it marketed fraudulent tax shelters and issued fraudulent legal opinions.  In addition, it has paid $76 million as a penalty for its tax shelter work.

97.    Moreover, prior to May 2004, a class of plaintiffs sued Jenkens for Jenkens' improper marketing of tax shelters.  Eventually, Jenkens agreed to settle the *Denney v. Jenkens & Gilchrist* litigation for $70 million and in January 2007 a final judgment was entered.  Finally, in large part as a result of its widespread marketing of tax shelters, Jenkens dissolved.  Consequently, Jenkens is no longer a practicing law firm.

98.    Upon information and belief, the Deutsche Bank defendants (and perhaps Amex) are still under investigation by the federal government.

## VII.    PLAINTIFFS HAVE SUFFERED SUBSTANTIAL DAMAGES

99.    But for the co-conspirators' conspiracy, including material misrepresentations and misleading omissions, plaintiffs would not have entered into the Son of BOSS transaction, paid for tax advice, paid close to $2 million in total fees and expenses to execute the Son of BOSS transaction, foregone legitimate tax savings opportunities, filed federal and state tax returns that reflected deductions for capital losses resulting from the Son of BOSS transactions and failed to amend their 2000 tax returns, thereby incurring additional penalties and interest.

100.    The Vadevoulises paid Jenkens $1,346,878 to participate in the strategy. The Vadevoulises split this fee three ways.  Thus, each brother paid $448,949.33.

101.    In addition, the Vadevoulises paid substantial amounts, believed to be around $300,000, to the Deutsche Bank defendants to execute the currency, stock, and

27

options transactions underlying Son of BOSS. And they paid substantial amounts, believed to be around $60,000, to Amex for preparation of their 2000 returns.

102.    Ultimately, the Vadevoulises also paid millions of dollars in additional taxes because the tax strategy didn't work. With respect to federal taxes, plaintiffs paid the following additional taxes: (a) Dino Vadevoulis owed $2,147,643, (b) Jim paid $2,142,603, and (c) Paul paid $1,638,508 for 2000 and $357,286 for 2001. With respect to State of Illinois taxes, plaintiffs paid the following additional taxes: (a) Dino Vadevoulis paid $298,039, (b) Jim paid $297,230, and (c) Paul paid $245,788 for 2000 and $28,553 for 2001. In addition, the Vadevoulises paid the following federal tax penalties: (a) Dino Vadevoulis paid $214,764, (b) Jim paid $214,260, and (c) Paul paid $199,500.00 for 2000 and $35,729 for 2001. They also paid the following federal interest: (a) Dino Vadevoulis paid $246,430.71, (b) Jim paid $245,852.41, and (c) Paul paid $188,010.21 for 2000 and $42,293.16 for 2001. And they paid the following state interest: (a) Dino Vadevoulis paid $52,886, (b) Jim paid $52,742, and (c) Paul paid $43,614 for 2000 and $3,168 for 2001.

103.    The Vadevoulises also paid substantial amounts, believed to be around $60,000, for legal and accounting advice concerning Son of BOSS to lawyers and accountants other than the co-conspirators. This was necessary to work through and resolve the IRS and the State of Illinois' issues with Son of BOSS. Thus, as set forth herein, plaintiffs damages are believed to be at least the following amounts:

| | Back Taxes | Transaction Fees | Penalties | Interest | Other Fees | Total Fees, Penalties, & Interest[1] |
|---|---|---|---|---|---|---|
| Dino | $2,445,682 | $ 568,949.33 | $214,764 | $299,316.71 | $20,000 | **$1,103,030.04** |
| Jim | $2,439,833 | $, 568,949.33 | $214,260 | $298,594.41 | $20,000 | **$1,101,803.74** |

[1] This column does not include back taxes.

| Paul | $2,270,135 | $ 568,949.33 | $235,229 | $277,085.37 | $20,000 | $1,101,263.70 |
| **Total** | **$7,155,650** | **$1,706,847.99** | **$664,253** | **$874,996.49** | **$60,000** | **$3,306,097.48** |

104.     Had plaintiffs not engaged in Son of BOSS, they would have explored and engaged in other legitimate and lawful tax saving opportunities.

