# EXHIBIT 1

NOV-29-2000  01:07     DEUTSCE BANK NY                    212 469 4466      P.17

# Deutsche Bank AG New York Branch

## Foreign Exchange Digital Option Transaction
### Our ref: 36574

V1 Investments LLC
Care of Craig Brubaker
DB Alex Brown
200 Crescent Court, Suite 500
Dallas ,Texas 75201
214-740-7777

Deutsche Bank AG New York Branch
1290 Ave. of the Americas
New York NY 10019

Telephone: 212-469-4033
Fax:         212-469-4466

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction. The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

### 1. Section 1 — General Terms

| | |
|---|---|
| Notional Amount: | USD 636,000.00 |
| Trade Date: | 27 November 2000 |
| Termination Date: | 15 December 2000, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/GBP |

### 2. Section 1 — First Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 318,000.00 |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 636,000.00 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | EUR 0.6155 per GBP 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital Option Trigger Event.

J6574cbnb.dov

**3. Section 1 – Second Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 314,820.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(II) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 629,640.00 |
| Second Range Level: | EUR 0.8157 per GBP 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

**Section 2 - Other Provisions**

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)                    Offices:

(a)   The Office of Party A for the Transaction is New York; and
(b)   The Office of Party B for the Transaction is Delaware.

**3.        Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)        **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)    **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4.    **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5.    **Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: _____
Name: Rick Pychewicz
Title:  VP

By: _____
Name:  Andrew Bayley
Title:    Associate

Confirmed as of the date first above written:
V1 Investments LLC

By: _____
Name:  Dino Vadeyoulis  Member
Authorised Signatory

By: _____
Name:
Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033.Please sign and fax to 212-469-4486.Thank you.

# EXHIBIT 2

NOV-29-2000  01:09        DEUTSCE BANK NY                212 469 4466        P.20

# Deutsche Bank AG New York Branch

29 November, 2000

### Foreign Exchange Digital Option Transaction
Our ref: 36575

V2 Investments LLC
Care of Craig Brubaker
DB Alex Brown
200 Crescent Court,Suite 500
Dallas ,Texas 75201
214-740-7777

Deutsche Bank AG New York Branch
1290 Ave. of the Americas
New York NY 10019

Telephone: 212-469-4033
Fax:       212-469-4466

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

## 1. Section 1 – General Terms

| | |
|---|---|
| Notional Amount: | USD 636,000.00 |
| Trade Date: | 27 November 2000 |
| Termination Date: | 15 December 2000, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/GBP |

## 2. Section 1 – First Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 318,000.00 |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 636,000.00 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | EUR 0.6155 per GBP 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

36575cbgb

3.  Section 1 – Second Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 314,820.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 629,640.00 |
| Second Range Level: | EUR 0.8157 per GBP 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.


Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)                      Offices:

(a)   The Office of Party A for the Transaction is New York; and
(b)   The Office of Party B for the Transaction is Delaware.

3.       Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)        Non-Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.**  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)   **Status of Parties.**  The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4.    **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates.  In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree.  Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement.  All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation.  Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S.. Dollars. (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5.    **Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: _____              By: _____
Name:  Rick Pychewicz                    Name:  Andrew Bayley
Title:   VP                              Title:   Associate

Confirmed as of the date first above written:
V2 Investments LLC

By: _____              By: _____
Name:  Paul Vadevoulis, Member           Name:
Authorised Signatory                     Authorised Signatory


For any query relating to this Confirmation please contact : 212-469-4033. Please sign and fax to 212-469-4466. Thank you.

36575cbgb

# EXHIBIT 3

NOV-29-2000  01:09          DEUTSCE BANK NY                      212 469 4466      P.23

# Deutsche Bank AG New York Branch

28 November, 2000

### Foreign Exchange Digital Option Transaction
Our ref: 36576

V3 Investments LLC
Care of Craig Brubaker
DB Alex Brown
200 Crescent Court,Suite 500
Dallas ,Texas 75201
214-740-7777

Deutsche Bank AG New York Branch
1290 Ave. of the Americas
New York NY 10019

Telephone: 212-469-4033
Fax:        212-469-4466

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

### 1.  Section 1 – General Terms

Notional Amount:                      USD 636,000.00
Trade Date:                           27 November 2000
Termination Date:                     15 December 2000, subject to modification in accordance with the
                                      Following Business Day Convention.
Business Days:                        In New York
Calculation Agent:                    Party A
Currency Pair:                        EUR/GBP

### 2.  Section 1 – First Digital Option Transaction

(i) Initial Exchange Provisions:

Party A Initial Exchange Amount:      Zero
Party B Initial Exchange Amount:      USD 316,000.00
Initial Exchange Date:                29 November 2000, subject to adjustment in accordance with the
                                      Following Business Day Convention.

(ii) Final Exchange Provisions:

Party A Final Exchange Amount:        USD 636,000.00
Party B Final Exchange Amount:        Zero
First Range Level:                    EUR .6155 per GBP 1.0000
First Rate Determination Date:        Means the Termination Date
Final Exchange Date:                  19 December 2000, subject to adjustment in accordance with the
                                      Following Business Day Convention.

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

36576cbgb.doc

3. Section 1 – Second Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 314,820.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 629,640.00 |
| Second Range Level: | EUR 0.6157 per GBP 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)        Offices:

(a)    The Office of Party A for the Transaction is New York; and
(b)    The Office of Party B for the Transaction is Delaware.

3.    Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)        Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)   **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4.    **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and it in good faith agree.  Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5.    **Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: _____            By: _____
Name: Rick Rychawicz                    Name:  Andrew Bayley
Title:  VP                              Title:   Associate

Confirmed as of the date first above written
V3 Investments LLC

By: _____            By: _____
Name:  Jim Vadeveolis, Member           Name:
Authorised Signatory                    Authorised Signatory


For any query relating to this Confirmation please contact : 212-469-4033.Please sign and fax to 212-469-4466.Thank you.

# EXHIBIT 4

# Deutsche Bank AG New York Branch



25 November, 2000

### Foreign Exchange Digital Option Transaction
Our ref: 36568

TR1 Investments LLC
Care of Craig Brubaker
DB Alex Brown
200 Crescent Court, Suite 500
Dallas ,Texas 75201
214-740-7777

Deutsche Bank AG New York Branch
1290 Ave. of the Americas
New York NY 10019

Telephone: 212-469-4033
Fax:        212-469-4466
Swift: DEUT US 33

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction. The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

### 1.  Section 1 – General Terms

Notional Amount:          USD 20,542,000.00
Trade Date:               27 November 2000
Termination Date:         16 December 2000, subject to modification in accordance with the Following Business Day Convention.
Business Days:            In New York
Calculation Agent:        Party A
Currency Pair:            EUR/JPY

### 2.  Section 1 – First Digital Option Transaction

(i) Initial Exchange Provisions:

Party A Initial Exchange Amount:    Zero
Party B Initial Exchange Amount:    USD 10,271,000.00
Initial Exchange Date:              29 November 2000, subject to adjustment in accordance with the Following Business Day Convention.

(ii) Final Exchange Provisions:

Party A Final Exchange Amount:      USD 20,542,000.00
Party B Final Exchange Amount:      Zero
First Range Level:                  JPY 98.40 per EUR 1.00
First Rate Determination Date:      Means the Termination Date
Final Exchange Date:                19 December 2000, subject to adjustment in accordance with the Following Business Day Convention.

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

36568cbjp.doc

3. **Section 1 – Second Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 10,168,290.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 20,336,580.00 |
| Second Range Level: | JPY 96.42 per EUR 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

**Section 2 - Other Provisions**

(i) For the purposes of this Transaction only, the following provision shall apply:

*Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)          Offices:

(a)   The Office of Party A for the Transaction is New York; and
(b)   The Office of Party B for the Transaction is Delaware.

3.      **Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)      **Non-Reliance.**  It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction. It being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii) **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

**4.    ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

**5.    Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: _____
Name: Rick Pychewicz
Title: VP

By: _____
Name: Andrew Bayley
Title:  Associate

Confirmed as of the date first above written:
TR1 Investments LLC

By: _____
Name: Bill P. Tsourapas, co-Trustee; Member
Authorised Signatory

By: _____
Name: _____
Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033. Please sign and fax to 212-469-4466. Thank you.

36568cbjp

# EXHIBIT 5

NOV-29-2000  01:06        DEUTSCHE BANK NY              212 469 4466    P.14

# Deutsche Bank AG New York Branch

28 November, 2000

### Foreign Exchange Digital Option Transaction
Our ref: 36573

TR2 Investments LLC
Care of Craig Brubaker
DB Alex Brown
200 Crescent Court, Suite 500
Dallas ,Texas 75201
214-740-7777

Deutsche Bank AG New York Branch
1290 Ave. of the Americas
New York NY 10019

Telephone: 212-469-4033
Fax:        212-469-4466

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction. The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

### 1. Section 1 – General Terms

| | |
|---|---|
| Notional Amount: | USD 20,542,000.00 |
| Trade Date: | 27 November 2000 |
| Termination Date: | 15 December 2000, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/GBP |

### 2. Section 1 – First Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 10,271,000.00 |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 20,542,000.00 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | EUR .6155 per GBP 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital Option Trigger Event.

36573ebgb.doc

3. **Section 1 – Second Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 10,168,290.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 20,336,580.00 |
| Second Range Level: | EUR 0.6157 per GBP 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 18 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

**Section 2 - Other Provisions**

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)             Offices:

(a)   The Office of Party A for the Transaction is New York; and
(b)   The Office of Party B for the Transaction is Delaware.

3.        **Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)        **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

36573cbgb.doc

(ii)     **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)    **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4.     **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S.. Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5.     **Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions" as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: _____          By: _____
Name:   Rick Pychewicz                Name:   Andrew Bayley
Title:  VP                            Title:  Associate

Confirmed as of the date first above written:
TR2 Investments LLC

By: _____          By: _____
Name: Bill P. Tsourapas, co-Trustee; Member     Name:
Authorised Signatory                  Authorised Signatory


For any query relating to this Confirmation please contact : 212-469-4033.Please sign and fax to 212-469-4466.Thank you.

36573cbgb.doc

# EXHIBIT 6

NOV-29-2000  01:03      DEUTSCE BANK NY                    212 469 4466     P.08

# Deutsche Bank AG New York Branch

28 November, 2000

Foreign Exchange Digital Option Transaction
Our ref: 36570

TR3 Investments LLC                           Deutsche Bank AG New York Branch
Care of Craig Brubaker                        1290 Ave. of the Americas
DB Alex Brown                                 New York NY 10019
200 Crescent Court,Suite 500
Dallas ,Texas 75201
214-740-7777                                  Telephone: 212-469-4033
                                              Fax:       212-469-4466
                                              Swift: DEUT US 33

Ladies and Gentlemen:


The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

## 1. Section 1 — General Terms

| | |
|---|---|
| Notional Amount: | USD 20,542,000.00 |
| Trade Date: | 27 November 2000 |
| Termination Date: | 15 December 2000, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/JPY |

## 2. Section 1 — First Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 10,271,000.00 |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 20,542,000.00 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | JPY 96.40 per EUR 1.00 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.


(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

36570cbjp.doc

**3. Section 1 – Second Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 10,168,290.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 20,336,580.00 |
| Second Range Level: | JPY 96.42 per EUR 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

**Section 2 – Other Provisions**

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)        Offices:

        (a)    The Office of Party A for the Transaction is New York; and
        (b)    The Office of Party B for the Transaction is Delaware.

**3.    Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)        **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction. It being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii) **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii) **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

**4.    ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

**5.    Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: _____

Name: Rick Pychewicz

Title: VP

By: _____

Name: Andrew Bayley

Title:  Associate

Confirmed as of the date first above written:
TR3 Investments LLC

By: _____

Name: Bill P. Tsourapas, co-Trustee; Member

Authorised Signatory

By: _____

Name:

Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033.Please sign and fax to 212-469-4466.Thank you.

36570cbjp

# EXHIBIT 7

Deutsche Banc Alex. Brown                                    **Deutsche Bank** /

# Account Agreement

### V1 INVESTMENTS LLC

Name(s)
_____                    **DB Alex. Brown LLC**
                                                                    P.O. Box 515
ATTN:  BILL P. TSOURAPAS                                             Baltimore, MD 21203

Address
1301 WEST 22ND STREET, SUITE 615
_____

OAK BROOK, IL 60523                               _223-78585_

City                                              Account Number

---

**IMPORTANT:  PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned, and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to DB Alex. Brown LLC, its subsidiaries, affiliates, officers, directors, agents and employees. DB Alex. Brown LLC is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1.  **Representations**

    Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2.  **Applicable Rules and Regulations**

    All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3.  **Confirmations, Statements and Written Communications**

    **I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me.** Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4.  **Aggregation of Orders and Average Prices**

    I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5.  **Cash Accounts.**

    This paragraph relates to and is effective solely with respect to cash accounts: (i) The undersigned will promptly make full cash payment for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale, and, unless such security is already held in the account, will promptly deliver such security thereto; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6.  **Short and Long Orders; Deliveries and Settlements**

    I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s)s with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

AA2 (12/99)

7. **Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

8. **Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

9. **Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

10. **Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

11. **Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in my possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

12. **Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

13. **Loan or Pledge of Securities and Other Property**

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that while securities held for My Account(s) are loaned out, I will lose voting rights attendant to such securities.

14. **Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

15. **Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

16. **Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security hold- ers, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**17. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**18. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**19. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21202, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver or any rights under this agreement except to the extent stated herein.

**20. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

**21. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**Please Complete 22a or 22b as applicable.**

**22a. Certification — Taxpayer Identification Number**

**Certification Instructions: I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here: _____. (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Banc Alex. Brown Investment Representative.)**

**Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.**

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.**

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED. THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____, Member  Date 11/2/00

Social Security or Employer ID No. 36-4400342

Signature _____  Date _____

Social Security or Employer ID No. _____

Signature _____  Date _____

Social Security or Employer ID No. _____

**22b. Certification — Non-U.S. Resident**

Permanent Residence Address: _____

_____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 22b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____  Date _____

Social Security or Employer ID No. _____

Signature _____  Date _____

Social Security or Employer ID No. _____

**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____, Member   Date 11/2/00

Signature _____   Date _____

Signature _____   Date _____

Paragraph 22 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

FOR OFFICE USE ONLY

Branch Manager approval for margin accounts:

Signature _____   Date 11/7/00

# EXHIBIT 8

Deutsche Banc Alex. Brown

Deutsche Bank ▨

# Account Agreement

### V2 INVESTMENTS LLC

Name(s)

DB Alex. Brown LLC
P.O. Box 515
Baltimore, MD 21203

ATTN: BILL P. TSOURAPAS

Address

1301 WEST 22ND STREET, SUITE 615

OAK BROOK, IL 60523

City

Account Number

**IMPORTANT: PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned, and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to DB Alex. Brown LLC, its subsidiaries, affiliates, officers, directors, agents and employees. DB Alex. Brown LLC is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1. **Representations**

   Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2. **Applicable Rules and Regulations**

   All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3. **Confirmations, Statements and Written Communications**

   **I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me.** Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4. **Aggregation of Orders and Average Prices**

   I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5. **Cash Accounts.**

   This paragraph relates to and is effective solely with respect to cash accounts: (i) The undersigned will promptly make full cash payment for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale, and, unless such security is already held in the account, will promptly deliver such security thereto; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6. **Short and Long Orders; Deliveries and Settlements**

   I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s)s with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

AA2 (12/99)

**7.  Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8.  Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9.  Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10. Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11. Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12. Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**13. Loan or Pledge of Securities and Other Property**

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that while securities held for My Account(s) are loaned out, I will lose voting rights attendant to such securities.

**14. Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**15. Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**16. Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety or risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**17. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**18. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**19. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21202, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver or any rights under this agreement except to the extent stated herein.

