IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KONSTANTINOS VADEVOULIS, JIM
VADEVOULIS, and PAUL VADEVOULIS,

                 Plaintiffs,

    v.

DEUTSCHE BANK AG, DEUTSCHE BANK
SECURITIES, INC., D/B/A DEUTSCHE BANK
ALEX. BROWN, and AMERICAN EXPRESS
TAX AND BUSINESS SERVICES, INC., N/K/A
RSM MCGLADREY LLC,

                 Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

Case No. 08 C 1251

Hon. Joan H. Lefkow

**DEUTSCHE BANK AG'S AND DEUTSCHE BANK SECURITIES INC.'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A STAY
PENDING ARBITRATION OF PLAINTIFFS' CLAIMS**

Erin L. Ziaja (ID # 6278775)
DEWEY & LeBOEUF LLP
Two Prudential Plaza, Suite 3700
180 North Stetson Avenue
Chicago, Illinois 60601
Telephone: (312) 794-8000
Facsimile: (312) 794-8100

Seth C. Farber
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019-6092
Telephone: (212) 259-8000
Facsimile: (212) 259-6333

*Attorneys for Defendants Deutsche Bank AG and Deutsche Bank Securities Inc.*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................... ii

PRELIMINARY STATEMENT ........................................................................ 1

PROCEDURAL AND FACTUAL HISTORY ..................................................... 1

    A.    The Account Agreements ....................................................... 2

    B.    Plaintiffs Implement the Strategy ............................................. 3

    C.    Plaintiffs' Allegations Against Deutsche Bank ........................... 4

I.    ARGUMENT .......................................................................... 6

    A.    DEUTSCHE BANK IS ENTITLED TO A MANDATORY STAY UNDER SECTION 3 OF THE FEDERAL ARBITRATION ACT ........... 6

        1.    Plaintiffs' Claims Are "Referable To Arbitration" ....................... 7

            a.    Plaintiffs Are Bound By The Arbitration Provisions in the Account Agreements................................................. 7

                i.    Plaintiffs Are Signatories to the Account Agreements ............................................. 7

                ii.    Plaintiffs Are Estopped from Denying Arbitration................................................. 9

            b.    Deutsche Bank AG Can Invoke The Arbitration Provision In The Account Agreements........................... 11

            c.    The Subject Matter of Plaintiffs' Claims Falls Within the Scope of the Arbitration Provision ................. 13

CONCLUSION................................................................................ 14

# TABLE OF AUTHORITIES

**Cases**

*Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*,
    170 F.3d 349 (2d Cir. 1999) ............................................................................. 9

*Amato v. KPMG*,
    433 F. Supp. 2d 460 (M.D. Pa. 2006), *modified by* 2006 WL 2376245 (M.D.
    Pa. Aug. 14, 2006) ...................................................................... 13

*Anders v. Hometown Mortgage Servs., Inc.*,
    346 F.3d 1024 (11th Cir. 2003) ...................................................... 13

*Buffler v. Elec. Computer Programming Inst., Inc.*,
    466 F.2d 694 (6th Cir. 1972) ........................................................... 6

*Chew v. KPMG*,
    407 F. Supp. 2d 790 (S.D. Miss. 2006) ............................................ 13

*Deputy v. Lehman Bros., Inc.*,
    345 F.3d 494 (7th Cir. 2003) .......................................................... 13

*Flender Corp. v. Techna-Quip Co.*,
    953 F.2d 273 (7th Cir. 1992) ............................................................ 7

*Fyrnetics (Hong Kong) Limited v. Quantum Group*,
    No. 99C4704, 2003 WL 164220 (N.D. Ill. Jan. 23, 2003) ............................ 9, 11, 12

*Gersten v. Intrinsic Tech., LLP*,
    442 F. Supp. 2d 573 (N.D. Ill. 2006) .................................................. 11, 14

*Halim v. Great Gatsby's Auction Gallery Inc.*,
    516 F.3d 557 (7th Cir. 2008) ............................................................ 4

*Hansen v. KPMG*,
    No. SA CV 04-10525-GLT, slip op. (C.D. Cal. Mar. 29, 2005) ............................ 13

*Harold Ives Trucking Co. v. Pickens*,
    139 S.W.3d 471 (Ark. 2003) ............................................................ 12

*Hoffman v. Deloitte & Touche, LLP*,
    143 F. Supp. 2d 995 (N.D. Ill. 2001) ................................................. 12

*Int'l Ins. Agency Svcs., LLC v. Revios Reins. U.S. Inc.*,
    No. 04C1190, 2007 WL 951943 (N.D. Ill. Mar. 27, 2007) ............................ 9, 10, 11

*J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*,
    863 F.2d 315 (4th Cir. 1988) .......................................................... 12

*Melton v. Sidley Austin Brown & Wood LLP.*,
    Chancery No. C192922 (Fairfax County, Va. Apr. 22, 2005) ............................ 13

*Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*,
    460 U.S. 1 (1983) ................................................................................................ 6, 13

*Palmer Ventures LLC v. Deutsche Bank AG*,
    No. 06-30584, 2007 WL 4105219 (5th Cir. Nov. 19, 2007) .................................... 13

*Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys.*,
    No. 02 Civ. 9369 (DFE), 2003 WL 23641529 (S.D.N.Y. June 4, 2003).................... 6

*PNC Capital Recovery v. Mech. Parking Sys.*,
    726 N.Y.S.2d 394 (N.Y. App. Div. 2001) ................................................................ 8

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*,
    388 U.S. 395 (1967)................................................................................................ 6

*Reddam v. KPMG LLP*,
    No. SA CV 04-1227-GLT, slip op. (C.D. Cal. Dec. 14, 2004),................................ 13

*Ricker v. B-W Corp.*,
    349 F.2d 892 (10th Cir. 1965) ................................................................................ 8

*S. Ill. Beverage, Inc. v. Hansen Beverage Co.*,
    No. 07cv391, 2007 WL 3046273 (S.D. Ill. Oct. 15, 2007)........................................ 8

*Safranek v. Copart, Inc.*,
    379 F. Supp. 2d 927 (N.D. Ill. 2005) ...................................................................... 2

*Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress, Int'l Ltd.*,
    1 F.3d 639 (7th Cir. 1993) ...................................................................................... 14

*United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*,
    363 U.S. 574 (1960)................................................................................................ 13

*Washington Mut. Fin. Group, LLC v. Bailey*,
    364 F.3d 260 (5th Cir. 2004) .................................................................................. 10

*Wilson v. Deutsche Bank AG*,
    No. 05cv03474, 2006 U.S. Dist. LEXIS 94847 (N.D. Ill. Mar. 20, 2006) ............... 14

**Statutes**

9 U.S.C. § 3 ...................................................................................................................... 1, 2, 6

**Treatises**

BLACK'S LAW DICTIONARY (8th Ed. 2004) ...................................................................... 11

Defendants Deutsche Bank AG and Deutsche Bank Securities Inc., d/b/a Deutsche Bank Alex. Brown ("DBSI" and together with Deutsche Bank AG, "Deutsche Bank" or the "Bank"), submit this memorandum of law in support of their motion for a stay of this action pursuant to Section 3 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 3.

## PRELIMINARY STATEMENT

Plaintiffs are sophisticated and successful businessmen who, on the advice of their legal advisors, undertook a tax strategy (the "Strategy") to avoid tax liability from windfall profits they made by selling their business in 2000. Now that the IRS has challenged the losses that Plaintiffs claimed as a result of their participation in the Strategy, Plaintiffs bring claims against Deutsche Bank in this Court. But, these claims do not belong here. Instead, they must be arbitrated pursuant to the unambiguous account agreements ("Account Agreements") with broad arbitration provisions that Plaintiffs signed when they opened accounts with Deutsche Bank in the names of the limited liability companies they created and used to execute the Strategy. The Account Agreements bind Plaintiffs in their individual capacities, and this Court should not allow Plaintiffs to ignore their contractual obligations by suing in this venue. Moreover, even if Plaintiffs were considered non-signatories to the Account Agreements (despite their signatures and the clear contractual language binding them individually), they not only benefited from the Account Agreements, but they also rely heavily on them in alleging their claims against Deutsche Bank. As a result, well-established principles of equitable estoppel bind Plaintiffs to the arbitration provisions, even if their signatures and the contractual language do not.

Accordingly, because Plaintiffs are bound by the arbitration agreements in the Account Agreements, the FAA compels Plaintiffs to pursue their claims against Deutsche Bank in arbitration and mandates a stay of these proceedings pending resolution of such arbitration.

## PROCEDURAL AND FACTUAL[1] HISTORY

According to the Amended Complaint, Plaintiffs Konstantinos Vadevoulis, Jim Vadevoulis, and Paul Vadevoulis sold their company, LaFrancaise Bakery, Inc., in December 2000 and, as a result, anticipated large capital gains for the tax year 2000. Plaintiffs' Amended

---

[1]     Deutsche Bank does not admit the factual allegations of the Amended Complaint and reserves the right to contest those allegations at the appropriate time.

Complaint dated July 22, 2008 ("Am. Compl.") ¶¶ 78-79. To avoid paying taxes on those gains, Plaintiffs allegedly sought tax advice from Jenkens & Gilchrist ("Jenkens") and, at its recommendation, undertook the Strategy and claimed tax losses for the 2000 tax year. *See id.* ¶¶ 79, 91, 94.

### A.    The Account Agreements

To implement the Strategy, Plaintiffs allegedly formed entities and opened accounts with DBSI in the names of those entities. *See id.* ¶¶ 70, 84-90, 126; Account Agreements in the names of V1 Investments, LLC, V2 Investments, LLC, V3 Investments, LLC, TR1 Investments LLC, TR2 Investments, LLC, TR3 Investments, LLC, La Francaise Bakery Inc. and Trinity Investment Partnership, attached as Exhibits 1-8; *see also* Complaint, *Vadevoulis v. Tsourapas*, Cook County Illinois, ¶ 31 (Feb. 14, 2008) (alleging that the LLCs and the partnership were formed to "effectuate the tax strategy"), attached as Exhibit 9.[2]

The Account Agreements (through which the Plaintiffs opened the DBSI accounts) all contain this mandatory arbitration clause:

> I understand that: (1) Arbitration is final and binding on the parties. (2) The parties are waiving their right to seek remedies in court, including the right to jury trial. (3) Pre-arbitration discovery is generally more limited than and different from court proceedings. (4) The arbitrators' award is not required to include factual findings or legal reasoning and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited. (5) The panel of arbitrator would typically include a minority of arbitrators who were or are affiliated with the securities industry.
>
> I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election. . . .

