# EXHIBIT 13

**Deutsche Banc Alex. Brown**
**Client Statement**

DB ALEX. BROWN LLC
P. O. BOX 1776
BALTIMORE MD 21203

CLENDENING/BRUBAKER
INVESTMENT REP #109
200 CRESCENT COURT SUITE500
DALLAS TX 75201-6959
(214) 740-7700 (800) 527-3903

TR1 INVESTMENTS LLC
ATTN BILL P TSOURAPAS
1301 WEST 22ND ST STE 615
OAKBROOK IL 60523

## Portfolio Overview

### Assets

| | Value as of November 30, 2000 | % of total assets |
|---|---|---|
| Cash | $0.00 | 0.0% |
| Money funds | 154,065.00 | 100.0 |
| Common stocks | 0.00 | 0.0 |
| Preferred stocks | 0.00 | 0.0 |
| Mutual funds | 0.00 | 0.0 |
| Government debt issues | 0.00 | 0.0 |
| Corporate debt issues | 0.00 | 0.0 |
| Municipal debt issues | 0.00 | 0.0 |
| Certificates of deposit | 0.00 | 0.0 |
| Options | 0.00 | 0.0 |
| Limited partnerships | 0.00 | 0.0 |
| Annuities | 0.00 | 0.0 |
| Other | 0.00 | 0.0 |
| Total assets | $154,065.00 | 100.0% |

### Liabilities

| | Value as of November 30, 2000 | % of total assets |
|---|---|---|
| Cash debit | $0.00 | 0.0% |
| Margin debit | 0.00 | 0.0 |
| Short options | 0.00 | 0.0 |
| Other short securities | 0.00 | 0.0 |
| Total liabilities | $0.00 | 0.0% |

**Net Value of Your Account**     $154,065.00

**Net Value as of December 31, 1999**     $0.00

**Deutsche Bank**

### Activity

| | This period |
|---|---|
| Net value of your account as of October 31 | $0.00 |
| Net cash activity | 154,055.00 |
| Net securities into/out of account | 0.00 |
| Net return on your portfolio | 0.00 |
| Net value of your account as of November 30 | $154,065.00 |

### Income

| | This period | Year to date |
|---|---|---|
| Net income received | $0.00 | $0.00 |
| Current estimated annual income | $9.26.174 | |
| Current estimated annual yield | 6.07% | |

Statement of Account
November 1 to November 30, 2000
Account 223-78380

Page 1 of 5

**Deutsche Bane Alex. Brown**

Statement of Account
November 1 to November 30, 2000
Account 223-78580

Page 2 of 5

## Cash Summary

Opening Cash Balance     $0.00

### Income Summary

| | This period | Year to date |
|---|---|---|
| Taxable dividends | $0.00 | $0.00 |
| Taxable interest | 0.00 | 0.00 |
| Capital gains distributions received | 0.00 | 0.00 |
| Non-taxable dividends | 0.00 | 0.00 |
| Non-taxable interest | 0.00 | 0.00 |
| Net income received | $0.00 | $0.00 |

### Cash Activity

| | This period | Year to date |
|---|---|---|
| Deposits | $154,065.00 | $154,065.00 |
| Withdrawals | 0.00 | 0.00 |
| U.S. tax withheld | 0.00 | 0.00 |
| Non-resident tax withheld | 0.00 | 0.00 |
| Foreign taxes withheld | 0.00 | 0.00 |
| Interest charges on cash debit | 0.00 | 0.00 |
| Interest charges on margin debit | 0.00 | 0.00 |
| Net cash activity | $154,065.00 | $154,065.00 |

### Purchases and Sales

| | This period | Year to date |
|---|---|---|
| Total purchases | $154,065.00 - | $154,065.00 - |
| Total sales | 0.00 | 0.00 |
| Other money fund sales | 0.00 | 0.00 |
| Net purchases/sales(incl. money funds) | $154,065.00 - | $154,065.00 - |

### Other Activity

| | This period | Year to date |
|---|---|---|
| Bond redemptions | $0.00 | $0.00 |
| Other activity | 0.00 | 0.00 |
| Net other activity | $0.00 | $0.00 |

Closing Cash Balance     $0.00

## Portfolio Summary

### Activity

| | This period | Year to date |
|---|---|---|
| Previous net account value | $0.00 | $0.00 |
| Net cash activity | 154,065.00 | 154,065.00 |
| Net securities interest of account | 0.00 | 0.00 |
| Adjusted previous account value | $154,065.00 | $154,065.00 |
| Net change in market value | 0.00 | 0.00 |
| Net income received | 0.00 | 0.00 |
| Net account value as of November 30, 2000 | $154,065.00 | $154,065.00 |
| Net return on portfolio | 0.00 | 0.00 |

## Portfolio Holdings

Prices are provided by an independent pricing service. For current market price quotations, call your Investment Representative.

### Cash and Equivalents

| | Amount | Estimated annual income | Current annual yield |
|---|---|---|---|
| DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | $154,085.00 | $9,351.74 | 6.07% |
| Total cash and equivalents | $154,085.00 | $9,351.74 | |

### Common Stocks

| | Symbol | Quantity | Current share price | Current market value | Estimated annual income | Estimated dividend yield |
|---|---|---|---|---|---|---|
| 1 | LONG CALL FX OPTION EUR/JPY STRIKE 96.40 PREM 12271000 DTD 11/27/00 EXP 12/12/00 | | 1 | Not Priced | Not Priced | | |
| 1 | SHORT CALL FX OPTION EUR/JPY STRIKE 96.42 PREM 12168250 DTD 11/27/00 EXP 12/12/00 | | 1 | Not Priced | Not Priced | | |
| | Total common stocks | | | | $0.00 | | |

## Portfolio Activity

### Purchases and Sales

| | Settlement date | Activity | Type | Quantity | Description | Unit price | Amount |
|---|---|---|---|---|---|---|---|
| 1 | 11/27/2000 | Purchased | Sweep | 154,085 | DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | $1 | $154,085.00 - |
| | Net purchases and sales | | | | | | $154,085.00 |

### Deposits

### Other Deposits

| | Date posted | | Description | Amount |
|---|---|---|---|---|
| 1 | 11/24/2000 | | FUNDS RECEIVED | $154,085.00 |
| | Total other deposits | | | $154,085.00 |



**Deutsche Bank**

Statement of Account
November 1 to November 30, 2000
Account 223-78580

Page 3 of 5

**Deutsche Banc Alex. Brown**

Statement of Account
November 1 to November 30, 2000
Account 223-78580

Page 4 of 5

## Portfolio Activity   continued

### Other Activity in Your Account

| | Settlement date | Activity | Quantity | Description | Amount |
|---|---|---|---|---|---|
| 1 | 11/30/2000 | Journal | 1 | LONG CALL FX OPTION EUR/JPY<br>STRIKE 96.40 PREM 10371000<br>UTD 11/17/00 EXP 12/15/00<br>SEE OB CONFIRM | |
| 1 | 11/30/2000 | Journal | 1 - | SHORT CALL FX OPTION EUR/JPY<br>STRIKE 96.42 PREM 10108250<br>UTD 11/17/00 EXP 12/15/00<br>SEE BS CONFIRM | |

## Market Indices

| Equities | Current | December 31, 1999 | Change year to date |
|---|---|---|---|
| Dow Jones Industrial Average | 10,414.49 | 11,497.12 | 9.4%- |
| NASDAQ Composite | 2,597.93 | 4,069.31 | 36.2%- |
| S&P 500 | 1,314.95 | 1,469.25 | 10.5%- |
| MSCI EAFE | 1,442.76 | 1,762.04 | 18.1%- |

| Fixed Income Securities | Current | December 31, 1999 |
|---|---|---|
| Long term treasury bond yield | 5.63% | 6.48% |
| Lehman Brothers Intermediate US Govt's Index | 7.36% | 8.16% |

## Disclosure

Please advise us promptly of any material change in your investment or financial situation.
Your account is with DB Alex. Brown LLC, a registered broker-dealer, referred to herein as Deutsche Banc Alex. Brown. The reporting period for your statement ends on the last day of the month. The dates indicated on purchases and sales are settlement dates. Margin interest charges incurred after the period indicated on this statement will be shown on the next statement. In order to review margin interest charges, you should retain this statement for use in conjunction with the next statement.
Any free credit balances represent funds payable on demand which, although properly accounted for on our books and records, are not segregated and may be used in the conduct of the Firm's business, without payment to you subject to the limitations of 17 CFR Section 240.15c3-3 under the Securities Exchange Act of 1934.
Positions and activity shown on your margin account comprise a combined statement of your margin account and your special memorandum account. The special memorandum account is maintained for you in accordance with Regulation T of the Board of Governors of the Federal Reserve System and is comprised of funds generated by your margin activity and segregated for your future use. A permanent detailed record of the activity in this account is available for inspection at your request. We reserve the right to establish or modify requirements pertaining to the operation of a margin account which may exceed requirements established by the Federal Reserve Board and/or the New York Stock Exchange.
Aggregate commissions which you have paid are not reported separately on this statement of account.
Commissions and charges incurred in connection with the execution of option and other transactions have been included in confirmations of those transactions previously furnished you. A summary of this information will be made available to you upon request.
Orders for your account may be aggregated with other customer orders. In so doing, you may receive an average price for your orders which may be different from the price(s) you may have received had your orders not been aggregated. This practice may also result in your orders being only partially completed.
A financial statement on this Firm is available for your personal inspection at our offices, or a copy will be mailed upon your written request.
Information regarding market price, market value, estimated income, dividends and annual yields is based on data obtained from sources we consider to be reliable but is not guaranteed as to accuracy. This information is provided as a convenience to aid in your financial recordkeeping.
Deutsche Banc Alex. Brown money fund yield figures are based on the seven-day period preceding the statement date. Flag Investors Funds estimated yield and income figures are computed based on either dividends for the preceding twelve-month period or the annualized rate of distribution.
Account information may have been provided regarding both publicly traded limited partnerships and certain other limited partnerships purchased through the Firm. The "market value" amount listed for these other limited partnerships does not necessarily reflect current market value but rather is based upon the information we obtain from sources outside the Firm but whose accuracy we cannot confirm.
We receive payment for routing for execution some orders in certain listed securities. The determination as to where to route orders is based on several factors, subject to the overriding consideration that customers receive best execution. All orders for which we receive payment are exposed to the possibility of price improvement, so that all such orders potentially can be executed at prices superior to the best bid or best offer. Payment is received in the form of rebates, or credits against exchange fees and specialist fees. Details will be furnished upon written request.
DB Alex. Brown LLC debits $50 from each account transferring to another broker-dealer or financial institution to cover the administrative costs of such transfer.
NASD Regulation, Inc. makes available to investors a brochure regarding its Public Disclosure Program. The Public Disclosure hotline number is (800) 289-9999. The NASD Regulation website can be located at www.nasdr.com.
DB Alex. Brown LLC. Member SIPC.

* The current portfolio value excludes unpriced securities.
** Denotes a mutual fund.
*** Denotes a foreign security.

## Money Market Fund 7 Day Average Yields:

| | |
|---|---|
| DB ALEX. BROWN CASH RESERVE PRIME | 6.07% |
| DB ALEX. BROWN CASH RESERVE TREASURY | 5.84% |
| DB ALEX. BROWN CASH RESERVE TAX FREE | 3.52% |

## Your Standing Instructions are:

Purchases: Hold securities in street name
Sales: Credit proceeds to account
Income: Hold in account

End of Statement

# EXHIBIT 14

**Deutsche Banc Alex. Brown**
**Client Statement**

DB ALEX. BROWN LLC
P. O. BOX 1776
BALTIMORE MD 21203

CLENDENING/BRUBAKER
INVESTMENT REP #109
200 CRESCENT COURT SUITE500
DALLAS TX 75201-6959
(214) 740-7700 (800) 527-3903

TR2 INVESTMENTS
ATTN BILL P TSOURAPAS
1301 WEST 22ND ST STE 615
OAKBROOK IL 60523

## Portfolio Overview

### Assets

| | Value as of November 30, 2000 | % of total assets |
|---|---|---|
| Cash | $0.00 | 0.0% |
| Money funds | 154,065.00 | 100.0 |
| Common stocks | 0.00 | 0.0 |
| Preferred stocks | 0.00 | 0.0 |
| Mutual funds | 0.00 | 0.0 |
| Government debt issues | 0.00 | 0.0 |
| Corporate debt issues | 0.00 | 0.0 |
| Municipal debt issues | 0.00 | 0.0 |
| Certificates of deposit | 0.00 | 0.0 |
| Options | 0.00 | 0.0 |
| Limited partnerships | 0.00 | 0.0 |
| Annuities | 0.00 | 0.0 |
| Other | 0.00 | 0.0 |
| **Total assets** | **$154,065.00** | **100.0%** |

### Liabilities

| | Value as of November 30, 2000 | % of total assets |
|---|---|---|
| Cash debit | $0.00 | 0.0% |
| Margin debit | 0.00 | 0.0 |
| Short options | 0.00 | 0.0 |
| Other short securities | 0.00 | 0.0 |
| **Total liabilities** | **$0.00** | **0.0%** |

**Net Value of Your Account**     $154,065.00

Net Value as of December 31, 1999     $0.00

### Activity

| | This period |
|---|---|
| Net value of your account as of October 31 | $0.00 |
| Net cash activity | 154,065.00 |
| Net result for loss/cost of account | 0.00 |
| Net return on your portfolio | 0.00 |
| Net value of your account as of November 30 | $154,065.00 |

### Income

| | This period | Year to date |
|---|---|---|
| Net income received | $0.00 | $0.00 |
| Current estimated annual income | $9,351.74 | |
| Current estimated annual yield | 5.07% | |


