# EXHIBIT A



Announcement 2002-2, 2002-2 I.R.B. 304, 2002-1 C.B. 304, 2001 WL 1637819                     Page 1
(IRS ANN)

**C**

Announcement 2002-2, 2002-2 I.R.B. 304, 2002-1 C.B. 304, 2001 WL 1637819 (IRS ANN)

DISCLOSURE STATEMENT RELEASED 2/23/2002 APPEARS AT THE END OF THIS DOCUMENT

Internal Revenue Service (I.R.S.)
IRS ANN

Announcement
DISCLOSURE INITIATIVE FOR CERTAIN TRANSACTIONS RESULTING IN WAIVER OF CERTAIN PEN-
ALTIES UNDER § 6662 OF THE INTERNAL REVENUE CODE

Released: December 22, 2001
Published: January 14, 2002

**Waiver of penalties.** To encourage taxpayers to disclose their tax treatment of
certain tax shelters, the IRS will waive the accuracy-related penalty under sec-
tion 6662 of the Code.

The Internal Revenue Service (IRS) announces a disclosure initiative to encourage
taxpayers to disclose their tax treatment of tax shelters and other items for
which the imposition of the accuracy-related penalty may be appropriate if there
is an underpayment of tax. If a taxpayer discloses any item in accordance with the
provisions of this announcement before April 23, 2002, the IRS will waive the ac-
curacy-related penalty under § 6662(b)(1), (2), (3), and (4) for any underpayment
of tax attributable to that item.

This disclosure initiative covers all items except items resulting from a transac-
tion that (1) did not in fact occur, in whole or in part, but for which the tax-
payer claimed a tax benefit on its return; (2) involved the taxpayer's fraudulent
concealment of the amount or source of any item of gross income; (3) involved the
taxpayer's concealment of its interest in, or signature or other authority over a
financial account in a foreign country; (4) involved the taxpayer's concealment of
a distribution from, a transfer of assets to, or that the taxpayer was a grantor
of a foreign trust; or (5) involved the treatment of personal, household, or liv-
ing expenses as deductible trade or business expenses.

SCOPE OF THE WAIVER
Under this disclosure initiative, the IRS will waive the accuracy-related penalty
under § 6662(b) for that portion of an underpayment attributable to the disclosed
item and due to one or more of the following: (1) negligence or disregard of rules
or regulations; (2) any substantial understatement of income tax; (3) any substan-
tial or gross valuation misstatement under chapter 1 of the Code, except for any

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Announcement 2002-2, 2002-2 I.R.B. 304, 2002-1 C.B. 304, 2001 WL 1637819                Page 2
(IRS ANN)

portion of an underpayment attributable to a net § 482 transfer price adjustment, unless the standards of § 6662(e)(3)(B) regarding documentation are met; and (4) any substantial overstatement of pension liabilities.

Disclosure under this initiative does not affect whether the IRS will impose, as appropriate, any other civil penalty that may be applicable under the Code or will investigate any associated criminal conduct or recommend prosecution for violation of any criminal statute.

PERIOD OF DISCLOSURE
The IRS will waive the accuracy-related penalty if the taxpayer discloses the item before the earlier of (1) the date the item or another item arising from the same transaction is an issue raised during an examination, or (2) April 23, 2002. For purposes of this disclosure initiative, an item is an issue raised during an examination if the person examining the return (the examiner) communicates to the taxpayer knowledge about the specific item or on or before December 21, 2001, the examiner has made a request to the taxpayer for information, and the taxpayer could not make a complete response to that request without giving the examiner knowledge of the specific item.

INFORMATION REQUIRED TO MAKE A DISCLOSURE
To disclose an item under this initiative, a taxpayer must provide the following:
   (1) A statement describing the material facts of the item;
   (2) A statement describing the taxpayer's tax treatment of the item;
   (3) The taxable years affected by the item;
   (4) If the taxpayer is a Coordinated Industry Case (CIC) taxpayer, a statement that the taxpayer will agree to address the disclosed item under the Accelerated Issue Resolution process described in Rev. Proc. 94-67 (1994-2 C.B. 800) if requested to do so by the IRS;
   (5) The names and addresses of (a) any parties who promoted, solicited, or recommended the taxpayer's participation in the transaction underlying the item and who had a financial interest, including the receipt of fees, in the taxpayer's decision to participate, and (b) if known to the taxpayer, any parties who advised the promoter, solicitor or recommender with respect to that transaction;
   (6) A statement agreeing to provide, if requested, copies of all of the following:
      (a) All transactional documents, including agreements, contracts, instruments, schedules, and, if the taxpayer's participation in the transaction was promoted, solicited or recommended by any other party, all material received from that other party or that party's advisor(s);
      (b) All internal documents or memoranda used by the taxpayer in its decision-making process, including, if applicable, information presented to the taxpayer's board of directors; and
      (c) All opinions and memoranda that provide a legal analysis of the item, whether prepared by the taxpayer or a tax professional on behalf of the tax-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

payer; and

(7) A penalty of perjury statement that the person signing the disclosure has examined the disclosure and that to the best of that person's knowledge and be-lief, the information provided as part of the disclosure contains all relevant facts and is true, correct, and complete. In the case of an individual taxpay-er, the declaration must be signed and dated by the taxpayer, and not the tax-payer's representative. In the case of a corporate taxpayer, the declaration must be signed and dated by an officer of the corporate taxpayer who has per-sonal knowledge of the facts. If the corporate taxpayer is a member of an af-filiated group filing consolidated returns, a penalties of perjury statement also must be signed, dated, and submitted by an officer of the common parent of the group. The person signing for a trust, a state law partnership, or a lim-ited liability company must be, respectively, a trustee, general partner, or member-manager who has personal knowledge of the facts. A stamped signature is not permitted.

PROCEDURE FOR MAKING THE DISCLOSURE

A CIC taxpayer must submit the disclosure information to the assigned team manager and send a copy of the information to the Office of Tax Shelter Analysis.

A non-CIC taxpayer not under examination as of December 21, 2001, must send the disclosure information to the Office of Tax Shelter Analysis.

A non-CIC taxpayer under examination as of December 21, 2001, must submit the dis-closure information to the examiner and send a copy of the information to the Of-fice of Tax Shelter Analysis.

The address for the Office of Tax Shelter Analysis is LM:PFTG:OTSA, 1111 Constitu-tion Ave, NW, Washington, DC 20224.

MISCELLANEOUS

The IRS is committed to considering and resolving disclosed items promptly. A tax-payer's disclosure of an item creates no inference that the taxpayer's tax treat-ment of the item was improper or that the accuracy-related penalty would apply if there is an underpayment of tax. Furthermore, taxpayers that do not disclose under this initiative are not prevented from demonstrating that they satisfy the reason-able cause exception under § 6664(c) and the regulations thereunder with respect to any portion of an underpayment of tax.