105.     The co-conspirators' fraudulent misrepresentations and material omissions were malicious and in reckless disregard of plaintiffs' rights.  They constituted gross deception and willful and wanton misconduct, for which plaintiffs are entitled to punitive or exemplary damages.

## Count I – Civil Conspiracy
### (All defendants)

106.     Plaintiffs repeat and reallege paragraphs 1-105 as if fully set forth herein.

107.     As described more fully above, the defendants and other co-conspirators knowingly entered into an agreement to participate in a scheme to create and market Son of BOSS and to induce the Vadevoulises to enter into the illegal Son of BOSS transaction in order to obtain professional and other fees from plaintiffs.  In so doing, defendants and the other co-conspirators acted with full awareness that the Son of BOSS transactions were designed to give the false impression that a complex series of financial transactions were legitimate business transactions with economic substance from an investment standpoint, which features would have been necessary for a successful and legal tax strategy.

108.     Defendants acted in their respective roles as described above according to a predetermined and commonly understood accepted plan of action (i.e., the defendants' arrangement), all for the purposes of obtaining professional fees from the Vadevoulises and other Son of BOSS participants.

109.    The acts of the co-conspirators were contrary to law and included fraudulent misrepresentation, negligent misrepresentation, malpractice, and breaches of fiduciary duty.

110.    The co-conspirators, including defendants, agreed to commit the unlawful acts alleged herein.  There was a meeting of the minds among the defendants and the other co-conspirators to commit the unlawful acts alleged herein.

111.    Each of the defendants acted in the respective roles described above according to a predetermined and commonly understood and accepted plan to further the conspiracy.  Each committed unlawful acts in furtherance of the conspiracy.

112.    The defendants' actions were contrary to numerous provisions of law.

113.    The defendants' agreement and unlawful actions pursuant to and in furtherance of the common scheme described above proximately caused the Vadevoulises damages as previously set forth herein.

114.    Each defendant is liable for the misrepresentations and omissions made by each of the other defendants as a principal and co-conspirator.

115.    As a result of defendants' conduct set forth herein, the Vadevoulises have been injured.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendants, jointly and severally, as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages; and

(d)    Such other relief as this Court deems reasonable, necessary, and just.

## Count II – Common Law Fraud
### (All defendants)

116.    Plaintiffs repeat and reallege paragraphs 1-105 as if fully set forth herein.

117.    As set forth above, defendants knowingly made numerous false statements of material fact and intentionally omitted material facts from plaintiffs, including: (1) persuading the Vadevoulises to enter into the Son of BOSS transaction; and (2) at all times, conveying that the transaction was valid and legitimate.  The Deutsche Bank defendants were heavily involved in the creation of Son of BOSS, but also in its implementation with respect to the Vadevoulises.  On numerous occasions, including through the use of trade confirmations and monthly account statements, the Deutsche Bank defendants conveyed that the transactions underlying Son of BOSS were valid, legitimate, purposeful, suitable for the Vadevoulises, and had a reasonable prospect of profit.  Moreover, the Deutsche Bank defendants knew that Jenkens and Amex were making false statements and omitting material facts from plaintiffs in order to induce plaintiffs to participate in Son of BOSS.  Amex was also involved in the development and marketing of Son of BOSS, and prepared plaintiffs' 2000 tax returns reflecting their participation in Son of BOSS.  This constituted a representation that Son of BOSS was legal and legitimate.

118.    The above affirmed representations and omissions made by each defendant were false, misleading, and material when made or omitted and the defendants knew these representations and omissions to be false, misleading, and material when

made or omitted with the intention that the Vadevoulises would rely upon them in entering into the Son of BOSS transaction and pay them substantial fees.

119.   Defendants had a duty to disclose the material facts that it concealed from plaintiffs.

120.   Plaintiffs would not have agreed to invest in the Son of BOSS transaction if they had known of defendants' omissions or that defendants' representations were false.