**20. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

**21. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**Please Complete 22a or 22b as applicable.**

**22a. Certification — Taxpayer Identification Number**

**Certification Instructions: I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here:** _____ **(For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Banc Alex. Brown Investment Representative.)**

**Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.**

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.**

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED. THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____, Member    Date _____

Social Security or Employer ID No. _____

Signature _____    Date _____

Social Security or Employer ID No. _____

Signature _____    Date _____

Social Security or Employer ID No. _____

**22b. Certification — Non-U.S. Resident**

Permanent Residence Address: _____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify under penalties of perjury, (1) that I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 22b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ Date _____

Social Security or Employer ID No. _____

Signature _____ Date _____

Social Security or Employer ID No. _____

**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

• When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.

• I will be obligated to pay interest on all sums I borrow from you.

• I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.

• By using a margin account to leverage my investments, I increase my risk of loss.

• Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

• My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.

• Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ , Member   Date 11-2-00

Signature _____   Date _____

Signature _____   Date _____

Paragraph 22 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

FOR OFFICE USE ONLY                    Branch Manager approval for margin accounts:

Signature _____   Date 11/1/00

# EXHIBIT 9

Deutsche Banc Alex. Brown                                                                    **Deutsche Bank** ▨

# Account Agreement

### V3 INVESTMENTS LLC
Name(s) _____

ATTN:  BILL P. TSOURAPAS
_____
Address   1301 WEST 22ND STREET, SUITE 615

OAK BROOK, IL 60523
_____
City

**DB Alex. Brown LLC**
P.O. Box 515
Baltimore, MD 21203

_____
Account Number

---

**IMPORTANT:  PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

---

In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned, and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to DB Alex. Brown LLC, its subsidiaries, affiliates, officers, directors, agents and employees. DB Alex. Brown LLC is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1.  **Representations**

    Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person.  I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s).  I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2.  **Applicable Rules and Regulations**

    All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed.  Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System.  You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3.  **Confirmations, Statements and Written Communications**

    **I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s).  In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me.** Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not.  Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4.  **Aggregation of Orders and Average Prices**

    I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated.  I understand that this practice may also result in my orders being only partially completed.

5.  **Cash Accounts.**

    This paragraph relates to and is effective solely with respect to cash accounts: (i) The undersigned will promptly make full cash payment for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security thereto; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6.  **Short and Long Orders; Deliveries and Settlements**

    I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long."  "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security.  I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice.  My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date.  In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s).  I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s)s with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

AA2 (12/99)

**7. Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8. Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9. Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10. Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11. Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12. Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short. In such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**13. Loan or Pledge of Securities and Other Property**

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that while securities held for My Account(s) are loaned out, I will lose voting rights attendant to such securities.

**14. Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**15. Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**16. Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety or risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations unless you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**17. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**18. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**19. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21202, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver or any rights under this agreement except to the extent stated herein.

**20. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

**21. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**Please Complete 22a or 22b as applicable.**

**22a. Certification — Taxpayer Identification Number**

**Certification Instructions: I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here: _____. (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Banc Alex. Brown Investment Representative.)**

**Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.**

**BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.**

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a joint Account, all account owners must sign.**

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____, Member   Date 11-2-00

Social Security or Employer ID No. _____        _____

Signature _____                          Date _____

Social Security or Employer ID No. _____        _____

Signature _____                          Date _____

Social Security or Employer ID No. _____        _____

**22b. Certification — Non-U.S. Resident**

Permanent Residence Address: _____

_____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 22b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____    Date _____

Social Security or Employer ID No. _____

Signature _____    Date _____

Social Security or Employer ID No. _____

**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____, Member    Date 11-2-00

Signature _____    Date _____

Signature _____    Date _____

Paragraph 22 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

FOR OFFICE USE ONLY              Branch Manager approval for margin accounts:

Signature _____    Date 11/7/00

# EXHIBIT 10

Deutsche Banc Alex. Brown                                    **Deutsche Bank** ☐

# Account Agreement

### TR1 INVESTMENTS LLC

Name(s)
_____        **DB Alex. Brown LLC**
ATTN: BILL P. TSOURAPAS                                   P.O. Box 515
                                                         Baltimore, MD 21203
Address
1301 WEST 22ND STREET, SUITE 615
_____

OAK BROOK, IL 60523
_____        _____
City                                                     Account Number

**IMPORTANT:  PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned, and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you. In which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account.  "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to DB Alex. Brown LLC, its subsidiaries, affiliates, officers, directors, agents and employees. DB Alex. Brown LLC is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others.  "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1.  **Representations**

    Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2.  **Applicable Rules and Regulations**

    All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed.  Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3.  **Confirmations, Statements and Written Communications**

    **I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s).  In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me.** Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not.  Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4.  **Aggregation of Orders and Average Prices**

    I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated.  I understand that this practice may also result in my orders being only partially completed.

5.  **Cash Accounts.**

    This paragraph relates to and is effective solely with respect to cash accounts: (i) The undersigned will promptly make full cash payment for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale, and, unless such security is already held in the account, will promptly deliver such security thereto; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6.  **Short and Long Orders; Deliveries and Settlements**

    I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long."  "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice.  My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s)s with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

AA2 (12/99)

**7. Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8. Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9. Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10. Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11. Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12. Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**13. Loan or Pledge of Securities and Other Property**

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that while securities held for My Account(s) are loaned out, I will lose voting rights attendant to such securities.

**14. Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**15. Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**16. Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety or risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**17. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**18. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**19. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21202, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court . Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver or any rights under this agreement except to the extent stated herein.

**20. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

**21. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

## Please Complete 22a or 22b as applicable.

**22a. Certification — Taxpayer Identification Number**

**Certification Instructions: I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here: _____ . (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Banc Alex. Brown Investment Representative.)**

**Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.**

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.**

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____  CO-TRUSTEE; MEMBER  Date 11/2/00

Social Security or Employer ID No. _____ 360-4400353 _____

Signature _____  CO-TRUSTEE; MEMBER  Date 11/2/00

Social Security or Employer ID No. _____

Signature _____  Date _____

Social Security or Employer ID No. _____

**22b. Certification — Non-U.S. Resident**

Permanent Residence Address: _____

_____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 22b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ Date_____

Social Security or Employer ID No. _____

Signature _____ Date_____

Social Security or Employer ID No. _____

**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

• When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.

• I will be obligated to pay interest on all sums I borrow from you.

• I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.

• By using a margin account to leverage my investments, I increase my risk of loss.

• Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

• My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.

• Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ See also CO-TRUSTEE; MEMBER  Date 11/2/00

Signature _____ CO-TRUSTEE; MEMBER  Date 11/2/00

Signature _____ Date_____

Paragraph 22 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

FOR OFFICE USE ONLY                    Branch Manager approval for margin accounts:

Signature _____Mary Doyle_____  Date 11/7/00

# EXHIBIT 11

Deutsche Banc Alex. Brown

Deutsche Bank /

# Account Agreement

TR2 INVESTMENTS LLC

Name(s)

**DB Alex. Brown LLC**
P.O. Box 515
Baltimore, MD 21203

ATTN: BILL P. TSOURAPAS

Address

1301 WEST 22ND STREET, SUITE 615

*223-78581-19*

OAK BROOK, IL 60523

City

Account Number

**IMPORTANT: PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned, and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to DB Alex. Brown LLC, its subsidiaries, affiliates, officers, directors, agents and employees. DB Alex. Brown LLC is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

**1.  Representations**

Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

**2.  Applicable Rules and Regulations**

All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

**3.  Confirmations, Statements and Written Communications**

**I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me.** Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

**4.  Aggregation of Orders and Average Prices**

I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

**5.  Cash Accounts.**

This paragraph relates to and is effective solely with respect to cash accounts: (i) The undersigned will promptly make full cash payment for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security thereto; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

**6.  Short and Long Orders; Deliveries and Settlements**

I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s)s with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

AA2 (12/99)

**7. Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8. Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9. Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10. Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11. Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12. Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**13. Loan or Pledge of Securities and Other Property**

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that while securities held for My Account(s) are loaned out, I will lose voting rights attendant to such securities.

**14. Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**15. Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**16. Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety or risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**17. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**18. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**19. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21202, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver or any rights under this agreement except to the extent stated herein.

**20. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

**21. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**Please Complete 22a or 22b as applicable.**

**22a. Certification — Taxpayer Identification Number**

**Certification Instructions:** I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here: _____. (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Banc Alex. Brown Investment Representative.)

**Under penalties of perjury, I certify that:** (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.**

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED. THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____    CO-TRUSTEE; MEMBER    Date _____

Social Security or Employer ID No. _____

Signature _____    CO-TRUSTEE; MEMBER    Date 11/2/16

Social Security or Employer ID No. _____

Signature _____    Date _____

Social Security or Employer ID No. _____

**22b. Certification — Non-U.S. Resident**

Permanent Residence Address: _____

_____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 22b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ Date _____

Social Security or Employer ID No. _____

Signature _____ Date _____

Social Security or Employer ID No. _____

**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _Magdalene Tadowilis_ CO-TRUSTEE; MEMBER Date _11/2/00_

Signature _____ CO-TRUSTEE; MEMBER Date _11/2/00_

Signature _____ Date _____

Paragraph 22 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

---

FOR OFFICE USE ONLY            Branch Manager approval for margin accounts:

Signature _Mary Sregu_            Date _11/2/00_

# EXHIBIT 12

Deutsche Banc Alex. Brown                                                Deutsche Bank ◣

# Account Agreement

TR3 INVESTMENTS LLC

Name(s)
_____

ATTN: BILL P. TSOURAPAS

**Address**
1301 WEST 22ND STREET, SUITE 615

OAK BROOK, IL 60523

City
_____

DB Alex. Brown LLC
P.O. Box 515
Baltimore, MD 21203

*223-78582-18*

Account Number

---

**IMPORTANT:  PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

---

In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned, and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to DB Alex. Brown LLC, its subsidiaries, affiliates, officers, directors, agents and employees. DB Alex. Brown LLC is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1. **Representations**

   Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2. **Applicable Rules and Regulations**

   All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3. **Confirmations, Statements and Written Communications**

   **I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me.** Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4. **Aggregation of Orders and Average Prices**

   I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5. **Cash Accounts.**

   This paragraph relates to and is effective solely with respect to cash accounts: (i) The undersigned will promptly make full cash payment for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale, and, unless such security is already held in the account, will promptly deliver such security thereto; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6. **Short and Long Orders; Deliveries and Settlements**

   I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s)s with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

AA2 (12/99)

**7. Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8. Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9. Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10. Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11. Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12. Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**13. Loan or Pledge of Securities and Other Property**

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that while securities held for My Account(s) are loaned out, I will lose voting rights attendant to such securities.

**14. Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**15. Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**16. Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety or risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**17. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**18. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products will not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**19. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21202, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver or any rights under this agreement except to the extent stated herein.

**20. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

**21. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**Please Complete 22a or 22b as applicable.**

**22a. Certification — Taxpayer Identification Number**

**Certification instructions:** I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here: _____. (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Banc Alex. Brown Investment Representative.)

**Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.**

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.**

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

| | | |
|---|---|---|
| Signature | CO-TRUSTEE; MEMBER | Date 11/2/00 |
| Social Security or Employer ID No. 56-4400356 | | |
| Signature | CO-TRUSTEE; MEMBER | Date 11/2/0 |
| Social Security or Employer ID No. | | |
| Signature | | Date |
| Social Security or Employer ID No. | | |

**22b. Certification — Non-U.S. Resident**

Permanent Residence Address: _____

_____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 22b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ Date _____

Social Security or Employer ID No. _____

Signature _____ Date _____

Social Security or Employer ID No. _____

**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ CO-TRUSTEE; MEMBER Date _11/2/00_

Signature _____ CO-TRUSTEE; MEMBER Date _11/2/00_

Signature _____ Date _____

Paragraph 22 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

FOR OFFICE USE ONLY          Branch Manager approval for margin accounts:

Signature _____          Date _11/7/00_

# EXHIBIT 13

Deutsche Banc Alex. Brown

Deutsche Bank ☒

# Account Agreement

**TRINITY INVESTMENT PARTNERSHIP**

Name(s)

**DB Alex. Brown LLC**
P.O. Box 515
Baltimore, MD 21203

ATTN: BILL P. TSOURAPAS

Address

1301 WEST 22ND STREET, SUITE 615

OAK BROOK, IL 60523

City                                                                 Account Number

**IMPORTANT: PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned, and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to DB Alex. Brown LLC, its subsidiaries, affiliates, officers, directors, agents and employees. "DB Alex. Brown LLC is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

1. **Representations**

   Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

2. **Applicable Rules and Regulations**

   All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

3. **Confirmations, Statements and Written Communications**

   **I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s). In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me.** Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

4. **Aggregation of Orders and Average Prices**

   I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

5. **Cash Accounts.**

   This paragraph relates to and is effective solely with respect to cash accounts: (i) The undersigned will promptly make full cash payment for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale, and unless such security is already held in the account, will promptly deliver such security thereto; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

6. **Short and Long Orders; Deliveries and Settlements**

   I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s)s with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

AA2 (12/99)

**7. Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8. Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9. Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10. Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11. Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities or other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12. Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**13. Loan or Pledge of Securities and Other Property**

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that while securities held for My Account(s) are loaned out, I will lose voting rights attendant to such securities.

**14. Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**15. Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**16. Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety of risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations unless you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase; (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**17. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**18. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**19. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21202, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver or any rights under this agreement except to the extent stated herein.

**20. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

**21. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**Please Complete 22a or 22b as applicable.**

**22a. Certification — Taxpayer Identification Number**

**Certification Instructions:** I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here: _____. (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Banc Alex. Brown Investment Representative.)

**Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.**

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.**

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____   Member; Partner   Date _____

Social Security or Employer ID No. _____

Signature _____   Date _____

Social Security or Employer ID No. _____

Signature _____   Date _____

Social Security or Employer ID No. _____

**22b. Certification — Non-U.S. Resident**

Permanent Residence Address: _____

_____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 22b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.**

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ Date _____

Social Security or Employer ID No. _____

Signature _____ Date _____

Social Security or Employer ID No. _____

**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

- When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.
- I will be obligated to pay interest on all sums I borrow from you.
- I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.
- By using a margin account to leverage my investments, I increase my risk of loss.
- Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

- My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.
- Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____, Member; Partner    Date 11/2/00

Signature _____ Date _____

Signature _____ Date _____

Paragraph 22 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

| FOR OFFICE USE ONLY | Branch Manager approval for margin accounts: |
|---|---|
| Signature _____ | Date _____ |

# EXHIBIT 14

Deutsche Banc Alex. Brown

**Deutsche Bank /**

# Account Agreement

LA FRANCAISE BAKERY, INC.

Name(s)

**DB Alex. Brown LLC**
P.O. Box 515
Baltimore, MD 21203

ATTN: BILL P. TSOURAPAS

Address

1301 WEST 22ND STREET, SUITE 615

*223-98584-16-104*

OAK BROOK, IL 60523

City

Account Number

---

**IMPORTANT:  PLEASE SIGN AND RETURN THIS ACCOUNT AGREEMENT IN THE ENCLOSED ENVELOPE.**

In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Banc Alex. Brown") accepting the Account(s) of the Undersigned, and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my," "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest. "You" and "your" refer to DB Alex. Brown LLC, its subsidiaries, affiliates, officers, directors, agents and employees. DB Alex. Brown LLC is a subsidiary of Deutsche Bank AG. As used herein, the term "affiliate of Deutsche Bank" means Deutsche Bank AG and its subsidiaries and affiliates. Each of Deutsche Bank and its affiliates is a separately incorporated legal entity, none of which is responsible for the obligations of the others. "Securities and Other Property" shall include, but shall not be limited to, money and securities, financial instruments, commodities of every kind and nature, and all contracts and options relating to any thereof (whether for present or future delivery), owned by the undersigned or in which the undersigned has an interest. Where the context requires, the singular shall be plural and the plural shall be singular.