---

[2]     In deciding this motion for a stay pursuant to Section 3 of the FAA, this Court may consider matters beyond the allegations in the Complaint. *See Safranek v. Copart, Inc.*, 379 F. Supp. 2d 927, 928 (N.D. Ill. 2005). In *Vadevoulis v. Tsourapas*, a parallel complaint that Plaintiffs have filed in state court, Plaintiffs are suing their own advisor, William Tsourapas (who is identified at Paragraph 30 of the Amended Complaint as a "Non-Party Co-Conspirator"), for his alleged role in advising them to implement the Strategy.

> Neither you nor I waive any right to seek equitable relief pending arbitration. No person shall bring a putative or certified class action to arbitration, nor seek to enforce any pre-dispute arbitration agreement against any person who has initiated in court a putative class action; or who is a member of a putative class who has not opted out of the class with respect to any claims encompassed by the punitive class action until (1) the class certification is denied; or (2) the class is decertified; or (3) the customer is excluded from the class by the court. Such forbearance to enforce an agreement to arbitrate shall not constitute a waiver or any rights under this agreement except to the extent stated herein.

Exs. 1-8 ¶ 20. Each of Dino Vadevoulis, Paul Vadevoulis and Jim Vadevoulis personally signed one of these Account Agreements, which also have "Member" on the signature line. Account Agreements, Exs. 1-3.

> The account agreements also state, in pertinent part, that:

> In consideration of DB Alex. Brown LLC (referred to herein as "Deutsche Bank Alex. Brown") accepting the Account(s) of the Undersigned, and agreeing to act as my broker, I agree to the following with respect to each of My Account(s) with you, in which I currently or in the future have an interest, for the extension of credit or the purchase or sale of securities, options or other property. Throughout this Agreement, "I," "me," "my" "we" and "us" and "the undersigned" refer to the person(s) whose signature(s) appear(s) below and all others who are legally obligated on this account. "Account(s) of the Undersigned" and "My Account(s)" shall mean each and every account in the name of the undersigned and each and every account in which the undersigned may have an interest.

Account Agreements, Exs. 1-8, Intro ¶.

## B.    Plaintiffs Implement the Strategy

According to the Complaint, after opening the accounts with DBSI, Plaintiffs used those accounts to execute the "currency, stock and options transactions" underlying the Strategy. Am. Compl. ¶¶ 84-90, 110.[3] Plaintiffs later allegedly received an opinion letter from

---

[3]    Although Plaintiffs executed digital options trades through the accounts they personally opened in the names of V1 Investments, LLC, V2 Investments, LLC and V3 Investments, LLC, they confine the discussion of their trading activity in the Amended Complaint to that done by the LLCs opened and co-managed by others, including their financial advisor, William Tsourapas, and ignore the trades done through the accounts they themselves opened. *See* Am. Compl. ¶¶ 85-90. Yet, it is clear that trades were done through the accounts of Plaintiffs' LLCs, (*see* Account Statements and Confirmations for V1 Investments LLC (created by Dino Vadevoulis), V2 Investments LLC (created by Paul Vadevoulis), and V3 Investments LLC (created by Jim Vadevoulis)) and not just through Accounts in the name of TR1 Investments LLC (confirmation signed by Bill Tsourapas, co-trustee of the Dino Vadevoulis Descendants

Jenkens confirming the propriety of claiming losses resulting from the Strategy, *see id.* ¶¶ 68, 91, and American Express Tax and Business Services, Inc. ("Amex") filed Plaintiffs' tax returns for the 2000 tax year claiming such losses. According to the Amended Complaint, the losses resulted in "significant tax savings" for the Vadevoulises. *See id.* ¶¶ 7, 91.

### C.     Plaintiffs' Allegations Against Deutsche Bank

On February 29, 2008, Plaintiffs filed their initial complaint against Deutsche Bank and Amex, seeking damages allegedly arising from Plaintiffs' implementation of the Strategy. In particular, Plaintiffs sued Deutsche Bank for (i) civil conspiracy; (ii) common law fraud; (iii) negligent misrepresentation; (iv) violations of the Illinois Consumer Fraud and Deceptive Business Practices Act; and (v) assisting in the breach of fiduciary duty. Deutsche Bank moved to dismiss the Complaint on May 14, 2008, on the grounds that (a) Plaintiffs' claims were time-barred; (b) the complaint failed to satisfy Rule 9(b) of the Federal Rules of Civil Procedure; and (c) each of Plaintiffs' claims failed as a matter of law. In its motion to dismiss, Deutsche Bank specifically reserved its arbitration rights and asserted that, in accordance with *Halim v. Great Gatsby's Auction Gallery Inc.*, 516 F.3d 557, 562 (7th Cir. 2008), it did not intend to waive its rights to later move to compel arbitration. *See* Deutsche Bank AG and Deutsche Bank Securities Inc.'s Memorandum of Law in Support of Their Motion to Dismiss Plaintiffs' Complaint, at 1 n.1.