**Deutsche Bank**

Statement of Account
November 1 to November 30, 2000
Account: 223-78581

Page 1 of 3

**Deutsche Banc Alex. Brown**

Statement of Account
November 1 to November 30, 2000
Account 223-78381

Page 2 of 5

## Cash Summary

Opening Cash Balance     $0.00

| Income Summary | Thisperiod | Year to date |
|---|---|---|
| Taxable dividends | $0.00 | $0.00 |
| Taxable interest | 0.00 | 0.00 |
| Capital gains distributions received | 0.00 | 0.00 |
| Non-taxable dividends | 0.00 | 0.00 |
| Non-taxable interest | 0.00 | 0.00 |
| Net income received | $0.00 | $0.00 |

| Cash Activity | Thisperiod | Year to date |
|---|---|---|
| Deposits | $154,065.00 | $154,065.00 |
| Withdrawals | 0.00 | 0.00 |
| U.S. tax withheld | 0.00 | 0.00 |
| Non-resident tax withheld | 0.00 | 0.00 |
| Foreign taxes withheld | 0.00 | 0.00 |
| Interest charges on cash debit | 0.00 | 0.00 |
| Interest charges on margin debit | 0.00 | 0.00 |
| Net cash activity | $154,065.00 | $154,065.00 |

| Purchases and Sales | Thisperiod | Year to date |
|---|---|---|
| Total purchases | $154,065.00 - | $154,065.00 - |
| Total sales | 0.00 | 0.00 |
| Other money fund sales | 0.00 | 0.00 |
| Net purchases/sales (incl. money funds) | $154,065.00 - | $154,065.00 - |

| Other Activity | Thisperiod | Year to date |
|---|---|---|
| Bond redemptions | $0.00 | $0.00 |
| Other activity | 0.00 | 0.00 |
| Net other activity | $0.00 | $0.00 |

Closing Cash Balance     $0.00

## Portfolio Summary

| Activity | Thisperiod | Year to date |
|---|---|---|
| Previous net account value | $0.00 | $0.00 |
| Net cash activity | 154,065.00 | 154,065.00 |
| Net securities in/out of account | 0.00 | 0.00 |
| Adjusted previous account value | $154,065.00 | $154,065.00 |
| Net change in market value | 0.00 | 0.00 |
| Net income received | 0.00 | 0.00 |
| Net account value as of November 30, 2000 | $154,065.00 | $154,065.00 |
| Net return on portfolio | 0.00 | 0.00 |

## Portfolio Holdings

Prices are provided by an independent pricing service. For current market price quotations, call your Investment Representative.

### Cash and Equivalents

| | Amount | Estimated annual income | Current annual yield |
|---|---|---|---|
| DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | $154,065.00 | $9,359.74 | 6.07% |
| **Total cash and equivalents** | $154,065.00 | $9,359.74 | |

### Common Stocks

| | Symbol | Quantity | Current share price | Current market value | Estimated annual income | Estimated dividend yield |
|---|---|---|---|---|---|---|
| LONG CALL FX OPTION EUR/GBP STRIKE .6155 PREM 10571000 DTD 11/2 3RD EXP 12/15/00 | | 1 | Not Priced | Not Priced | | |
| SHORT CALL FX OPTION EUR/GBP STRIKE .6157 PREM 124.08250 DTD 11/2 3RD EXP 12/15/00 | | 1 - | Not Priced | Not Priced | | |
| **Total common stocks** | | | | $0.00 | | |

## Portfolio Activity

### Purchases and Sales

| | Settlement date | Activity | Type | Quantity | Description | Unit price | Amount |
|---|---|---|---|---|---|---|---|
| S | 11/27/2000 | Purchased | Sweep | 154,065 | DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | $1 | $154,065.00 - |
| **Net purchases and sales** | | | | | | | $154,065.00 - |

### Deposits

#### Other Deposits

| | Date opened | Description | Amount |
|---|---|---|---|
| 1 | 11/24/2000 | FUNDS RECEIVED | $154,065.00 |
| **Total other deposits** | | | $154,065.00 |

 Deutsche Bank

Statement of Account
November 1 to November 30, 2000
Account 223-78581

Page 3 of 5

**Deutsche Banc Alex. Brown**

Statement of Account
November 1 to November 30, 2000
Account 223-78381

Page 4 of 5

## Portfolio Activity   continued

### Other Activity in Your Account

| Settlement date | Activity | Quantity | Description | Amount |
|---|---|---|---|---|
| 1 | 11/30/2000 | Journal | 1 | LONG CALL FX OPTION EUR/GBP STRIKE .6536 PREM 105 79000 DTD 11/27/00 EXP 12/15/00 SEE DB CONFIRM | |
| 1 | 11/30/2000 | Journal | 1 | SHORT CALL FX OPTION EUR/GBP STRIKE .6157 PREM 105 68250 DTD 11/27/00 EXP 12/15/00 SEE DB CONFIRM | |

## Market Indices

### Equities

| | Current | December 31, 1999 | Change year to date |
|---|---|---|---|
| Dow Jones Industrial Average | 10,414.49 | 11,497.12 | 9.4% - |
| NASDAQ Composite | 2,597.93 | 4,069.31 | 36.2% - |
| S&P 500 | 1,314.95 | 1,469.25 | 10.5% - |
| MSCI EAFE | 1,442.76 | 1,740.04 | 13.0% - |

### Fixed Income Securities

| | Current | December 31, 1999 |
|---|---|---|
| Long term treasury bond yield | 5.63% | 6.46% |
| Lehman Brothers Intermediate US Credit Index | 7.36% | 0.16% |

## Disclosure

Please advise us promptly of any material change in your investment or financial situation.
Your account is with DB Alex. Brown LLC, a registered broker-dealer, referred to herein as Deutsche Banc Alex. Brown. The reporting period for your statement ends on the last day of the month. The dates indicated on purchases and sales are settlement dates. Margin interest charges incurred after the period indicated on this statement will be shown on the next statement. In order to review margin interest charges, you should retain this statement for use in conjunction with the next statement.
Any free credit balances represents funds payable on demand which, although properly accounted for on our books and records, are not segregated and may be used in the conduct of the Firm's business, without payment to you subject to the limitations of 17 CFR Section 240.15c3-3 under the Securities Exchange Act of 1934.
Positions and activity shown on your margin account comprise a combined statement of your margin account and your special memorandum account. The special memorandum account is maintained for you in accordance with Regulation T of the Board of Governors of the Federal Reserve System and is comprised of funds generated by your margin activity and segregated for your future use. A permanent detailed record of the activity in this account is available for inspection at your request. We reserve the right to establish or modify requirements pertaining to the operation of a margin account which may exceed requirements established by the Federal Reserve Board and/or the New York Stock Exchange.
Aggregate commissions which you have paid are not reported separately on this statement of account.
Commissions and charges incurred in connection with the execution of option and other transactions have been included in confirmations of those transactions previously furnished you. A summary of this information will be made available to you upon request.
Orders for your account may be aggregated with other customer orders. In so doing, you may receive an average price for your orders which may be different from the price(s) you may have received had your orders not been aggregated. This practice may also result in your orders being only partially completed.
A financial statement on this Firm is available for your personal inspection at our offices, or a copy will be mailed upon your written request.
Information regarding market price, market value, estimated income, dividends and annual yields is based on data obtained from sources we consider to be reliable but is not guaranteed as to accuracy. This information is provided as a convenience to aid in your financial recordkeeping.
Deutsche Banc Alex. Brown money fund yield figures are based on the seven-day period preceding the statement date. Flag Investors Funds estimated yield and income figures are computed based on either dividends for the preceding twelve-month period or the annualized rate of distribution.
Account information may have been provided regarding both publicly traded limited partnerships and certain other limited partnerships purchased through the Firm. The "market value" amount listed for these other limited partnerships does not necessarily reflect current market value but rather is based upon the information we obtain from sources outside the Firm but whose accuracy we cannot confirm.
We receive payment for routing for execution some orders in certain listed securities. The determination as to where to route orders is based on several factors, subject to the overriding consideration that customers receive best execution. All orders for which we receive payment are exposed to the possibility of price improvement, so that all such orders potentially can be executed at prices superior to the best bid or best offer. Payment is received in the form of rebates, or credits against exchange fees and specialist fees. Details will be furnished upon written request.
DB Alex. Brown LLC debits $50 from each account transferring to another broker-dealer or financial institution to cover the administrative costs of such transfer.
NASD Regulation, Inc. makes available to investors a brochure regarding its Public Disclosure Program. The Public Disclosure hotline number is (800) 289-9999. The NASD Regulation website can be located at www.nasdr.com.
DB Alex. Brown LLC. Member SIPC.
* The current portfolio value excludes unpriced securities.
** Denotes a mutual fund.
*** Denotes a foreign security.

## Money Market Fund 7 Day Average Yields:

| | |
|---|---|
| DB ALEX. BROWN CASH RESERVE PRIME | 6.07% |
| DB ALEX. BROWN CASH RESERVE TREASURY | 5.84% |
| DB ALEX. BROWN CASH RESERVE TAX FREE | 3.52% |

## Your Standing Instructions are:

Purchases: Hold securities in street name
Sales: Credit proceeds to account
Income: Hold in account

End of Statement

# EXHIBIT 15

**Deutsche Banc Alex. Brown**
**Client Statement**

DB ALEX. BROWN LLC
P. O. BOX 1776
BALTIMORE MD 21203

CLENDENING/BRUBAKER
INVESTMENT REP #109
200 CRESCENT COURT SUITE 5500
DALLAS TX 75201-6959
(214) 740-7700 (800) 527-3903

TR3 INVESTMENTS LLC
ATTN BILL P TSOURAPAS
1301 WEST 22ND ST STE 615
OAKBROOK IL 60523

## Portfolio Overview

### Assets

| | Value as of November 30, 2000 | % of total assets |
|---|---|---|
| Cash | $0.00 | 0.0% |
| Money funds | 154,046.00 | 100.0 |
| Common stocks | 0.00 | 0.0 |
| Preferred stocks | 0.00 | 0.0 |
| Mutual funds | 0.00 | 0.0 |
| Government debt issues | 0.00 | 0.0 |
| Corporate debt issues | 0.00 | 0.0 |
| Municipal debt issues | 0.00 | 0.0 |
| Certificates of deposit | 0.00 | 0.0 |
| Options | 0.00 | 0.0 |
| Limited partnerships | 0.00 | 0.0 |
| Annuities | 0.00 | 0.0 |
| Other | 0.00 | 0.0 |
| Total assets | $154,046.00 | 100.0% |

### Liabilities

| | Value as of November 30, 2000 | % of total assets |
|---|---|---|
| Cash debit | $0.00 | 0.0% |
| Margin debit | 0.00 | 0.0 |
| Short options | 0.00 | 0.0 |
| Other short securities | 0.00 | 0.0 |
| Total liabilities | $0.00 | 0.0% |

**Net Value of Your Account**          $154,046.00

**Net Value as of December 31, 1999**          $0.00

### Activity

| | This period |
|---|---|
| Net value of your account as of October 31 | $0.00 |
| Net cash activity | 154,085.00 |
| Net securities transfer of account | 0.00 |
| Net return on your portfolio | 0.00 |
| Net value of your account as of November 30 | $154,046.00 |

### Income

| | This period | Year to date |
|---|---|---|
| Net income received | $0.00 | $0.00 |
| Current estimated annual income | $9,25.174 | |
| Current estimated annual yield | 5.07% | |

Statement of Account
November 1 to November 30, 2000
Account 223-78382

Page 1 of 5

**Deutsche Banc Alex. Brown**

Statement of Account
November 1 to November 30, 2000
Account 223-78582

Page 2 of 5

## Cash Summary

Opening Cash Balance     $0.00

### Income Summary

| | This period | Year to date |
|---|---|---|
| Taxable dividends | $0.00 | $0.00 |
| Taxable interest | 0.00 | 0.00 |
| Capital gains distributions received | 0.00 | 0.00 |
| Non-taxable dividends | 0.00 | 0.00 |
| Non-taxable interest | 0.00 | 0.00 |
| Net income received | $0.00 | $0.00 |

### Cash Activity

| | This period | Year to date |
|---|---|---|
| Deposits | $154,065.00 | $154,065.00 |
| Withdrawals | 0.00 | 0.00 |
| U.S. tax withheld | 0.00 | 0.00 |
| Non-resident tax withheld | 0.00 | 0.00 |
| Foreign taxes withheld | 0.00 | 0.00 |
| Interest charges on cash debit | 0.00 | 0.00 |
| Interest charges on margin debit | 0.00 | 0.00 |
| Net cash activity | $154,065.00 | $154,065.00 |

### Purchases and Sales

| | This period | Year to date |
|---|---|---|
| Total purchases | $154,065.00 - | $154,065.00 - |
| Total sales | 0.00 | 0.00 |
| Other money fund sales | 0.00 | 0.00 |
| Net purchases/sales (incl. money funds) | $154,065.00 - | $154,065.00 - |

### Other Activity

| | This period | Year to date |
|---|---|---|
| Bond redemptions | $0.00 | $0.00 |
| Other activity | 0.00 | 0.00 |
| Net other activity | $0.00 | $0.00 |

Closing Cash Balance     $0.00

## Portfolio Summary

### Activity

| | This period | Year to date |
|---|---|---|
| Previous net account value | $0.00 | $0.00 |
| Net cash activity | 154,065.00 | 154,065.00 |
| Net securities into/out of account | 0.00 | 0.00 |
| Adjusted previous account value | $154,065.00 | $154,065.00 |
| Net change in market value | 0.00 | 0.00 |
| Net income received | 0.00 | 0.00 |
| Net account value as of November 30, 2000 | $154,065.00 | $154,065.00 |
| Net return on portfolio | 0.00 | 0.00 |

## Portfolio Holdings

Prices are provided by an independent pricing service. For current market price quotations, call your Investment Representative.