PAPERWORK REDUCTION ACT

The collection of information contained in this announcement has been reviewed and approved by the Office of Management and Budget in accordance with the Paperwork Reduction Act (44 U.S.C. § 3507) under control number 1545-1764. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless the collection of information displays a valid OMB control num-ber.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

The collection of information in this announcement is in the section titled IN-
FORMATION REQUIRED TO MAKE A DISCLOSURE. This information is required to assess
the item the taxpayer is disclosing under the initiative. This information will be
used to determine whether the taxpayer has reported the disclosed item properly
for income tax purposes. The collection of information is required to obtain the
benefit described in this announcement. The likely respondents are businesses or
other for-profit institutions, small businesses or organizations, and individuals.

The estimated total annual reporting burden is 450 hours.

The estimated annual burden per respondent varies from 2 hours to 4 hours, depend-
ing on individual circumstances, with an estimated average of 3 hours. The estim-
ated number of respondents is 150.

The estimated frequency of responses is one time per respondent.

Books or records relating to a collection of information must be retained as long
as their contents may become material in the administration of any internal reven-
ue law. Generally tax returns and tax return information are confidential, as re-
quired by 26 U.S.C. § 6103.

CONTACT INFORMATION

For further information regarding this announcement, contact Jozef Chilinski of
the Office of Tax Shelter Analysis at (202) 283-8425 (not a toll-free call).

Released: February 23, 2002
February 19, 2002

   MEMORANDUM FOR LARGE AND MID-SIZE BUSINESS EXECUTIVES, MANAGERS AND EXAMIMRS

FROM: Larry L. Langdon Commissioner, Large and Mid-Size Business Division

SUBJECT: Agreement with Respect to Disclosure in Compliance with Announcement
2002-2

Some taxpayers have indicated that they want to make a disclosure under Announce-
ment 2002-2 but are concerned that the production of certain documents and opin-
ions may be a waiver of the attorney-client privilege. The Service has developed
an agreement to address this concern. The agreement states that the IRS will not
assert that the production of documents under the announcement causes a waiver of
the privilege. Note, however, that the agreement is not a concession that the
claimed privilege applies, and it explicitly leaves open the ability of the IRS to
argue that the claimed privilege does not apply for another reason.

The attached document is the agreement the IRS will enter into with taxpayers that
want to disclose under Announcement 2002-2. If a taxpayer wants to enter into the
agreement, examiners must seek assistance from LMSB Counsel. LMSB Counsel attor-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# EXHIBIT B

1 of 1 DOCUMENT

Copyright 2001 The Washington Post

# The Washington Post

## washingtonpost.com

The Washington Post

December 22, 2001 Saturday
Final Edition

SECTION: FINANCIAL; Pg. E03

LENGTH: 369 words

HEADLINE: Shelter Tips Sought From the Sheltered;
No Penalties for Disclosures, IRS Pledges

BYLINE: Albert B. Crenshaw, Washington Post Staff Writer

BODY:

The Internal Revenue Service, looking for help in finding promoters of abusive tax shelters that cost the government billions of dollars a year, appealed yesterday to new tipsters: the corporations and individuals who use the shelters.

Under the new policy, taxpayers during the next four months can disclose their use of a shelter and still maintain that it is legitimate and that they are entitled to the tax benefits it provides. "Disclosure creates no inference that the taxpayer's tax treatment of the item was improper or that the accuracy-related penalty would apply," the IRS said.

The taxpayer may still lose on the issue but would owe only the taxes and interest. Penalties for negligence and substantial understatement, which range up to 20 percent, would not be imposed.

The move is a switch for the agency from the stick to the carrot, tax attorneys said.

In the past, the IRS "generally would only waive penalties if the taxpayer conceded the underlying tax liability. If you owe tax and interest, that could be a lot of money to get the penalties to go away," said Richard M. Lipton, of McDermott, Will & Emery in Chicago, chairman of the American Bar Association's tax section.

While the initiative applies to both individuals and corporations, Lipton thinks it will appeal more to business.

"My guess is it will have greater impact on the corporate side because [corporate] tax directors have a great incentive to avoid penalties. Their bosses want them to be appropriately aggressive in tax planning but generally do not want their companies to be subject to penalties. It will allow the in-house tax directors to continue to maintain their position with respect to an aggressive tax strategy while avoiding a penalty," Lipton said.

The penalty relief does not apply to taxpayers involved in fraud, criminal conduct, concealment of a foreign financial account or foreign trust, or the treatment of personal expenses as deductible business expenses, the IRS said.

Those who make disclosures must be willing to provide the promoter's name and address, documents describing the shelter and a signed statement swearing, under penalty of perjury, that the information is accurate, the IRS said.

LOAD-DATE: December 22, 2001

Westlaw.

12/25/01 LATIMES 3

NewsRoom

Page 1

12/25/01 L.A. Times 3
2001 WLNR 10534804

Los Angeles Times
Copyright 2001 Los Angeles Times

December 25, 2001

Section: Business

**IRS      Targeting      Doubtful** Tax Shelters

IRS

The Internal Revenue Service says it will forgo penalties for taxpayers who voluntarily disclose the use of doubtful tax shelters.

The move will give taxpayers until April 23 to reveal the use of questionable tax shelters and the name of the shelter promoter, the agency said in a news release.

The IRS said it will not impose its traditional penalty--20% of the underpaid tax--but will require taxpayers to pay the taxes that should have been paid and the interest on them, the agency said.

The agency said it will use the information gathered under the new rules to target promoters who have not followed requirements to register questionable shelters. The rules also will help the IRS find tax shelters, warn potential clients and teach its own agents how to look for them, it said.

"The IRS believes some taxpayers entered into questionable transactions based on the representations of promoters who marketed these tax shelters," said Larry Langdon, commissioner of the agency's Large and Mid-Size Business Division.

"They now have additional incentive to bring any questionable transactions to the IRS' attention," he said.

The amnesty program doesn't apply to taxpayers involved in fraud, criminal conduct, concealing a foreign account or trust or the treatment of personal expenses as deductible business expenses.

---- INDEX REFERENCES ----

NEWS SUBJECT:  (Taxation (1TA10))

INDUSTRY:  (Accounting, Consulting & Legal Services (1AC73))

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

12/25/01 LATIMES 3                                                        Page 2


Language:  EN

OTHER INDEXING:  (INTERNAL REVENUE SERVICE; IRS; IRS TARGETING DOUBTFUL TAX)
(Larry Langdon)

KEYWORDS: INTERNAL REVENUE SERVICE; TAX SHELTERS; TAX EVASION

EDITION: Home Edition

Word Count: 264
12/25/01 LATIMES 3
END OF DOCUMENT

© 2008 Thomson Reuters/West. No Claim to Orig. US Gov. Works.