121.   Plaintiffs could not have discovered the concealed information through reasonable inquiry or inspection.

122.   Plaintiffs reasonably relied to their detriment upon the truth of defendants' material misrepresentations and omissions of material fact in deciding to enter into the Son of BOSS transactions, in paying large fees to defendants for tax advice, and in sticking with Son of BOSS throughout the transactions.  Moreover, plaintiffs did not avail themselves of legitimate tax savings opportunities and deductions, filed federal and state tax returns in 1999 and 2000 that reflected deductions for losses resulting from Son of BOSS and the defendants' fees and did not promptly amend those returns, thereby incurring substantial back taxes and out-of-pocket losses.

123.   But for defendants' intentional misrepresentations and material omissions described above, the Vadevoulises would never have hired defendants for advice on the Son of BOSS transaction, engaged in the Son of BOSS transaction, claimed the purportedly resulting losses on their income tax returns, or filed and signed their 2000 tax returns prepared in accordance with Jenkens' opinion letter or in reliance on defendants'

advice, and otherwise failed to avail themselves of legitimate tax savings opportunities and deductions.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendants, jointly and severally, as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages; and

(d)    Such other relief as this Court deems reasonable, necessary, and just.

## Count III – Negligent Misrepresentation
### (All defendants)

124.    Plaintiffs repeat and reallege paragraphs 1-105 as if fully set forth herein.

125.    Defendants were in the business of giving information and guidance to clients to be used in those clients' business transactions.

126.    Accordingly, defendants had a duty to communicate accurate information to plaintiffs.

127.    Defendants (as alleged above), made false statements of material fact and omitted to disclose material facts to plaintiffs.  Ultimately, defendants knew or should have known that Son of BOSS was not a legitimate tax strategy, but continuously pretended otherwise to plaintiffs.  Defendants intentionally or negligently failed to disclose this information to plaintiffs.

128.    Plaintiffs would not have agreed to invest in the Son of BOSS transaction if they had known that defendants' representations were false or if they had been aware of the material omissions.

129.    Defendants were careless or negligent in failing to ascertain the truth of the statements they made to plaintiffs and in failing to disclose all the material facts relevant to the Son of BOSS transaction.

130.    In making the material misstatements and omitting to disclose material facts, defendants intended to induce plaintiffs to invest in the Son of BOSS transactions and pay large fees to defendants.

131.    Defendants' intentional omissions were made willfully, wantonly, or recklessly to plaintiffs to induce the purchase of Son of BOSS.

132.    Plaintiffs reasonably relied upon the truth of defendants' statements in deciding to invest in the Son of BOSS transactions, in agreeing to pay large fees to defendants, and in taking the other actions prescribed by defendants and the other co-conspirators.

133.    But for defendants' intentional misrepresentations and material omissions described above, the Vadevoulises would never have participated in Son of BOSS.

134.    As a result of their reliance on defendants' material misrepresentations and omissions of material fact, the Vadevoulises have suffered substantial damages.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendants, jointly and severally, as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages; and

(d)    Such other relief as this Court deems reasonable, necessary, and just.

### Count  IV – Violation of the Illinois Consumer Fraud
### and Deceptive Business Practices Act
### (All defendants)

135.    Plaintiffs repeat and reallege paragraphs 1-105 as if fully set forth herein.

136.    Defendants engaged in unfair and deceptive business acts and practices described above, in violation of Section 2 the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq*.

137.    Defendants' unfair and deceptive acts and practices occurred in the conduct of trade and commerce, including offering the Son of BOSS tax shelter product for sale.

138.    Defendants used or employed deception, fraud, false pretense, false promise, misrepresentation and the concealment, suppression or omission of material facts with intent that the Vadevoulises rely upon the misrepresentation, concealment, suppression or omission of such material facts.

139.    Defendants actions were taken with actual or deliberate intention to harm plaintiffs, or if not intentional, with an utter indifference to or the conscious disregard for the injury to plaintiffs.

140.    Defendants' unfair and deceptive acts and practices caused plaintiffs substantial damages.

141.    Defendants' actions occurred in the course of conduct involving trade or commerce within the State of Illinois, namely the marketing and implementation of tax and investment advice and implementation.

142.    The Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/10a(c), allows a court to award attorney's fees and costs to a prevailing plaintiff.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendants, jointly and severally, as follows:

(a)    An award of compensatory damages to be established definitively at trial;

(b)    An award of appropriate prejudgment interest;

(c)    An award of punitive or exemplary damages;

(d)    Costs and attorneys' fees as provided by statute; and

(e)    Such other relief as this Court deems reasonable, necessary, and just.