**1.  Representations**

Unless I have advised you otherwise in writing, I represent that I am of legal age, that I am not an employee or member of any securities exchange (or corporation of which any exchange owns a majority of the capital stock), the National Association of Securities Dealers, Inc., or of any broker-dealer, nor am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person. I further represent that I am financially capable of satisfying any obligations undertaken through My Account(s) and that no one except the persons named on the account(s) has any interest in the account(s). I will promptly notify you in writing if any of the above circumstances change. I acknowledge that the purchase and sale of securities entails substantial economic risk, and I represent to you that I knowingly and willingly assume such risk.

**2.  Applicable Rules and Regulations**

All transactions in My Account(s) shall be subject to the constitution, rules, regulations, customs and usages of the exchange or market, and its clearing house, if any, where the transactions are executed. Transactions shall also be subject to the provisions of federal and state securities laws, as amended, and to the rules and regulations of the Securities and Exchange Commission and the Board of Governors of the Federal Reserve System. You shall not be liable for any loss caused directly or indirectly by your compliance with such rules or regulations or by government restrictions, exchange or market rulings, suspension of trading, war, or other conditions beyond your control.

**3.  Confirmations, Statements and Written Communications**

**I agree to notify you in writing, within ten (10) days of your sending me a confirmation, of any objection I have to any transaction in My Account(s).  In the absence of such written notification, I agree that all transactions for My Account(s) will be final and binding on me.** Confirmations of transactions, as well as other communications, may be sent to the address I provided to you or to such other address I may hereafter give to you in writing, and all communications so sent, whether by mail, private carrier, facsimile, messenger or otherwise, shall be deemed given to me, whether actually received or not. Unless I advise you in writing to the contrary, you may disclose my name and address to the issuers of securities which you hold for me.

**4.  Aggregation of Orders and Average Prices**

I authorize you, at your discretion, to aggregate orders for My Account(s) with other customer orders. I recognize that in so doing, I may receive an average price for my orders which may be different from the price(s) I might have received had my orders not been aggregated. I understand that this practice may also result in my orders being only partially completed.

**5.  Cash Accounts.**

This paragraph relates to and is effective solely with respect to cash accounts: (i) The undersigned will promptly make full cash payment for each security purchased, unless funds sufficient therefor are already held in the account; (ii) the undersigned does not contemplate selling any security before it is paid for as provided in the preceding clause; (iii) the undersigned will own each security sold at the time of sale and, unless such security is already held in the account, will promptly deliver such security thereto; and (iv) the undersigned will promptly make full cash payment of any amount which may become due in order to meet necessary requests for additional deposits or, with respect to any unissued security purchased or sold, to mark to the market.

**6.  Short and Long Orders; Deliveries and Settlements**

I agree that, in giving orders to sell, all "short" sales will be designated by me as "short" and all other sales will be designated by you as "long." "Short sale" means any sale of a security not owned by me or any sale that is consummated on settlement date by delivery of a borrowed security. I also agree that you may, at your discretion, immediately cover any short sales in My Account(s), without prior notice. My failure to designate a sale order as "short" is a representation on my part that I own the security free of restriction, and if the security is not in your possession at the time of the sale, I agree to deliver the security to you by settlement date. In case of non-delivery of a security, you are authorized to purchase the security to cover my position and charge any loss, commissions and fees to My Account(s). I agree that if you fail to receive payment for securities I have purchased you may, without prior demand or notice, sell those securities or other property held by you in any of My Account(s)s with you and any loss resulting therefrom will be charged to such account(s). I authorize you, at your discretion, to request and obtain extension(s) of my time to make payment for securities I purchase, as provided for by Federal Reserve Bank Regulation T.

AA2 (12/99)

**7. Authority to Borrow**

In case of the sale of any security or other property by you at my direction and your inability to timely deliver the same to the purchaser by reason of my failure to supply you therewith, I authorize you to purchase or borrow any security or other property necessary to make the required delivery, and I agree to be responsible for any loss or cost, including interest, which you sustain as a result of my failure to make delivery to you.

**8. Interest Charges**

I acknowledge that debit balances in my cash or margin account, including but not limited to those arising from my failure to make payment by settlement date for securities purchased, will be charged interest at the then current rate, in accordance with your usual custom. Interest will be computed on the net daily debit balance, which is computed by combining all debit balances and credit balances in each account with the exception of credit balances associated with short security positions. I acknowledge receipt of your statement regarding interest charges and that you may charge an account maintenance fee with respect to inactive accounts.

**9. Credit Information and Investigation**

I authorize you to obtain reports concerning my credit standing and business conduct at your discretion. I also authorize you and any affiliate of Deutsche Bank (including, without limitation, Deutsche Bank AG) to share among such affiliates such information and any other confidential information you and such affiliate(s) may have about me and My Account(s).

**10. Satisfaction of Indebtedness**

I agree to satisfy, upon demand, any indebtedness, including any interest and commission charges. I further agree to pay the reasonable costs and expenses of collection of any amount I owe you, including reasonable attorney's fees and court costs.

**11. Liens**

I hereby grant to you and all affiliates of Deutsche Bank AG a security interest in all securities and other property in your possession or in the possession of any of your affiliates in which I have an interest in order to secure any and all indebtedness or any other of my obligations to you or any affiliate of Deutsche Bank AG. All such securities and other property shall be held as security for the payment of any such obligations or indebtedness in any account with you in which I have an interest, and you may, in your discretion, at any time and without prior notice, sell and/or transfer any or all securities and other property in order to satisfy such obligations. In enforcing this lien, you shall have the discretion to determine which securities and property are to be sold and/or which contracts are to be closed.

**12. Margin Maintenance, Calls for Additional Collateral, Liquidations and Covering Short Positions**

If I engage in margin transactions, I will maintain such securities and other property in My Account(s) for margin purposes as you shall require from time to time in your sole discretion for any reason whatsoever. You shall have the right in accordance with your general policies regarding margin maintenance requirements, as such may be modified or amended from time to time, to require additional collateral or the liquidation of any securities and other property whenever in your sole discretion you consider it necessary for your protection. You may do so under circumstances which include, but are not limited to, the failure to promptly meet any call for additional collateral, the filing of a petition in bankruptcy, the appointment of a receiver by or against me or the attachment or levy against any account with you in which I have an interest. In such event, you are authorized to sell any and all securities and other property in any of My Account(s) with you whether carried individually or jointly with others, to buy all securities or other property which may be short in such account, to cancel any open orders and to close any or all outstanding contracts, all without demand for margin or additional margin, notice of sale or purchase, or other notice or advertisement, each of which is expressly waived. Any such sales or purchases may be made at your discretion on any exchange or other market where such business is usually transacted or at public auction or private sale, and you may be the purchaser for your own account. I understand that any prior demand, or call, or prior notice of the time and place of such sale or purchase shall not be considered a waiver of your right to sell or buy without demand or notice as provided herein.

**13. Loan or Pledge of Securities and Other Property**

Within the limitations imposed by applicable law, all securities and other property now or hereafter held, carried or maintained by you in your possession that have not been fully paid for or are held in a margin account may be lent, either to yourself or to others, pledged and repledged by you, without notice to me, either separately or in common with other securities and other property of your other customers for any amount due in any account with you in which I have an interest, or for any greater amount, and you may do so without retaining in your possession or control for delivery a like amount of similar securities or other property. I understand that while securities held for My Account(s) are loaned out, I will lose voting rights attendant to such securities.

**14. Correspondent Account; No Agency**

If My Account(s) has been introduced to you by arrangement with another broker-dealer, you are authorized to accept from such other broker-dealer, without inquiry or investigation by you (i) orders for the purchase or sale of securities or other property for My Account(s), on margin or otherwise, and (ii) any other instructions concerning My Account(s). I understand and agree that such other broker-dealer is not your agent and that you shall have no responsibility or liability to me for any acts or omissions of such other broker-dealer, its officers, employees or agents.

**15. Joint Accounts**

If this is a Joint Account, we agree that each of us shall have authority with respect to this account to deal with you as if each of us alone were the account owner, all without notice to the other account owner(s). We agree that notice to any account owner shall be deemed to be notice to all account owners. Each account owner shall be jointly and severally liable for this account. You may follow the instructions of any of us concerning this account and make deliveries to any of us, of any or all property and payment, even if such deliveries and/or payments shall be made to one of us personally, and not to all of the account owners. You shall be under no obligation to inquire into the purpose of any such demand for delivery of securities or payment, and you shall not be bound to see to the application or disposition of the securities and/or monies so delivered or paid to any of us. Notwithstanding the foregoing, you are authorized, in your discretion, to require joint action by all of the account owners with respect to any matter concerning the account, including the giving or cancellation of orders and the withdrawal of monies, securities or other property. We agree that our account will be carried on your books in the form reflected by the above account name. In the event of the death of any of us, the survivor(s) shall immediately give you written notice thereof, and you may, before or after receiving such notice, take such action, require such documents, retain such securities and/or restrict transactions in the account as you may deem advisable to protect you against any tax, liability, penalty or loss under any present or future laws or otherwise. Any cost resulting from the death of any of us, or through the exercise by any decedent's estate or representatives of any rights in the account shall be chargeable against the interest of the survivor(s) as well as against the interest of the estate of the decedent.

**16. Foreign Securities**

With respect to debt or equity securities of non-U.S. issuers or debt or deposit instruments of non-U.S. banks ("Foreign Securities"), I acknowledge and understand that: (i) Foreign Securities are, in most cases, not registered with the Securities and Exchange Commission or listed on a U.S. securities exchange; (ii) Foreign Securities, particularly those of issuers in the so-called "emerging markets" are often illiquid, are sometimes subject to legal and/or contractual transfer restrictions, and it may be difficult or impossible to dispose of such Foreign Securities prior to the maturity thereof or to determine the market price thereof for valuation purposes; (iii) Foreign Securities, and the issuer, guarantors or other obligors with respect thereto ("Obligors") are subject to a variety or risks in addition to those typically faced in the case of U.S. securities and issuers, including, among other things, currency risk, exchange controls, confiscatory taxation, withholding, limitations on the rights of security holders, civil unrest, hyperinflation, discriminatory treatment of foreign investors, etc.; (iv) there is often less information available regarding Obligors, and such information may be more difficult to interpret, than is the case with U.S. issuers whose securities are subject to the periodic reporting requirements under U.S. securities laws; (v) there may be no effective means to determine if an Obligor is in default of its obligations in respect of its debt securities or other financial obligations (and you specifically acknowledge that Foreign Securities purchased by you may be in default at the time of purchase); (vi) the Foreign Securities in question may be unrated; and (vii) such securities are not suitable for all investors.

I authorize Deutsche Banc Alex. Brown to purchase Foreign Securities (and, in the case of Foreign Securities denominated in foreign currencies, the relevant foreign currencies) from or sell Foreign Securities (and foreign exchange) to an affiliate of Deutsche Bank AG. In dealing with such affiliates, such affiliates may take their normal commissions, spreads or other fees without regard to Deutsche Banc Alex. Brown's relationship with me.

**17. Acknowledgment of Possible Conflicts of Interest**

I acknowledge that the advice provided to me by your employees may differ from the advice or the timing or nature of action recommended by or taken by other individuals or groups at Deutsche Banc Alex. Brown and/or affiliates of Deutsche Bank AG, whether acting as principal or agent. I understand that you provide investment advice, portfolio management and execution services for many clients and, in addition, act as principals in various markets. Given these different roles, individuals and groups at Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG are seldom of one view as to an investment strategy and will often pursue differing or conflicting strategies. Your employees shall have no obligation to recommend to me or inform me of strategies being pursued by you or by other clients. I also acknowledge that: Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may perform services for or solicit business from issuers whose securities are recommended by your employees; Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG may be paid fees by Registered Investment Companies or other investment vehicles, including without limitation fees for acting as investment advisor, administrator, custodian and transfer agent; and Deutsche Banc Alex. Brown and affiliates of Deutsche Bank AG act as brokers, principals, and/or market makers in certain markets and may do so in transactions with me.

**18. No FDIC Insurance, Not Obligations of Any Bank**

I understand that the assets in My Account(s) are subject to the risk of partial or total loss due to market fluctuations or the insolvency of the issuer(s).

The assets in My Account(s) (including all related cash balances and shares of any mutual fund) are not deposits or other obligations of Deutsche Bank AG or any other bank, are not guaranteed by Deutsche Bank AG and are not insured by the Federal Deposit Insurance Corporation ("FDIC").

I may from time to time be offered investment products as to which Deutsche Bank AG is an obligor. These products may be complex, may not provide for the return of the full amount of principal invested or for the payment of a fixed rate of interest (or any interest) and will not usually be subject to FDIC insurance. I will assume they are not subject to FDIC insurance and that such products may not be protected as to principal or interest unless Deutsche Bank AG states in writing that a particular product is subject to FDIC insurance.

**19. Arbitration**

I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrators would typically include a minority of arbitrators who were or are affiliated with the securities industry.

I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. I agree that I shall make my election by registered mail to you, at P.O. Box 515, Baltimore, MD 21202, Attention Director of Compliance. If my election is not received by you within ten (10) calendar days of receipt of a written request from you that I make an election, then you may elect the forum before which the arbitration shall be held.

Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the putative class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver or any rights under this agreement except to the extent stated herein.

**20. Miscellaneous**

This Agreement shall be binding upon my heirs, executors, administrators, personal representatives and permitted assigns. It shall inure to the benefit of your successors and assigns to whom you may transfer My Account(s). This Agreement contains the entire understanding between us concerning the subject matter of this Agreement. I agree that Deutsche Banc Alex. Brown has the right to amend this Agreement at any time by sending written notice of such amendment to me. Any such amendment shall be effective as of the date established by Deutsche Banc Alex. Brown. If any provision of this Agreement is held to be invalid, void or unenforceable by reason of any law, rule, administrative order or judicial decision, that determination shall not affect the validity of the remaining provisions of this Agreement. This Agreement shall be deemed to have been made in the State of New York and shall be construed, and the rights of the parties determined, in accordance with the laws of the State of New York and the United States, as amended, without giving effect to the choice of law or conflict-of-laws provisions thereof.

**21. Paragraph Headings**

Paragraph headings are for convenience only and shall not affect the meaning or interpretation of any provision of this Agreement.

**Please Complete 22a or 22b as applicable.**

**22a. Certification — Taxpayer Identification Number**

Certification Instructions: I will cross out item (2) below if I have been notified by the IRS that I am currently subject to backup withholding because I have failed to report all interest and dividends on my tax return. If I am exempt from backup withholding, I will write the word "Exempt" here: _____. (For further information, see "Payees and Payments Exempt from Backup Withholding" on IRS Form W-9, a copy of which can be obtained from a Deutsche Bank Investment Representative.)

Under penalties of perjury, I certify that: (1) The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and (2) I am not subject to backup withholding because (a) I am exempt from backup withholding, or (b) I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest and dividends, or (c) the IRS has notified me that I am no longer subject to backup withholding.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ , OFFICER    Date 12-00

Social Security or Employer ID No. 36-3264328

Signature _____    Date _____

Social Security or Employer ID No. _____

Signature _____    Date _____

Social Security or Employer ID No. _____

**22b. Certification — Non-U.S. Resident**

Permanent Residence Address: _____

_____

Type of Beneficial Owner: _____

Country of Incorporation or Organization: _____

By signing below, I hereby certify under penalties of perjury, (1) that (a) I am the beneficial owner of all the income earned in My Account(s), (b) I am neither a citizen nor a resident of the U.S. (and I have not made an election to be treated as a resident because of my marriage to a citizen or resident), (c) I have not been and do not intend to be present in the U.S. for 183 days or more during any calendar year in which this Agreement is in effect, and (d) I am not a former citizen or long-term resident of the United States subject to section 877 (relating to certain acts of expatriation) or (2) if signing on behalf of a corporation, partnership, trust or estate, that I am authorized to sign for the payee named on My Account(s) and such payee (a) is the beneficial owner of all the income earned in My Account(s) and (b) is not a United States person and (3) that in either case, I am neither engaged, nor expect to be, or any such named payee is not and does not expect to be, engaged during the year, in a U.S. trade or business that has effectively connected income from transactions within My Account(s).