On July 22, 2008, Plaintiffs filed their Amended Complaint against Deutsche Bank and alleged, among other things, that Deutsche Bank "along with their co-conspirators played a central role in creating, marketing, selling and/or implementing" the Strategy. Am. Compl. ¶ 50. Plaintiffs make no effort to distinguish between DBSI and Deutsche Bank AG in the Amended Complaint and instead refer to them collectively as "Deutsche Bank" or the "Deutsche Bank Defendants" throughout. *See, e.g.,* Am. Compl. Intro ¶. In fact, the only time Deutsche Bank and DBSI are separately mentioned in the Amended Complaint is in three paragraphs out of the 183-paragraph complaint -- the prefatory paragraph and two paragraphs describing Deutsche Bank AG and DBSI as parties to the action. *See id.*, Intro ¶, ¶¶ 14-15.

---

Trust), TR2 Investments LLC (confirmation signed by Bill Tsourapas, co-trustee of the Paul Vadevoulis Descendants Trust) and TR3 Investments LLC (confirmation signed by Bill Tsourapas, co-trustee of the Jim Vadevoulis Descendants Trust). *See* Exhibits 10-21.

The gist of Plaintiffs' Amended Complaint is that Deutsche Bank and others each played "roles" in the "scheme" to defraud Plaintiffs into implementing a faulty tax strategy. *See, e.g., id.* ¶ 68. According to the Amended Complaint, Deutsche Bank's "role" was to provide the "needed banking and trading services" that the Strategy required (*id.* ¶ 70), which services necessitated the "account agreements, option transaction confirmations, and account statements," *id.* ¶ 54. Thus, Plaintiffs' Amended Complaint places the foreign currency trades done through the accounts in the names of Plaintiffs' entities, and the Account Agreements that Plaintiffs executed to facilitate such trades (Exs. 1-8), at the heart of the case.

Indeed, Plaintiffs' Amended Complaint is replete with references to the Account Agreements and the foreign currency trades done through the DBSI accounts. Plaintiffs allege that "by preparing and circulating to plaintiffs certain documents, including account statements and trade confirmations," Deutsche Bank gave them the "impression that the trading and other financial machinations underlying the Son of Boss tax shelter were valid and legitimate." *Id.* ¶ 2. Plaintiffs further allege that "[e]ach time Deutsche Bank . . . sent out an account agreement, trade confirmation, or account statement" Deutsche Bank "reinforced…false statement[s]" about the validity of the Strategy. *Id.* ¶ 71. Plaintiffs also allege that "the Vadevoulises paid substantial amounts, believed to be around $300,000, to the Deutsche Bank defendants to execute the currency, stock, and options transactions underlying Son of Boss." *Id.* ¶ 110.

Moreover, when describing their conspiracy claim, Plaintiffs allege that the "defendants" knew that the Strategy was "designed to give the false impression that a complex series of financial transactions were legitimate business transactions with economic substance from an investment standpoint…" *Id.* ¶ 116. Plaintiffs also allege, when describing their fraud claim, that Deutsche Bank committed fraud in "recommending, advising, instructing, and assisting the Vadevoulises in the Options." *Id.* ¶ 125 (22). Plaintiffs further allege, with their fraud claim, that "on numerous occasions, including through the use of account agreements, option transaction confirmations and monthly account statements, Deutsche Bank represented that the transactions underlying Son of Boss were valid, legitimate, suitable for the Vadevoulises, and had a reasonable prospect of profit." *Id.* ¶ 126. Lastly, to support their aiding a breach of fiduciary duty claim, Plaintiffs assert that "by providing the facilities for, and acting as the counterparty in the currency, options, and stock transactions," Deutsche Bank aided in the breach of Jenkens' and Amex's fiduciary duty to Plaintiffs. *Id.* ¶ 168.

5

# I.

# ARGUMENT

**A.    DEUTSCHE BANK IS ENTITLED TO A MANDATORY STAY UNDER SECTION 3 OF THE FEDERAL ARBITRATION ACT**

Section 3 of the FAA requires federal courts to enter a mandatory stay in cases asserting claims that are referable to arbitration by written agreement:

> If any suit or proceeding be brought in any of the courts of the United States *upon any issue referable to arbitration under an agreement in writing for such arbitration*, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement*, providing the applicant for the stay is not in default in proceeding with such arbitration.