### Cash and Equivalents

|  | Amount | Estimated annual income | Current annual yield |
|---|---|---|---|
| DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | $154,065.00 | $9,351.74 | 6.07% |
| **Total cash and equivalents** | $154,065.00 | $9,351.74 | |

### Common Stocks

|  | Symbol | Quantity | Current share price | Current market value | Estimated annual income | Estimated dividend yield |
|---|---|---|---|---|---|---|
| 1 | LONG CALL FX OPTION EUR/JPY STRIKE 96.40 PREM 100710JD DTD 10/27/00 EXP 12/25/00 | | 1 | Not Priced | Not Priced | | |
| 1 | SHORT CALL FX OPTION EUR/JPY STRIKE 96.42 PREM 101 68260 DTD 10/27/00 EXP 12/25/00 | | 1 - | Not Priced | Not Priced | | |
| | **Total common stocks** | | | | $0.00 | | |

## Portfolio Activity

### Purchases and Sales

|  | Settlement date | Activity | Type | Quantity | Description | Unit price | Amount |
|---|---|---|---|---|---|---|---|
| 5 | 11/27/2000 | Purchased | Sweep | 154,065 | DEUTSCHE BANC ALEX. BROWN CASH RESERVE FUND, INC.- PRIME SERIES | $1 | $154,065.00 - |
| | **Net purchases and sales** | | | | | | $154,065.00 - |

### Deposits

#### Other Deposits

|  | Date posted | Description | Amount |
|---|---|---|---|
| 1 | 11/24/2000 | FUNDS RECEIVED | $154,065.00 |
| | **Total other deposits** | | $154,065.00 |



**Deutsche Bank**

Statement of Account
November 1 to November 30, 2000
Account 223-78582

Page 3 of 5

**Deutsche Banc Alex. Brown**

Statement of Account
November 1 to November 30, 2000
Account 223-78582

Page 4 of 5

## Portfolio Activity  continued

### Other Activity in Your Account

| Settlement date | Activity | Quantity | Description | Amount |
|---|---|---|---|---|
| 11/20/2000 | Journal | 1 | LONG CALL FX OPTION EUR/JPY STRIKE 96.40 PREM 102.75000 DTD 11/27/00 EXP 12/13/00 SEE DB CONFIRM | |
| 11/20/2000 | Journal | 1 | SHORT CALL FX OPTION EUR/JPY STRIKE 96.42 PREM 101.08250 DTD 11/27/00 EXP 12/13/00 SEE DB CONFIRM | |

## Market Indices

| Equities | Current | December 31, 1999 | Change year to date |
|---|---|---|---|
| Dow Jones Industrial Average | 10,414.49 | 11,497.12 | 9.4%- |
| NASDAQ Composite | 2,597.93 | 4,069.31 | 36.2%- |
| S&P 500 | 1,314.95 | 1,469.25 | 10.3%- |
| MSCI EAFE | 1,442.76 | 1,760.06 | 18.0%- |

| Fixed Income Securities | Current | December 31, 1999 |
|---|---|---|
| Long term treasury bond yield | 5.63% | 6.48% |
| Lehman Brothers Intermediate US Credit Index | 7.36% | 0.16% |

## Disclosure

Please advise us promptly of any material change in your investment or financial situation.

Your account is with DB Alex. Brown LLC, a registered broker-dealer, referred to herein as Deutsche Banc Alex. Brown. The reporting period for your statement ends on the last day of the month. The dates indicated on purchases and sales are settlement dates. Margin interest charges incurred after the period indicated on this statement will be shown on the next statement. In order to review margin interest charges, you should retain this statement for use in conjunction with the next statement.

Any free credit balances represent funds payable on demand which, although properly accounted for on our books and records, are not segregated and may be used in the conduct of the Firm's business, without payment to you subject to the limitations of 17 CFR Section 240.15c3-3 under the Securities Exchange Act of 1934.

Positions and activity shown on your margin account comprise a combined statement of your margin account and your special memorandum account. The special memorandum account is maintained for you in accordance with Regulation T of the Board of Governors of the Federal Reserve System and is comprised of funds generated by your margin activity and segregated for your future use. A permanent detailed record of the activity in this account is available for inspection at your request. We reserve the right to establish or modify requirements pertaining to the operation of a margin account which may exceed requirements established by the Federal Reserve Board and/or the New York Stock Exchange.

Aggregate commissions which you have paid are not reported separately on this statement of account. Commissions and charges incurred in connection with the execution of option and other transactions have been included in confirmations of those transactions previously furnished you. A summary of this information will be made available to you upon request.

Orders for your account may be aggregated with other customer orders. In so doing, you may receive an average price for your orders which may be different from the price(s) you may have received had your orders not been aggregated. This practice may also result in your orders being only partially completed.

A financial statement on this Firm is available for your personal inspection at our offices, or a copy will be mailed upon your written request.

Information regarding market price, market value, estimated income, dividends and annual yields is based on data obtained from sources we consider to be reliable but is not guaranteed as to accuracy. This information is provided as a convenience to aid in your financial recordkeeping.

Deutsche Banc Alex. Brown money fund yield figures are based on the seven-day period preceding the statement date. Flag Investors Funds estimated yield and income figures are computed based on either dividends for the preceding twelve-month period or the annualized rate of distribution.

Account information may have been provided regarding both publicly traded limited partnerships and certain other limited partnerships purchased through the Firm. The "market value" amount listed for these other limited partnerships does not necessarily reflect current market value but rather is based upon the information we obtain from sources outside the Firm but whose accuracy we cannot confirm.

We receive payment for routing for execution some orders in certain listed securities. The determination as to where to route orders is based on several factors, subject to the overriding consideration that customers receive best execution. All orders for which we receive payment are exposed to the possibility of price improvement, so that all such orders potentially can be executed at prices superior to the best bid or best offer. Payment is received in the form of rebates, or credits against exchange fees and specialist fees. Details will be furnished upon written request.

DB Alex. Brown LLC debits $50 from each account transferring to another broker-dealer or financial institution to cover the administrative costs of such transfer.

NASD Regulation, Inc. makes available to investors a brochure regarding its Public Disclosure Program. The Public Disclosure hotline number is (800) 289-9999. The NASD Regulation website can be located at www.nasdr.com.

DB Alex. Brown LLC, Member SIPC.

* The current portfolio value excludes unpriced securities.

** Denotes a mutual fund.

*** Denotes a foreign security.

## Money Market Fund 7 Day Average Yields:

| | |
|---|---|
| DB ALEX. BROWN CASH RESERVE PRIME | 6.07% |
| DB ALEX. BROWN CASH RESERVE TREASURY | 5.84% |
| DB ALEX. BROWN CASH RESERVE TAX FREE | 3.52% |

## Your Standing Instructions are:

Purchases: Hold securities in street name
Sales: Credit proceeds to account
Income: Hold in account

End of Statement

# EXHIBIT 16

NOV-29-2000  01:07      DEUTSCE BANK NY                    212 469 4466    P.17

# Deutsche Bank AG New York Branch

28 November, 2000

### Foreign Exchange Digital Option Transaction
Our ref: 36574

V1 Investments LLC
Care of Craig Brubaker
DB Alex Brown
200 Crescent Court, Suite 500
Dallas , Texas 75201
214-740-7777

Deutsche Bank AG New York Branch
1290 Ave. of the Americas
New York NY 10019

Telephone: 212-469-4033
Fax:     212-469-4466

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

**1.  Section 1 – General Terms**

| | |
|---|---|
| Notional Amount: | USD 636,000.00 |
| Trade Date: | 27 November 2000 |
| Termination Date: | 15 December 2000, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/GBP |

**2.  Section 1 – First Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 318,000.00 |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 636,000.00 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | EUR 0.6155 per GBP 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

J6574cbgb.dou

**3. Section 1 – Second Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 314,820.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 629,640.00 |
| Second Range Level: | EUR 0.6157 per GBP 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

**Section 2 - Other Provisions**

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)        Offices:

(a)    The Office of Party A for the Transaction is New York; and
(b)    The Office of Party B for the Transaction is Delaware.

**3.      Representations:**

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)        **Non-Reliance.**  It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)   **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4.      **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5.      **Definitions.**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York.

By: _____                          By: _____
Name: Rick Pychewicz                                  Name: Andrew Bayley
Title:  VP                                            Title:  Associate

Confirmed as of the date first above written:
V1 Investments LLC

By: _____                          By: _____
Name: Dino Vadevoulis, Member                         Name:
Authorised Signatory                                  Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033.Please sign and fax to 212-469-4466.Thank you.

# EXHIBIT 17

NOV-29-2000  01:08      DEUTSCE BANK NY                              212 469 4466      P.20

# Deutsche Bank AG New York Branch

29 November, 2000

**Foreign Exchange Digital Option Transaction**
Our ref: 36575

V2 Investments LLC                                         Deutsche Bank AG New York Branch
Care of Craig Brubaker                                     1290 Ave. of the Americas
DB Alex Brown                                              New York NY 10019
200 Crescent Court, Suite 500
Dallas ,Texas 75201
214-740-7777                                               Telephone: 212-469-4033
                                                           Fax:     212-469-4465

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction. The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

**1. Section 1 – General Terms**

| | |
|---|---|
| Notional Amount: | USD 636,000.00 |
| Trade Date: | 27 November 2000 |
| Termination Date: | 15 December 2000, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/GBP |

**2. Section 1 – First Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 318,000.00 |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 636,000.00 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | EUR 0.6155 per GBP 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 18 December 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital Option Trigger Event.

J6575chab

3.  Section 1 – Second Digital Option Transaction

(I) Initial Exchange Provisions:

Party A Initial Exchange Amount:        USD 314,820.00
Party B Initial Exchange Amount:        Zero
Initial Exchange Date:                  29 November 2000, subject to adjustment in accordance with the
                                        Following Business Day Convention

(ii) Final Exchange Provisions:

Party A Final Exchange Amount:          Zero
Party B Final Exchange Amount:          USD 629,640.00
Second Range Level:                     EUR 0.8157 per GBP 1.0000
Second Rate Determination Date:         Means the Termination Date
Final Exchange Date:                    19 December 2000, subject to adjustment in accordance with the
                                        Following Business Day Convention

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

Section 2 - Other Provisions

(I) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (d) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)            Offices:

                (a)   The Office of Party A for the Transaction is New York; and
                (b)   The Office of Party B for the Transaction is Delaware.

3.      Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)     Non-Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

36375sbgb

(ii)    **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)   **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4.      **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5.      **Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: _____                    By: _____
Name:  Rick Pychewicz                            Name:  Andrew Bayley
Title:  VP                                       Title:  Associate

Confirmed as of the date first above written:
V2 Investments LLC

By: _____                    By: _____
Name:  Paul Vadevonias, Member                   Name:
Authorised Signatory                             Authorised Signatory


For any query relating to this Confirmation please contact : 212-469-4033.Please sign and fax to 212-469-4466.Thank you.

3657Sebgb

# EXHIBIT 18

NOV-29-2000  01:09        DEUTSCE BANK NY                    212 469 4466    P.23

# Deutsche Bank AG New York Branch

Foreign Exchange Digital Option Transaction
Our ref: 38578

28 November, 2000

V3 Investments LLC
Care of Craig Brubaker
DB Alex Brown
200 Crescent Court,Suite 500
Dallas ,Texas 75201
214-740-7777

Deutsche Bank AG New York Branch
1290 Ave. of the Americas
New York NY 10019

Telephone: 212-469-4033
Fax:        212-469-4466

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

## 1. Section 1 – General Terms

| | |
|---|---|
| Notional Amount: | USD 636,000.00 |
| Trade Date: | 27 November 2000 |
| Termination Date: | 15 December 2000, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/GBP |

## 2. Section 1 – First Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 318,000.00 |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 636,000.00 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | EUR .6155 per GBP 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

38576cbgb.doc

3. Section 1 – Second Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 314,820.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 629,640.00 |
| Second Range Level: | EUR 0.6157 per GBP 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)            Offices:

(a)    The Office of Party A for the Transaction is New York; and
(b)    The Office of Party B for the Transaction is Delaware.

3.      Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)     Non-Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

NOV-25-2000  01:09        DEUTSCE BANK NY                    212 469 4466      P.25

(ii)  **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)  **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

**4.    ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

**5.    Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
**Deutsche Bank AG, New York**

By: _____
Name:  Rick Rychewicz
Title:     VP

By: _____
Name:  Andrew Bayley
Title:    Associate

Confirmed as of the date first above written:
**V3 Investments LLC**

By: _____
Name:  Jim Vadevoulis, Member
Authorised Signatory

By: _____
Name:
Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033.Please sign and fax to 212-469-4466.Thank you.

36576cbgb.doc

# EXHIBIT 19

# Deutsche Bank AG New York Branch



26 November, 2000

### Foreign Exchange Digital Option Transaction
Our ref: 36568

TR1 Investments LLC
Care of Craig Brubaker
DB Alex Brown
200 Crescent Court, Suite 500
Dallas ,Texas 75201
214-740-7777

Deutsche Bank AG New York Branch
1290 Ave. of the Americas
New York NY 10019

Telephone: 212-469-4033
Fax:          212-469-4466
Swift: DEUT US 33

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T  Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

**1.  Section 1 – General Terms**

| | |
|---|---|
| Notional Amount: | USD 20,542,000.00 |
| Trade Date: | 27 November 2000 |
| Termination Date: | 15  December  2000,  subject  to  modification  in  accordance  with  the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/JPY |

**2.  Section 1 – First Digital Option Transaction**

**(i) Initial Exchange Provisions:**

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 10,271,000.00 |
| Initial Exchange Date: | 29  November  2000,  subject  to  adjustment  in  accordance  with  the Following Business Day Convention. |

**(ii) Final Exchange Provisions:**

| | |
|---|---|
| Party A Final Exchange Amount: | USD 20,542,000.00 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | JPY 96.40 per EUR 1.00 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19  December  2000,  subject  to  adjustment  in  accordance  with  the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

36568cbjp.doc

3. Section 1 – Second Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 10,168,290.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 20,336,580.00 |
| Second Range Level: | JPY 96.42 per EUR 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.


Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)          Offices:

(a)    The Office of Party A for the Transaction is New York; and
(b)    The Office of Party B for the Transaction is Delaware.


3.       Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)       Non-Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction. It being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)    **Assessment and Understanding.**  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)   **Status of Parties.**  The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4.    **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5.    **Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: _____

Name: Rick Pychewicz

Title: VP

Confirmed as of the date first above written:

TR1 Investments LLC

By: _____

Name: Bill P. Tsourapas, co-Trustee; Member

Authorised Signatory

By: _____

Name: Andrew Bayley

Title: Associate

By: _____

Name:

Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033.Please sign and fax to 212-469-4466.Thank you.