# EXHIBIT C

# SUPREME COURT OF THE STATE OF NEW YORK — NEW YORK COUNTY

PRESENT: _____     PART *60*

Index Number : 105471/2007

TAYEBI, M.D., SEAN

vs

KPMG LLP

Sequence Number : 001

DISMISS ACTION

INDEX NO. **FBEM**

MOTION DATE _____

MOTION SEQ. NO. _____

MOTION CAL. NO. _____

---

The following papers, numbered 1 to _____ were read on this motion to/for _____

|  | PAPERS NUMBERED |
|---|---|
| Notice of Motion/ Order to Show Cause — Affidavits — Exhibits ... | _____ |
| Answering Affidavits — Exhibits _____ | _____ |
| Replying Affidavits _____ | _____ |

**Cross-Motion:** ☐ Yes   ☐ No

Upon the foregoing papers, it is ordered that this motion

This motion is decided in accordance with the accompanying memorandum decision.

SO ORDERED

**FILED**

FEB 20 2008

NEW YORK
COUNTY CLERK'S OFFICE

Dated: ____2/20/08____

_____ J.S.C.

**HON. BERNARD J. FRIED**

MOTION/CASE IS RESPECTFULLY REFERRED TO JUSTICE
FOR THE FOLLOWING REASON(S):

Check one:   ☐ FINAL DISPOSITION   1 ☒ NON-FINAL DISPOSITION

Check if appropriate:   ☐ DO NOT POST

Check if appropriate:   ☐ DO NOT POST   ☐ REFERENCE

FBEM

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK:  PART 60
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

SEAN TAYEBI, M.D. and
PASCAGOULA VENTURES, LLC,                         Index No. 105471/07

                    Plaintiffs,

               - against -

KPMG LLP, DAVID RIFKIN, RANDALL
S. BICKHAM, SIDLEY AUSTIN BROWN &
WOOD LLP, SABW HOLDING LLP, PRESIDIO,
ADVISORY SERVICES, LLC, PRESIDIO
GROWTH, LLC, PRESIDIO RESOURCES, LLC,
BAYERISCHE HYPO- UND VEREINSBANK AG, HVB
STRUCTURED FINANCE INC., HVB RISK
MANAGEMENT PRODUCTS INC., HVB AMERICA INC,
DOMENICK DEGIORGIO and DOES 1 through 50,
inclusive,

FILED

FEB 2 0 2008

NEW YORK
COUNTY CLERK'S OFFICE

                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

APPEARANCES:

For Plaintiffs:                            For KPMG LLC:

Fensterstock & Partners LLP                Willkie Farr & Gallagher LLP
30 Wall Street                             787 Seventh Avenue
New York, New York 10005                   New York, New York 10019-6099
(Blair C. Fensterstock, Eugene D.          (Robert J. Kheel, Andy Thomas)
Kublanovsky, Allison M. Charles)

For the HVB Defendants:                    For the Presidio Defendants:

Fulbright & Jaworski LLP                    Latham & Watkins LLP
555 South Flower Street                     885 Third Avenue
Los Angeles, California 90071               New York, New York 10022-4834
(Helen L. Duncan)                           (Joseph M. Salama)

**FRIED, J.:**

        Motion Sequence Numbers 001, 002, and 006 are consolidated for disposition.  In

motion number 001, defendant KPMG (KPMG) moves, pursuant to CPLR 3211 (a) (5) and (a) (7), for an order dismissing the second and third causes of action.

In motion number 002, defendants Bayerische Hypo- und Vereinsbank AG (HVB-AG); HVB U.S. Finance Inc. f/k/a HVB Structured Finance Inc. (HVB Finance); HVB Risk Management Products Inc. (HVB Risk); and HVB America Inc. (HVB America) (collectively, HVB) move, pursuant to CPLR 3211 (a) (1), (a) (5), (a) (7), and CPLR 3016 (b), for an order dismissing the complaint on the grounds of a defense founded upon documentary evidence, statute of limitations, failure to state a cause of action, and failure to plead the fraud claims with sufficient particularity.

In motion number 006, defendants Presidio Advisory Services, LLC, Presidio Growth, LLC, and Presidio Resources, LLC (collectively, Presidio) move, pursuant to CPLR 3211, for an order dismissing the complaint on the grounds of a forum selection clause, statute of limitations, and failure to state a cause of action.

The facts and allegations underlying this action are closely related to another action, also in this court, entitled *Shalam v KPMG LLP*, Index Number 112732/05 [*Shalam Action*]). The complaint here alleges as follows: plaintiffs seek damages resulting from defendants' operation of an abusive and illegal tax shelter. Plaintiff Sean Tayebi, M..D. is a California resident, and plaintiff Pascagoula Ventures, LLC (Pascagoula) is a Delaware-registered limited liability partnership, of which Tayebi is the sole member and shareholder.

Defendant KPMG is the third largest accounting firm in the United States, and generates more than $4 billion in annual revenues. Defendant David Rivkin is a former KPMG tax partner and a certified public accountant. Defendant Randall S. Bickham was a

partner of KPMG (KPMG, Rivkin, and Bickham, collectively, the KPMG Defendants).

Defendant Sidley Austin Brown & Wood (Brown & Wood) is one of the nation's largest law firms. Defendant SABW Holding LLP is a Delaware limited liability partnership and, effectively, the parent of Brown & Wood, liable for its liabilities and obligations. Defendant Presidio Advisory Services, LLC is the parent of Presidio Growth, LLC and Presidio Resources, LLC (collectively, Presidio). Defendant HVB-AG is a German corporation. Defendants HVB Finance, HVB Risk, and HVB America are affiliates or subsidiaries of HVB-AG. Defendant Domenick DeGiorgio was a principal of HVB. Finally, the actual identities of defendants Does 1 through 50 are presently unknown to plaintiffs, and they were responsible in some manner for the acts alleged in the complaint.

In 1997, KPMG and Brown & Wood began to jointly create a fraudulent tax shelter scheme known as "Bond Linked Issue Premium Structure" (BLIPS). KPMG personnel formed Presidio as an investment advisor to further that scheme, and they enlisted HVB to provide a "loan" so that the BLIPS transaction would not have a taxable benefit. The personnel of these entities all knew of the defects in BLIPS, that the HVB loans were shams, and that BLIPS was a tax shelter subject to Internal Revenue Service list maintenance requirements.

As part of the scheme, KPMG agreed to advise clients that BLIPS was lawful, and then provide opinion letters attesting to its lawfulness, while making other representations to induce participation. Defendants used these opinion letters as a marketing tool to induce Tayebi to enter into the transaction, the purpose of which was to provide protection against the imposition of tax penalties in the event that the IRS or state tax authorities challenge the

3

tax treatment of a particular strategy.  The BLIPS transaction was intended to generate a substantial ordinary or capital loss through the use of "loans" issued at above-market interest rates with substantial loan premiums, which were not true loans.  Defendants knew that the purported loans were shams, because they were designed so that no money ever left the bank.

Defendants marketed BLIPS in such a way as to fraudulently induce Tayebi to enter into the transaction, knowing that he had large capital gains or significant income.  HVB, acting with the other defendants, prepared loan documents, which Presidio approved and reviewed, that falsely represented to Tayebi that BLIPS was a three-stage, seven-year investment program, when it was a short-term transaction to trigger tax losses, as Rivkin and DeGiorgio have admitted in federal court.