### Count V – Breach of Fiduciary Duty
### (Against Amex)

143.    Plaintiffs repeat and reallege paragraphs 1-105 as if fully set forth herein.

144.    Amex, as the Vadevoulises' accountants, were the Vadevoulises' fiduciaries and thus were obligated to exercise their best care, skill, judgment and compliance with the applicable codes of professional and ethical responsibility.

145.    Amex knew that the Vadevoulises had little to no knowledge of tax laws and tax shelter transactions and knew that the Vadevoulises were relying on it to protect their interests

146.    As described above, Amex represented itself as having specialized expertise and superior knowledge of tax laws and tax shelter transactions and solicited the Vadevoulises to trust it as an expert in these areas.

147.    The Vadevoulises did in fact repose complete trust and confidence in Amex and relied on Amex for guidance and to protect their financial interests.

148.    As set forth in this complaint, Amex violated the fiduciary duty owed to the Vadevoulises by signing and filing the tax returns prepared by Amex, which Amex knew or should have known to be improper, for the sole purpose of generating large fees and profits for itself and for the other co-conspirators, and by not providing complete and truthful information to the Vadevoulises when preparing their 2000 tax returns.

149.    Amex violated the fiduciary duties it owed to the Vadevoulises for its own enrichment, with no regard for the injury it would cause the Vadevoulises.

150.    Amex's breach of fiduciary duty damaged plaintiffs.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendants, jointly and severally, as follows:

> (a)    An award of compensatory damages to be established definitively at trial;
>
> (b)    An award of appropriate prejudgment interest;
>
> (c)    An award of punitive or exemplary damages; and
>
> (d)    Such other relief as this Court deems reasonable, necessary, and just.

### Count VI – Assisting in the Breach of Fiduciary Duty
### (All defendants)

151.    Plaintiffs repeat and reallege paragraphs 1-105 as if fully set forth herein.

152.    Jenkens and Amex owed fiduciary duties to plaintiffs to exercise their best care, skill, judgment and compliance with the applicable codes of professional and ethical responsibility.

37

153.    Jenkens and Amex breached their fiduciary duties to plaintiffs by, among other things, advising them to engage in the Son of BOSS transaction, which Jenkens knew or should have known to be improper and for the sole purpose of generating large fees and profits for themselves, by not providing complete and truthful information to the Vadevoulises when promoting Son of BOSS, and by preparing tax returns that they knew or should have known were based on an illegal tax shelter.

154.    Defendants knew of Jenkens and Amex's fiduciary duties to plaintiffs, and knew of the breaches thereof.

155.    Defendants knew or should have known that Jenkens was acting as an unregistered promoter of a tax shelter and concealed that fact and its implications from the Vadevoulises in order to obtain substantial fees.

156.    Defendants induced and participated in these fiduciary breaches by persuading the Vadevoulises to engage in Son of BOSS, by providing the facilities for and acting as the counterparty in the currency, options, and stock transactions, by providing substantial assistance to and playing a substantial role in the defendants' arrangement, and by remaining silent and failing to inform the Vadevoulises that Son of BOSS would not provide plaintiffs with legitimate tax losses, or with any reasonable prospect of profits, which defendants knew was an expectation that the Vadevoulises had.

157.    Defendants benefited from Jenkens and Amex's breach of fiduciary duties by receiving fees from plaintiffs.

158.    Plaintiffs did not know, nor could they have reasonably known, that they were injured by defendants' assistance of Jenkens and Amex's breach of fiduciary duties

or that such injury was wrongfully caused until they learned that the IRS was disallowing capital losses for the Son of BOSS transactions.

159.    An award of punitive damages based on the defendants' assistance in Jenkens and Amex's breach of fiduciary duty is appropriate because defendants acted willfully or with such gross negligence as to indicate a wanton disregard for plaintiffs' interests and rights.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendants, jointly and severally, as follows:

      (a)    An award of compensatory damages to be established definitively at trial;

      (b)    An award of appropriate prejudgment interest;

      (c)    An award of punitive or exemplary damages; and

      (d)    Such other relief as this Court deems reasonable, necessary, and just.