In addition, if I, or any such named payee, is claiming a United States tax treaty benefit, I hereby certify, under penalties of perjury, that I, or any such named payee, is a resident of _____ within the meaning of the income tax treaty between the United States and that country. If required, a U.S. Taxpayer Identification Number is included above. I also certify under penalties of perjury that the named payee meets the requirements of the article in the applicable treaty dealing with limitations on benefits, if any, and derives the income for which the treaty benefits are claimed.

Under penalties of perjury, I declare that I have examined the information provided for in Paragraph 22b and to the best of my knowledge and belief it is true, correct, and complete.

BY SIGNING BELOW I ACKNOWLEDGE THAT I HAVE RECEIVED, READ AND AGREE TO THE TERMS OF THIS AGREEMENT.

**The Internal Revenue Service does not require your consent to any provision of this document other than the certifications required to avoid backup withholding. If this is a Joint Account, all account owners must sign.**

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____ Date _____

Social Security or Employer ID No. _____

Signature _____ Date _____

Social Security or Employer ID No. _____

**PLEASE READ AND SIGN BELOW TO OPEN A MARGIN ACCOUNT.**

I agree to open a margin account with you and acknowledge to you that, in addition to the preceding information, I understand each of the following:

• When I purchase securities on margin, I borrow money from you to finance that purchase; I may also borrow against collateral in my margin account for other purposes.

• I will be obligated to pay interest on all sums I borrow from you.

• I may be required to deliver additional collateral consisting of cash or securities to you to maintain my loan balance, as you require.

• By using a margin account to leverage my investments, I increase my risk of loss.

• Deutsche Banc Alex. Brown will deduct all interest charges from my account.

Deutsche Banc Alex. Brown represents to me that:

• My current margin debit balance will appear on each account statement Deutsche Banc Alex. Brown sends to me.

• Deutsche Banc Alex. Brown will charge me interest on a monthly basis and will disclose on my account statement the interest rate and total interest charge.

By signing below, I authorize you to open and carry a margin account for my benefit, and acknowledge that securities in my account may be loaned to Deutsche Banc Alex. Brown as principal or loaned to others. I also acknowledge that I have received, read and agree to the terms of this Margin Agreement.

I ACKNOWLEDGE THAT MUTUAL FUNDS AND OTHER SECURITIES ARE NOT INSURED BY THE FDIC, ARE NOT DEPOSITS OR OTHER OBLIGATIONS OF, OR GUARANTEED BY, ANY BANK, AND ARE SUBJECT TO INVESTMENT RISK, INCLUDING POSSIBLE LOSS OF THE PRINCIPAL INVESTED.

THIS AGREEMENT CONTAINS A PRE-DISPUTE ARBITRATION CLAUSE AT PARAGRAPH 19.

Signature _____, OFFICER Date 11-2-00

Signature _____ Date _____

Signature _____ Date _____

Paragraph 22 of this Agreement includes a certification of the Taxpayer Identification Number designated for this account and a representation regarding the applicability of backup withholding. If Deutsche Banc Alex. Brown does not receive this certification, it will be required to withhold a portion of all payments to this account.

FOR OFFICE USE ONLY                Branch Manager approval for margin accounts:

Signature _____  Date 11/7/00

# EXHIBIT 15

STATE OF MINNESOTA        FILED                    DISTRICT COURT

COUNTY OF HENNEPIN        06 AUG 16  FM 4:  FOURTH JUDICIAL DISTRICT

_____  DEPUTY

                              HENN CO. DISTRIC  **Court File No.** 27CV05-11478
                              COURT ADMINISTRATOR

BFS MORGAN INVESTORS, LLC; RDH
LOCH INVESTMETNS LLC; WFW GRAYS
LANDING INVESTMENTS LLC; WRB
PARTNERS; WRB LAKE INVESTORS, INC.,
WILLIAM F. WANNER, JR; KATHLEEN A.
WANNER; BRIAN F. SULLIVAN; MARIA T.
SULLIVAN; RICHARD D. HEMBREE; and
MARY-ANNE MACKINNON-HEMBREE

        Plaintiffs,

vs.                                        **ORDER DISMISSING**
                                           **COMPLAINT**

DEUTSCHE BANK AG, DEUTSCHE BANK
SECURITES, INC., D/B/A DEUTSCHE BANK
ALEX BROWN, a DIVISION OF DEUTSCHE
BANKE SECURTIES, INC.; DAVID PARSE;
SIDLEY AUSTIN BROWN & WOOD LLP;
R.J. RUBLE; GRADY DICKENS; SCHEEF &
STONE, LLP

        Defendants.

_____

     The above-entitled matter came before the Honorable Harry Seymour Crump on

August 2, 2006, pursuant to Defendants Deutsche Bank and David Parse's ("Defendants

Deutsche Bank") Motion to Dismiss Plaintiff's Original Complaint.   The record closed

on August 16, 2006.

     Plaintiffs BFS Morgan Investors, et al. ("Plaintiff BFS") was represented by

Jeven Sloan of Deary Montgomery DeFeo & Canada, L.L.P., Chateau Plaza, Suite 1565,

2515 McKinney Avenue, Dallas, TX 75201; and K. Jon Breyer of Fruth Jamison &

Elsass P.A., 3902 IDS Center, 80 South Eighth Street, Minneapolis MN 55402.

Defendants Deutsche Bank were represented by Adam Keiser of Dewey Ballantine

L.L.P., 1301 Avenue of the Americas, New York, NY 10019-6092; Daniel Walworth (for

David Parse) of Brune & Richard L.L.P., 2019 Webster Street, San Francisco, CA 94115;

1

and Michael J. Bleck (for Deutsche Bank and David Parse) of Oppenheimer Wolff & Donnelly L.L.P., Plaza VII, Suite 3300, 45 South Seventh Street, Minneapolis, MN 55402-1609.

Based on the record, the parties' oral consent, and pursuant to Minn. R. Civ. Proc. 12.02(b) the Court makes the following order with respect to the Deutsche Bank Defendants:

### IT IS HEREBY ORDERED:

1.   Plaintiff BFS's Count One: for Declaratory Judgment and Unjust Enrichment, is **DISMISSED**;

2.   Plaintiff BFS's Count Two: Breach of Contract or Breach of the Duty of Good Faith and Fair Dealing, is **DISMISSED**;

3.   Plaintiff BFS's Count Three: Breach of Fiduciary Duty is **DISMISSED**;

4.   Plaintiff BFS's Count Four: Fraud claim is **DISMISSED**;

5.   Plaintiff BFS's Count Five: Negligence claim is **DISMISSED**;

6.   Plaintiff BFS's Count Six: Negligent Misrepresentation claim is **DISMISSED**:

7.   Plaintiff BFS's Count Seven: Breach of Contract claim is **DISMISSED**;

8.   Plaintiff BFS's Count Eight: Declaratory Judgment claim is **DISMISSED**;

9.   Plaintiff BFS's Count Nine: Unethical, Excessive and Illegal Fees is **DISMISSED**;

10.  Plaintiff BFS's Count Ten: Civil Conspiracy is **DISMISSED**;

11.  The attached Memorandum of Law is incorporated herein.

*There Being No Just Reason for Delay, Let Judgment Be Entered Accordingly,*

BY THE COURT:

Dated: August 16, 2006

Harry Seymour Crump

Judge of District Court

2

## MEMORANDUM OF LAW

### I.    INTRODUCTION

Defendants Deutsche Bank brings this motion to dismiss pursuant to Minn. R. Civ. Proc. 12.02(e) for failure to state a claim upon which relief can be granted on all of Plaintiff BFS's ten counts for claims of declaratory judgment and unjust enrichment; breach of the duty of good faith and fair dealing; breach of fiduciary duty; fraud; negligence; negligent misrepresentation; breach of contract; declaratory judgment; unethical, excessive and illegal fees; and civil conspiracy. Plaintiffs' claims arise out of foreign exchange contracts ("FX contracts") signed by Plaintiff and executed by investment bank Defendants Deutsche Bank as part of a tax savings strategy initiated by accounting firm Ernst & Young LLP. (Ernst & Young is not a defendant in this action since they are in separate arbitration proceedings with Plaintiff BFS).

As a preliminary matter the court addresses the governing law in this dispute. Minnesota courts traditionally uphold contractual choice-of-law provisions as enforceable. See Hagstrom v. Am. Circuit Breaker Corp., 518 N.W. 2d 46, 48 (Minn.App. 1994). The FX contracts between Plaintiff BFS and Defendants Deutsche Bank designate New York law as the applicable law. Plaintiff has made no objection to the application of New York law and in its defensive motion papers rely heavily on New York law. Therefore, New York law will apply to the substantive claims and defenses of the parties (Plaintiff BFS and Defendants Deutsche) to this action. However, Minnesota law governs all procedural aspects of these claims, particularly in adjudging the sufficiency of the claims and pleadings under Minn. R. Civ. Proc. 9.01 and Minn. R. Civ. Proc. 12.02(e). On a motion to dismiss a court will liberally construe the pleadings and take all facts alleged as true. See Northern States Power Co. v. Franklin, 122 N.W.2d 26, 29 (Minn. 1963).

3

<u>Brief Factual Summary</u>

Plaintiff BFS are a series of businesses set up to effectuate a tax-shelter strategy called COBRA marketed by accounting firm, Ernst & Young. The overall strategy was designed to limit Plaintiff BFS's tax liability by increasing their tax basis and off-setting their capital gains liability resulting from their multi-million dollar sale of their business, REI, Inc.. The strategy was implemented through the use of foreign exchange digital option contracts ("FX contracts"). Defendant Deutsche Bank, investment bank, was the brokerage house who executed the FX contracts. Defendant David Parse at all relevant times of Plaintiff's complaint was an employee of Deutsche Bank. Plaintiffs bought into the COBRA strategy sometime in November of 1999. The strategy was ultimately declared illegal by the Internal Revenue Service (IRS), retroactive to October of 1999. Plaintiff BFS suffered several million dollars in tax penalties as a result. Plaintiff BFS seeks to recover from all defendants who were in any way related to the COBRA strategy.

## II.    PLAINTIFF BFS's TEN COUNTS

After reading all two-hundred-and-sixty-three paragraphs of Plaintiff BFS's original complaint, the court makes the following conclusions of law with respect to each claim asserted against Defendants Deutsche Bank.

### A. Count One: Declaratory Judgment and Unjust Enrichment

Plaintiff BFS asks the court to declare the FX contracts signed with Defendants Deutsche Bank unenforceable and as a consequence the fees paid under the contracts, a sum of $4,227,500, unjust enrichment. Plaintiff's grounds for asserting the unenforceability of the contracts are alternative theories of lack of consideration or failure of consideration. Specifically, Plaintiffs allege that because Defendants Deutsche had

4

discretion to select the "spot-rates" at which the FX contracts paid out, this discretion made the FX contracts illusory.

Declaratory relief is appropriate where there are no alternative theories of recovery, such as breach of contract. *See* Arthur Young & Co. v. Fleischman, 445 N.Y.S.2d 720, 720-721 (App. Div. 1981); *see also* Apple Records v. Capitol Records, 529 N.Y.S.2d 279, 281 (App. Div. 1988). "A 'failure of consideration' means a failure to render the performance the parties agreed on (citation omitted)." In re Estate of Wirth, 842 N.E.2d 480, 481 (N.Y. 2005); *see also* Fugeslang v. Fugeslang, 517 N.Y.S.2d 176, 177 (App. Div. 1987).

In their ten counts of claims for relief against Defendants Deutsche Bank, Plaintiff BFS alleges breach of contract twice. The signed FX contracts at issue contain provisions which read in part, "[i]n determining whether a First Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent [Deutsche Bank], acting in good faith considers that it would not be commercially reasonable to take account of it." (Def. Ex. 2-4; Compl. ¶ 43). While Plaintiffs BFS opine that the contracts were designed to never pay out and as a result were not profitable investments, they tacitly acknowledge having been informed that such a limited profit potential was consistent with Ernst and Young's COBRA strategy—to increase Plaintiffs' tax basis and offset their capital gains liability, resulting in substantial tax savings to Plaintiffs. (Compl. ¶¶ 30-32, 139-141).

Declaring the FX contracts unenforceable is inappropriate given the alternative theories of recovery available to, and already alleged by, Plaintiffs BFS. Further, the discretionary nature of Defendants Deutsche Bank with regard to the spot rates of the FX contracts is plainly evident from the language of the contracts themselves. Plaintiff knew of Defendant Deutsche Bank's discretionary power at the time they signed the contracts and therefore Plaintiff's claim that the contracts were illusory must fail.

Similarly, Plaintiff BFS must allege facts demonstrating Deutsche Bank did not perform in accordance with the written terms of the FX agreements, or in a manner inconsistent with the tax strategy adopted by Plaintiff, to support their claims of failure of consideration or lack of consideration. They did not. To the contrary, taking all of Plaintiff's allegations as true and all reasonable inferences therefrom, the court finds

5

Defendants Deutsche Bank performed under the contracts' terms as agreed by both parties.

The FX contracts were not illusory. The contracts are enforceable. Plaintiff BFS may not recover for unjust enrichment. Therefore, count one is dismissed.

## B. Count Two: Breach of Contract/Breach of the duty of good faith and fair dealing

Next, Plaintiff BFS alleges breach of contract, or breach of the duty of good faith and fair dealing. Where a plaintiff alleges breach of contract, the complaint must set forth specific provisions of the contract upon which liability is predicated, either by citing to the contract's express language or attaching a copy of the contract to the complaint. *See* Chrysler Capital Corp. v. Hilltop Egg Farms, Inc., 514 N.Y.S.2d 1002, 1003 (App. Div. 1987). New York law maintains that valid contracts carry the implied covenants of good faith and fair dealing. *See* Rowe v. Great Atlantic and Pacific Tea Co., 46 N.Y.2d 62,69 (N.Y. 1978); *see also* Wood v. Duff-Gordon, 222 N.Y. 88, 91 (N.Y. 1917). A party alleging breach of the duty of good faith and fair dealing must demonstrate that the defendant acted to prevent performance of the contract or impaired rights under the contract, causing injury to the plaintiff. *See* Maxon Int'l Inc. v. International Harvester, 442 N.Y.S.2d. 588, 589 (App. Div. 1981).

Conspicuously absent from Plaintiff BFS's lengthy complaint are any cites to actual provisions of the FX contracts allegedly breached by Defendants Deutsche Bank. Further, copies of the actual FX contracts purportedly breached were not even appended to Plaintiff's original complaint. The court was only made aware of the contracts at issue and the terms therein by way of Defendants Deutsche Bank's Answer, which included copies of the FX contracts in the appendix.

Plaintiff BFS's claims for breach of implied covenants of good faith and fair dealing are deficient. Because Plaintiffs have not alleged facts showing that Defendants Deutsche Bank impaired performance of the contract—that is, they did not execute the options transactions as provided under the agreements, or that any of Plaintiff's enumerated rights under the FX contracts were impaired by defendants, their claims for breach of the implied covenants of good faith and fair dealing must fail.

6

In sum, Plaintiff BFS has not adequately plead facts supporting their claims of breach of contract and or breach of the duty of good faith and fair dealing. Accordingly, their claims under count two are dismissed.