9 U.S.C. § 3 (emphasis added).[4]

The rationale for this rule is evident:  the FAA strongly favors arbitration, *see Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983), and, indeed, the loss of an arbitration right is deemed to constitute irreparable damage in and of itself. *See, e.g., Buffler v. Elec. Computer Programming Inst., Inc.*, 466 F.2d 694, 698 (6th Cir. 1972) ("After the parties go through the expense and delay of a trial on the merits of the court action, the advantages of arbitration are lost even if the dispute ultimately returns to arbitration.  We find this consequence to be 'serious, perhaps irreparable'"); *Paramedics Electromedicina Comercial Ltda. v. GE Med. Sys.*, No. 02 Civ. 9369 (DFE), 2003 WL 23641529, at *12 (S.D.N.Y. June 4, 2003) ("The deprivation of [the defendant's] contractual right to arbitrate its claims, a right protected by international, federal, and state law, constitutes irreparable harm.").  Here, the claims against the Deutsche Bank Defendants are "referable to arbitration" and, accordingly, this Court should stay this action pursuant to Section 3 of the FAA to preserve Deutsche Bank's arbitration rights.

---

[4]    The FAA applies here because the transactions at issue involve interstate commerce. *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 402 (1967) (Section 3 of the FAA applies to transactions involving interstate commerce).

1.     **Plaintiffs' Claims Are "Referable To Arbitration"**

In determining whether claims are "referable to arbitration" under the FAA, the court must "focus solely on the arbitration clause and determine whether there is an agreement to arbitrate the underlying dispute. If the court determines that the underlying dispute is within the ambit of the arbitration agreement, resolution of that dispute is for the arbitrator." *Flender Corp. v. Techna-Quip Co.*, 953 F.2d 273, 277 (7th Cir. 1992).

In this case, there is an agreement to arbitrate because Plaintiffs are bound by the arbitration provisions in the Account Agreements they signed when they opened accounts with DBSI to implement the Strategy. In addition to DBSI, Deutsche Bank AG is entitled to enforce the arbitration provisions on grounds of estoppel and agency. Finally, Plaintiffs' claims fall squarely within the scope of the arbitration provisions.

   a.     **Plaintiffs Are Bound By The Arbitration Provisions in the Account Agreements**

      i.     **Plaintiffs Are Signatories to the Account Agreements**

Each Plaintiff signed one of the Account Agreements. *See* Exs. 1-3 (bearing signatures of Plaintiffs Dino Vadevoulis, Jim Vadevoulis and Paul Vadevoulis). Those Agreements make clear that they bind Plaintiffs personally, notwithstanding the fact that each Plaintiff titled his account with the name of one of his limited liability companies. Specifically, the definition section at the beginning of each of the Account Agreements states: "[t]hroughout this Agreement, 'I,' 'me,' 'my,' 'we' and 'us' and 'the undersigned' *refer to the person(s) whose signatures(s) appear(s) below* and all others who are legally obligated on this account." Account Agreements, Intro. ¶, Exs. 1-8 (emphasis added). Because each Plaintiff is "the person whose signature appears below" on one of the Account Agreements, Plaintiffs are the "I," "me," "we," "us" and "the undersigned" referred to therein. As such, Plaintiffs are bound by the arbitration provision in the Account Agreements, which provides that "*I* agree to arbitrate with you any controversies that may arise…" *Id.* (emphasis added).

Although Plaintiffs include the word "Member" after their signatures, the context makes clear that Plaintiffs were obligating themselves personally. The inclusion of a title after the signatory's name does not alter the personally binding nature of the agreement unless the contract otherwise indicates an intent only to bind an entity. *See, e.g.*, *PNC Capital Recovery v.*

7

*Mech. Parking Sys.*, 726 N.Y.S.2d 394 (N.Y. App. Div. 2001).[5] To begin with, the definitional section referred to above plainly obligates them personally as the "undersigned." Other provisions in the Account Agreements only reinforce the conclusion that the "I" in the Agreements refers to natural persons, not corporate entities. First, the Account Agreements provide that "I am of legal age" and "am not an employee or member of any securities exchange…," nor "am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person." Account Agreements ¶ 1, Ex. 1-8. A corporate entity has no "legal age." Moreover, a corporate entity is incapable of being an "employee," the "senior officer of any bank," or a "member of the immediate family of such a person." Thus, the unambiguous contractual terms manifest an intent that "I" refers to natural persons, *i.e.* Plaintiffs. Paragraph 20 of the Account Agreements is also instructive. It provides that the "Agreement shall be binding upon *my* heirs, executors, administrators, personal representatives and permitted assigns." *Id.* ¶ 20 (emphasis added). The words "heirs, executors, administrators and personal representatives" are apt terms with respect to a natural person, but not a corporate entity. *See, e.g., Ricker v. B-W Corp.*, 349 F.2d 892, 895 (10th Cir. 1965).