# EXHIBIT 20

NOV-29-2000  01:06        DEUTSCE BANK NY                    212 469 4466      P.14

# Deutsche Bank AG New York Branch



28 November, 2000

### Foreign Exchange Digital Option Transaction
Our ref: 36573

TR2 Investments LLC
Care of Craig Brubaker
DB Alex Brown
200 Crescent Court,Suite 500
Dallas ,Texas 75201
214-740-7777

Deutsche Bank AG New York Branch
1290 Ave. of the Americas
New York NY 10019

Telephone: 212-469-4033
Fax:      212-469-4466

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction.The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

**1.  Section 1 – General Terms**

| | |
|---|---|
| Notional Amount: | USD 20,542,000.00 |
| Trade Date: | 27 November 2000 |
| Termination Date: | 15 December 2000, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/GBP |

**2.  Section 1 – First Digital Option Transaction**

**(i) Initial Exchange Provisions:**

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 10,271,000.00 |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention. |

**(ii) Final Exchange Provisions:**

| | |
|---|---|
| Party A Final Exchange Amount: | USD 20,542,000.00 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | EUR .6155 per GBP 1.0000 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital OptionTrigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital OptionTrigger Event.

*36573ebgb.doc*

3. Section 1 – Second Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 10,166,290.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 20,336,580.00 |
| Second Range Level: | EUR 0.6157 per GBP 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)                Offices:

(a)    The Office of Party A for the Transaction is New York; and
(b)    The Office of Party B for the Transaction is Delaware.

3.      Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)        Non-Reliance. It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction, it being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

36573cbgb.doc

(ii)  **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)  **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4.  **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S. Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5.  **Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1997 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"). are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By:  _____              By:  _____
Name:  Rick Pychewicz                      Name:  Andrew Bayley
Title:  VP                                 Title:  Associate

Confirmed as of the date first above written:
TRZ Investments LLC

By:  _____              By:  _____
Name: Bill P. Tsouraptis, co-Trustee; Member    Name:  _____
Authorised Signatory                       Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033.Please sign and fax to 212-469-4466.Thank you.

# EXHIBIT 21

NOV-29-2000  01:03      DEUTSCE BANK NY                      212 469 4466    P.08

# Deutsche Bank AG New York Branch



28 November, 2000

**Foreign Exchange Digital Option Transaction**
Our ref: 36570

TR3 Investments LLC
Care of Craig Brubaker
DB Alex Brown
200 Crescent Court, Suite 500
Dallas ,Texas 75201
214-740-7777

Deutsche Bank AG New York Branch
1290 Ave. of the Americas
New York NY 10019

Telephone: 212-469-4033
Fax:      212-469-4466
Swift: DEUT US 33

Ladies and Gentlemen:

The purpose of this letter agreement (this "Confirmation") is to confirm the terms and conditions of the Foreign Exchange Digital Option Transaction entered into between us ("Party A") and you ("Party B") on the Trade Date referred to below (the "Transaction"). The parties acknowledge and agree that B.T. Alex Brown has acted as introducing broker to Party A with respect to this Transaction. The Transaction consists of a number of elements as detailed below in Sections 1, 2(i) and (ii), 3(i) and (ii) and Section 4. Certain definitions and provisions which are applicable to more than one element of the Transaction are detailed in Section 1. The terms of the Transaction to which this Confirmation relates are as follows:

**1. Section 1 – General Terms**

| | |
|---|---|
| Notional Amount: | USD 20,542,000.00 |
| Trade Date: | 27 November 2000 |
| Termination Date: | 15 December 2000, subject to modification in accordance with the Following Business Day Convention. |
| Business Days: | In New York |
| Calculation Agent: | Party A |
| Currency Pair: | EUR/JPY |

**2. Section 1 – First Digital Option Transaction**

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | Zero |
| Party B Initial Exchange Amount: | USD 10,271,000.00 |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | USD 20,542,000.00 |
| Party B Final Exchange Amount: | Zero |
| First Range Level: | JPY 95.40 per EUR 1.00 |
| First Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention. |

(A) If the Spot Rate is, on the First Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the First Range Level (such event being a "First Digital Option Trigger Event"), then upon the occurrence of such First Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a First Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of the First Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the First Digital Option Trigger Event and provide details of the occurrence of such First Digital Option Trigger Event. A failure to give such notice shall not, however, prejudice the occurrence of the First Digital Option Trigger Event.

36570cbjp.doc

3.  Section 1 – Second Digital Option Transaction

(i) Initial Exchange Provisions:

| | |
|---|---|
| Party A Initial Exchange Amount: | USD 10,168,290.00 |
| Party B Initial Exchange Amount: | Zero |
| Initial Exchange Date: | 29 November 2000, subject to adjustment in accordance with the Following Business Day Convention |

(ii) Final Exchange Provisions:

| | |
|---|---|
| Party A Final Exchange Amount: | Zero |
| Party B Final Exchange Amount: | USD 20,336,580.00 |
| Second Range Level: | JPY 96.42 per EUR 1.0000 |
| Second Rate Determination Date: | Means the Termination Date |
| Final Exchange Date: | 19 December 2000, subject to adjustment in accordance with the Following Business Day Convention |

(A) If the Spot Rate is, on the Second Rate Determination Date at 10:00 a.m. local time in New York, greater than or equal to the Second Range Level (such event being a "Second Digital Option Trigger Event"), then upon the occurrence of such Second Digital Option Trigger Event, (i) Party A shall pay to Party B the Party A Final Exchange Amount and (ii) Party B shall pay to Party A the Party B Final Exchange Amount. In determining whether a Second Digital Option Trigger Event has occurred, a particular spot rate shall be disregarded if the Calculation Agent, acting in good faith considers that it would not be commercially reasonable to take account of it.

(B) Upon the occurrence of a Second Digital Option Trigger Event, the Calculation Agent shall notify the other party orally (and, if requested, shall confirm such notice in writing by telex or telecopy) of the occurrence of the Second Digital Option Trigger Event and provide details of the occurrence of such Second Digital Option Trigger Event. A failure to give such notice shall not however prejudice the occurrence of the Second Digital Option Trigger Event.

Section 2 - Other Provisions

(i) For the purposes of this Transaction only, the following provision shall apply:

"Subparagraph (ii) of Section 2 (c) of the ISDA Form shall not apply to the First Digital Option Transaction and the Second Digital Option Transaction.

(ii)          Offices:

(a)  The Office of Party A for the Transaction is New York; and

(b)  The Office of Party B for the Transaction is Delaware.

3.     Representations:

Each party represents to the other party as of the date that it enters into this Transaction that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for this Transaction):

(i)          **Non-Reliance.** It is acting for its own account, and it has made its own independent decisions to enter into this Transaction and as to whether the Transaction is appropriate or proper for it based upon its own judgement and upon advice from such advisers as it has deemed necessary. It is not relying on any communication (written or oral) of the other party including any affiliate or subsidiary thereof as investment advice or as a recommendation to enter into this Transaction. It being understood that information and explanations related to the terms and conditions of this Transaction shall not be considered to be investment advice or a recommendation to enter into the Transaction. No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of this Transaction.

(ii)   **Assessment and Understanding.** It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms and conditions and risks of this Transaction. It is also capable of assuming, and assumes, the risks of the Transaction.

(iii)  **Status of Parties.** The other party is not acting as a fiduciary for or adviser to it in respect of this Transaction.

4.    **ISDA Agreement:**

If you and we are parties to either an ISDA Interest Rate and Currency Exchange Agreement (for which purposes this Transaction shall constitute a "Swap Transaction") or an ISDA Master Agreement (in each case an "Agreement") then this Confirmation supplements forms part of and is subject to such Agreement. If you and we are not yet parties to an Agreement then this Confirmation evidences a complete and binding agreement between Party A and Party B as to the terms of the Transaction to which this Confirmation relates. In addition Party A and Party B agree to use all reasonable efforts promptly to negotiate, execute and deliver an agreement in the form of the ISDA Master Agreement (Multicurrency-Cross Border) (the "ISDA Form") with such modifications as you and we will in good faith agree. Upon execution by Party A and Party B of such an agreement, this Confirmation will supplement, form part of, and be subject to that agreement. All provisions contained or incorporated by reference in that agreement upon its execution will govern this Confirmation. Until we execute and deliver that agreement, this Confirmation, together with all other documents referring to the ISDA Form (each a "Confirmation") confirming transactions (each a "Transaction") entered into between us (notwithstanding anything to the contrary in a Confirmation) shall supplement, form a part of, and be subject to an agreement in the form of the ISDA Form as if we had executed an agreement on the Trade Date of the first such Transaction between us in such form with the Schedule thereto (i) specifying only that (a) the governing law is New York law and (b) the Termination Currency is U.S., Dollars, (ii) incorporating the addition to the definition of "Indemnifiable Tax" contained in (page 48 of) the ISDA "Users Guide to the 1992 ISDA Master Agreements" and (iii) incorporating any other modifications to the ISDA form specified below.

5.     **Definitions:**

The definitions and provisions contained in the 1991 ISDA Definitions (as amended by the 1897 Supplement) as published by the International Swaps and Derivatives Association, Inc (the "Swap Definitions") and in the 1998 FX and Currency Option Definitions (the "FX Definitions") as published by the International Swaps and Derivatives Association, Inc., the Emerging Markets Traders Association and The Foreign Exchange Committee (the "1998 Definitions", and together with the Swap Definitions, the "Definitions"), are incorporated into this Confirmation. In the event of any inconsistency between the Swap Definitions and the 1998 Definitions, the 1998 Definitions will govern. In the event of any inconsistency between either set of Definitions and this Confirmation, this Confirmation will govern.

Please confirm that the foregoing correctly sets forth the terms of our agreement by executing the copy of this Confirmation enclosed for that purpose and returning it to us or by sending to us a letter or telex substantially similar to this letter, which letter or telex sets forth the material terms of the Transaction to which this Confirmation relates and indicates your agreement to those terms.

Yours faithfully,
for and on behalf of
Deutsche Bank AG, New York

By: _____          By: _____
Name: Rick Pychewicz                     Name: Andrew Bayley
Title: VP                                Title: Associate

Confirmed as of the date first above written:
TR3 Investments LLC

By: _____          By: _____
Name: Bill P. Tsourapas, co-Trustee; Member     Name:
Authorised Signatory                     Authorised Signatory

For any query relating to this Confirmation please contact : 212-469-4033.Please sign and fax to 212-469-4466.Thank you.

# EXHIBIT 22



**ENTERED**

DEC 15 2004

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SANTA ANA OFFICE
BY _____ DEPUTY

X Priority
X Send
☐ Clsd
X Enter
X JS-5/JS-6
___ JS-2/JS-3

**FILED**

DEC 14 2004

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _____ DEPUTY

**THIS CONSTITUTES NOTICE OF ENTRY
AS REQUIRED BY FRCP, RULE 77(d).**

✓ Docketed
X Copies / NTC Sent
X JS - 5 / JS - 6
___ JS - 2 / JS - 3
___ CLSD

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| J. PAUL REDDAM et al., | Case No. SA CV 04-1227-GLT (MANx) |
| Plaintiffs, | ORDER ON PLAINTIFFS' MOTION TO REMAND AND DEFENDANTS' MOTIONS TO COMPEL ARBITRATION OR STAY PROCEEDINGS |
| vs. | |
| KPMG LLP et al., | |
| Defendants. | |

Among other things, the Court holds that, under appropriate circumstances, a non-signatory to an arbitration agreement may compel arbitration under the theory of contractual right or the theory of equitable estoppel.

I.    BACKGROUND

Seeking to sell his corporation while minimizing his tax liability, Plaintiff consulted Defendants, which developed and implemented three tax strategies known as the Offshore Portfolio Investment Strategy ("OPIS"), the Bond Linked Issue Premium Structure ("BLIPS"), and Presidio/Greenvest 2001. Defendants' strategies allegedly resulted in huge tax liabilities, compelling Plaintiffs to

(40)

1 | sue.  In the Complaint, Plaintiffs allege professional negligence, legal

2 | malpractice, breach of fiduciary duty, fraud, negligent

3 | misrepresentation, joint venture liability, and violation of California

4 | Business and Professions Code section 17200.

5 |     Here, Plaintiffs bring a motion to remand, and Defendants bring

6 | motions to compel arbitration or stay proceedings.

7 |                   II.    DISCUSSION

8 |     A.    Remand

9 |     Plaintiffs assert the sole basis for federal jurisdiction is 9

10 | U.S.C. §§ 201-208, which allows for removal to federal court "[w]here

11 | the subject matter of an action or proceeding pending in a State court

12 | relates to an arbitration agreement or award falling under the

13 | Convention."  9 U.S.C. § 205 (1999) (emphasis added).  Plaintiffs argue

14 | their claims against Defendant Deutsche Bank A.G. do not "relate to an

15 | arbitration agreement"; therefore, there is no basis for federal

16 | jurisdiction and remand is proper.

17 |     The central issue is whether this action "relates to" the

18 | arbitration clause.  Plaintiffs deny any relation, arguing they have an

19 | arbitration agreement with only Deutsche Bank Securities, Inc. because

20 | their agreement is expressly limited to "controversies which may arise

21 | between us concerning any transaction of construction, performance or

22 | breach of this or any agreement between us . . . ."  (Burgunder Decl.

23 | Ex. 1 (emphases added).)

24 |     The standard for what satisfies the "relates to" requirement,

25 | however, is broad.  In Beiser v. Weyler, the Fifth Circuit stated:

26 |       whenever an arbitration agreement falling under the Convention

27 |       could conceivably affect the outcome of the plaintiff's case,

28 |       the agreement "relates to" the plaintiff's suit.  Thus, the

1     district court will have jurisdiction under § 205 over just

2     about any suit in which a defendant contends [ ] an arbitration

3     clause falling under the Convention provides a defense.

4  284 F.3d 665, 666, 669 (5th Cir. 2002).  The Fifth Circuit

5  continued: "In allowing removal whenever the arbitration clause

6  could conceivably impact the disposition of the case, we make it

7  easy, not hard, for defendants to remove. . . . [E]asy removal is

8  exactly what Congress intended in § 205."  Id. at 674.