In 1998, Tayebi retained KPMG on a limited basis as his financial advisors for his medical practice.  In 2000, KPMG pursued Tayebi in an aggressive effort to convince him to participate in the BLIPS scheme, having learned that Tayebi was one of several owners of a company that was planning a lucrative initial public offering.   Tayebi and his representatives regularly met with KPMG accountants to discuss tax matters.

At a meeting in early 2000, Rivkin, acting on behalf of all defendants, described BLIPS, and represented that it was "more likely than not" that the IRS would allow a deduction for losses generated by BLIPS. Rivkin estimated a tax loss of $35 million at a cost of approximately $2.45 million, representing seven percent of the $35 million in projected tax savings.

In so doing, however, Rivkin did not disclose the following: (1) the HVB loans were shams, in that no money would ever leave HVB, and HVB would not set aside its own

4

money or procure money to fund the BLIPS loans; (2) the investment component of BLIPS was not leveraged; (3) the purported HVB loans did not secure foreign currency trades; (4) defendants each had a financial stake in BLIPS; and (5) defendants knew or suspected that the IRS or a court would not validate BLIPS.

In early 2000, Tayebi sold some of his stock in one of his business entities, yielding net proceeds of approximately $35 million. In mid-year 2000, Tayebi retained defendants, and paid Presidio, acting as promoter of BLIPS, the required fee of more than $2.45 million for its participation in BLIPS. On September 13, 2000, Brown & Wood provided Tayebi with a lengthy opinion letter regarding BLIPS. In reliance upon defendants' representations, Tayebi conducted his business in such a way as to realize taxable income that would be offset by the losses generated by BLIPS. KPMG prepared Tayebi's federal and state personal income tax returns for 2000 that reflected the results of the BLIPS scheme. KPMG continued to provide accounting services and tax advice to Tayebi in May 2003. At no time between 2001 and 2003, did KPMG attempt to correct any of the misrepresentations and omissions that KPMG used to induce Tayebi to enter into the BLIPS transaction.

In 2002, KPMG wrote Tayebi a letter regarding an IRS announcement about tax shelters and other questionable items reported on the tax returns, and KPMG recommended that Tayebi make prompt disclosure in accordance with the announcement, but that such disclosure would not create an inference of impropriety. Tayebi participated in the voluntary disclosure plan with the IRS. In 2003, the IRS wrote to Tayebi informing him that his 2000 tax return was being opened for examination and requesting certain information. In 2004, the IRS contacted Tayebi, and informed him that the tax deduction claimed on his 2000

5

income tax return, based on the BLIPS transaction, was invalid. Thereupon, Tayebi entered into a "Closing Agreement" with the IRS, pursuant to which he paid additional federal income taxes and interest totaling more than $7 million, and additional state income taxes and interest totaling more than $4 million.

The complaint alleges further that KPMG and HVB admitted their wrongful participation in the BLIPS scheme when they each entered into a "Deferred Prosecution Agreement" with the United States Attorneys Office, on August 26, 2005, and February 14, 2006, respectively. HVB admitted to: (1) participating in transactions falsely purporting to be loans; (2) participating in trading activity on instructions from promoters that was intended to create the false appearance of investment activity; (3) participating in creating documentation that contained false representations about BLIPS; and (4) engaging in activity with others, including accounting firms, investment advisory firms, lawyers, and clients, to implement the tax shelters designed to defraud the United States. HVB admitted that this conduct occurred under DeGiorgio's direction, and it accepted responsibility for his actions. Rivkin pled guilty on March 27, 2006, to conspiracy and tax evasion for his participation in the fraudulent BLIPS tax scheme.

The complaint also alleges that KPMG's conduct violated section 302 of the AICPA Code of Professional Conduct, and Brown & Wood's conduct violated Disciplinary Rules 2-106, 22 NYCRR § 1200.11; 3-102, 22 NYCRR § 1200.17; and 5-105, 22 NYCRR § 1200.24.

The complaint contains five causes of action for (1) fraud and civil conspiracy against all defendants; (2) professional malpractice against the KPMG Defendants; (3) rescission of

invalid fee agreement and unjust enrichment against KPMG and Brown & Wood; (4)

rescission and unjust enrichment against Presidio; and (5) unjust enrichment against HVB.

**Motion 001**

As against the KPMG Defendants, the complaint alleges fraud and civil conspiracy

(first cause of action); professional malpractice (second cause of action); and, against KPMG

as the sole KPMG Defendant, rescission of invalid fee agreement and unjust enrichment

(third cause of action). Presently, KPMG seeks dismissal of the second and third causes of

action on the grounds that the statute of limitations bars both of them, and the rescission and

unjust enrichment claims fail to state a cause of action.

For the second cause of action, plaintiffs allege that the services that the KPMG

Defendants provided to them were deficient, inadequate, not competent, and fell below the

standard of care to be exercised by accountants engaged to provide tax advice and similar

services. For the third cause of action, plaintiffs allege that the KPMG Defendants have been

unjustly enriched by collecting fees that were excessive and improper, and, therefore,

plaintiffs are entitled to rescind the agreement to pay them $475,000, and to recoup that

amount, plus any additional amounts that the KPMG Defendants may have received.

KPMG argues that the parties executed the BLIPS transaction between June and

September 2000, and that KPMG gave Tayebi an opinion letter on October 29, 2000.

Therefore, the claim for malpractice became barred three years later, on October 29, 2003.

Plaintiffs filed the complaint, however, on April 23, 2007. KPMG argues that, although

Tayebi may not have discovered the alleged malpractice until sometime thereafter, the period

within which to have commenced an action as to this claim began to run when KPMG

7

delivered the work product.

Plaintiffs contend that KPMG's continuous representation tolled the statute of limitations period. Allegedly, after KPMG issued its opinion to Tayebi, it continued to advise Tayebi regarding the BLIPS transaction through July 15, 2003. Thus, the three-year statute could not have started to run until July 15, 2003. In addition, the parties entered into a "Tolling Agreement" on April 26, 2005, whereby they agreed that, as of that date, any of Tayebi's claims were tolled so as to permit the parties an opportunity to resolve their issues. The tolling period expired in December 2007, after plaintiffs commenced this action.

KPMG responds that the parties' BLIPS engagement letter, dated June 19, 2000 (Engagement Letter), contemplated that it would not provide any services after delivery of the opinion letter in October 2000, and that the Engagement Letter explicitly states that KPMG's representation of plaintiffs regarding the BLIPS transaction terminated upon delivery of KPMG's opinion letter.