### Count VII- Breach Of Contract
**(Against Amex)**

160.    Plaintiffs repeat and reallege paragraphs 1-105 as if fully set forth herein.

161.    Plaintiffs and defendant Amex entered into valid and enforceable oral and/or written contracts pursuant to which Amex agreed to provide the Vadevoulises with professionally competent tax advice, accounting services and tax return services, to exercise the applicable standard of care, loyalty and honesty, and to comply with all rules of professional conduct and in return, the Vadevoulises agreed to pay Amex significant fees for its services.

162.     Plaintiffs fully performed their obligations to Amex under the terms of these contracts and paid Amex fees for its services.

163.    Defendant Amex breached its agreement with the Vadevoulises by failing to perform its obligations pursuant to the agreement and instead providing the Vadevoulises with advice that it knew or should have known was wrong or illegal.

164.    By reason of Amex's breach of contract, plaintiffs have been damaged.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendants, jointly and severally, as follows:

        (a)    An award of compensatory damages to be established definitively at trial;

        (b)    An award of appropriate prejudgment interest; and

        (c)    Such other relief as this Court deems reasonable, necessary, and just.

## Count VIII- Accounting Malpractice
### (Against Amex)

165.    Plaintiffs repeat and reallege paragraphs 1-105 as if fully set forth herein.

166.    Amex owed a duty to the Vadevoulises to use the skill and care of a reasonably competent accountant, tax consultant, and tax preparer.

167.    Amex owed a duty to the Vadevoulises to perform professional accounting, financial planning and tax consulting services in a proper, skillful and careful manner.

168.    Amex intentionally, recklessly and/or with gross negligence breached its duty owed to the Vadevoulises to act with the skill and care of a reasonably competent accountant, tax consultant, and tax preparer.

169.    Amex intentionally, recklessly and/or with gross negligence breached its duty owed to the Vadevoulises by acts and omissions alleged herein including,

(a)    Taking advantage of a relationship of trust and confidence in recommending Son of BOSS and representing that it was legal under tax laws;

b.    Charging and collecting unreasonable, excessive and unethical fees;

c.    Failing to disclose that Amex was receiving undisclosed payments from Jenkens for Amex's participation in certain tax shelter conspiracies, including Son of BOSS;

d.    Representing that the tax savings from the Son of BOSS transactions would be significant and far outweigh the amount of fees and costs incurred by the Vadevoulises;

e.    Advising the Vadevoulises that the Jenkens' opinion letter was an "independent" legal opinion from an "independent" law firm and could be relied upon to avoid IRS and state penalties and interest;

f.    Failing to disclose to the Vadevoulises that if they filed tax returns claiming capital and/or ordinary losses based on Son of BOSS that they could be liable for penalties and interest;

g.    Failing to advise the Vadevoulises that the Son of BOSS transactions made no economic or investment sense and had no business purpose or economic substance, and in fact, advising the Vadevoulises to the contrary; and

h.    Failing to advise, recommend or instruct the Vadevoulises to amend or correct their tax returns, or to participate in the amnesty program offered by the IRS.

170.    Amex either knew or reasonably should have known their representations, recommendations, advice, instructions and opinions to be false.

171.    As a direct and proximate result of Amex's malpractice, in violation of the standard of care or skill required of a reasonably competent accountant, tax consultant, and tax preparer, the Vadevoulises have incurred economic and consequential damages.

WHEREFORE, plaintiffs respectfully request that the Court enter judgment in their favor and against defendants, jointly and severally, as follows:

(a)     An award of compensatory damages to be established definitively at trial;

(b)     An award of appropriate prejudgment interest;

(c)     An award of punitive or exemplary damages; and

(d)     Such other relief as this Court deems reasonable, necessary, and just.

Dated: February 29, 2008          KONSTANTINOS VADEVOULIS, JIM
                                  VADEVOULIS, and PAUL VADEVOULIS


                                  By:_____/s/ Adam P. Merrill_____
                                          One of their attorneys

Adam P. Merrill  (6229850)
Scott F. Hessell (6275119)
SPERLING & SLATER
55 West Monroe St., Suite 3200
Chicago, Illinois 60603
(312) 641-3200