## C. Count Three: Breach of Fiduciary Duty

Plaintiff BFS alleges a breach of a fiduciary duty by Defendants Deutsche Bank. "A fiduciary relationship may exist where one party reposes confidence in another and reasonably relies on the other's superior expertise or knowledge [citation omitted], but an arms-length business relationship does not give rise to a fiduciary relationship." Wit Holding Corp. v. Klein, 724 N.Y.S.2d 66, 68 (App. Div. 2001). Section three of the signed FX contracts between Plaintiff BFS and Defendant Deutsche Bank expressly provides,

> "Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between parties that expressly imposes affirmative obligations to the contrary for this Transaction) ... *It is acting for its own account,* and *it has made its own independent decisions* to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary. *It is not relying on any communication (written or oral) of the other party* [Defendant Deutsche Bank] including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter it into this transaction."

In Plaintiff BFS's complaint there are numerous assertions that Defendants Deutsche Bank acted as Plaintiff's investment advisor. However, these assertions are conclusory, unsupported by any underlying facts, and directly contradict the signed representations made by Plaintiff BFS. The transactions between Plaintiff BFS and Defendants Deutsche Bank were sophisticated, intricate, lucrative business dealings. Unless fraud in the inducement of the contract is plead with specific facts, this court

7

concludes these FX contracts exemplify the arms-length business negotiations that do not give rise to a fiduciary relationship.

No fiduciary relationship existed between Plaintiff BFS and Defendants Deutsche Bank. Consequently, there was no breach of a fiduciary duty by Defendants Deutsche Bank. Count three of Plaintiff's complaint is dismissed.

### D. Count Four: Fraud

Plaintiff next alleges Fraud against Defendants Deutsche Bank. Elements for common law fraud are a representation of a material fact, falsity, scienter, reliance and injury. *See* Channel Master Corp. v. Aluminum Limited Sales, 176 N.Y.S.2d 259, 262 (App. Div. 1958). Fraud must be plead with particularity. Minn. R. Civ. Proc. 9.02.

With respect to Defendants Deutsche Bank, Plaintiff has not alleged the falsity of any material fact represented by Defendant Deutsche Bank. Instead, it is the falsity of the COBRA tax strategy which Plaintiff attacks. Throughout the complaint Plaintiff asserts that it was Ernst & Young who introduced Plaintiff BFS to the COBRA tax saving strategy, represented along with law firm Jenkens and Gilchrist that such strategy was immune from attack by the IRS, knew that the strategy was likely to be attacked by the IRS during marketing of COBRA to Plaintiff, and that as a result of the falsity of these representations, Plaintiff suffered tax penalties when the strategy was retroactively declared illegal. (Compl. 33, ¶¶ 50-51, 75-77, 84-85, 97, 164-173). Nowhere in the complaint does Plaintiff BFS allege any particular facts—such as time, place, specific persons, or statements made, showing Defendants Deutsche had anything to do with designing the COBRA strategy or introducing the strategy to Plaintiff BFS. By Plaintiff's own admission, Defendant Deutsche only implemented the strategy brought to them by Plaintiff BFS and Ernst & Young. (Compl. ¶ 97).

To find that Plaintiff BFS has adequately pled fraud against Defendants Deutsche would require the court to take all factual assertions fairly made against Ernst and Young, and attribute them to Defendants Deutsche Bank. Such leaps in logic are untenable and are not contemplated when liberally construing the pleadings on a motion to dismiss. As

8

Plaintiff BFS has not made out with particularity their claims of fraud against Defendants
Deutsche Bank, their count four fraud claim is dismissed with leave to replead.

### E.  Count Five: Negligence

Plaintiff BFS asserts a claim of negligence against Defendants Deutsche Bank
premised on allegations of duties owed as Plaintiff's investment advisors.  The tort of
negligence is established where there is a duty of care owed, breach of that duty, and
breach was the proximate cause of injury.  *See* Wolfe v. Samaritan Hosp. 484 N.Y.S.2d
168, 171 (App.Div. 1984).

The court has already addressed the issue of the existence of an investment
advisor relationship between Plaintiff BFS and Defendant Deutsche Bank.  (*infra* Section
II.C).  There was no such relationship.  Defendant Deutsche Bank owed no duty of care to
Plaintiff BFS.  Therefore, Plaintiff BFS cannot, and did not, set forth facts sufficient to
make out a claim for negligence.  Count Five of Plaintiff BFS's complaint is dismissed.

### F.  Count Six: Negligent Misrepresentation

Plaintiff BFS asserts a claim of negligent misrepresentation premised on the
nearly identical set of allegations made for its negligence claim.  A claim for negligent
misrepresentation will not lie absent some special relationship between the parties.
*See* Wit Holding Corp., 724 N.Y.S.2d at 68.  Again, as the court finds no special
relationship existed between Plaintiff BFS and Defendant Deutsche there is no basis for
Plaintiff's negligent misrepresentation claim. Count six for negligent misrepresentation is
therefore dismissed.

### G.  Count Seven: Breach of Contract

For reasons discussed in Section II.B  of this memorandum, count seven for
breach of contract is also dismissed.

## H. Count Eight: Declaratory Judgment

Plaintiff BFS's count eight claim for declaratory relief asks the court to declare all defendants in this action, including Defendants Deutsche Bank, liable for the tax penalties suffered by Plaintiff. As Plaintiff BFS has not adequately pled any theory of liability against Defendant Deutsche Bank, this count eight claim for declaratory judgment is dismissed.

## I. Count Nine: Unethical, excessive and illegal fees

Plaintiff BFS's claim for unethical, excessive, and illegal fees against Defendants Deutsche Bank flounders. Plaintiff BFS cites no law broken, no code of conduct—at least one applicable to Deutsche Bank, abrogated, and no customary fee arrangement violated, to support these claims. As a result, these claims must also fail and count nine is dismissed.

## J. Count Ten: Civil Conspiracy

Plaintiff BFS's last claim for civil conspiracy against all defendants, including Defendant Deutsche Bank, fails as a matter of law. New York does not recognize civil conspiracy as a substantive tort. However, conspiracy may be pled for an actionable underlying tort in New York. *See* Empire State Building Assocs. v. Trump, 669 N.Y.S.2d 205 (App. Div. 1998); *see also* American Preferred Prescription, Inc. v. Health Management, Inc., 678 N.Y.S.2d 1, 3 (App. Div. 1998). Plaintiff BFS has not sufficiently pled an independent tort in any of the two-hundred-and-sixty-three paragraphs of its complaint. Therefore, no relief may be granted on Plaintiff BFS's civil conspiracy claim. Count ten for civil conspiracy is dismissed.

## III.    CONCLUSION

For all of the reasons stated herein, Plaintiff BFS's original complaint alleging ten counts of declaratory judgment and unjust enrichment; breach of contract/ breach of the

10

duty of good faith and fair dealing; breach of fiduciary duty; fraud; negligence; negligent misrepresentation; breach of contract; declaratory judgment; unethical, excessive and illegal fees; and civil conspiracy are all dismissed.

**HSC**

11

# EXHIBIT 16

1

2

3

4

5

6

7                    IN THE UNITED STATES DISTRICT COURT

8                      FOR THE DISTRICT OF OREGON

9

10   MICHAEL L. E. KING, et al.,    )
                                    )    No. 04-1029-HU
11                  Plaintiff,       )
                                    )
12        v.                        )
                                    )    FINDINGS AND RECOMMENDATION
13   DEUTSCHE BANK AG, et al.,       )
                                    )
14                  Defendants.      )
                                    )
15   _____)

16   John S. Stone
     Preston Bunnell & Stone
17   1100 S.W. Sixth Avenue, Suite 1405
     Portland, Oregon 97204
18
     David R. Deary
19   W. Ralph Canada
     Stewart Clancy
20   Jeven R. Sloan
     Deary Montgomery Defeo & Canada
21   2515 McKinney Avenue, Suite 1565
     Dallas, Texas 95201
22        Attorneys for plaintiffs

23   Keith Dubanevich
     Garvey Schubert Barer
24   121 S.W. Morrison Street, 11th floor
     Portland, Oregon 97204
25
     Seth C. Farber
26   Dewey Ballantine
     1301 Avenue of the Americas
27

28   FINDINGS AND RECOMMENDATION Page 1

1   New York, New York 10010
         Attorneys for defendants Deutsche Bank AG; Deutsche Bank
2        Securities, Inc., d/b/a Deutsche Bank Alex Brown, a division
         of Deutsche Bank Securities, Inc.; Craig Brubaker; David
3        Parse

4   Kerry J. Shepherd
    Markowitz, Herbold, Glade & Mehlhaf
5   1211 S.W. Fifth Avenue, Suite 3000
    Portland, Oregon 97204
6        Attorneys for defendants BDO Seidman LLP, Michael Kerekes,
         and Robert Greisman
7
    Peter C. Richter
8   Sarah Lowinger
    Miller Nash
9   111 S.W. Fifth Avenue, Suite 3400
    Portland, Oregon 97204
10       Attorneys for defendants
         Lincoln National Corporation, d/b/a Lincoln Financial Group;
11       Lincoln Financial Advisors Corporation; Michael Nelson;
         James Siegfried
12

13  HUBEL, Magistrate Judge:

14       This is an action by three groups of plaintiffs (the "King

15  plaintiffs," the "Mulholland plaintiffs," and the "Allen

16  plaintiffs") against four groups of defendants, investment advisors

17  and accountants (the "Deutsche Bank defendants," the "Lincoln

18  defendants," the "BDO defendants," and the "Brown defendants").

19  Plaintiffs assert claims under the Racketeering Influenced and

20  Corrupt Organization Act (RICO), 18 U.S.C. § 1965, breach of

21  fiduciary duty, fraud, breach of contract or breach of the duty of

22  good faith and fair dealing, negligent misrepresentation,

23  professional malpractice, declaratory judgment, unjust enrichment,

24  and civil conspiracy.

25       The court has previously ruled on the Deutsche defendants'

26  motion to arbitrate or stay claims (doc. # 37), the BDO defendants'

27

28  FINDINGS AND RECOMMENDATION Page 2

1   motion to arbitrate or stay claims (doc. # 43), the Lincoln
2   defendants' motion to dismiss (doc. # 53), and the BDO defendants'
3   motion to strike and to seal certain portions of plaintiffs' briefs
4   and supporting evidence (doc. # 63). The matter now before the
5   court is the Deutsche defendants' motion under Rule 12(b)(6) of the
6   Federal Rules of Civil Procedure to dismiss all or parts of the
7   claims asserted against them in plaintiffs' Amended Complaint (doc.
8   # 124).

9        The facts alleged and the claims asserted in the Amended
10  Complaint are discussed in the Findings and Recommendation filed on
11  March 9, 2005 (doc. # 107) and adopted by Judge Mosman on May 9,
12  2005. The Deutsche defendants move to dismiss the claims asserted
13  against them on the grounds that 1) the RICO claims are barred by
14  the Private Securities Litigation Reform Act (PSLRA) 2) the RICO
15  claim asserted under § 1962(c)(Claim One) fails to allege
16  adequately the standing and pattern requirements; 2) the RICO
17  conspiracy claim asserted under § 1962(d) (Claim Two) fails to
18  allege a substantive RICO claim under § 1962(c); 3) the RICO aiding
19  and abetting claim (Claim Three) cannot stand as a matter of law;
20  4) plaintiffs have failed to state cognizable state law claims; 5)
21  plaintiffs have failed to plead their fraud-based claims with the
22  degree of particularity required by Rule 9(b) of the Federal Rules
23  of Civil Procedure; and 6) to the extent that any of plaintiffs'
24  claims against the Deutsche defendants survive the motion, certain
25  of plaintiffs' damages claims fail as a matter of law.
26  ///
27
28  FINDINGS AND RECOMMENDATION Page 3

1

**Standard**

2     A motion under Rule 12(b)(6) should be granted only if "it

3 appears beyond doubt that the plaintiff can prove no set of facts

4 in support of his claim which would entitle him to relief." <u>Conley</u>

5 <u>v. Gibson</u>, 355 U.S. 41, 45-46 (1957); <u>Edwards v. Marin Park, Inc.</u>,

6 356 F.3d 1058, 1061 (9th Cir. 2004). When ruling on a Rule 12(b)(6)

7 motion, the complaint must be construed in the light most favorable

8 to the plaintiff. <u>Broam v. Bogan</u>, 320 F.3d 1023, 1028 (9th Cir.

9 2003). The court accepts as true all material allegations in the

10 complaint, as well as any reasonable inferences to be drawn from

11 them. <u>Id.</u>

12                                 **Discussion**

13 **A.    RICO Claims**

14     Claim One is for violation of 18 U.S.C. § 1962(c), which

15 provides that it

16        shall be unlawful for any person employed by or
         associated with any enterprise engaged in, or the
17        activities of which affect, interstate or foreign
         commerce, to conduct or participate, directly or
18        indirectly, in the conduct of such enterprise's affairs
         through a pattern of racketeering activity or collection
19        of an unlawful debt.

20     Claim Two is for violation of 18 U.S.C. § 1962(d) by

21 conspiring to violate 18 U.S.C. § 1962(c). Section 1962(d) provides

22 that it "shall be unlawful for any person to conspire to violate

23 any of the provisions of subsection (a) or (c) of this section."

24     Claim Three is a claim for violation of 18 U.S.C. § 2 by

25 "seeking to and aiding and abetting a scheme to violate 18 U.S.C.

26 § 1962(c).

27

28 FINDINGS AND RECOMMENDATION Page 4

1          **1.    Preemption by the PSLRA**

2          In 1995, RICO was amended by the PSLRA, to provide, "Any

3    person injured in his business or property by reason of a violation

4    of [RICO] may sue * * * except that no person may rely upon any

5    conduct that would have been actionable as fraud in the purchase or

6    sale of securities to establish a violation of [RICO]." 18 U.S.C.

7    § 1964(c).

8          The Deutsche defendants argue that the PSLRA precludes the

9    plaintiffs' RICO claims because 1) it was integral to the COBRA tax

10   shelter scheme to generate the desired tax losses through the

11   purchase and sale of securities; 2) plaintiffs have alleged that

12   they were deceived into believing the FX contracts involved the

13   purchase of securities in the form of exchange-traded foreign

14   currency option contracts; and 3) the COBRA tax shelter scheme

15   involved the issuance of securities in the form of S Corporation

16   shares. The court has previously ruled that the RICO claims of the

17   Allen plaintiffs against the Lincoln defendants are precluded by

18   the PSLRA.

19         The King plaintiffs allege that as part of the COBRA strategy,

20   M & M King Investment Partners purchased shares of Cisco Systems,

21   Inc. and Canadian Dollars and subsequently contributed these assets

22   to Michael L.E. King and Associates, Inc., an Oregon corporation in

23   which Michael King was the 100% shareholder, as a contribution to

24   capital. Amended Complaint, ¶¶ 94, 96. M & M King Investment

25   Partners was subsequently liquidated, and Michael L.E. King and

26   Associates sold all of the Cisco shares and the Canadian Dollars it

27

28   FINDINGS AND RECOMMENDATION Page 5

had received from M & M King Investment Partners. Id. at ¶ 97.

The Mulholland plaintiffs allege that the transaction into which they entered was "identical in form to the one entered into by the King Plaintiffs and differed only in the size of the various "trades" and the type of currency involved." Amended Complaint, ¶ 100.