Finally, Plaintiffs' allegations in their Amended Complaint demonstrate that they themselves understood that they personally (and not the LLCs) were the "customers" of the Bank. For example, the Amended Complaint describes the Account Agreements themselves as misrepresentations to the Vadevoulises about the suitability and profitability of the underlying transactions. *See, e.g.,* Am. Compl. ¶ 126 ("On numerous occasions, including through the use of account agreements, option transaction confirmations and monthly account statements, Deutsche Bank represented that the transactions underlying Son of Boss were valid, legitimate, purposeful, suitable for the Vadevoulises, and had a reasonable prospect of profit."). Similarly, Plaintiffs describe themselves – and not their limited liability companies – as the parties who engaged in the options transactions that were executed in the Accounts. Thus, Paragraph 125 of the Amended Complaint alleges that Deutsche Bank and Amex made misrepresentations to

---

[5]     Whether parties have agreed to arbitrate is controlled by state-law principles governing contract formation. *See S. Ill. Beverage, Inc. v. Hansen Beverage Co.*, No. 07cv391, 2007 WL 3046273, at * 9 (S.D. Ill. Oct. 15, 2007). In this case, New York law governs interpretation of the Account Agreements pursuant to the choice of law clause at Paragraph 20.

Plaintiffs by:

>    (21) Recommending that the Vadevoulises purchase the Options; [and]
>    (22) Recommending, advising, instructing, and assisting the Vadevoulises
>    in the Options.

Am. Compl. ¶ 125.

### ii.    Plaintiffs Are Estopped from Denying Arbitration

Even if this Court were to find that Plaintiffs did not sign the Account Agreements in their individual capacities, principles of estoppel would still require Plaintiffs to arbitrate their claims. It is well-established that the obligation to arbitrate a dispute is not limited to those who have personally signed a written agreement. *Int'l Ins. Agency Svcs., LLC v. Revios Reins. U.S. Inc.*, No. 04C1190, 2007 WL 951943, at *3 (N.D. Ill. Mar. 27, 2007) (internal citations omitted). Instead, a non-signatory party is estopped from denying its obligation to arbitrate when it receives a direct benefit from a contract containing an arbitration clause. *Id.*; *see also Fyrnetics (Hong Kong) Ltd. v. Quantum Group,* No. 99C4704, 2003 WL 164220, at *4 (N.D. Ill. Jan. 23, 2003); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999).

Here, it was Plaintiffs personally who enjoyed the purported tax benefits resulting from the options transactions executed in the Accounts opened by the Account Agreements at issue. *See* Am. Compl. ¶ 7 (alleging that Plaintiffs personally claimed tax savings from a Son of Boss tax strategy); ¶ 54 (alleging that a Deutsche Bank employee "sent or caused to be sent many of the account agreements . . . necessary to set up and implement the Son of Boss transaction in which plaintiffs participated."). Because they personally benefited from the Account Agreements – without them, they would not have been able to engage in the Options transactions and thus would not have been able to claim any tax benefits – it is equitable for the Plaintiffs to be bound by the arbitration provisions in those same agreements, and, accordingly, Plaintiffs should be estopped from avoiding arbitration for this reason alone. *See Fyrnetics*, 2003 WL 164220, at *4; *Am. Bureau of Shipping*, 170 F.3d at 353.

In addition, courts routinely hold that claims premised upon agreements containing arbitration provisions are subject to those provisions regardless of a party's "non-signatory status" because, absent those agreements, there would be no claims. *See Fyrnetics*, 2003 WL 164220, at *4 (estopping a non-signatory from avoiding arbitration where "without the

[agreement containing the arbitration provision]," the facts giving rise to Plaintiffs' claim would not have occurred); *Revios Reins.*, 2007 WL 951943, at *6 (granting motion to compel non-signatory to arbitration where the "agreements [containing the arbitration clause] provide the factual foundation for every claim asserted"); *see also Washington Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267-68 (5th Cir. 2004) (holding that non-signatory plaintiff was required to arbitrate a dispute with a signatory defendant when the claims of the non-signatory plaintiff "hing[ed] on rights arising from . . . transactions" effected through the agreements with the arbitration provisions). As Judge Gottschall held in *Revios Reinsurance*, "[t]he principle that a party cannot use its relationship with a contract to allege liability but then disavow the arbitration provision in the contract is consistent with the notion that the doctrine of estoppel prevents a party from having it both ways." 2007 WL 951943, at * 5 (citing *Washington Mut. Fin. Group*, 364 F.3d at 268).

Just as in *Revios Reins.*, not only did Plaintiffs benefit from the Account Agreements, but the agreements provide the "factual foundation" for Plaintiffs' claims. As an initial matter, Plaintiffs describe their case as "aris[ing] out of Deutsche Bank's and Amex's participation . . . in a conspiracy to create, market, sell and implement an illegal [Strategy] to the Vadevoulises during 2000." Am. Compl. ¶ 1. Plaintiffs allege that the "defendants and the other co-conspirators each had their own primary roles" in the "scheme," *id.* ¶¶ 68, 70, and that Deutsche Bank's role was to provide "the needed banking and trading services." *Id.* ¶ 70. To obtain these "banking and trading services," Plaintiffs executed the Account Agreements with DBSI. Indeed, Plaintiffs themselves allege that the Account Agreements were "necessary to set up and implement" the Strategy that generated "significant tax savings" for the Vadevoulises. *Id.* ¶¶ 7, 54. Now that these "significant tax savings" have been challenged by the IRS, *id.* ¶ 111, Plaintiffs are suing their tax advisors and Deutsche Bank for damages Plaintiffs assert they suffered as a result of their implementation of the Strategy. Thus, there is no question that the Account Agreements are at the heart of Plaintiffs' claims against Deutsche Bank.