9     In light of this "easy" standard, this Court holds the arbitration

10  agreement Plaintiffs entered into with Deutsche Bank Securities, Inc.

11  "relates to" Plaintiffs' claims against Defendant Deutsche Bank A.G.

12  For example, the arbitration agreement (or Customer's Agreement) enabled

13  Plaintiffs to implement a number of transactions relevant to this

14  action.  (Compl. ¶ 35 ("To effectuate the OPIS tax strategy [in this

15  action] . . . Reddam Trust opened an account with Deutsche Bank in late

16  May 1999 . . . ."); Reddam Decl. Ex. B (listing the "account opening

17  forms," or Customer's Agreement, as a "Condition Precedent").)

18     In short, where, as here, the Customer's Agreement enabled

19  Plaintiffs to implement the relevant transactions in this action, it is

20  at minimum "conceivable" that the arbitration clause will affect the

21  outcome of this action.

22     Alternatively, Plaintiffs contend § 205 -- Defendants' sole basis

23  for federal jurisdiction -- applies only if the agreement is itself an

24  international agreement; here, Plaintiffs argue the agreement is purely

25  domestic.  Consequently, Plaintiffs conclude § 205 does not apply and

26  there is no basis for federal jurisdiction.

27     Plaintiffs are mistaken.  An "international arbitration agreement"

28  per se is not necessary; rather, for the Convention and § 205 to apply,

1 | the commercial relationship out of which the agreement arises need only

2 | involve property located abroad, envision performance abroad, or

3 | otherwise relate to a foreign state.  9 U.S.C. § 202; e.g.,

4 | Freudensprung v. Offshore Technical Servs., Inc., 379 F.3d 327, 340 (5th

5 | Cir. 2004).

6 |     Here, the facts indicate the agreement involved property located

7 | abroad.  For example, Plaintiffs allege the "OPIS strategy involved an

8 | investment by the KPMG client in a foreign bank's stock [and] the

9 | purchase of call options on the same foreign bank's stock."  Plaintiffs

10 | continue: an "off-shore limited partnership was set up to engage in

11 | highly leveraged purchases of stock in the same foreign bank, using

12 | proceeds of a loan transaction with that bank."  (E.g., Compl. ¶¶ 19-20

13 | (emphases added).)

14 |     Plaintiffs also envisioned performance abroad, as demonstrated by

15 | Plaintiffs' plan to borrow $83.3 million principal and $50 million

16 | premium in a loan from Deutsche Bank A.G. -- a foreign bank -- to fund

17 | the BLIPS tax strategy.  (Compl. ¶ 45.)  Given the "easy" removal

18 | standard articulated by Beiser, the Court holds the Convention and § 205

19 | apply.[1/]

20 |     Next, Plaintiffs contend that, even if the Court has jurisdiction

21 | over Defendant Deutsche Bank A.G., the claims against the other

22 | Defendants should be remanded.  This contention is not well-taken.

23 | ─────────────────

24 |     [1/] Plaintiffs also argue Defendant Deutsche Bank A.G. agreed
to resolve disputes related to its financing activities in court.

25 | Upon reviewing the agreements Plaintiffs cite, the Court does not
agree.  Absent "clear and unequivocal" language, courts do not

26 | interpret forum selection clauses to waive removal rights under
the Convention.  McDermott Int'l, Inc. v. Lloyds Underwriters of

27 | London, 944 F.2d 1199, 1209-13 (5th Cir. 1991).  Here, the
language in the submission-to-jurisdiction clause does not

28 | address arbitration directly, or waive the right.

1  Because the Court has original jurisdiction over the claims against

2  Defendant Deutsche Bank A.G., the Court also has original jurisdiction

3  over the claims against all other Defendants.  The Ninth Circuit has

4  held that, where a federal statute provides for original jurisdiction

5  over "an action or proceeding," the grant of original jurisdiction

6  applies to the entire suit, not just certain claims or parties.

7  Brockman v. Merabank, 40 F.3d 1013, 1015-17 (9th Cir. 1994); California

8  v. Keating, 986 F.2d 346, 348 (9th Cir. 1993) ("The words 'action, suit,

9  or proceeding' are not limited to specific claims, but are synonymous

10  with the term 'case' in the constitutional sense . . . [the] terms

11  'action' and 'case' refer to the same thing, i.e., the entirety of a

12  civil proceeding . . . .") (internal citation omitted).

13      Here, the jurisdictional statute provides, "An action or

14  proceeding falling under the Convention shall be deemed to arise under

15  the laws and treaties of the United States.  The district courts of the

16  United States . . . shall have original jurisdiction over such an action

17  or proceeding . . . ."  9 U.S.C. § 203 (emphases added).  Consequently,

18  because the claims against Defendant Deutsche Bank A.G. "relate to" an

19  arbitration agreement subject to the Convention, the Court also has

20  original jurisdiction over the entire "action or proceeding" under §

21  205, including claims against the other Defendants.

22      In reply, Plaintiffs argue Brockman is inapplicable, as the

23  statute in Brockman specifically "vest[ed] the district court with

24  original jurisdiction over every claim in an action where the RTC is a

25  party."  40 F.3d at 1015.  Plaintiffs' argument is not convincing.

26  Plaintiffs' quote is a summary of the Third and Eighth Circuits'

27  conclusion as to the effect of the jurisdictional statute in Brockman;

28  the statute, by its terms, did not provide original jurisdiction over

1  every claim.

2      In short, the Court retains jurisdiction over the claims against

3  the other Defendants.  Plaintiffs' motion to remand is denied.

4      B. · <u>Arbitration</u>

5      The Federal Arbitration Act ("FAA") strongly favors arbitration.

6  <u>Chiron Corp. v. Ortho Diagnostic Sys., Inc.</u>, 207 F.3d 1126, 1131 (9th

7  Cir. 2000).  A court compels arbitration if the claim at issue is

8  within the scope of a valid, enforceable agreement to arbitrate.  9

9  U.S.C. §§ 3, 4.  On a motion to compel arbitration, courts resolve any

10  doubts in favor of arbitration.  <u>Moses H. Cone Mem'l Hosp. v. Mercury</u>

11  <u>Constr. Corp.</u>, 460 U.S. 1, 24-25 (1983).  If a court finds a party's

12  claims are subject to arbitration, then the court may stay the action

13  pending arbitration.  9 U.S.C. § 3.

14      1.  <u>Olson Lemons PC</u>

15      Defendant Olson Lemons PC's motion to compel arbitration is based

16  on different grounds from Defendants Deutsche Bank A.G.'s, Sidley Austin

17  Brown & Wood's, and KPMG's motions.  Its motion centers on whether an

18  arbitration agreement exists between it and Plaintiffs.

19      Defendant sent Plaintiffs an opinion letter on the tax

20  consequences of investments Plaintiffs desired to make.  Defendant

21  asserts the letter conditioned its use on Plaintiffs' agreement to

22  arbitrate disputes pursuant to the FAA.  Defendant argues that, even

23  though Plaintiffs did not sign the letter, its requirement to arbitrate

24  is enforceable, <u>Nghiem v. NEC Elec. Inc.</u>, 25 F.3d 1437, 1438-39 (9th

25  Cir. 1994), because Plaintiffs relied on it and reliance manifests

26  acceptance of the contract's terms, including the arbitration clause.

27      Plaintiffs contend they received and acted on Defendant's advice

28  almost one year before receiving the written opinion letter and

1   "unilateral arbitration provision," which was "never discussed with or

2   agreed to by Mr. Reddam." (Pls.' Opp'n at 2; Reddam Decl. ¶ 6.)

3   Plaintiffs argue they never agreed to the arbitration clause.

4        Under these facts, the parties agree the existence of an agreement

5   to arbitrate is based on state law contract principles governing the

6   formation of a contract.   Cheng-Canindin v. Renaissance Hotel Assocs.,

7   50 Cal. App. 4th 676, 683 (Ct. App. 1996).

8        Applying state law contract principles, the Court concludes

9   Defendant's AAA arbitration clause is not enforceable because agreement

10  to arbitrate cannot be inferred from the conduct of the parties.   Here,

11  the only mention of arbitration was about a year after Defendant's

12  advice was given, relied upon, and acted on.   When the arbitration

13  clause was sent to Plaintiffs, they had already received, relied on, and

14  paid for Defendant's services.   As Defendant states, "It was too late

15  for Mr. Reddam to reject the opinion letter . . . ." (Pls.' Opp'n at

16  5.)[2/]

17       Defendant Olson Lemons PC's motion to compel arbitration is

18  denied.[3/] Under the Court's ruling on Defendant Presidio's motion to

19  stay, infra, this action is stayed as to Defendant Olson Lemons PC as

20  _____

21       [2/] Defendant, however, contends Nghiem holds "an unsigned
     writing is a sufficient basis to support the contractual
22   arbitration obligation between the parties."   Defendant is
     incorrect.   While a signed writing is unnecessary, an unsigned
23   writing, standing alone, is insufficient.   Nghiem, 25 F.3d at
     1439-40 (finding an unsigned writing yet proceeding to analyze
24   plaintiff's conduct to determine whether he impliedly assented to
     arbitrate, thereby indicating an unsigned writing, by itself, is
25   not enough).
26

27       [3/]Olson Lemons does not make a non-signatory's motion to
28  compel arbitration under the Deutsche Bank Securities, Inc.,
     arbitration agreement, as other defendants do.

1 well.

2     2.   **Defendants Deutsche Bank A.G., Sidley Austin Brown & Wood,**

3          **and KPMG: Arbitration Compelled by Non-signatory**

4     Plaintiffs and Deutsche Bank Securities, Inc. (not named as a

5 defendant) entered into an arbitration agreement, which applies to "all

6 controversies which may arise between us concerning any transaction . .

7 . performance, or breach of this or any other agreement between us."

8 (Burgunder Decl. Ex. 1.) Non-signatory Defendants Deutsche Bank A.G.,

9 Sidley Austin Brown & Wood, and KPMG (non-signatories) seek arbitration

10 under this agreement.

11     The Court holds that, if appropriate circumstances exist,

12 arbitration may be compelled by a non-signatory to the arbitration

13 agreement under either the theory of contractual right or the equitable

14 estoppel theory.

15          a.   **The contractual right theory**

16     While signatories to a contract containing an arbitration

17 provision are generally the only ones bound by it, the Ninth Circuit

18 Court of Appeals has recognized instances where a non-signatory may

19 compel arbitration.

20     In 1993 the Court summarized Ninth Circuit rulings in **Britton v.**

21 **Co-op Banking Group**, 4 F.3d 742 (9th Cir. 1993). The Court noted the

22 Circuit has declined to adopt the judicial estoppel theory. Observing

23 that the right to compel arbitration stems from a contractual right, the

24 Court noted Ninth Circuit precedent holds "an entity that is neither a

25 party to nor agent for nor beneficiary of the contract lacks standing to

26 compel arbitration." Id. at 744. Applying this contractual right

27 limitation, the Court observed non-signatory arbitration enforcement

28 might be available to a third-party beneficiary, a successor in

1    interest, or a class of agents intended to benefit from the arbitration
2    clause.  Id. at 745-48.
3        In the decade since Britton, several district courts in the Ninth
4    Circuit have applied the contractual right theory of non-signatory
5    enforcement.  Newport Petroleum, Inc., v. Tug Justine Foss, 1997
6    WL876955 (W.D. Wash. 1997), relied on the rule that a successor in
7    interest can enforce an arbitration clause in a contract signed by its
8    predecessor.  Citing the Britton case, Creative Telecommunications,
9    Inc., v. Breeden, 120 F.Supp. 2d 1225, 1240 (D. Hawaii, 1999) held
10   "federal courts have consistently afforded agents, employees, and
11   representatives the benefit of arbitration agreements entered into by
12   their principals to the extent that the alleged misconduct relates to
13   their behavior as officers or directors or in their capacities as agents
14   of the corporation."[4/]
15       The Court holds the conduct alleged by Plaintiff is sufficient
16   under the contractual right theory to permit the non-signatories to
17   compel arbitration in this case.  Plaintiff alleges the non-defendant
18   Deutsche Bank Securities, Inc., a signatory, and the non-signatory
19   Defendants were agents of each other, and engaged in substantially
20   interdependent and concerted misconduct.  Deutsche Bank A.G. and
21   Deutsche Bank Securities, Inc. are treated as a single entity, and
22   referred to simply as "Deutsche Bank.  Defendants are alleged to have
23   formed a "de facto joint venture," and to have conspired together to
24   devise and promote the transactions.  All defendants are alleged to be
25

26       [4/]Other district court cases applying the Britton rules have
27   dealt with a signatory seeking to enforce an arbitration clause
     against a non-signatory.  Comer v. Micor, Inc., 278 F. Supp. 2d
28   1030 (N.D. Cal. 2003); Ahtna Government Services Corp. v. 52
     Rausch, LLC, 2003 WL 403359 (N.D. Cal. 2003).

1  jointly and severally liable.  Under the facts Plaintiff has alleged,

2  the non-signatories may invoke the arbitration requirement.

3                    b.   The equitable estoppel theory

4       Even if the non-signatories did not qualify under Britton's

5  contractual right theory, they qualify under the equitable estoppel

6  theory.

7       Although the Ninth Circuit Court of Appeals has apparently not yet

8  ruled on the subject, other circuits that have ruled on the point have

9  held that, under appropriate facts, a non-signatory may compel

10 arbitration under an equitable estoppel theory. See, e.g., Choctaw

11 Generation Ltd. Partnership v. American Home Assur. Co., 271 F.3d 403,

12 407 (2nd Cir. 2001); Grigson v. Creative Artists Agency L.L.C., 210 F.3d

13 524, 528 (5th Cir. 2000); Sunkist Soft Drinks, Inc. v. Sunkist Growers,

14 Inc., 10 F.3d 753, 757 (11th Cir. 1993); J.J. Ryan & Sons, Inc. v.

15 Rhone Poulenc Textile, S.A., 863 F.2d 315, 320-21 (4th Cir. 1988);

16 Hughes Masonry Co., Inc. v. Greater Clark County Sch. Bldg. Corp., 659

17 F.2d 836, 841 n. 9 (7th Cir. 1981); see also Medical Air Technology

18 Corp. v. Marwan Inv., Inc., 303 F.3d 11, 18-19 (1st  Cir. 2002) (noting

19 the availability of equitable estoppel to compel arbitration).  This

20 principle was recently adopted by at least one California state court.