The statute of limitations for accountant malpractice is three years, and a claim accrues when the accountant commits the alleged malpractice, and not upon the client's discovery of it (*Williamson v PricewaterhouseCoopers LLP*, 9 NY3d 1 [2007]). The statute may be tolled, however, under the doctrine of continuous representation, which is applicable to cases involving accountants, and it is based upon continuous treatment jurisprudence, first recognized in medical malpractice cases (*id.* at 5). Under this doctrine, when the course of treatment, which includes the wrongful acts or omissions, has run continuously, and is related to the same original condition or complaint, then the limitations period does not begin to run until the termination of the treatment (*id.*). In the accounting context, the mere

recurrence of professional services does not constitute continuous representation where the later services performed were not related to the original services (*Booth v Kriegel*, 36 AD3d 312, 314 [1st Dept 2006]).  Plaintiffs have the burden of demonstrating that the continuous representation doctrine applies (*CLP Leasing Co. v Nessen*, 12 AD3d 226 [1st Dept 2004]).

KPMG rests its argument on the Engagement Letter, stating that it expressly contemplates that it would not provide any services to plaintiffs after delivery of the opinion letter in October 2000, and that KPMG's representation of plaintiffs regarding the BLIPS transaction terminated upon delivery of KPMG's opinion letter.   On this basis alone, KPMG's motion must be denied, because, fairly read, rather than providing for the cessation of services relating to BLIPS, the Engagement Letter has language indicating that the parties may have contemplated further services pertaining to the BLIPS transaction.  KPMG mischaracterizes the import of the letter by asserting that the Engagement Letter "explicitly states that KPMG's representation of Plaintiffs would be completed upon delivery of KPMG's opinion letter" (Reply Memorandum, at 3).  It contains no such statement.

The Engagement Letter provides that KPMG will provide the following services regarding plaintiffs' involvement in the Investment Program: (1) "Meet with you to discuss the U.S. federal income tax implications associated with participation in the Investment Program," and (2) "Provide Client with an opinion letter that addresses the U.S. federal income tax consequences associated with participation in the Investment Program based upon your unique facts and circumstances."  Hence, KPMG contractually agreed to meet with Tayebi to "discuss the U.S. federal income tax implications associated with participation in the Investment Program."  Moreover, the Engagement Letter notes that the

law is "subject to change, retroactively and/or prospectively," and, therefore, "[u]nless you specifically engage us do so in writing, we will not update our advice for subsequent changes or modifications to the law and regulations, or to the judicial and administrative interpretations thereof." Thus, it appears that it was only as to updates about changes in the law and regulations that KPMG was excluding from its future services. This hardly indicates an intent by KPMG to dissociate itself from plaintiffs' BLIPS transaction. The intent of the Engagement Letter raises a significant factual issue, because the nature and scope of the Engagement Letter plays a key role in determining whether the parties contemplated continuous representation (*Williamson v PricewaterhouseCoopers LLP*, 9 NY3d at 10).

Moreover, according to plaintiffs, KPMG provided an invoice to Tayebi, dated August 7, 2003, for "Professional services rendered through July 15, 2003" for the following services: "Review correspondence from attorney, respond to attorney request for information to respond to IDR request, issues regarding asserting privilege, and initial meeting with IRS regarding initial settlement initiative." Contrary to KPMG's assertion, that Tayebi paid an additional amount for these services does not negate a finding of continuous representation, and cause it to be a "new engagement." The issue is not whether it is a "new engagement," but whether the later services performed were related to the original services (*see Shumsky v Eisenstein*, 96 NY2d 164, 168 [2001] [the concern is not whether there has been continuing treatment, and not mere a continuing relationship]). To be sure, plaintiffs' evidence is not conclusive as to this issue, but it is sufficient to raise an issue of fact as to the nature and timing of the services that KPMG may have performed on plaintiffs' behalf.

10

KPMG next argues that the rescission and unjust enrichment claims fail, because they are duplicative of the malpractice claim, in that they arise out of the same facts, and they do not seek damages distinct from one another. This assertion is unpersuasive. In the malpractice claim, plaintiffs contend that KPMG's failure to provide adequate accounting services caused it damages totaling $4 million, representing a portion of Tayebi's tax liability, whereas, in the rescission and unjust enrichment claims, plaintiffs seek to recoup the professional fees paid to KPMG in the amount of $437,500.

KPMG also argues that plaintiffs cannot satisfy an essential element of an unjust enrichment claim, because it has not retained the fees that plaintiffs paid, and, therefore, it has not been enriched. As a result of KPMG's tax shelter activities, it and the United States government entered into the Deferred Prosecution Agreement, which required KPMG to disgorge to the government the fees that plaintiffs paid. This assertion, too, is unpersuasive.

Unjust enrichment occurs when a defendant enjoys a benefit bestowed by the plaintiff without adequately compensating the plaintiff (*Sergeants Benevolent Assn. Annuity Fund v Renck*, 19 AD3d 107 [1st Dept 2005]). That KPMG disgorged the fees does not render the claim a nullity, because KPMG had the use of the money, and the manner in which it used the funds is inconsequential for the unjust enrichment claim. Moreover, KPMG obtained a benefit from the use of these fees by exchanging them for consideration offered by the government.

Thus, KPMG's citation to decisions such as *Apollon Waterproofing & Restoration Corp. v Bergassi* (241 AD2d 347 [1st Dept 1997]) is unpersuasive, because in that action the defendants "had returned the subject funds to the underwriter of the performance and

11

payment bonds, and therefore did not retain any benefit unjustly" (*id.* at 348). Furthermore, KPMG's assertion that the United States government views itself as the victim of KPMG's scheme fails to take into account the underlying premise of the complaint here, that plaintiffs are the victims of defendants' wrongdoing.

### Motion 002

As against HVB, the complaint alleges fraud and civil conspiracy (first cause of action), and unjust enrichment (fifth cause of action). HVB moves for dismissal of these claims on the grounds of a defense founded upon documentary evidence, statute of limitations, failure to state a cause of action, and failure to plead the fraud claims with sufficient particularity. Of these grounds, the defense of statute of limitations is dispositive in HVB's favor.

HVB argues that plaintiffs failed to file their complaint within six years of the alleged fraudulent representations. According to plaintiffs, Rivkin and KPMG made various misrepresentations and failed to disclose certain facts in December 1999 and early 2000 to induce Tayebi to invest in BLIPS in mid-2000. Thus, at the latest, the statute of limitations began to run on July 26, 2000. However, plaintiffs failed to file their complaint within six years, i.e., by July 25, 2006.

HVB also asserts that, as to plaintiffs' claims against HVB-AG, but not the other HVB entities, the statute of limitations was tolled for a period of 6-1/2 months, because HVB-AG was named as a defendant in a class action entitled *Becenel v KPMG*, No. 2005-18 (Clark County, Ark 2005]). That toll lasted from January 28, 2005, when the class action complaint was filed, to August 9, 2005, when the federal court, to which the action had been

12

removed, denied a motion for class certification. Hence, the toll lasted just under the 6-1/2 months, and expired six years and 6-1/2 months after it began to accrue on or before July 26, 2000, i.e., in early March 2007. Plaintiffs commenced this action on April 23, 2007.

Plaintiffs argue that the fraud and civil conspiracy claims are timely under New York's discovery rule, because the earliest that they could have discovered HVB's fraud was on February 14, 2006, the date of HVB's Deferred Prosecution Agreement. They argue further that the fraud could not have been known earlier, because KPMG and the other defendants continued to advise and assure them that BLIPS was a valid strategy. Moreover, KPMG's Deferred Prosecution Agreement did not name HVB, nor did it reveal HVB's fraud.