Plaintiffs argue, as they have previously, that the purchase and sale of stock were not necessary to implementation of the COBRA strategy. As discussed in the March 9, 2005 Findings and Recommendation, even if the COBRA strategy could have been accomplished with the use of assets other than stock,[1] in this particular case, the purchase and sale of stock was an intrinsic part of the COBRA strategy. I conclude that the PSLRA bar applies to the RICO claims of the King and Mulholland plaintiffs, and

_____

[1] The Deutsche defendants' argument that the COBRA scheme involved securities because plaintiffs have alleged that they were deceived into believing the FX contracts were traded on a national securities exchange is unpersuasive. Plaintiffs alleged that the FX Contracts were "not something traded on any recognized exchange but were simply a matter of private contract between the participants. ... Plaintiffs were unaware of these aspects of the FX Contracts." Amended Complaint, ¶¶ 38, 92. I disagree with the defendants that this amounts to an affirmative statement that plaintiffs intended to purchase securities that did not in fact exist.

FINDINGS AND RECOMMENDATION Page 6

1  recommend that the motion to dismiss the RICO claims on this ground
2  be granted.
3        **2.    RICO Standing**
4        The Deutsche defendants assert that the plaintiffs' RICO
5  claims fail because plaintiffs cannot establish RICO standing.
6  Standing to assert a RICO claim requires an allegation that
7  defendants' conduct proximately caused plaintiffs' injuries and
8  that they suffered a concrete financial loss as a result. See
9  Holmes v. Sec. Inv. Prot. Corp., 503 U.S. 258, 268 (1992)(18 U.S.C.
10 § 1964(c)'s provision that "[a]ny person injured ... by reason of
11 a violation of [§ 1962] may sue therefor" means that in order to
12 prevail on a civil RICO claim, plaintiff must show that the
13 defendant's violation was the "proximate cause" of the plaintiff's
14 injury); see also Chaset v. Fleer/Skybox Int'l, LP, 300 F.3d 1083,
15 1086 (9th Cir. 2002).
16       The Deutsche defendants argue that because the predicate
17 offense alleged by the plaintiffs is mail fraud, the proximate
18 cause element requires a showing of reasonable reliance, citing
19 Bank of China v. NBM LLC, 359 F.3d 171, 176 (2d Cir. 2004), and
20 that the Mulholland and Allen plaintiffs cannot show such reliance
21 because the FX Contracts they executed included a letter agreement
22 confirming the terms of the investments entered into with Deutsche
23 Bank (the Confirmation), which expressly disclaims such reliance.
24       The Confirmation states:
25       Each party represents to the other party as of the date
         that it enters into this Transaction that ...
26       It is acting for its own account, and it has made its own
         independent decisions to enter into this Transaction and
27
28 FINDINGS AND RECOMMENDATION Page 7

1   as to whether the Transaction is appropriate or proper
    for it based upon its own judgment and upon advice from
2   such advisers as it has deemed necessary. It is not
    relying on any communication (written or oral) of the
3   other party ... as investment advice or as a
    recommendation to enter into this Transaction, it being
4   understood that information and explanations related to
    the terms and conditions of this Transaction shall not be
5   considered to be investment advice or a recommendation to
    enter into the Transaction. No communication (written or
6   oral) received from the other party shall be deemed to be
    an assurance or guarantee as to the expected results of
7   this Transaction.

8   Dubanevich Declaration, Exhibit 4, ¶ 3(iii); Dubanevich Reply

9   Declaration, Exhibit 1, ¶ 3(iii). Defendants argue that given this

10  representation, the Mulholland plaintiffs cannot, as a matter of

11  law, have reasonably relied upon any representations or omissions

12  by the Deutsche defendants and, thus, cannot demonstrate the

13  causation necessary for RICO standing.

14      Plaintiffs counter that when mail or wire fraud is the

15  predicate act for a RICO violation, the mailing or use of the wires

16  need only be incident to the underlying scheme, not essential to

17  it, and that the mailing or use of the wires need not contain any

18  misrepresentations, citing United States v. Shipsey, 363 F.3d 962,

19  971 (9th Cir. 2004).

20      In Bank of China, the court stated the established rule in the

21  Second Circuit that where mail fraud was the predicate act for a

22  civil RICO claim, the proximate cause element articulated in Holmes

23  required the plaintiff to show "reasonable reliance." 359 F.3d at

24  176. The court noted that the same rule applied in other

25  jurisdictions, including the Fifth, Eighth, and Fourth Circuits.

26  Id.

27

28  FINDINGS AND RECOMMENDATION Page 8

1    The Deutsche defendants have not cited a Court of Appeals case
2    from the Ninth Circuit which so holds. They do cite a district
3    court ruling from Washington, Swartz v. KPMG, 2004 U.S. Dist. LEXIS
4    22757 (W.D. Wash. 2004), a case involving a similar tax avoidance
5    strategy, in which the court held that an essential element of a
6    predicate wire fraud claim is proof of reasonable reliance on
7    allegedly fraudulent statements. The Swartz court relied on cases
8    from the Second, Fifth and Eleventh Circuits and on Martin v.
9    Dahlberg, Inc., 156 F.R.D. 207, 215 (N.D. Cal. 1994).

10    This court has previously ruled that the Allen plaintiffs'
11    RICO claims are precluded by the PSLRA. The RICO claims of the King
12    and Mulholland plaintiffs are based on the same allegations. I find
13    it unnecessary, therefore, to consider whether plaintiffs' RICO
14    claims should also be dismissed for failure to allege RICO
15    standing, in the absence of authority from the Court of Appeals. I
16    recommend that the motion to dismiss on this ground be denied as
17    moot. If, upon review, the court rejects my recommendation that the
18    RICO claims of the King and Mulholland plaintiffs be dismissed as
19    precluded by the PSLRA, I recommend that the question of whether
20    the plaintiffs have alleged RICO standing be considered by the
21    reviewing court or remanded to me for consideration.

22    **3.    Pattern of Racketeering Activity**

23    The Deutsche defendants contend that the Amended Complaint
24    fails to allege a pattern of racketeering activity under 18 U.S.C.
25    § 1962, because the plaintiffs have failed to allege that the
26    "racketeering predicates are related, and that they amount to or
27
28    FINDINGS AND RECOMMENDATION Page 9

1   pose a threat of continued criminal activity." <u>H.J. Inc. v.</u>

2   <u>Northwestern Bell Tel. Co.</u>, 492 U.S. 229, 239 (1989). In <u>H.J.</u>, the

3   Supreme Court held that continuity can be demonstrated by proving

4   either "a series of related predicates extending over a substantial

5   period of time" or "past conduct that by its nature projects into

6   the future with a threat of repetition." <u>Id.</u> at 241-42; see also

7   <u>Religious Technology Center v. Wollersheim</u>, 971 F.2d 364, 366 (9th

8   Cir. 1992).

9       The Deutsche defendants contend that the plaintiffs have

10  failed to establish the continuity requirement because they have

11  pleaded neither open-ended continuity, by pleading predicate acts

12  that "specifically threaten repetition or that become a regular way

13  of doing business," <u>Howard v. AOL, Inc.</u>, 208 F.3d 741, 750 (9th Cir.

14  2000) nor closed-ended continuity, by alleging a series of related

15  predicates extending over a substantial period of time.

16      They allege that the Amended Complaint fails to allege open-

17  ended continuity because none of the alleged predicate acts

18  threatens to recur. See <u>H.J., Inc.</u>, 492 U.S. at 241-42 and <u>Howard</u>,

19  208 F.3d at 750. Defendants point to allegations in the Amended

20  Complaint that the IRS invalidated the COBRA strategy retroactively

21  to before the date of Plaintiffs' transactions, so that there was

22  no realistic possibility that the alleged conduct would recur. See,

23  e.g., Amended Complaint ¶¶ 104 (IRS issues IRS Notice 1999-59 on

24  December 27, 1999), 106 (IRS issues Notice 2000-44 in August 2000);

25  136 (in June 2003, IRS formalizes its position regarding the COBRA

26  strategy and other 2000-44 transactions by issuing new regulations

27

28  FINDINGS AND RECOMMENDATION Page 10

1  retroactive to October 18, 1999).

2      Plaintiffs have not addressed the Deutsche defendants'
3  arguments with respect to open-ended continuity. I agree with the
4  Deutsche defendants' contention that plaintiffs have failed to
5  allege open-ended continuity because they have alleged that the IRS
6  had already invalidated the COBRA strategy before the date of
7  Plaintiffs' transactions, so that there was no realistic
8  possibility that the alleged conduct would recur.

9      The Deutsche defendants contend that according to the Amended
10 Complaint, Deutsche Bank's alleged activities occurred between the
11 summer of 1999 and December 2000, and apparently lasted no more
12 than one year for each group of plaintiffs. See, e.g., Amended
13 Complaint, ¶¶ 101 (in approximately October 1999, the Allen
14 plaintiffs agreed to engage in the COBRA strategy); 170F (facsimile
15 dated October 20, 1999, from Mr. Allen to Deutsche defendant Parse,
16 attaching letters authorizing the wire transfer of funds); 64-65
17 (in the summer of 2000, or "shortly thereafter," King met with
18 Brubaker of Deutsche); 85-86 ("In approximately August September
19 2000, the King Plaintiffs agreed to engage in the COBRA strategy";
20 in October 2000, King plaintiffs formed the entities for the
21 purpose of carrying out the COBRA strategy; 170B (letter dated
22 October 11, 2000 sent from Deutsche to Michael King enclosing new
23 account forms); 89 (on or about November 10, 2000, King plaintiffs
24 entered into FX contract with Deutsche Bank); 93-97 (between
25 November 13, 2000 and December 26, 2000, King plaintiffs went
26 through remaining steps of COBRA strategy); 69 (at unspecified

27

28 FINDINGS AND RECOMMENDATION Page 11

1    time, Mulholland plaintiffs were referred to Deutsche defendant

2    Judd, who sold the strategy to them over the phone); 98 (in

3    approximately November 2000, the Mulholland plaintiffs agreed to

4    engage in the COBRA strategy); 170D (email dated April 10, 2001

5    from Deutsche employee on behalf of Judd, to Mulholland regarding

6    fees relating to the COBRA strategy).

7        The Deutsche defendants assert that these allegations fail to

8    establish a period long enough to constitute closed-ended

9    continuity, citing <u>Religious Technology Center</u>, 971 F.2d at 966-67

10   (predicate acts extending over six months at most did not satisfy

11   continuity requirement, citing Supreme Court's holding in <u>H.J.,</u>

12   <u>Inc.</u> that predicate acts extending over a few weeks or months and

13   threatening no future criminal conduct do not satisfy the

14   continuity requirement; court noting that it had found "no case in

15   which a court has held the requirement to be satisfied by a pattern

16   of activity lasting less than a year."); <u>Symantec Corp. v. DC</u>

17   <u>Micro, Inc.</u>, 2002 WL 31112178 at *2 (D. Or. 2002)(same).

18       Plaintiffs argue that they have alleged closed-ended

19   continuity because the Amended Complaint alleges a time period

20   from January 1999 to December 2003. See Amended Complaint, ¶ 165

21   ("The predicate acts of mail and wire fraud began at least as early

22   as January 1999 and continued until at least December 2003.")

23   However, the court is not required to accept as true legal

24   conclusions that are cast in the form of factual allegations,

25   <u>Warren v. Fox Family Worldwide, Inc.</u>, 328 F.3d 1136, 1139 (9th Cir.

26   2003) and conclusory allegations of law and unwarranted inferences

27

28   FINDINGS AND RECOMMENDATION Page 12

1   are insufficient to defeat a motion to dismiss. <u>Associated Gen.</u>
2   <u>Contractors v. Metropolitan Water Dist. of S. California</u>, 159 F.3d
3   1178, 1181 (9th Cir. 1998).

4       The acts specifically alleged against the Deutsche defendants
5   comprise the period between October 1999 and November 2000, a
6   period of, at most, 14 months. This is sufficient to allege closed-
7   ended continuity, under <u>Allwaste, Inc. v. Hecht</u>, 65 F.3d 1523 (9th
8   Cir. 1995). In <u>Allwaste</u>, the court acknowledged that it had decided
9   no case in which the continuity requirement was satisfied by a
10  pattern of activity lasting less than a year, but cautioned against
11  a "hard and fast, bright line, one-year rule." 65 F.3d at 1528. The
12  court noted that although Allwaste's original complaint failed to
13  specify the dates of the first and last alleged predicate acts, it
14  had maintained at oral argument that it could show acts occurring
15  over a period of as much as 13 months. <u>Id.</u> The court held that such
16  a showing would demonstrate that the criminal activity spanned a
17  "substantial period of time," and would therefore satisfy the
18  continuity requirement. I conclude, therefore, that under <u>Allwaste</u>,
19  plaintiffs have sufficiently alleged closed-ended continuity.

20      Because of my recommendation that the court apply to the King
21  and Mulholland plaintiffs its previous ruling that the Allen
22  plaintiffs' RICO claims are foreclosed by the PSLRA, it may be
23  unnecessary for the reviewing court to consider whether plaintiffs
24  have pleaded the continuity requirement, so that the motion to
25  dismiss on this ground should be denied as moot. If, upon review,
26  the court rejects my recommendation that the RICO claims of the
27
28  FINDINGS AND RECOMMENDATION Page 13

1  King and Mulholland plaintiffs be dismissed on the grounds of

2  PSLRA, I recommend that the motion to dismiss on the basis of a

3  failure to plead the continuity requirement be denied.

4                    **4.    RICO Conspiracy Claim**

5       The Deutsche defendants assert that Claim Two must be

6  dismissed because plaintiffs' failure to allege the requisite

7  substantive elements of a RICO claim under § 1962 (c) necessarily

8  requires dismissal of a claim under § 1962(d). They rely on <u>Turner</u>

9  <u>v. Cook</u>, 362 F.3d 1219, 1231 n. 17 (9th Cir. 2004):

10       Because appellants failed to allege the requisite
         substantive elements of a RICO claim under 18 U.S.C. §
11       1962(c), appellants' claim under 18 U.S.C. § 1962(d),
         which makes it "unlawful for any person to conspire to
12       violate any of the provisions of subsections (a), (b), or
         (c) of this section," also fails.
13
     They also rely on <u>Religious Technology Center</u>, 971 F.2d at 367 n.
14
     8 (where plaintiff has failed to allege requisite substantive
15
     elements of RICO, conspiracy cause of action cannot stand).
16
17       The plaintiffs argue that a RICO conspiracy defendant need not

18  himself commit or agree to commit predicate acts, citing <u>Salinas v.</u>

    <u>United States</u>, 522 U.S. 52, 65 (1997). In <u>Salinas</u>, 522 U.S. at 65,
19
    the Supreme Court held that a violation of § 1962(c) was not a
20
    prerequisite to a violation of § 1962(d).
21
22       However, the Deutsche defendants point out that in <u>Beck v.</u>

    <u>Prupis</u>, 529 U.S. 494, 506 n. 10 (2000), the Supreme Court declined
23
    to resolve whether its holding in <u>Salinas</u>, a criminal RICO case,
24
    extended to a civil RICO case:
25
         Respondents argue that a § 1962(d) claim must be
26       predicated on an *actionable* violation of §§ 1962(a)-(c).
         However, the merit of this view is a different (albeit
27

28  FINDINGS AND RECOMMENDATION Page 14

1    related) issue from the one on which we granted
2    certiorari, namely, whether a plaintiff can bring a §
     1962 claim for injury flowing from an overt act that is
3    not an act of racketeering. Therefore, contrary to
     Justice STEVENS' suggestion, see *post*, at 1619-20, we do
4    not resolve whether a plaintiff suing under § 1964(c) for
     a RICO conspiracy must allege an actionable violation
5    under §§ 1962 (a)-(c), or whether it is sufficient for
     the plaintiff to allege an agreement to complete a
6    substantive violation and the commission of at least one
     act of racketeering that caused him injury.