Tellingly, Plaintiffs' Amended Complaint is replete with references to the Account Agreements, and the options trading done in the accounts created by the Account Agreements:

> Deutsche Bank at all times gave the Vadevoulises the impression that the
> trading and other financial machinations underlying the Son of Boss tax

shelter were valid and legitimate. They did this, in part, by preparing and circulating to plaintiffs certain documents, including account statements and trade confirmations. Am. Compl. ¶ 2.

Jenkens and Deutsche Bank collaborated in the development of numerous tax shelters, including Son of Boss. Eventually, Jenkens & Deutsche Bank marketed these shelters to hundreds of people, including the Vadevoulises. Indeed, Brubaker sent or caused to be sent many of the account agreements, option transaction confirmations, and account statements necessary to set up and implement the Son of boss transaction in which plaintiffs participated. *Id.* ¶ 15.

In the end, Deutsche Bank's participation constituted an affirmative representation that Son of Boss was valid, legitimate, purposeful, and suitable for plaintiffs. Each time Deutsche Bank (often via Craig Brubaker) sent out an account agreement, trade confirmation, or account statement, Deutsche Bank reinforced this false statement. *Id.* ¶ 71.

On numerous occasions, including through the use of the account agreements, option transaction confirmations and monthly account statements, Deutsche Bank represented that the transactions underlying Son of Boss were valid, legitimate, purposeful, suitable for the Vadevoulises, and had a reasonable prospect of profit. *Id.* ¶ 126.

In short, Plaintiffs' own allegations estop them from refusing to arbitrate their dispute with Deutsche Bank. *Cf. Revios Reins.*, 2007 WL 951943, at *5; *Gersten v. Intrinsic Tech., LLP,* 442 F. Supp. 2d 573, 580 (N.D. Ill. 2006) (compelling a nonsignatory to arbitrate his claims where he cited to the contract containing the arbitration clause "repeatedly" in "averring the factual foundation for his claim"); *Fyrnetics*, 2003 WL 164220, at *4 ("By exploiting the [agreement containing the arbitration clause] and accepting its benefits with knowledge of the arbitration clause, [non-signatory] is estopped from denying its obligation to arbitrate.").

b.    **Deutsche Bank AG Can Invoke The Arbitration Provision In The Account Agreements**

Deutsche Bank AG, DBSI's ultimate corporate parent, while not a signatory to the account agreements, may also enforce the arbitration provisions. Under the terms of the Account Agreements, Plaintiffs agreed to arbitrate with "you." "You" is defined in the Account Agreements to include DBSI and its "affiliates." Account Agreements, Intro. ¶, Exs. 1-8. A parent is an affiliate of any of its subsidiaries. BLACK'S LAW DICTIONARY (8th Ed. 2004) (defining "affiliate" as: "1. A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, *parent*, or sibling corporation.") (emphasis added); *see*

*also Harold Ives Trucking Co. v. Pickens*, 139 S.W.3d 471, 473-74 (Ark. 2003) (citing BLACK's definition with approval in finding that the "ordinary and usually accepted meaning" of the term "affiliate" includes a parent company). Moreover, the Account Agreements themselves define "affiliate of Deutsche Bank" as "Deutsche Bank AG and its subsidiaries," Account Agreements, Intro. ¶, Exs. 1-8, and thus expressly identify DBSI and Deutsche Bank AG as affiliates. Thus, the plain language of the Account Agreements covers claims against Deutsche Bank AG, as well as those against DBSI.

Moreover, well-established principles of estoppel prevent Plaintiffs from suing Deutsche Bank AG and DBSI as a single, integrated entity while at the same time arguing that they are distinct for purposes of the arbitration agreement. *Fyrnetics*, 2001 WL 40900, at *3 ("[I]f claims against two affiliated companies are based on the same facts and are inherently inseparable, the claims against both may be referred to arbitration even though just one of the companies is a party to the arbitration agreement.") (citing *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.,* 863 F.2d 315, 320-21 (4th Cir. 1988) ("When the charges against a parent company and its subsidiary are based on the same facts and are inherently inseparable, a court may refer claims against the parent to arbitration even though the parent is not formally a party to the arbitration agreement.")). The Amended Complaint does not distinguish between Deutsche Bank AG and DBSI. Indeed, it alleges substantially interdependent and concerted conduct by them, *e.g.*, ¶¶ 2, 50, 125, 167, and consistently refers to them collectively as "Deutsche Bank" or the "Deutsche Bank Defendants," *e.g.*, ¶ 166, drawing no distinction between the two entities. It further alleges that all Defendants "knowingly entered into an agreement to participate in a scheme to create and market Son of Boss and to induce the Vadevoulises to enter into the illegal Son of BOSS transaction in order to obtain professional and other fees from plaintiffs." *Id.* ¶ 116. Finally, Count I accuses Deutsche Bank and DBSI of being co-conspirators.