21 See, e.g., Metalclad Corp. v. Ventana Envtl. Org. P'ship, 109

22 Cal.App.4th 1705, 1717 (2003).  Equitable estoppel has been held

23 appropriate where: (1) the complaint raises allegations of substantially

24 interdependent and concerted misconduct by both a signatory and one or

25 more non-signatories; and (2) this misconduct is founded in and

26 intertwined with the underlying contractual obligations. MS Dealer Serv.

27 Corp. v. Franklin, 177 F.3d 942, 947 (11th Cir. 1999).

28      "The circuits have been willing to estop a signatory from avoiding

1  arbitration with a nonsignatory when the issues the nonsignatory is

2  seeking to resolve in arbitration are intertwined with the agreement

3  that the estopped party has signed." Choctaw, *supra*, 271 F.3d at 406.

4  If the non-signatories were not allowed to compel arbitration in these

5  instances, "the arbitration proceedings between the two signatories

6  would be rendered meaningless and the federal policy in favor of

7  arbitration effectively thwarted." MS Dealer Serv. Corp. at id.

8  (internal quotation marks omitted).

9      Several Ninth Circuit district courts have recognized and applied

10 the equitable estoppel theory.  Estate of Garcia v. Stonechange, Ltd.,

11 1998 WL118177 (N.D. Cal. 1998) recognized equitable estoppel standing,

12 and cited with approval Eleventh Circuit equitable estoppel cases,

13 applicable when "obligations and duties are 'intimately founded in and

14 intertwined with the underlying contract obligations.'"  In a

15 significant recent case citing the Fifth Circuit, Boston

16 Telecommunications Group, Inc., v. Deliotte Touche Tohmatsu, 278 F. Supp

17 2d 1041, 1048 (N.D. Cal. 2003) held a non-signatory may compel

18 arbitration "'when the signatory to the contract containing an

19 arbitration clause raises allegations of substantially interdependent

20 and concerted misconduct by both the nonsignatory and one or more of the

21 signatories to the contract.'"[5/]

22      The reasoning from the other circuits and district courts from

23 this circuit is persuasive.  There is no good reason to believe the

24

25  _____

26      [5/]Other Ninth Circuit district court cases have recognized
    the equitable estoppel theory, but held it did not apply under
27  the facts of that particular case.  Ahtna Government Services
    Corp. v. 52 Rausch, LLC, 2003 WL 403359 (N.D. Cal. 2003); Pacific
28  Builders, Inc. v. Mitsui Trust & Banking Co., 57 F. Supp 2d 1018
    (D. Hawaii, 1999).

1  Ninth Circuit Court of Appeals would not recognize equitable estoppel as

2  a theory for a non-signatory to compel arbitration in an appropriate

3  case.

4        The Court holds that, under appropriate circumstances, a non-

5  signatory to an arbitration agreement may compel arbitration under the

6  theory of equitable estoppel.  Under the allegations in this case, as

7  stated above, the conditions for equitable estoppel are present.  The

8  non-signatory defendants may compel arbitration.

9                2.    Whether the Agreement Covers the Dispute

10       Plaintiffs contend the agreement with Deutsche Bank Securities,

11  Inc. does not cover the allegations in the Complaint.  Plaintiffs argue

12  the arbitration clause is narrow: textually, it is not only limited to

13  controversies "between us concerning any transactions . . . or breach of

14  the agreement or any other agreement between us," (Burgunder Decl. Ex.

15  1), but the language covers only contract interpretation and performance

16  claims, and cannot be construed to cover the tort claims at issue here.

17       Arbitration clauses in general, as well as clauses containing the

18  phrase "relating to," are usually construed broadly; but arbitration

19  clauses containing the phrases "arising from" or "arising out of" are

20  usually construed narrowly.  Tracer Research Corp. v. Nat'l Envtl.

21  Servs. Co., 42 F.3d 1292, 1294-95 (9th Cir. 1994).

22       Here, the arbitration agreement states, "all controversies which

23  may arise between us concerning any transaction . . . or breach of this

24  or any other agreement between us . . . shall be determined by

25  arbitration."  (Burgunder Decl. Ex. 1 (emphasis added).)  Plaintiffs

26  appear to contend the "concerning any transaction" phrase is narrow

27  because it specifies the types of disputes covered by the agreement.

28  According to Plaintiffs, if the "arising from" language in Tracer

1 | Research Corp. was narrow -- all disputes "arising from" the agreement -
2 | - then the "concerning" language here -- only specific types of
3 | disputes -- must also be narrow.
4 |      The Court disagrees.  The general rule is to construe
5 | arbitration clauses expansively.  Moses H. Cone Mem'l Hosp., 460 U.S. at
6 | 24-25.  In Tracer Research Corp., the Ninth Circuit held the phrases
7 | "arising from" or "arising out of" would trigger a narrow construction.
8 | Here, the agreement does not contain those phrases; therefore, the
9 | general rule applies, as does the Supreme Court's instruction to resolve
10 | any doubts in favor of arbitration.  Id.
11 |      In sum, Defendants Deutsche Bank A.G.'s, Sidley Austin Brown &
12 | Wood's, and KPMG's motions to compel arbitration are granted.[6]
13 |     C.   Stay
14 |      A party to a suit in federal court may seek a stay of the action
15 | pending arbitration of the issues in the litigation.  Wagner v. Stratton
16 | Oakmont, Inc., 83 F.3d 1046, 1048 (9th Cir. 1996).
17 |      Defendant Presidio asks the Court to stay this action pending the
18 | resolution of the arbitration.  Defendant argues Plaintiffs' claims
19 | center on their allegation of a joint conspiracy to defraud.  Given this
20 | commonality, Defendant contends allowing two proceedings to run
21 | concurrently would be inefficient and risk duplicative findings and
22 | inconsistent rulings.  See, e.g., United States ex rel. Newton v.
23 | Neumann Carribean Int'l, Ltd., 750 F.2d 1422, 1427 (9th Cir. 1985)
24 | (noting the importance of "economy and efficiency" in determining the
25 |
26 |     [6] Defendant KPMG also argues the non-signatory Plaintiff
27 | (i.e., Zed Corporation) should be compelled to arbitrate.
Plaintiffs do not appear to contest this argument.  Having
28 | considered the merits of the argument, the Court grants Defendant
KPMG's motion on this point.

1 propriety of a stay).

2      Here, Johnston v. Deutsche Bank (Civ. No. 03-5240) and Whipple v.

3 Deutsche Bank (Civ. No. 03-5240) are on point and persuasive.   In

4 Johnston and Whipple -- two related cases involving claims against

5 Deutsche Bank, Sidley Austin Brown & Wood, KPMG, and Presidio arising

6 from plaintiff's participation in an investment strategy similar to the

7 investment in this case -- the United States District Court for the

8 Western District of Arkansas granted Deutsche Bank's motion to stay

9 after finding the case against Presidio would involve "common questions

10 of fact . . . within the scope of the arbitration agreement."

11 (Presidio's Mot. at 4.)  Like Johnston and Whipple, where plaintiff's

12 conspiracy and aiding-and-abetting claims implicated common questions of

13 fact, here Plaintiffs allege "joint venture liability" and "aiding and

14 abetting breach of fiduciary duty."  These allegations rebut Plaintiffs'

15 assertion that no common questions apply to Defendant.

16      Defendant Presidio's motion to stay is granted.

17                    III.   DISPOSITION

18      Plaintiffs' motion to remand is DENIED.  Defendants Deutsche Bank

19 A.G.'s, Sidley Austin Brown & Wood's, and KPMG's motions to compel

20 arbitration are GRANTED, and this action is STAYED pending completion of

21 the arbitration.  Defendant Olson Lemons PC's motion to compel

22 arbitration is DENIED.  Defendant Presidio's motion to stay is

23 GRANTED.[7/]

24 DATED: December 14, 2004

25

26                                        GARY L. TAYLOR
                                          UNITED STATES DISTRICT JUDGE

27 _____

28      [7/] Defendant Presidio's agreed motion for extension of time
to respond to the Complaint is granted as well.

S:\GLT\LC1\Civil\2004\04-1227.Order.Remand-Arbitrate2.wpd   14

# EXHIBIT 23

RightFAX                3/30/2005 10:45   PAGE 002/010   Fax Server

ORIGINAL                    SEND



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| STEPHEN L. HANSEN,<br><br>      Plaintiff,<br><br>  vs.<br><br>KPMG, LLP et al.,<br><br>      Defendants. | Case No. SA CV 04-10525-GLT (MANx)<br><br>ORDER ON PLAINTIFF'S MOTION TO REMAND AND DEFENDANTS' MOTIONS TO COMPEL ARBITRATION OR STAY PROCEEDINGS |

Remand is DENIED and the action is STAYED.

## I.   BACKGROUND

Plaintiff alleges Defendants conspired and fraudulently induced him to participate in an investment transaction known as "BLIPS." Now, Plaintiff moves to remand, and Defendants move to compel arbitration or stay proceedings.[1]

_____

[1] The Court takes judicial notice of its December 14, 2004 Order in Reddam v. KPMG, LLP, SA CV 04-1227 GLT (MANx). The parties dispute whether the Reddam Order is applicable here. Defendants contend it is applicable because the arbitration clause in Reddam is identical to the arbitration clause here, and the issues the Court analyzed in its Reddam Order are almost

1          II.  DISCUSSION

2     A.  Motion to Remand

3          This action was removed under 9 U.S.C. § 205, allowing removal to

4     federal court where an action in state court "relates to" an

5     arbitration agreement under the Convention.

6          Plaintiff argues (1) this action does not relate to the

7     arbitration agreement and (2) the agreement does not fall under the

8     Convention.[2]

9          1.    Whether This Action Relates to the Arbitration Agreement

10         In Beiser v. Weyler,[3] the Fifth Circuit elaborated on § 205's

11    "relates to" requirement:

12    _____

13    identical to the issues presented here.  But Plaintiff argues the
      Reddam Order is not applicable because, in part, Deutsche Bank

14    Securities Inc. (the signatory to the arbitration agreement) and
      Deutsche Bank (a related entity) have been dismissed with

15    prejudice.  The Court considers the Reddam Order for whatever
      applicability it has.

16

17    [2] Plaintiff also argues remand is proper because he will
      not be bound by the arbitration agreement; that is, the non-

18    signatory Defendants cannot compel arbitration under the theory
      of contractual right or the theory of equitable estoppel.  The

19    Court does not address this argument in the context of
      Plaintiff's motion to remand because the jurisdiction question

20    under § 205 is distinct from whether Defendants can compel

21    arbitration on the merits.  See Beiser v. Weyler, 284 F.3d 665,
      670-72 (5th Cir. 2002).

22

23    [3] Plaintiff argues Beiser is not controlling.  According to
      Plaintiff, Beiser adopted a "low bar" for jurisdiction under §

24    205 "because of the risk of jeopardizing the treaty obligations
      of the United States."  (Pl.'s Reply at 4.)  This concern,

25    Plaintiff contends, is not implicated here.
           In arriving at its conclusion, however, the Fifth Circuit

26    did not rely on Plaintiff's concern.  On the page Plaintiff
      cites, (Pl.'s Reply at 4 n.2), the Fifth Circuit based its

27    holding on congressional intent and federalism concerns, not on
      the risk of jeopardizing treaty obligations.  Beiser is on point

28    and persuasive.

Case 1:08-cv-01251    Document 34-3    Filed 08/13/2008    Page 61 of 87

KIGHTFAX             3/30/2005 10:45     PAGE 004/010    Fax Server

1    [W]henever an arbitration agreement falling under the Convention

2    could conceivably affect the outcome of the plaintiff's case,

3    the agreement "relates to" the plaintiff's suit. . . . [T]he

4    district court will have jurisdiction under § 205 over just

5    about any suit in which a defendant contends . . . an

6    arbitration clause falling under the Convention provides a

7    defense.

8    284 F.3d 665, 669 (5th Cir. 2002).

9        The Fifth Circuit set a "low bar" for jurisdiction under § 205:

10   "In allowing removal whenever the arbitration clause could conceivably

11   impact the disposition of the case, we make it easy, not hard, for

12   defendants to remove. . . . [E]asy removal is exactly what Congress

13   intended in § 205."[4/]   Id.

14       In light of this "easy" standard, the Court finds the arbitration

15   agreement Plaintiff entered into with Deutsche Bank Securities Inc.

16   relates to Plaintiff's claims against Defendants.  Here, the arbitration

17   agreement enabled Plaintiff to implement the BLIPS transaction.  (See,

18   e.g., Compl. ¶¶ 15, 17, 113 (alleging the tax loss generated by BLIPS

19   depended on the structure of a loan provided by Deutsche Bank, and the

20   loan was "necessary" to the fraudulent scheme).)  Given this enablement,

21   the arbitration agreement will conceivably impact the disposition of

22

23   ─────────────────────

24       [4/] Relying on Gaus v. Miles, Inc., 980 F.2d 564, 566 (9th
     Cir. 1992), Boggs v. Lewis, 863 F.2d 662, 663 (9th Cir. 1988),
25   and Takeda v. Northwestern National Life Insurance Co., 765 F.2d
     815, 818 (9th Cir. 1985), Plaintiff argues § 205 should be
26   strictly construed against removal.
         Plaintiff's argument is not well taken.  Gaus, Boggs, and
27   Takeda did not address § 205; instead, they addressed removal
     based either on diversity or § 1441.  They are inapplicable
28   because Congress intended to make removal easier under § 205.
     Beiser, 284 F.3d at 674.

S:\GLT\LC1\Civil\2004\04-10525.Order.Remand-Arbl.wpd        3

1  this case.