According to HVB, the two-year discovery rule (CPLR 213 [8]) does not help plaintiffs, because plaintiffs' own allegations reveal that they had knowledge of sufficient facts to trigger inquiry notice of potential fraud. This is because plaintiffs allege that, as early as 2002, KPMG advised Tayebi of IRS Announcement 2002-2, which encouraged taxpayers to voluntarily disclose tax shelters reported on their tax returns. Thus, even while applying the two-year discovery rule, the fraud claim is time-barred.

An action alleging a cause of action for fraud must be commenced within six years from the time of the fraud or within two years from the time the fraud was discovered or, with reasonable diligence, could have been discovered (*St. Clement v Londa*, 8 AD3d 89 [1st Dept 2004]). CPLR 213 (8) provides:

> "8. an action based upon fraud; the time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it."

Contrary to plaintiffs assertion, the cause of action for fraud accrued at the time that plaintiffs entered into the BLIPS transaction (*see Fandy Corp. v Lung-Fong Chen*, 262 AD2d 352 [2d Dept 1999]). As for the two-year discovery rule, even without more, the IRS announcement should have been sufficient to put plaintiffs on inquiry notice of the existence of problems with the BLIPS transaction (*see Sheth v New York Life Ins. Co.*, 308 AD2d 387 [1st Dept 2003]; *Weisl v Polaris Holding Co.*, 226 AD2d 286 [1st Dept 1996]). The "more" includes media coverage about KPMG's BLIPS transactions which contributed to inquiry notice (*Gaslow v QA Invs. LLC*, 36 AD3d 286 [1st Dept 2006]) as well as similar lawsuits (*Weiss v La Suisse, Societe D'Assurrances Sur La Vie*, 381 F Supp 2d 334 [SD NY 2005]) (*see e.g.* Exhibits 22-29 of Affidavit of Sarah E. O'Connell, Esq.). Although plaintiffs argue that they had no reason to question their "trusted advisor," KPMG, an objective test is applied to determine when, with reasonable diligence, the plaintiff should have discovered the fraud (*K&E Trading & Shipping v Radmar Trading Corp.*, 174 AD2d 346 [1st Dept 1991]).

As for the conspiracy component, there is no independent cause of action for this claim in New York (*Burns Jackson Miller Summit & Spitzer v Lindner*, 88 AD2d 50 [2d Dept 1982], *affd* 59 NY2d 314 [1983]), but allegations of conspiracy are permitted to the extent of connecting the actions of separate defendants with an actionable injury, and to show that the actionable acts flowed from a common plan (*SRW Assoc. v Bellport Beach Prop. Owners*, 129 AD2d 328 [2d Dept 1987]). Therefore, because the fraud claim is time-barred, the conspiracy claim is also time-barred, because it is part of the same fraud cause of action.

The unjust enrichment claim is time-barred, in that it has a six-year limitations period

14

(CPLR 213; *Insurance Co. State of Pa. v HSBC Bank USA*, 37 AD3d 251 [1st Dept 2007]),

which expired in 2006, six years after Tayebi entered into the BLIPS transaction, and prior

to the commencement of this action. Plaintiffs' attempt to apply the two-year discovery rule

is unpersuasive for two reasons: (1) that rule pertains to fraud claims (CPLR 213 [8]), and

(2) as discussed above, even if applicable, the claim would, nevertheless, be time-barred.

Lastly, plaintiffs argue that, by concealing material facts, HVB is equitably estopped

from arguing that plaintiffs' claims are time-barred. Under this doctrine, a defendant is

estopped from pleading a statute of limitations defense if fraud, misrepresentation, or

deception induced the plaintiff to refrain from filing a timely action (*Ross v Louise Wise*

*Servs. Inc.*, 8 NY3d 478, 491 [2007]). The party relying upon equitable estoppel must show

(1) lack of knowledge, (2) reliance upon the conduct of the party to be estopped, and (3) a

prejudicial change in position (*Broadworth Realty Assocs. v Chock 336 B'way Operating*,

168 AD2d 299 [1st Dept 1990], *appeal denied* 77 NY2d 808 [1991]). For the doctrine to

apply, however, the plaintiff may not rely on the same act that forms the basis for the claim

– the later fraudulent misrepresentation must be for the purpose of concealing the former tort

(*Ross v Louise Wise Servs. Inc.*, 8 NY3d at 491). Based on the foregoing, it is evident that

such is not the case here, in that there are no allegations tending to support this theory.

**Motion 006**

As against Presidio, the complaint alleges fraud and civil conspiracy (first cause of

action) and rescission and unjust enrichment (fourth cause of action).

Presidio moves to dismiss the complaint on the grounds of a forum selection clause,

statute of limitations and failure to state a cause of action. As for statute of limitations,

15

Presidio incorporates the arguments made by HVB. In addition, Presidio contends that, by bringing this action, plaintiffs have violated a forum selection clause in their agreement with it.

Presidio argues that the parties' "Subscription Agreement" contains a forum selection clause that designates the Northern District of California as the exclusive forum for any dispute brought by plaintiffs against Presidio, and therefore, plaintiffs are barred from maintaining this action. I reject this argument for the same reasons as set forth in the decision in the *Salam* Action (13 Misc 3d 1205 [A] [Sup Ct, NY County 2006], 2006 NY Slip Op. 51697 [U], *affd* 43 AD3d 752 [1st Dept 2007]).

As for the statute of limitations defense, Presidio adopts HVB's arguments, and, for the reasons discussed above, these arguments are persuasive. Although the complaint does not allege rescission as against HVB, that claim is subject to the same six-year period as unjust enrichment (*Percoco v Lesnak*, 24 AD3d 427 [2d Dept 2005]), and the same analysis, set forth above in motion 002, applies. Thus, as against Presidio, the complaint is dismissed.

Accordingly, it is

ORDERED that the motion by KPMG LLB (sequence number 001) is denied; and it is further

ORDERED that KPMG LLP is directed to serve its answer to the complaint within 20 days after service of a copy of this order with notice of entry; and it is further

ORDERED that the motion by Bayerische Hypo- und Vereinsbank AG, HVB U.S. Finance Inc., HVB Structured Finance Inc., HVB Risk Management Products Inc., and HVB America, Inc. (sequence number 002) is granted and, as against these defendants, the

complaint is severed and dismissed, with costs and disbursements to them as taxed by the Clerk of the Court; and it is further

ORDERED that the motion by Presidio Advisory Services, LLC, Presidio Growth, LLC, and Presidio Resources, LLC (sequence number 006) is granted and, as against these defendants, the complaint is severed and dismissed, with costs and disbursements to them as taxed by the Clerk of the Court; and it is further

ORDERED that the Clerk is directed to enter judgment accordingly; and it is further

ORDERED that the remainder of the action shall continue.