7    The Deutsche defendants argue that the issue has been resolved in

8    the Ninth Circuit by <u>Turner</u> and <u>Religious Technology Center</u>. I

9    agree that the court is bound by this authority. Accordingly, I

10   recommend that Claim Two be dismissed with leave to replead, if my

11   recommendation that Claim Two be dismissed as barred under PSLRA is

12   not adopted, and if plaintiffs are given leave to replead Claim

13   One.

14          **5.   Aiding and Abetting**

15          The Deutsche defendants assert that Claim Three must be

16   dismissed because there is no private cause of action for aiding

17   and abetting a RICO violation. In the March 9, 2005 Findings and

18   Recommendation adopted by Judge Mosman, the court so held, on the

19   basis of <u>Central Bank of Denver v. First Interstate Bank of Denver</u>,

20   511 U.S. 164,182 (1994), in which the Supreme Court held that

21   liability for aiding and abetting would not be read into a statute.

22   Although <u>Central Bank</u> was a § 10(b) securities fraud case, the

23   court applied its holding to RICO claims.

24          If my recommendation that Claim Three be dismissed as

25   foreclosed by the PSLRA is not adopted, I recommend that Claim

26   Three be dismissed with prejudice on this ground.

27

28   FINDINGS AND RECOMMENDATION Page 15

1    **B.    Common Law Claims**

2        **1.    Unjust Enrichment**

3        The Deutsche defendants assert that the Amended Complaint

4    fails to state a claim for the equitable remedy of unjust

5    enrichment because a valid contract existed between the plaintiffs

6    and Deutsche Bank. Unjust enrichment is an equitable rather than a

7    legal claim; consequently, no action for unjust enrichment lies

8    where a contract governs the parties' relationship. McKesson HBOC

9    v. New York State Common Retirement Fund, Inc., 339 F.3d 1087, 1091

10   (9th Cir. 2003).

11       Plaintiffs respond by asking the court to declare that the FX

12   Contracts were invalid for lack of consideration, because Deutsche

13   Bank had unlimited discretion to determine whether the FX Contracts

14   would pay out, and therefore had the sole ability to determine

15   whether it was required to perform under the contract.

16       In reply, the Deutsche defendants contend that under New York

17   law,[2] even "unbridled discretion" is not fatal to enforcement of an

18

19

20       [2] The Deutsche defendants assert that New York law applies

21   to this claim because the Account Agreements contain New York

22   choice of law clauses. The plaintiffs do not concede that New

23   York law governs, arguing that contractual choice of law

24   provisions do not govern tort claims. See, e.g., Sutter Home

25   Winery, Inc. v. Vintage Selections, Ltd., 971 F.2d 401, 407-08

26   (9th Cir. 1992). However, the parties' contractual agreement to

27   application of New York law would govern the question of whether

28   FINDINGS AND RECOMMENDATION Page 16

1    agreement. Lee v. Joseph E. Seagram & Sons, Inc., 552 F.2d 447, 454

2    (2d Cir. 1977). Rather than invalidate the contract, the court

3    analyzes such discretion under the duty of good faith. Id.; see

4    also Paper Corp. of U.S. v. Schoeller Technical Papers, Inc., 807

5    F. Supp. 337, 346 (S.D.N.Y. 1992). The Deutsche defendants argue

6    that, in addition, the amounts received by the Deutsche defendants,

7    the premiums, were provided for in the FX Contracts, and therefore

8    cannot be recovered on an unjust enrichment theory.

9        The Deutsche defendants contend that if the discretion

10   provided for in the contract is analyzed under a contractual good

11   faith theory, the claim must fail because plaintiffs can point to

12   no contractual right of which plaintiffs were deprived as a result

13   of the Deutsche defendants' conduct. Agency Dev., Inc. v.

14   Medamerica Ins. Co. of New York, 327 F. Supp.2d 199, 203 (W.D.N.Y.

15   2004)(covenant of good faith and fair dealing prohibits a party

16   from engaging in conduct that "will have the effect of destroying

17   or injuring the rights of the other party to receive the benefit of

18   the contract."); Jaffe v. Paramount Communications, Inc., 644

19   N.Y.S.2d 43, 47-48 (N.Y. App. Div. 1996)(failure to allege facts

20   demonstrating that defendants deprived plaintiff of any rights he

21   possessed under agreement was fatal to claim for breach of covenant

22   of good faith and fair dealing); Sutton Associates v. Lexis-Nexis,

23   761 N.Y.S.2d 800, 804 (N.Y. Sup. Ct. 2003)(complaint failed to

24   identify any specific contractual provision actually breached).

25       And finally, the Deutsche defendants assert that plaintiffs

26   _____

27   the agreement was a valid contract.

28   FINDINGS AND RECOMMENDATION Page 17

1    cannot ground a claim for breach of the implied covenant of good
2    faith and fair dealing on allegations that Deutsche Bank had
3    discretion with respect to the spot rates, because that discretion
4    was explicitly disclosed in the contract itself and plaintiffs have
5    not alleged that Deutsche Bank acted arbitrarily or irrationally in
6    exercising that discretion. See State St. Bank & Trust Co. v.
7    Inversiones Errazuriz Limitada, 374 F.3d 158, 169 (2d Cir.
8    2004)(where contract contemplates exercise of discretion, covenant
9    of good faith and fair dealing includes promise not to act
10   arbitrarily or irrationally in exercising that discretion).

11        Plaintiffs counter that they have alleged, in ¶ 44 of the
12   Amended Complaint, that the Deutsche defendants breached the
13   covenant of good faith and fair dealing in their contracts with the
14   plaintiffs by 1) failing to disclose the true likelihood that the
15   FX contracts would pay out; 2) failing to disclose that the
16   Deutsche defendants retained unlimited discretion to determine
17   whether the FX contracts would pay out; 3) failing to apprise
18   plaintiffs that the FX contracts had no reasonable possibility of
19   a profit, or at least not in excess of the fees paid; and 4)
20   failing to disclose that the COBRA strategy had been devised by
21   Jenkens and, in some instances, affirmatively stating that COBRA
22   was Deutsche Bank's own proprietary strategy.

23        In reply, the Deutsche defendants argue that ¶ 44 of the
24   Amended Complaint contains no factual allegations supporting the
25   conclusion that the transactions would almost certainly be
26   unprofitable for plaintiffs. Moreover, they argue, even assuming
27
28   FINDINGS AND RECOMMENDATION Page 18

1  for purposes of the present motion that there had been failures to
2  disclose of the type plaintiffs assert, plaintiffs point to no
3  contractual obligations in the FX contracts that such purported
4  failures to disclose allegedly breached.

5      I agree that plaintiffs have failed to state a claim for
6  unjust enrichment because their relationship with the Deutsche
7  defendants was contractual. I further conclude that, because the
8  agreements between the plaintiffs and Deutsche Bank explicitly
9  granted Deutsche Bank unfettered discretion in selecting the spot
10 rates, the agreements between them cannot be invalidated on the
11 basis of that discretion. Absent any allegation that Deutsche Bank
12 exercised its discretion in an arbitrary or irrational manner,
13 plaintiffs have not stated a claim for breach of the implied
14 covenant of good faith and fair dealing. I recommend that
15 plaintiffs' claim for unjust enrichment be dismissed with leave to
16 replead.

17         **2.**   **Breach of Fiduciary Duty**

18     Plaintiffs and the Deutsche defendants have cited both New
19 York and Oregon law in support of their arguments on the various
20 tort claims.  However, as discussed above, contractual choice of
21 law provisions do not ordinarily control claims arising in tort;
22 rather, the tort claims are decided according to the law of the
23 forum state. Sutter Home, 971 F.2d at 407; see also Consolidated
24 Data Terminals v. Applied Digital Data Systems, 708 F.2d 385, 390
25 n. 3 (9th Cir. 1983). Accordingly, the court will apply Oregon law
26 to the remaining common-law tort claims.

27

28 FINDINGS AND RECOMMENDATION Page 19

1    The Deutsche defendants move against plaintiffs' claim for

2 breach of fiduciary duty on the ground that there was no fiduciary

3 relationship between them. They argue that although the Amended

4 Complaint alleges, "Defendants, as the Plaintiffs' attorneys,

5 accountants, and advisors, were Plaintiffs' fiduciaries ..." ¶ 222,

6 the Amended Complaint does not allege that Deutsche Bank itself

7 acted as attorney, accountant or advisor to plaintiffs.

8    With respect to the Mulholland and Allen plaintiffs, the

9 Deutsche defendants argue that the Confirmation explicitly states

10 that the Deutsche defendants were not "acting as a fiduciary for or

11 advisor to [Plaintiffs] in respect of this Transaction." Dubanevich

12 Declaration, Exhibit 4.

13    Plaintiffs counter that the relationship between plaintiffs

14 and the Deutsche defendants was not merely an arms-length

15 commercial transaction because they have alleged that Parse and

16 other employees of Deutsche Bank were instrumental in developing

17 and designing the COBRA transaction for use as a tax strategy,

18 Amended Complaint, ¶ ¶ 35, 38, 39, 65, 69, and advising plaintiffs

19 on the consequences of the COBRA transaction. Id. at ¶¶ 65, 66, 68,

20 69, 224.

21    Under Oregon law, no fiduciary duties are implied unless the

22 parties are in a "special relationship." Bennett v. Farmers Ins.

23 Co. of Oregon, 332 Or. 138 (2001). A special relationship arises

24 when

25        the party who is owed the duty effectively has authorized
          the party who owes the duty to exercise independent
26        judgment in the former party's behalf and in the former
          party's interests. In doing so, the party who is owed the
27

28 FINDINGS AND RECOMMENDATION Page 20

duty is placed in a position of reliance upon the party
who owes the duty; that is, because the former has given
responsibility and control over the situation at issue to
the latter, the former has a right to rely on the latter
to achieve a desired outcome or resolution.

Conway v. Pacific University, 324 Or. 231, 240 (1996); see also

Bird v. Lewis & Clark College, 303 F.3d 1015, 1023 (9th Cir.

2002)(citing Conway). A special relationship is defined, not by its

name, but by the roles assumed by the parties. Bird, 303 F.3d at

1023, citing Strader v. Grange Mut. Ins. Co., 179 Or. App. 329

(2002).

The disclaimer in the Confirmation signed by the Allen and

Mulholland plaintiffs requires dismissal of the breach of fiduciary

duty claim asserted by them. See Steckman v. Hart Brewing, Inc.,

143 F.3d 1293, 1295-96 (9th Cir. 1998)(on a motion to dismiss, court

is not required to accept as true conclusory allegations which are

contradicted by documents referred to in the complaint).

Aside from the disclaimer, although paragraph 222 of the

Amended Complaint alleges that "defendants" were plaintiffs'

"attorneys, accountants, and advisors," the factual allegations of

the Amended Complaint do not bear out this conclusion. See Holden

v. Hagopian, 978 F.2d 1115, 1121 (9th Cir. 1992)(on a motion to

dismiss, court examines whether conclusory allegations follow from

the description of facts as alleged by the plaintiff). It is not

alleged that the Deutsche defendants were plaintiffs' attorneys or

accountants. This leaves only a possible role as "advisors." But

there are no allegations from which it could reasonably be inferred

that the Deutsche defendants exercised independent judgment on the

FINDINGS AND RECOMMENDATION Page 21

1  plaintiffs' behalf or took care of the plaintiffs' affairs in any

2  way. Paragraph 65 of the Amended Complaint merely alleges that Mr.

3  King was placed in contact with Brubaker of Deutsche Bank.

4  Paragraph 66 alleges that "[b]ased on the representations and

5  assurances of Brown [the King plaintiffs' "long-time accountant,"

6  according to ¶ 62 of the Amended Complaint], Brubaker [a Deutsche

7  defendant] and Mayer [a lawyer at Jenkens & Gilchrest, according to

8  ¶ 63 of the Amended Complaint], the King Plaintiffs agreed to

9  engage in the COBRA strategy." The King plaintiffs' decision to

10 engage in the COBRA strategy based on the alleged "representations

11 and assurances" of their long-time accountant, a lawyer, and a

12 Deutsche defendant does not establish that the Deutsche defendant

13 had a special relationship with the King plaintiffs.

14     The allegations pertaining to the Mulholland and Allen

15 plaintiffs are even less substantive. Plaintiffs allege that

16 Deutsche defendant Judd "sold" the strategy to the Mulholland

17 plaintiffs over the phone. Amended Complaint ¶ 69, and that

18 "[b]ased on the representations and assurances of Mount [the

19 Mulholland plaintiffs' long-time accountant, according to ¶ 67 of

20 the Amended Complaint] and Judd, the Mulholland plaintiffs agreed

21 to engage in the COBRA strategy." Amended Complaint, ¶ 70. The

22 Mulholland plaintiffs allege that their decision to engage in the

23 COBRA strategy was "based in large measure upon the Defendants'

24 advice ... and the representations and recommendations of the

25 Defendants during the initial COBRA Strategy presentation and

26 thereafter." Amended Complaint ¶ 98. They allege further that the

27

28 FINDINGS AND RECOMMENDATION Page 22

1  "Defendants instructed, advised, and orchestrate the formation of
2  [the COBRA strategy entities]." Amended Complaint ¶ 99.

3      The Allen plaintiffs allege that the COBRA strategy was
4  presented to them by Nelson, Siegfried and Kerekes, none of whom is
5  a Deutsche defendant, and that they agreed to engage in the COBRA
6  strategy based on the "representations and assurances" of those
7  three individuals. Amended Complaint, ¶¶ 72-74.

8      Paragraph 224 of the Amended Complaint enumerates separate
9  breaches of fiduciary duty, but none is specific to the Deutsche
10 defendants.

11     I conclude that the plaintiffs have not pleaded the existence
12 of a special relationship with the Deutsche defendants and, insofar
13 as the Mulholland and Allen plaintiffs are concerned, such a
14 relationship is contradicted by the terms of the Confirmation. I
15 recommend that all the plaintiffs' claims for breach of fiduciary
16 duty against the Deutsche defendants be dismissed, with leave to
17 replead.

18      3.  **Fraud**

19     The Deutsche defendants assert that the Mulholland and Allen
20 plaintiffs cannot assert a claim for fraud because of their
21 representations in the Confirmation that they were "not relying on
22 any communication (written or oral) of [Deutsche Bank] including
23 any affiliate or subsidiary thereof as investment advice or as a
24 recommendation to enter into [the] Transaction." They assert
25 further that none of the plaintiffs has alleged, with the
26 particularity required by Rule 9(b) of the Federal Rules of Civil
27
28 FINDINGS AND RECOMMENDATION Page 23

1  Procedure, any material misrepresentation or omission by the

2  Deutsche defendants.

3      The elements of a cause of action for fraud under Oregon law

4  are 1) that the defendants falsely represented a material fact; 2)

5  that the misrepresentation was knowingly made, or made with an

6  insufficient basis for asserting its truth (scienter); 3) that the

7  misrepresentation was made with the intent to induce plaintiff to

8  act or refrain from acting; 4) that plaintiff justifiably relied on

9  defendants' misrepresentation; and 5) that plaintiff suffered

10 resultant damage. In re Harris Pine Mills, 44 F.3d 1431 (9th Cir.

11 1995); see also Riley Hill General Contractor v. Tandy Corp., 303

12 Or. 390, 405 (1987). The Confirmations directly contradict the

13 Mulholland and Allen plaintiffs' allegations of reliance on

14 statements or advice made by the Deutsche defendants. The court is

15 not required to accept as true conclusory allegations which are

16 contradicted by documents referred to in the complaint. Steckman,

17 143 F.3d at 1295-96).

18     Rule 9(b) requires that fraud be alleged with particularity.

19 Mere conclusory allegations of fraud are insufficient; although the

20 complaint need not allege, in detail, all facts supporting each and

21 every allegation, it must be specific. See United States ex rel.