These allegations of substantially interdependent and concerted misconduct between signatory DBSI and non-signatory Deutsche Bank AG estop Plaintiffs from avoiding arbitration with Deutsche Bank AG, as well. *See Hoffman v. Deloitte & Touche, LLP*, 143 F. Supp. 2d 995, 1005 (N.D. Ill. 2001) (equitable estoppel allows a non-signatory to compel arbitration when the signatory raises allegations of substantially interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract) (citation

omitted). Indeed, a number of federal courts interpreting the same or substantially similar arbitration agreements and involving the same basic claims, have already ruled that Deutsche Bank AG may, under basic principles of estoppel (and/or agency), compel identically situated or nearly identically situated plaintiffs to arbitrate their claims against Deutsche Bank AG, based on the fact that such plaintiffs entered into arbitration agreements with DBSI. *See, e.g., Amato v. KPMG*, 433 F. Supp. 2d 460 (M.D. Pa. 2006), *modified by* 2006 WL 2376245 (M.D. Pa. Aug. 14, 2006) (reconsidering plantiffs' claim for recoupment of interest paid to the IRS); *Chew v. KPMG,* 407 F. Supp. 2d 790, 799 (S.D. Miss. 2006); *Reddam v. KPMG LLP*, No. SA CV 04-1227-GLT, slip op. at 8-10 (C.D. Cal. Dec. 14, 2004)(reversed on other grounds), Exhibit 22; *Hansen v. KPMG.*, No. SA CV 04-10525-GLT, slip op. at 5-8 (C.D. Cal. Mar. 29, 2005), Exhibit 23; *Melton v. Sidley Austin Brown & Wood LLP,* Chancery No. C192922 (Fairfax County, Va. Apr. 22, 2005), hearing transcript at 9-12, Exhibit 24.[6]

### c.    The Subject Matter of Plaintiffs' Claims Falls Within the Scope of the Arbitration Provision

In determining whether claims are referable to arbitration, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration…." *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25. Pursuant to this strong presumption, courts must grant a party's request to arbitrate "unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *See United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83 (1960).[7]

In this instance, the broad arbitration clause in Paragraph 20 of the Account Agreements encompasses not only disputes concerning activity in the accounts, but *all* disputes with DBSI and its affiliates, including any controversies arising out of or relating to transactions with or through Deutsche Bank. Specifically, the clause covers:

---

[6]    *But see Palmer Ventures LLC v. Deutsche Bank AG*, No. 06-30584, 2007 WL 4105219 (5th Cir. Nov. 19, 2007)(affirming district court's decision that estoppel did not apply because there, unlike here, there were no allegations of interrelated misconduct by nonsignatory Deutsche Bank and signatory DBSI, and, in fact, signatory DBSI was not even a defendant).

[7]    In this vein, courts routinely find that broad arbitration clauses, such as those here, cover all disputes between the parties to the agreements. *See, e.g., Deputy v. Lehman Bros., Inc.*, 345 F.3d 494, 513 (7th Cir. 2003) (finding broad arbitration clause was not limited to foreseeable claims); *Anders v. Hometown Mortgage Servs., Inc.*, 346 F.3d 1024, 1028 (11th Cir. 2003) (where agreement provided for arbitration of "any" disputes it "could not have been broader" because "'any' means all").

> any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election.

Account Agreements ¶ 20, Exs. 1-8.

The controversy between Plaintiffs and Deutsche Bank alleged in the Amended Complaint relates to transactions that were effected through the brokerage accounts opened pursuant to the Account Agreements, which contain these broad arbitration provisions. As such, "[t]he law is clear that sweeping arbitration provisions of this type-if properly applied to the litigants at hand . . . cover all disputes 'having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract *per se*'." *See Gersten*, 442 F. Supp. 2d at 577 (citing *Sweet Dreams Unlimited, Inc. v. Dial-A-Mattress, Int'l Ltd.*, 1 F.3d 639, 642 (7th Cir. 1993)). Accordingly, Plaintiffs' claims all fall within the scope of the arbitration agreements and a stay is appropriate. *See Gersten*, 442 F. Supp. 2d at 587; *see also Wilson v. Deutsche Bank AG*, No. 05cv03474, 2006 U.S. Dist. LEXIS 94847 (N.D. Ill. Mar. 20, 2006) (granting stay after finding that Deutsche Bank could compel similarly situated plaintiffs to arbitration).

## CONCLUSION

For the reasons described above, Deutsche Bank respectfully submits that this action must be stayed pending arbitration of Plaintiffs' claims.

Dated: August 13, 2008

DEWEY & LeBOEUF LLP

By: s/ Erin L. Ziaja
    Erin Ziaja
Two Prudential Plaza, Suite 3700
180 North Stetson Avenue
Chicago, Illinois 60601
Telephone: (312) 794-8000
Facsimile: (312) 794-8100

Seth C. Farber

DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019-6092
Telephone: (212) 259-8000
Facsimile: (212) 259-6333

*Attorneys for Defendants Deutsche Bank AG and Deutsche Bank Securities Inc.*

14