2      This action relates to the arbitration agreement.

3          2.    Whether the Arbitration Agreement Falls Under the

4                Convention

5      For the Convention to apply, the commercial relationship out of

6  which the agreement arises need only involve property located abroad,

7  envision performance abroad, or otherwise relate to a foreign state.  9

8  U.S.C. § 202 (1999); Freudensprung v. Offshore Technical Servs., Inc.,

9  379 F.3d 327, 340 (5th Cir. 2004) (declaring the Convention applies to

10 an arbitration agreement, even between two U.S. citizens, "provided

11 there is a 'reasonable relation' between the parties' commercial

12 relationship and some 'important foreign element'").

13     Plaintiff, however, appears to argue the question is whether the

14 arbitration agreement itself envisions performance abroad.  The Court

15 cannot adopt this view.  Under § 202, the question is whether the

16 commercial relationship envisions performance abroad -- that is, whether

17 the commercial relationship involves a "reasonable relation" with a

18 foreign element.

19     Here, Plaintiff borrowed millions of dollars from Deutsche Bank --

20 a foreign bank -- in connection with the BLIPS transaction, (Compl. ¶

21 15).  This demonstrates the commercial relationship envisioned

22 performance abroad: the implementation of a transaction involving

23 millions of dollars in loans from a foreign bank.

24     The arbitration agreement falls under the Convention.  Plaintiff's

25 motion to remand is DENIED.[5]

26  ─────────────

27     [5] Plaintiff's other arguments do not change this result.
   Relying on Brockman v. Merabank, 40 F.3d 1013, 1016 (9th Cir.

28 1994), and Sabater v. Lead Industries Ass'n, No. 00 Civ. 8026,
   2001 U.S. Dist. LEXIS 14758, at *17-18 (S.D.N.Y. Sept. 21, 2001),

B.    **Motions to Compel Arbitration or Stay Proceedings**

    1.    **Arbitration**

At the March 14, 2004 hearing, Plaintiff requested that, before any stay was ordered, the Court first rule whether Defendant non-signatories could compel arbitration.  Defendants did not object to such a ruling.  Therefore, the Court will rule on this issue.

Plaintiff and Deutsche Bank Securities, Inc. entered into an arbitration agreement, which applies to "all controversies which may arise between us concerning any transaction . . . performance or breach of this or any other agreement between us." (Def. KPMG's Mot. Compel Arbitration at 3.)  Defendants, non-signatories to the agreement, seek to compel arbitration under this agreement.  The question is presented whether a non-signatory to an arbitration agreement can compel arbitration.

While the Ninth Circuit has apparently not yet ruled on the

---

Plaintiff argues the Court no longer has jurisdiction over this action because Deutsche Bank Securities Inc. and Deutsche Bank have been dismissed with prejudice.

Here, the Court has original jurisdiction over this action because it relates to an arbitration agreement under § 205. Neither Brockman nor Sabater addresses the effect of dismissal under § 205.

Plaintiff also asserts the arbitration provision is limited to "controversies which may arise between us concerning any transaction of construction, performance or breach of this or any agreement between us." (Pl.'s Mot. Remand at 9.)  According to Plaintiff, this "narrow" arbitration clause does not extend to the tort claims at issue here.  See Tracer Research Corp. v. Nat'l Envtl. Servs. Co., 42 F.3d 1292, 1295-96 (9th Cir. 1994).

The Court addressed this argument in its Reddam Order. There, the Court did not accept this argument because (1) the general rule is to construe arbitration clauses broadly, (2) any doubts are to be resolved in favor of arbitration, and (3) the Court found Tracer Research Corp. to be inapplicable.  The Court reaches the same conclusion here.

1 | subject, other circuits have held a non-signatory may compel arbitration

2 | under an equitable estoppel theory.  See, e.g., Choctaw Generation Ltd.

3 | P'ship v. Am. Home Assurance Co., 271 F.3d 403, 407 (2d Cir. 2001);

4 | Grigson v. Creative Artists Agency L.L.C., 210 F.3d 524, 528 (5th Cir.

5 | 2000); Sunkist Soft Drinks, Inc. v. Sunkist Growers, Inc., 10 F.3d 753,

6 | 757 (11th Cir. 1993); J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile,

7 | S.A., 863 F.2d 315, 320-21 (4th Cir. 1988); Hughes Masonry Co. v.

8 | Greater Clark County Sch. Bldg. Corp., 659 F.2d 836, 841 n.9 (7th Cir.

9 | 1981).  See also Med. Air Tech. Corp. v. Marwan Inv., Inc., 303 F.3d

10 | 11, 18-19 (1st Cir. 2002) (noting the availability of equitable

11 | estoppel to compel arbitration).  This principle was recently adopted by

12 | at least one California state court.  Metalclad Corp. v. Ventana Envtl.

13 | Org. P'ship, 109 Cal. App. 4th 1705, 1717 (2003).

14 |     Several Ninth Circuit district courts have recognized and applied

15 | the equitable estoppel theory.  For example, Estate of Garcia v.

16 | Stonechange, Ltd., No. C-97-4368, 1998 WL118177, at *5 (N.D. Cal. Mar.

17 | 2, 1998), recognized equitable estoppel standing, and cited with

18 | approval Eleventh Circuit equitable estoppel cases, applicable when

19 | "obligations and duties are 'intimately founded in and intertwined with

20 | the underlying contract obligations.'"  In a significant recent case,

21 | Boston Telecommunications Group, Inc. v. Deliotte Touche Tohmatsu, 278

22 | F. Supp. 2d 1041, 1048 (N.D. Cal. 2003), held a non-signatory may compel

23 | arbitration "'when the signatory to the contract containing an

24 | arbitration clause raises allegations of substantially interdependent

25 | and concerted misconduct by both the nonsignatory and one or more of the

26 | signatories to the contract.'"

27 |     The reasoning from the other circuits and district courts from

28 | this Circuit is persuasive.  There is no good reason to believe the

1 | Ninth Circuit would not recognize equitable estoppel as a theory for a
2 | non-signatory to compel arbitration in an appropriate case.
3 |       Here, the Court holds the conduct alleged by Plaintiff is
4 | sufficient under the equitable estoppel theory to permit the non-
5 | signatory Defendants to compel arbitration.  Plaintiff alleges Deutsche
6 | Bank Securities, Inc. (a signatory) and the non-signatory Defendants
7 | "entered into an agreement and conspiracy between themselves to
8 | fraudulently induce Plaintiff to invest in BLIPS."  (Compl. ¶ 112.)
9 | Plaintiff describes the non-signatory Defendants as one team involved in
10 | a single course of misconduct, (Compl. ¶¶ 19, 31, 112), and seeks to
11 | hold them jointly liable for each other's conduct.  (Compl. ¶¶ 112-14).
12 | Plaintiff's allegations plead interdependent and concerted misconduct.
13 | See, e.g., Roberson v. The Money Tree, 954 F. Supp. 1519, 1529 n.11
14 | (M.D. Ala. 1997) ("A civil conspiracy is a kind of partnership, in which
15 | each member becomes the agent of the other."); Rutledge v. Elec. Hose &
16 | Rubber Co., 327 F. Supp. 1267, 1274 (C.D. Cal. 1971) ("[A] conspiracy
17 | creates an agency relationship . . . ."), aff'd, 511 F.2d 668 (9th Cir.
18 | 1975).
19 |       The Court holds that, under the present pleadings, the non-
20 | signatory defendants may compel arbitration.[6]
21 |            2.    Stay
22 |       A provision in the arbitration agreement limits the ability to
23 | compel arbitration against a party whose claims are encompassed by a
24 |
25 | _____
26 |       [6]At the March 14, 2005 hearing Plaintiff offered to amend
    | the complaint to take out the conspiracy-related facts.
27 | Plaintiff may make a future motion to amend if he wishes, but it
    | is doubtful an amendment would change the outcome: Plaintiff's
28 | underlying theory is an inter-related, cooperative course of
    | misconduct.

1  class action. Specifically, the provision reads:

2      No person shall . . . seek to enforce any pre-dispute

3      arbitration agreement against any person . . . who is a member

4      of a putative class who has not opted out of the class with

5      respect to any claims encompassed by the putative class action

6      until; (x) the class certification is denied; (y) the class is

7      decertified; or (z) the customer is excluded from the class[.]

8  (Def. KPMG's Reply at 12.)

9      Here, the Becnel putative class action is pending in Arkansas and

10 it appears to encompass Plaintiff's claims.

11     This action will be STAYED.[7/]

12                   III.   DISPOSITION

13     Plaintiff's motion to remand is DENIED. The Court STAYS this

14 action for 180 days in light of Becnel. Any party may advise the Court

15 ─────────────────────────

16     [7/] Neither Plaintiff nor Defendants appear to dispute the
   propriety of a stay pending resolution in Becnel. Plaintiff
17 asserts "it is clear . . . the Court cannot order arbitration
   until either (1) Becnel is not certified as a class or (2)
18 [Plaintiff] elects to opt out of Becnel." (Pl.'s Reply at 12.)
   Defendant KPMG requests the stay in its reply in support of its
19 motion to compel arbitration or stay proceedings and in its
   opposition to Plaintiff's motion to remand. All Defendants
20 joined in Defendant KPMG's opposition. (See Def. Carl D.
   Hasting's Notice of Joinder; Defs. Presidio Growth & Presidio
21 Advisory Services' Joinder; Def. Sidley Austin's Opp'n at 3 n.2.)
22     Defendants Presidio Growth and Presidio Advisory Services
   separately request a stay as to all parties if the Court grants
23 Defendants' motions to compel arbitration.
24     In Reddam, the Court addressed this issue under almost
   identical circumstances. In its Reddam Order, the Court granted
25 a stay because plaintiffs' claims centered on their allegation of
   a joint conspiracy to defraud, and, given this commonality,
26 allowing two proceedings to run concurrently would be inefficient
   and risk duplicative findings and inconsistent rulings. (See
27 Reddam Order at 13-14 (relying on Johnston v. Deutsche Bank (Civ.
   No. 03-5240) and Whipple v. Deutsche Bank (Civ. No. 03-5240)).)
28 This reasoning is applicable here.

1  if, as a result of action in the Becnel case, it is appropriate to

2  continue or lift this stay.  If, at the end of 180 days, the Court has

3  not heard from either party that it is appropriate to continue the stay,

4  the Court will assume the matter has been otherwise resolved, and will

5  dismiss his case without prejudice.

6

7  DATED: March 28 , 2005

8

9                                        GARY L. TAYLOR
                                         UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 24

Page 1

VIRGINIA

     IN THE CIRCUIT COURT OF FAIRFAX COUNTY

- - - - - - - - - - - - - - - -

WILLIAM N. MELTON,

            Plaintiff,

       -vs-              In Chancery 192922

SIDLEY AUSTIN, et al.,

            Defendants.

- - - - - - - - - - - - - - - -

                      Friday, April 22, 2005
                      Fairfax, Virginia

     The above-entitled matter came on for
hearing, without a jury, before the HONORABLE
MARCUS D. WILLIAMS, a Judge in and for the Circuit
Court of Fairfax County, in the courthouse,

Fairfax, Virginia, pursuant to notice, when there

were present on behalf of the parties:

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

Page 2

```
 1   APPEARANCES:
 2        On Behalf of the Plaintiff:
 3        Benjamin Dimuro, Esquire
          DIMURO GINSBERG & MOOK
 4        908 King Street
          Suite 200
 5        Alexandria, Virginia 22314
 6        Maureen McGuirl, Esquire
          FENSTERSTOCK & PARTNERS LLP
 7        30 Wall Street
          New York, New York 10005
 8
          On Behalf of the Defendant:
 9
          James S. Kurz, Esquire
10        WOMBLE CARLYLE SANDRIDGE & RICE
          Fourth Floor
11        8065 Leesburg Pike
          Tysons Corner, Virginia 22182
12
          Seth C. Farber, Esquire
13        DEWEY BALLANTINE LLP
          1301 Avenue of the Americas
14        New York, New York 10019
15        James R. Hart, Esquire
          HART & HORAN
16        3905 Railroad Avenue
          Suite 202 South
17        Fairfax, Virginia 22030
18        Jay T. Smith, Esquire
          COVINGTON & BURLING
19        1201 Pennsylvania Avenue, N.W.
          Washington, D.C. 20004
20
          On Behalf of Jenkens & Gilcrist:
21
          John J. Brandt, Esquire
22        WILSON ELSER MOSKOWITZ & DICKER
          8444 Westpark Drive
23        Suite 510
          McLean, Virginia 22102
24
                    C O N T E N T S
25
     Proceedings........................Page Three
26
```

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.     www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

Page 3

1                   P R O C E E D I N G S

2              (The court reporter was sworn.)

3              MR. DIMURO:  Good morning, your Honor.

4    Ben Dimuro for the plaintiff.  With me, again,

5    is Maureen McGuirl of the New York Bar, who has

6    already been admitted in this case.

7              The parties have agreed to split their

8    time five minutes each, and perhaps we won't

9    even use all of that time.

10             Thank you.

11             THE COURT:  Thank you.

12             MR. SMITH:  Jay Smith, your Honor, for

13   Defendant Sidley Austin Brown & Wood, and Thomas

14   Smith.  I'm going to limit my remarks to the

15   only new issue that's been raised since briefing

16   was completed, which is the Steckler case, which

17   plaintiff submitted to the Court.

18             Now, as the Court is aware, our case

19   concerns the exact same Ernst and Young

20   arbitration clause that was at issue in the

21   Camferdam case in New York where the Southern

22   District of New York allowed Brown & Wood to

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

Page 4

1    compel arbitration.

2          The Steckler case did not compel

3    arbitration.  And what the Court should

4    appreciate is that the reason some of these

5    cases are coming out differently is that they

6    contain and concern different arbitration

7    clauses.

8          In Steckler, on pages 7 and 9, in

9    footnotes 67 and 86, the Court specifically

10   distinguished the Camferdam case twice and said

11   that it was different because, in that case, it

12   concerned an Ernst and Young agreement that

13   contained an arbitration clause that pertained

14   to the provision of tax services, and that this

15   meant that claims at issue were more intertwined

16   in Camferdam than in Steckler.