Dated:

2/20/08

ENTER:

_____
J.S.C.

HON. BERNARD J. FRIED

FILED

FEB 20 2008

NEW YORK
COUNTY CLERK'S OFFICE

17

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
KONSTANTINOS VADEVOULIS, JIM              :
VADEVOULIS, and PAUL VADEVOULIS,          :
                                          :
                 Plaintiffs,              :        Case No. 08 C 1251
                                          :
        v.                                :        Hon. Joan H. Lefkow
                                          :
DEUTSCHE BANK AG, DEUTSCHE BANK           :
SECURITIES, INC., D/B/A DEUTSCHE BANK     :
ALEX. BROWN, and AMERICAN EXPRESS         :
TAX AND BUSINESS SERVICES, INC., N/K/A    :
RSM MCGLADREY LLC,                        :
                                          :
                 Defendants.              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**DEUTSCHE BANK AG'S AND DEUTSCHE BANK SECURITIES INC.'S
MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A STAY
PENDING ARBITRATION OF PLAINTIFFS' CLAIMS**

Erin L. Ziaja (ID # 6278775)
DEWEY & LeBOEUF LLP
Two Prudential Plaza, Suite 3700
180 North Stetson Avenue
Chicago, Illinois 60601
Telephone: (312) 794-8000
Facsimile: (312) 794-8100

Seth C. Farber
DEWEY & LeBOEUF LLP
1301 Avenue of the Americas
New York, New York 10019-6092
Telephone: (212) 259-8000
Facsimile: (212) 259-6333

*Attorneys for Defendants Deutsche Bank AG and Deutsche Bank Securities Inc.*

1.    **Plaintiffs' Claims Are "Referable To Arbitration"**

In determining whether claims are "referable to arbitration" under the FAA, the court must "focus solely on the arbitration clause and determine whether there is an agreement to arbitrate the underlying dispute. If the court determines that the underlying dispute is within the ambit of the arbitration agreement, resolution of that dispute is for the arbitrator." *Flender Corp. v. Techna-Quip Co.*, 953 F.2d 273, 277 (7th Cir. 1992).

In this case, there is an agreement to arbitrate because Plaintiffs are bound by the arbitration provisions in the Account Agreements they signed when they opened accounts with DBSI to implement the Strategy. In addition to DBSI, Deutsche Bank AG is entitled to enforce the arbitration provisions on grounds of estoppel and agency. Finally, Plaintiffs' claims fall squarely within the scope of the arbitration provisions.

a.    **Plaintiffs Are Bound By The Arbitration Provisions in the Account Agreements**

i.    **Plaintiffs Are Signatories to the Account Agreements**

Each Plaintiff signed one of the Account Agreements. *See* Exs. 1-3 (bearing signatures of Plaintiffs Dino Vadevoulis, Jim Vadevoulis and Paul Vadevoulis). Those Agreements make clear that they bind Plaintiffs personally, notwithstanding the fact that each Plaintiff titled his account with the name of one of his limited liability companies. Specifically, the definition section at the beginning of each of the Account Agreements states: "[t]hroughout this Agreement, 'I,' 'me,' 'my,' 'we' and 'us' and 'the undersigned' *refer to the person(s) whose signatures(s) appear(s) below* and all others who are legally obligated on this account." Account Agreements, Intro. ¶, Exs. 1-8 (emphasis added). Because each Plaintiff is "the person whose signature appears below" on one of the Account Agreements, Plaintiffs are the "I," "me," "we," "us" and "the undersigned" referred to therein. As such, Plaintiffs are bound by the arbitration provision in the Account Agreements, which provides that "*I* agree to arbitrate with you any controversies that may arise…" *Id.* (emphasis added).

Although Plaintiffs include the word "Member" after their signatures, the context makes clear that Plaintiffs were obligating themselves personally. The inclusion of a title after the signatory's name does not alter the personally binding nature of the agreement unless the contract otherwise indicates an intent only to bind an entity. *See, e.g., PNC Capital Recovery v.*

7

*Mech. Parking Sys.*, 726 N.Y.S.2d 394 (N.Y. App. Div. 2001).[5]  To begin with, the definitional section referred to above plainly obligates them personally as the "undersigned."  Other provisions in the Account Agreements only reinforce the conclusion that the "I" in the Agreements refers to natural persons, not corporate entities.  First, the Account Agreements provide that "I am of legal age" and "am not an employee or member of any securities exchange...," nor "am I a senior officer of any bank, savings and loan institution, insurance company, registered investment company, registered investment advisory firm or institution that purchases securities, nor am I a member of the immediate family of such a person."  Account Agreements ¶ 1, Ex. 1-8.  A corporate entity has no "legal age."  Moreover, a corporate entity is incapable of being an "employee," the "senior officer of any bank," or a "member of the immediate family of such a person."  Thus, the unambiguous contractual terms manifest an intent that "I" refers to natural persons, *i.e.* Plaintiffs.  Paragraph 20 of the Account Agreements is also instructive.  It provides that the "Agreement shall be binding upon *my* heirs, executors, administrators, personal representatives and permitted assigns."  *Id.* ¶ 20 (emphasis added).  The words "heirs, executors, administrators and personal representatives" are apt terms with respect to a natural person, but not a corporate entity.  *See, e.g., Ricker v. B-W Corp.*, 349 F.2d 892, 895 (10th Cir. 1965).

   Finally, Plaintiffs' allegations in their Amended Complaint demonstrate that they themselves understood that they personally (and not the LLCs) were the "customers" of the Bank.  For example, the Amended Complaint describes the Account Agreements themselves as misrepresentations to the Vadevoulises about the suitability and profitability of the underlying transactions.  *See, e.g.*, Am. Compl. ¶ 126 ("On numerous occasions, including through the use of account agreements, option transaction confirmations and monthly account statements, Deutsche Bank represented that the transactions underlying Son of Boss were valid, legitimate, purposeful, suitable for the Vadevoulises, and had a reasonable prospect of profit.").  Similarly, Plaintiffs describe themselves – and not their limited liability companies – as the parties who engaged in the options transactions that were executed in the Accounts.  Thus, Paragraph 125 of the Amended Complaint alleges that Deutsche Bank and Amex made misrepresentations to

---

[5]  Whether parties have agreed to arbitrate is controlled by state-law principles governing contract formation.  *See S. Ill. Beverage, Inc. v. Hansen Beverage Co.*, No. 07cv391, 2007 WL 3046273, at * 9 (S.D. Ill. Oct. 15, 2007).  In this case, New York law governs interpretation of the Account Agreements pursuant to the choice of law clause at Paragraph 20.

Plaintiffs by:

> (21) Recommending that the Vadevoulises purchase the Options; [and]
> (22) Recommending, advising, instructing, and assisting the Vadevoulises in the Options.

Am. Compl. ¶ 125.