22 Lee v. Smithkline Beecham, Inc., 245 F.3d 1048, 1051-52 (9th Cir.

23 2001). Rule 9(b) requires the identification of the circumstances

24 constituting fraud, Walling v. Beverly Enterprises, 476 F.2d 393,

25 397 (9th Cir. 1973); this means the plaintiff must state the time

26 and specific content or nature of the fraudulent misrepresentations

27

28 FINDINGS AND RECOMMENDATION Page 24

1  or omissions, <u>Misc. Service Workers, Etc. v. Philco-Ford Corp.</u>, 661

2  F.2d 776, 782 (9th Cir. 1981), and the identities of the parties to

3  it. <u>Riley v. Brazeau</u>, 612 F. Supp. 674, 677 (D. Or. 1985). In a

4  case involving multiple defendants, plaintiff must specify the role

5  of each defendant in the fraud. <u>Id.</u>

6      Plaintiffs contend that they have alleged the Deutsche

7  defendants falsely represented that 1) the COBRA strategy was a

8  legitimate tax saving strategy, Amended Complaint ¶¶ 84, 129;  2)

9  the opinion letter was from an "independent" law firm, Amended

10 Complaint, ¶ 56, 61, 64, 69, and 73; 3) through the partnership

11 formed to engage in the COBRA strategy, it was possible to create

12 capital losses to offset expected capital gain and income, Amended

13 Complaint ¶ 77; and 4) the losses created by the COBRA strategy

14 were legitimate and legal, Amended Complaint ¶ 84, 129.

15     They contend that the Deutsche defendants also made the

16 following omissions of fact: 1) the significance of the IRS

17 notices, Amended Complaint ¶¶ 104, 109, 110, 112; 2) the existence

18 of the IRS Amnesty program, Amended Complaint ¶ 164; 3) the true

19 likelihood that the FX Contracts would pay out; 4) that Defendants

20 retained unlimited discretion to determine whether the FX Contracts

21 would pay out; 5) that the FX Contracts had no reasonable

22 possibility of a profit; and 6) that COBRA was a Jenkins strategy,

23 Amended Complaint ¶ 44.

24     However, none of these cited allegations contains the

25 requisite specificity of dates or identity of parties, as required

26 by Rule 9(b). Paragraphs 84, 129, 56, 61, 77, 84, 129, 104, 109,

27

28 FINDINGS AND RECOMMENDATION Page 25

110, 112, 164, and 44 refer to "the defendants," without specifying which defendant or defendants made the misrepresentations or omitted the material facts, see Newman v. Comprehensive Care Corp., 794 F. Supp. 1513, 1527 (D. Or. 1992)[generic references to "defendants" fail to reach the level of particularity required by Rule 9(b)], and contain no indication as to the date or time the misrepresentation or omission occurred. Paragraph 64 does not identify the party making some of the misrepresentations; other misrepresentations are attributed to Brown and Mayer, who are not Deutsche defendants. Paragraph 69 refers to statements allegedly made by Judd, a Deutsche defendant, but does not identify the time the statement was made; other statements alleged in that paragraph are not attributed to anyone ("The Mulholland plaintiffs were also told ..."). Paragraph 73 refers to statements made by Kerekes, Nelson and Siegfried, who are not Deutsche defendants.

Plaintiffs have not pleaded their fraud claims with the specificity required by Rule 9(b), and the disclaimer of reliance in the Confirmations signed by the Mulholland and Allen plaintiffs specifically contradict one of the elements of fraud. I recommend that the fraud claims be dismissed with leave to replead.

### 4. Negligent Misrepresentation and Professional Malpractice

To state a claim for professional negligence, or malpractice, the plaintiff must allege and prove 1) a duty that runs from the defendant to the plaintiff; 2) breach of that duty; 3) resulting harm measurable in damages; and 4) causation. Varner v. Eves, 164 Or. App. 66, 73 (1999).

FINDINGS AND RECOMMENDATION Page 26

1    The tort of negligent misrepresentation requires that one
2  party in a relationship owe a duty "beyond the common law duty to
3  exercise reasonable care to prevent foreseeable harm to the other
4  party." <u>Conway</u>, 324 Or. at 236. However, the law does not imply a
5  tort duty "simply because one party to a business relationship
6  begins to dominate and to control the other party's financial
7  future;" rather, a duty is imposed "only when that relationship is
8  of the type that, by its nature, allows one party to exercise
9  judgment on the other party's behalf." <u>Bennett</u>, 332 Or. at 161-62.
10    As discussed above and in the Findings and Recommendation of
11 March 9, 2005, plaintiffs have not pleaded the existence of a
12 special relationship between the plaintiffs and the Deutsche
13 defendants.  They have not alleged that the Deutsche defendants
14 exercised independent judgment with respect to the COBRA strategy,
15 or that the plaintiffs relinquished control over the COBRA strategy
16 to the Deutsche defendants.
17    I therefore recommend that the claims for professional
18 malpractice and negligent misrepresentation be dismissed with leave
19 to replead.
20      **5.  Civil Conspiracy**
21    The Deutsche defendants move to dismiss the civil conspiracy
22 claim on the ground that such a claim is not permitted under New
23 York law. However, New York law is not applicable to this claim.
24    Under Oregon law, a civil conspiracy is a "combination of two
25 or more persons by concerted action to accomplish an unlawful
26 purpose, or to accomplish some purpose not in itself unlawful by
27
28 FINDINGS AND RECOMMENDATION Page 27

1  unlawful means," so that to plead a claim for civil conspiracy, the

2  plaintiff must allege facts showing 1) two or more persons; 2) an

3  object to be accomplished; 3) a meeting of minds on the object or

4  course of action; 4) one or more unlawful overt acts; and 5)

5  damages as the proximate result thereof. Bonds v. Landers, 279 Or.

6  169, 174 (1977).[3]

7      Plaintiffs argue that they have properly pleaded a civil

8  conspiracy to commit fraud. They rely on their allegations at ¶¶

9  256-257 and 260 of the Amended Complaint:

10      [T]he Defendants acted with full knowledge and awareness
       that the transaction was designed to give the false
11      impression that a complex series of financial
       transactions were legitimate business transactions which
12      had economic substance from an investment standpoint,
       when they in fact lacked these features ... [and they did
13      so] all for the purposes of obtaining professional fees
       from consumers, including the Plaintiffs.

14
15      Plaintiffs also rely on their allegation that the defendants

16  "conspired to devise and promote the ... Strategy" and "[t]he

17  receipt of fees ... was the primary ... motive in the development

18  and execution of the transaction." Amended Complaint ¶ 127.

19      I conclude that these allegations are insufficient. As the

20  court held previously in the March 9, 2005 Findings and

21  _____

22      [3] Oregon law does not conflict with federal common law on

23  civil conspiracy. See, e.g., Gilbrook v. City of Westminster, 177

24  F.3d 839, 856 (9th Cir. 1999)(civil conspiracy is a combination

25  of two or more persons who, by some concerted action, intend to

26  accomplish some unlawful objective for the purpose of harming

27  another, and which results in damage).

28  FINDINGS AND RECOMMENDATION Page 28

1  Recommendation, plaintiffs' general allegations against
2  "defendants," as discussed above, do not suffice to plead the
3  necessary element of intent, or a "meeting of minds on the object
4  or course of action." See <u>Lawver v. Lawvor</u>, 86 Or. App. 721, 726
5  (1987)(plaintiffs who "merely plead in a vague and conclusory
6  manner that the named persons 'have conspired with and among each
7  other' to achieve the allegedly fraudulent objectives" fail to
8  plead a claim for civil conspiracy) and <u>Yanney v. Koehler</u>, 147 Or.
9  App. 269 (1997)(plaintiffs failed to plead the meeting of the minds
10 element because the allegations were vague and conclusory). I
11 recommend, therefore, that the civil conspiracy claim be dismissed
12 with leave to replead.
13 ///
14          **6.   Declaratory Judgment Claim**
15      The Deutsche defendants move for dismissal of the declaratory
16 judgment claim because plaintiffs have pleaded insufficient facts
17 in support of their underlying claims. This is the ground upon
18 which the court dismissed the declaratory judgment claim asserted
19 against the Lincoln defendants in the March 9, 2005 Findings and
20 Recommendation. I agree with the Deutsche defendants that dismissal
21 of this claim is warranted, for the reasons discussed in the March
22 9, 2005 Findings and Recommendation.
23     **C.   Damages**
24          **1.   Interest**
25      Defendants assert that plaintiffs are not entitled to recover
26 any interest allegedly paid to the IRS or other taxing authorities.
27
28 FINDINGS AND RECOMMENDATION Page 29

1  In the March 5, 2005 Findings and Recommendation, the court held
2  that plaintiffs' interest recovery should be limited to the
3  difference between the interest earned on the tax savings and the
4  interest paid to the IRS for possessing the money unlawfully.
5  Defendants assert that New York law applies to plaintiffs' claims
6  against the Deutsche defendants, and that under New York law, no
7  interest at all is recoverable as compensatory damages, because
8  plaintiffs had the use of the government's money from the time they
9  filed their tax returns until they paid any tax deficiencies to the
10 IRS. See <u>Alpert v. Shea Gould Climenko & Casey</u>, 559 N.Y.S.2d 312,
11 315 (N.Y. App. Div. 1990).

12     I decline to apply the contractual choice of law provision to
13 the tort claims asserted in this case, and conclude that the
14 court's earlier ruling, allowing the plaintiffs to assert a claim
15 for the "interest differential" should stand.

16     **2.  Penalties**

17     Defendants assert that plaintiffs are not entitled to recover
18 from the Deutsche defendants any penalties paid to the IRS because
19 they have not alleged any statements or acts by the Deutsche
20 defendants that prevented plaintiffs from taking advantage of the
21 IRS amnesty program, or any facts giving rise to an inference that
22 the Deutsche defendants had any duty to advise plaintiffs to take
23 advantage of the amnesty program. I agree.

24     I recommend that plaintiffs' claim for recovery of penalties
25 paid to the IRS be dismissed with leave to plead facts showing that
26 the Deutsche defendants prevented the plaintiffs from taking
27
28 FINDINGS AND RECOMMENDATION Page 30

1  advantage of the IRS amnesty program, or that they had a duty to

2  advise plaintiffs to take advantage of the IRS amnesty program.

3                              **Conclusion**

4      I recommend that the Deutsche defendants' motion to dismiss

5  (doc. # 124) be GRANTED in part and DENIED in part. I recommend

6  that the motion to dismiss Claims One, Two and Three as barred

7  under the PSLRA be granted. If this recommendation is rejected, I

8  recommend that 1) the issue of whether plaintiffs have pleaded RICO

9  standing be reconsidered; 2) the motion to dismiss Claim One for

10  failure to allege the continuity requirement be denied; 3) Claim

11  Two be dismissed with leave to replead; and 4) Claim Three be

12  dismissed with prejudice. I recommend further that the claim for

13  unjust enrichment be dismissed, with leave to replead; that the

14  claim for breach of fiduciary duty be dismissed with leave to

15  replead; that the fraud claim be dismissed, with leave to replead;

16  that the negligent misrepresentation and professional malpractice

17  claims be dismissed, with leave to replead; that the civil

18  conspiracy claim be dismissed with leave to replead; that the

19  declaratory judgment claim be dismissed, with leave to replead;

20  that the motion to dismiss the claim for interest be denied; and

21  that the motion to dismiss the claim for penalties be granted with

22  leave to replead.

23                           **Scheduling Order**

24      The above Findings and Recommendation will be referred to a

25  United States District Judge for review. Objections, if any, are

26  due September 27, 2005. If no objections are filed, review of the

27

28  FINDINGS AND RECOMMENDATION Page 31

1   Findings and Recommendation will go under advisement on that date.

2   If objections are filed, a response to the objections is due

3   October 11, 2005, and the review of the Findings and Recommendation

4   will go under advisement on that date.

5

6

7                       Dated this 12th day of September, 2005.

8

9                               /s/   Dennis James Hubel

10                                  Dennis James Hubel
                                    United States Magistrate Judge
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28   FINDINGS AND RECOMMENDATION Page 32

# EXHIBIT 17

Page 1

! of 1 DOCUMENT

Copyright 2001 The Washington Post

# The Washington Post

# washingtonpost.com

The Washington Post

December 22, 2001 Saturday
Final Edition

**SECTION:** FINANCIAL; Pg. E03

**LENGTH:** 369 words

**HEADLINE:** Shelter Tips Sought From the Sheltered;
No Penalties for Disclosures, IRS Pledges

**BYLINE:** Albert B. Crenshaw, Washington Post Staff Writer

**BODY:**

The Internal Revenue Service, looking for help in finding promoters of abusive tax shelters that cost the government billions of dollars a year, appealed yesterday to new tipsters: the corporations and individuals who use the shelters.

Under the new policy, taxpayers during the next four months can disclose their use of a shelter and still maintain that it is legitimate and that they are entitled to the tax benefits it provides. "Disclosure creates no inference that the taxpayer's tax treatment of the item was improper or that the accuracy-related penalty would apply," the IRS said.

The taxpayer may still lose on the issue but would owe only the taxes and interest. Penalties for negligence and substantial understatement, which range up to 20 percent, would not be imposed.

The move is a switch for the agency from the stick to the carrot, tax attorneys said.

In the past, the IRS "generally would only waive penalties if the taxpayer conceded the underlying tax liability. If you owe tax and interest, that could be a lot of money to get the penalties to go away," said Richard M. Lipton, of McDermott, Will & Emery in Chicago, chairman of the American Bar Association's tax section.

While the initiative applies to both individuals and corporations, Lipton thinks it will appeal more to business.

"My guess is it will have greater impact on the corporate side because [corporate] tax directors have a great incentive to avoid penalties. Their bosses want them to be appropriately aggressive in tax planning but generally do not want their companies to be subject to penalties. It will allow the in-house tax directors to continue to maintain their position with respect to an aggressive tax strategy while avoiding a penalty," Lipton said.

The penalty relief does not apply to taxpayers involved in fraud, criminal conduct, concealment of a foreign

Page 2

Shelter Tips Sought From the Sheltered; No Penalties for Disclosures, IR

financial account or foreign trust, or the treatment of personal expenses as deductible business expenses, the IRS said.

Those who make disclosures must be willing to provide the promoter's name and address, documents describing the shelter and a signed statement swearing, under penalty of perjury, that the information is accurate, the IRS said.

**LOAD-DATE:** December 22, 2001

# EXHIBIT 18

1 of 1 DOCUMENT

Copyright 2001 Los Angeles Times
All Rights Reserved
Los Angeles Times

December 25, 2001 Tuesday
Home Edition

**SECTION:** BUSINESS; Part 3; Business Desk; Pg. 3

**LENGTH:** 220 words

**HEADLINE:** IRS Targeting Doubtful Tax Shelters

**BYLINE:** From Reuters

**BODY:**

The Internal Revenue Service says it will forgo penalties for taxpayers who voluntarily disclose the use of doubtful tax shelters.

The move will give taxpayers until April 23 to reveal the use of questionable tax shelters and the name of the shelter promoter, the agency said in a news release.

The IRS said it will not impose its traditional penalty—20% of the underpaid tax—but will require taxpayers to pay the taxes that should have been paid and the interest on them, the agency said.

The agency said it will use the information gathered under the new rules to target promoters who have not followed requirements to register questionable shelters. The rules also will help the IRS find tax shelters, warn potential clients and teach its own agents how to look for them, it said.

"The IRS believes some taxpayers entered into questionable transactions based on the representations of promoters who marketed these tax shelters," said Larry Langdon, commissioner of the agency's Large and Mid-Size Business Division.

"They now have additional incentive to bring any questionable transactions to the IRS' attention," he said.

The amnesty program doesn't apply to taxpayers involved in fraud, criminal conduct, concealing a foreign account or trust or the treatment of personal expenses as deductible business expenses.

**LOAD-DATE:** December 25, 2001