17         In Steckler, the arbitration clause

18   was contained in an agreement concerning the

19   creation of an LLC as one part of a transaction.

20   And so we think it's clear that, on pages 7 and

21   9, the Court indicates the result would not be

22   different.

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

Page 5

1          Steckler also says at one point that

2     in that case where you had an arbitration

3     agreement in a kind of collateral agreement, not

4     the tax advice agreement, the claims couldn't be

5     said to be integrally related to the agreement

6     that contained the clause.

7          In Camferdam and here, they are

8     integrally related.  I will not go into the

9     details of the complaint --

10          THE COURT:  I understand.

11          MR. SMITH:  Okay, then, your Honor,

12     then I'll leave it at that.  And, unless the

13     Court has any questions, I'll be through.

14          Thank you.

15          MS. MCGUIRL:  Good morning, your

16     Honor.

17          We believe that the Steckler Court

18     employed the right analysis on two issues.  One

19     was equitable estoppel and the second was the

20     stay.

21          Now, Camferdam did involve the same

22     E&Y agreement, but in that case, Judge Jones in

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c55b42

Page 6

1    the Southern District really didn't analyze how

2    the claims against the lawyers in Deutsche Bank

3    were intertwined with the contract with E&Y.

4            And Judge Sheindlin said that's what

5    this Court must do.  When we submit, as we

6    explained in our papers, that if you look at

7    whether or not we would have a claim against

8    Sidley Austin if there was no agreement with

9    Ernst & Young, the answer is clearly yes.  We

10   would have that claim because we had a separate

11   agreement with Sidley Austin.

12           Our claims for legal malpractice don't

13   depend on a contract for accounting malpractice.

14           In both cases, in Camferdam and in

15   Steckler, the Court was not asked to consider

16   and wasn't directed to consider the fiduciary

17   duties that lawyers and Deutsche Bank, which had

18   been a long-term investment for Mr. Burlow and

19   Mr. Melton, had to make full disclosure about

20   arbitration agreements and what the consequences

21   of arbitration agreements would be.

22           And if the Court here allows them to

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

1    overlook their duties, duties they had as

2    fiduciaries, in --

3              THE COURT:  This is all the agreed

4    part, basically.  We've dealt with this.

5              MS. MCGUIRL:  Okay.  And then with

6    respect to the stay, Judge Sheindlin makes the

7    point that the defendants in this case are faced

8    with discovery all over the country.  There's no

9    need for them to have a stay.

10             And one thing we didn't address in our

11   briefs was how long an arbitration against E&Y

12   is likely to take.  It hasn't commenced yet.  My

13   experience with the Triple-A in complex cases is

14   that you get no more than a day or two at a

15   time, your Honor.

16             You spread your arbitration out over

17   months.  So we would be looking at staying, at

18   delaying this case if there was a stay, I think

19   in excess of a year.

20             And then here the plaintiffs have made

21   a number of motions attacking the pleadings.

22             So we're talking about delaying a case

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff53-44ed-861e-8fa5d3c66b42

Page 8

1  filed in November for probably several years.

2  Our clients have paid a significant amount of

3  money.  Mr. Melton has paid $6 million in

4  penalties already to the government, and that

5  kind of delay causes them prejudice.

6            THE COURT:  Is that everybody now?

7            I'm dividing up my ruling between two

8  sets of defendants.  The attorney defendants,

9  the law firm defendants and the nonattorney

10 defendants.  The analysis is different.

11           What we're dealing with here is a

12 mandatory arbitration clause which is found in

13 the Ernst & Young agreement between Ernst &

14 Young and the plaintiffs entered into on

15 November 5th, 1999.

16           This case involves nonsignatories to

17 that agreement, asking the Court to compel

18 arbitration for certain disputes that allegedly

19 arose from that agreement and staying the

20 pending lawsuits.

21           Mandatory arbitration provision in the

22 Ernst & Young agreement states as follows:  Any

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

Page 9

1    controversy or claim arising out of or relating

2    to tax and tax-related services now or hereafter

3    provided by us to you (including any such matter

4    involving a parent, subsidiary, affiliate,

5    successor in interest or agent of Ernst & Young

6    LLP) shall be submitted first to voluntary

7    mediation.  And if mediation is not successful,

8    then to binding arbitration in accordance with

9    the dispute resolution procedures set forth in

10   the agreement in support of the attachment to

11   this letter.

12              For reasons I'm about to state, I will

13   be granting Defendant Deutsche Bank and

14   Defendant Fisk motion to compel arbitration.

15              First of all, we're dealing with broad

16   arbitration provision disagreement and it

17   applies to tax and tax related services.

18              It's clear from the pleadings that

19   Deutsche Bank provided tax-related services to

20   the plaintiffs and acted as their investor,

21   advisor, money manager and broker in relation to

22   the COBRA tax strategy.

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

1          Although Defendants Deutsche Bank are

2    nonsignatories to the Ernst & Young agreement,

3    the doctrine of equitable estoppel can allow --

4    it doesn't permit a nonsignatory to compel the

5    signatory to arbitrate if, one, the signatory to

6    a written agreement containing arbitration

7    clause must rely on the terms of the written

8    agreement in asserting its claims against the

9    nonsignatory or, two, when the signatory to the

10   contract containing the arbitration clause

11   raises allegations of substantial interdependent

12   and concerted misconduct by both the

13   nonsignatory and one or more of the signatories

14   to the contract.

15          In this case we're dealing with the

16   second circumstance.  The second circumstance is

17   satisfied in that the plaintiff's allegations

18   throughout their complaint allege concerted

19   misconduct and interconnected facts.

20          Specifically plaintiffs allege that

21   Defendants Deutsche Bank had an agreement with

22   Ernst & Young involving the design, development

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.     www.casamo.com
Fax: 703-837-8118     Court Reporting, Video Depositions, Trial Presentation & Web Design     info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c86b42

Page 11

1    and promoting the COBRA tax shelters and that

2    Ernst & Young made many misrepresentations to

3    the plaintiffs with the knowledge, authority, or

4    consent of Deutsche Bank.

5                The plaintiffs allege that Defendants

6    Deutsche Bank structured the transactions in a

7    way that would not allow the plaintiffs to earn

8    a profit, and that the structure was key to the

9    defendants' promotion of tax shelters.

10               The plaintiff's allegation that -- the

11   plaintiffs allege that Defendant Deutsche Bank

12   conspired with Ernst & Young and other

13   defendants regarding COBRA tax shelters.

14   Plaintiff's allegations are generally stated

15   against the defendants collectively and many

16   ways undifferentiated in terms of conduct.  It's

17   indicative of concerted misconduct and

18   interconnectedness.  That's the term I think has

19   been used in some federal cases.

20               Without belaboring this, I will just

21   point to examples of this interconnectedness

22   that's been on the pleadings, concerted actions

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c63b42

1  that allege: Paragraphs 57, 58, 82. 84, 87, 89

2  through 91, 94, 146, 147, 150, 155.  It's not

3  meant to be exhaustive but simply as an example

4  of what it's referring to.

5            With regard to Defendants Brown &

6  Wood, Defendant Smith and Defendant Ruble's

7  motion to compel arbitration, the Court is going

8  to deny your motion to arbitrate.

9            Arbitration provision in the Ernst &

10 Young agreement is, indeed, broad and both

11 Virginia and New York recognize that an

12 attorney-client relationship is a special

13 relationship which is governed by professional

14 rules.

15            In Heinzman versus Fine, Virginia

16 Supreme Court appears to recognize that such

17 attorney-client contracts are not mere

18 commercial contracts and are under the

19 classification peculiar to themselves.  You'll

20 find this at 217 VA 958, 1977 case.

21            In Heinzman, the Virginia Supreme

22 Court implicitly recognized that professional

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.     www.casamo.com
Fax: 703-837-8118     Court Reporting, Video Depositions, Trial Presentation & Web Design     info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

Page 13

1  rules may affect the contract between attorneys

2  and clients.  Similarly, I believe that New York

3  law recognizes the same.

4          In this case, it appears that there

5  was no informed consent by the plaintiffs in

6  entering into an agreement whereby liability

7  against their attorneys would be limited or

8  their ability to choose a forum in which to

9  litigate would be constrained.

10          Both Virginia and New York, the

11  professional rules prohibit an attorney from

12  including a mandatory arbitration provision

13  without making certain disclosures and obtaining

14  informed consent of their client.

15          Although the provisions of the

16  agreement that contained limitations on the

17  terms of liability in the Ernst & Young

18  agreement could be severed from the agreement

19  because of the severability clause, nothing

20  under these facts presented to the Court

21  indicate that the plaintiffs were ever advised

22  by their attorneys that they had waived their

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-f158-44ad-851a-8fa5d3c66b42

Page 14

1   right to litigate their disputes in court.

2              Therefore, even if the above

3   provisions were severed, it would not cure the

4   fact that disclosures of consent to the clients

5   would be required.

6              If this arbitration provision were to

7   be enforced against attorneys or law firms, the

8   attorney-client relationship would be

9   undermined.

10              It is noted that applying the

11   equitable estoppel is within the Court's

12   discretion.

13              This can be found in Grigson versus

14   Creative Artists Agency, 210 Federal 3rd 524,

15   line 24, 5th Circuit.  And it's also clear that

16   the linchpin for the application of equitable

17   estoppel is equitable in nature.  It awards

18   basic fairness.

19              In applying that standard here, the

20   Court finds to apply equitable estoppel as far

21   as to the claims against the attorneys.

22              I will deny that.

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.   www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

Page 15

1        However, I will grant a stay pending

2    arbitration without prejudice.  You may have to

3    come in and ask for a lift of stay if an

4    unreasonable time has passed before resolution

5    of this matter at arbitration.

6        I think that concludes the issues.

7    Anything else?

8        Who will draft the order?

9        MR. DIMURO:  I'll draft the order,

10    your Honor.  Is this something that you would

11    permit us to do over the next several days, or

12    do you want -- this is a fairly complicated

13    order.

14        THE COURT:  Well, I can make it

15    simple.  Just say that for reasons stated of

16    record.

17        MR. DIMURO:  That's obviously an

18    option.  That way you don't have to worry about

19    -- I'll be the scrivener out in the hallway.

20        THE COURT:  Thank you.

21        (Whereupon, the proceedings were

22    adjourned at 12:57 o'clock a.m.)

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff59-44ed-851c-8fa5d3c86b42

1               THE COURT:  Do you all need something

2     on the Melton case?  I see everyone back in

3     here.

4               What is the --

5               MS. MCGUIRL:  If I could explain, your

6     Honor.

7               You had compelled us to arbitrate with

8     Deutsche Bank, and the order doesn't clearly say

9     if we're supposed to arbitrate --

10              THE COURT:  Not just Deutsche, but all

11     the non -- nonattorneys.

12              MS. MCGUIRL:  The nonattorneys.  Not

13     clear if we're arbitrating under Triple-A rules

14     or the NASD rules with that.

15              THE COURT:  I don't think that was an

16     issue of the long brief, was it?

17              MS. MCGUIRL:  I'm sorry?

18              THE COURT:  Was that an issue of the

19     long brief?

20              MS. MCGUIRL:  No, it wasn't.  But if

21     we do NASD rules, the NASD will decline to hear

22     the case because there's class action pending.

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.     www.casamo.com
Fax: 703-837-8118     Court Reporting, Video Depositions, Trial Presentation & Web Design     info@casamo.com
77fd23c7-ff58-44ed-851e-8fa5d3c65b42

Page 17

1    So either we --

2            THE COURT:  That would frustrate the

3    arbitration.

4            MS. MCGUIRL:  Yes.  And, also, Sidley

5    is saying that the stay against them is as long

6    as we're arbitrating with E&Y or Deutsche Bank.

7    I could finish the E&Y arbitration.  And if I

8    have to do NASD with Deutsche Bank, it's going

9    to be a long time.

10           THE COURT:  I understand what we're

11   going to be facing here.  But my understanding

12   is because of these facts, I mean, it's still

13   the same --

14           You have to finish all arbitration, I

15   would think.

16           MS. MCGUIRL:  Well, if your Honor then

17   is finding the Deutsche Bank has to compel

18   arbitration under E&Y and you order them to

19   arbitration before the Triple-A, I think the

20   problem simply goes away.

21           THE COURT:  All right.  Anybody have

22   any problem with Triple-A?

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

Page 18

1          MR. SMITH:  Well, your Honor, the -- I

2   think set forth on behalf of Deutsche Bank, as I

3   understood your Honor, you were granting our

4   motion to compel arbitration based on estoppel

5   grounds.  And the estoppel arguments that we

6   were making were tied to the E&Y agreement which

7   provides for Triple-A arbitration.

8          We had a separate motion which I think

9   Court didn't address, based on our own

10   arbitration.

11          THE COURT:  Right, I did, and I think

12   I need to reach it.

13          MR.SMITH:  I think the Court doesn't

14   necessarily need to reach it if there's going to

15   be an arbitration.

16          THE COURT:  Let's say Triple-A then.

17   All right?

18          MS. MCGUIRL:  Then I think if we put

19   Triple-A on the Deutsche Bank, that will resolve

20   the issue with Sidley, your Honor.

21          MR. SMITH:  Because then it would be

22   clear that the litigation with Sidley is stayed,

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23c7-ff58-44ed-851c-8fa5d3c66b42

1   having resolution of arbitration with the other

2   parties, include Deutsche Bank.

3              THE COURT:  I like that better, yes.

4              MS. MCGUIRL:  Thank you, your Honor.

5              THE COURT:  Thank you.

6              MR. SMITH:  Thank you, your Honor.

7              (Whereupon, the above-entitled

8   proceedings were concluded at 1:02 o'clock p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Phone: 703-837-0076 CASAMO & ASSOCIATES, INC.    www.casamo.com
Fax: 703-837-8118    Court Reporting, Video Depositions, Trial Presentation & Web Design    info@casamo.com
77fd23o7-ff58-44ed-851c-8fa5d3c66b42