### ii.   Plaintiffs Are Estopped from Denying Arbitration

Even if this Court were to find that Plaintiffs did not sign the Account Agreements in their individual capacities, principles of estoppel would still require Plaintiffs to arbitrate their claims. It is well-established that the obligation to arbitrate a dispute is not limited to those who have personally signed a written agreement. *Int'l Ins. Agency Svcs., LLC v. Revios Reins. U.S. Inc.*, No. 04C1190, 2007 WL 951943, at *3 (N.D. Ill. Mar. 27, 2007) (internal citations omitted). Instead, a non-signatory party is estopped from denying its obligation to arbitrate when it receives a direct benefit from a contract containing an arbitration clause. *Id.*; *see also Fyrnetics (Hong Kong) Ltd. v. Quantum Group,* No. 99C4704, 2003 WL 164220, at *4 (N.D. Ill. Jan. 23, 2003); *Am. Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 353 (2d Cir. 1999).

Here, it was Plaintiffs personally who enjoyed the purported tax benefits resulting from the options transactions executed in the Accounts opened by the Account Agreements at issue. *See* Am. Compl. ¶ 7 (alleging that Plaintiffs personally claimed tax savings from a Son of Boss tax strategy); ¶ 54 (alleging that a Deutsche Bank employee "sent or caused to be sent many of the account agreements . . . necessary to set up and implement the Son of Boss transaction in which plaintiffs participated."). Because they personally benefited from the Account Agreements – without them, they would not have been able to engage in the Options transactions and thus would not have been able to claim any tax benefits – it is equitable for the Plaintiffs to be bound by the arbitration provisions in those same agreements, and, accordingly, Plaintiffs should be estopped from avoiding arbitration for this reason alone. *See Fyrnetics,* 2003 WL 164220, at *4; *Am. Bureau of Shipping*, 170 F.3d at 353.

In addition, courts routinely hold that claims premised upon agreements containing arbitration provisions are subject to those provisions regardless of a party's "non-signatory status" because, absent those agreements, there would be no claims. *See Fyrnetics,* 2003 WL 164220, at *4 (estopping a non-signatory from avoiding arbitration where "without the

9

[agreement containing the arbitration provision]," the facts giving rise to Plaintiffs' claim would not have occurred); *Revios Reins.*, 2007 WL 951943, at \*6 (granting motion to compel non-signatory to arbitration where the "agreements [containing the arbitration clause] provide the factual foundation for every claim asserted"); *see also Washington Mut. Fin. Group, LLC v. Bailey,* 364 F.3d 260, 267-68 (5th Cir. 2004) (holding that non-signatory plaintiff was required to arbitrate a dispute with a signatory defendant when the claims of the non-signatory plaintiff "hing[ed] on rights arising from . . . transactions" effected through the agreements with the arbitration provisions). As Judge Gottschall held in *Revios Reinsurance*, "[t]he principle that a party cannot use its relationship with a contract to allege liability but then disavow the arbitration provision in the contract is consistent with the notion that the doctrine of estoppel prevents a party from having it both ways." 2007 WL 951943, at \* 5 (citing *Washington Mut. Fin. Group*, 364 F.3d at 268).

Just as in *Revios Reins.*, not only did Plaintiffs benefit from the Account Agreements, but the agreements provide the "factual foundation" for Plaintiffs' claims. As an initial matter, Plaintiffs describe their case as "aris[ing] out of Deutsche Bank's and Amex's participation . . . in a conspiracy to create, market, sell and implement an illegal [Strategy] to the Vadevoulises during 2000." Am. Compl. ¶ 1. Plaintiffs allege that the "defendants and the other co-conspirators each had their own primary roles" in the "scheme," *id.* ¶¶ 68, 70, and that Deutsche Bank's role was to provide "the needed banking and trading services." *Id.* ¶ 70. To obtain these "banking and trading services," Plaintiffs executed the Account Agreements with DBSI. Indeed, Plaintiffs themselves allege that the Account Agreements were "necessary to set up and implement" the Strategy that generated "significant tax savings" for the Vadevoulises. *Id.* ¶¶ 7, 54. Now that these "significant tax savings" have been challenged by the IRS, *id.* ¶ 111, Plaintiffs are suing their tax advisors and Deutsche Bank for damages Plaintiffs assert they suffered as a result of their implementation of the Strategy. Thus, there is no question that the Account Agreements are at the heart of Plaintiffs' claims against Deutsche Bank.

Tellingly, Plaintiffs' Amended Complaint is replete with references to the Account Agreements, and the options trading done in the accounts created by the Account Agreements:

> Deutsche Bank at all times gave the Vadevoulises the impression that the trading and other financial machinations underlying the Son of Boss tax

> shelter were valid and legitimate. They did this, in part, by preparing and circulating to plaintiffs certain documents, including account statements and trade confirmations. Am. Compl. ¶ 2.
>
> Jenkens and Deutsche Bank collaborated in the development of numerous tax shelters, including Son of Boss. Eventually, Jenkens & Deutsche Bank marketed these shelters to hundreds of people, including the Vadevoulises. Indeed, Brubaker sent or caused to be sent many of the account agreements, option transaction confirmations, and account statements necessary to set up and implement the Son of boss transaction in which plaintiffs participated. *Id.* ¶ 15.
>
> In the end, Deutsche Bank's participation constituted an affirmative representation that Son of Boss was valid, legitimate, purposeful, and suitable for plaintiffs. Each time Deutsche Bank (often via Craig Brubaker) sent out an account agreement, trade confirmation, or account statement, Deutsche Bank reinforced this false statement. *Id.* ¶ 71.
>
> On numerous occasions, including through the use of the account agreements, option transaction confirmations and monthly account statements, Deutsche Bank represented that the transactions underlying Son of Boss were valid, legitimate, purposeful, suitable for the Vadevoulises, and had a reasonable prospect of profit. *Id.* ¶ 126.

In short, Plaintiffs' own allegations estop them from refusing to arbitrate their dispute with Deutsche Bank. *Cf. Revios Reins.*, 2007 WL 951943, at *5; *Gersten v. Intrinsic Tech., LLP*, 442 F. Supp. 2d 573, 580 (N.D. Ill. 2006) (compelling a nonsignatory to arbitrate his claims where he cited to the contract containing the arbitration clause "repeatedly" in "averring the factual foundation for his claim"); *Fyrnetics*, 2003 WL 164220, at *4 ("By exploiting the [agreement containing the arbitration clause] and accepting its benefits with knowledge of the arbitration clause, [non-signatory] is estopped from denying its obligation to arbitrate.").

   **b. Deutsche Bank AG Can Invoke The Arbitration Provision In The Account Agreements**

   Deutsche Bank AG, DBSI's ultimate corporate parent, while not a signatory to the account agreements, may also enforce the arbitration provisions. Under the terms of the Account Agreements, Plaintiffs agreed to arbitrate with "you." "You" is defined in the Account Agreements to include DBSI and its "affiliates." Account Agreements, Intro. ¶, Exs. 1-8. A parent is an affiliate of any of its subsidiaries. BLACK'S LAW DICTIONARY (8th Ed. 2004) (defining "affiliate" as: "1. A corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, *parent*, or sibling corporation.") (emphasis added); *see*