# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Konstantinos Vadevoulis, Jim Vadevoulis, and Paul Vadevoulis, | ) ) ) | |
| Plaintiffs, | ) ) ) | No. 08 C 1251 |
| v. | ) ) | |
| Deutsche Bank AG; Deutsche Bank Securities, Inc., d/b/a/ Deutsche Bank Alex. Brown, and American Express Tax and Business Services, Inc., n/k/a RSM McGladrey LLC | ) ) ) ) ) ) | Hon. Joan Humphrey Lefkow |
| Defendants. | ) | |

**PLAINTIFFS' FIRST SET OF DOCUMENT REQUESTS AND
FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 33 and 34, plaintiffs Konstantinos Vadevoulis, Jim Vadevoulis, and Paul Vadevoulis hereby request that defendants Deutsche Bank AG, Deutsche Bank Securities, Inc., d/b/a/ Deutsche Bank Alex. Brown, and American Express Tax and Business Services, Inc., n/k/a RSM McGladrey LLC (a) respond to and produce documents in response to the following document requests, and (b) answer the following interrogatories within 30 days in accordance with the following definitions and instructions:

**DEFINITIONS AND INSTRUCTIONS**

1.     "Plaintiff" shall mean any of Konstantinos, Jim, or Paul Vadevoulis. "Plaintiffs" shall mean more than one Plaintiff.

2.     "Deutsche Bank AG" shall include any of its agents, officers, representatives, employees and attorneys as well as any and all persons acting on its

behalf, associated or affiliated with, or controlled by Deutsche Bank AG with respect to any matter relevant to any discovery request.

3.    "DBSI" refers to Deutsche Bank Securities, Inc., d/b/a/ Deutsche Bank Alex. Brown, including any of its agents, officers, representatives, employees and attorneys as well as any and all persons acting on its behalf, associated or affiliated with, or controlled by DBSI with respect to any matter relevant to any discovery request.

4.    "Deutsche Bank" shall refer to Deutsche Bank AG and/or DBSI.

5.    "TBS" refers to American Express Tax and Business Services, Inc., n/k/a RSM McGladrey LLC, including any of its agents, officers, representatives, employees and attorneys as well as any and all persons acting on its behalf, associated or affiliated with, or controlled by TBS with respect to any matter relevant to any discovery request.

6.    "Defendants" means Deutsche Bank and/or TBS.

7.    "Complaint" means the Complaint filed by Plaintiffs in this action on February 29, 2008.

8.    "Son of BOSS" shall mean the tax shelter created, developed, marketed and implemented by, among others, Jenkens & Gilchrist and Deutsche Bank and marketed to hundreds of people, including Plaintiffs in the late 1990s and early 2000s. It is also the tax shelter that numerous TBS clients, including Plaintiffs, participated in and for whom TBS prepared their tax returns as referred by Jenkens & Gilchrist. Note: unless expressly limited to plaintiffs' Son of BOSS transaction, document requests or interrogatories seeking documents or information concerning Son of BOSS shall mean Son of BOSS generally and not just the Son of BOSS transaction in which plaintiffs participated. With any document requests or interrogatories concerning Son of BOSS

2

generally, however, Plaintiffs are not seeking any personal information of other Son of

BOSS participants. Plaintiffs agree such information may be withheld or redacted as

appropriate given the document request or interrogatory.

9.    "Document" means any and all non-identical copies of information or data

recorded upon any medium including, without limitation, any and all: (a) writings or

whatever type, nature or description, whether typed, handwritten, printed, or otherwise;

(b) tape or other sound or video recordings, e-mail, computer tapes, discs, and other

electronic or mechanical recordings, however produced or reproduced; and

(c) information stored in a computer, including archive files and backup tapes, whether or

not ever printed out or displayed. A draft is a separate document from the final text and

each non-identical copy is a separate document. Defendants are to produce all

electronically stored information in its native format. This definition includes

"communication" as described below.

10.    "Communication" is used in the most general sense of the word to refer to

any document as defined above relating or referring to any written or oral conversation,

recording, correspondence, voicemail, e-mail, or other electronic communication. This

definition includes internal communications between persons working for or representing

the same person or entity.

11.    "Person" includes the plural and the singular and includes, without

limitation, any natural person, alive or deceased, any corporation, partnership, sole

proprietorship, joint venture, firm, business, unincorporated associates, trust, foundation,

organization, or other entity, and any governmental or non-governmental body,

commission, department, committee, board, or agency.

12.    The terms "refer" and "relate to" and "concerning" mean containing, concerning, dealing with, constituting, defining, describing, discussing, embodying, evidencing, explaining, identifying, mentioning, reflecting, referring to, relating to, setting forth, showing, stating, summarizing, supporting or in any way pertaining to the subject matter of the relevant request.

13.    "Identify" means such designation of a person or document as to facilitate discovery, specifically:

    a.    When used in reference to a natural person, state the person's name, last known business and residential address (by street, city, state, and zip code), last known place of employment, last known employment title, and last known business and residential telephone numbers;

    b.    When used in reference to a corporation, state the full name of such corporation, the state in which it is incorporated, and the address (by street, city, state and zip code) and telephone number of its principal place of business;

    c.    When used in reference to a partnership or limited liability company, state the full name of such partnership or limited liability company, the names of each partner or corporate officer, and the address (by street, city, state and zip code) and telephone number of its principal place of business;

    d.    When used in reference to any other entity, state the entity's official name, any fictitious names under which it holds or has held itself out, its organizational form, and its address (by street, city, state and zip code) and telephone number;

    e.    When used in reference to any document, state with respect to each such document: the nature and substance thereof, the date it bears, the date it was prepared, the identity or identities of the author or authors thereof, the identify of each addressee, and the present location of the document. In lieu of identifying the document, identical copies thereof may be furnished; and

    f.    When used in reference to any act, occurrence, occasion, transaction or conversation state: the event or events constituting such act, occurrence, occasion, transaction, or conduct, as well as

4

its location, date and identity of the person or persons participating, present or involved and the identity of any and all documents that related or refer in any way thereto.

14.    The terms "and" and "or" shall be read to mean "and/or".

## DOCUMENT REQUESTS

1.    All documents concerning Plaintiff's participation in Son of BOSS.

2.    All contracts or agreements between Plaintiff(s) and Defendants concerning the Son of BOSS strategy in which Plaintiffs participated.

3.    All correspondence between Plaintiff and Defendants concerning the creation, marketing, or implementation of the Son of BOSS strategy in which Plaintiff participated.

4.    All documents concerning the creation, marketing, or implementation of Son of BOSS generally.

5.    All documents that concern, show, or relate to any Defendants' participation in Son of BOSS generally.

6.    Plaintiff's 2000 tax returns and all supporting tax workpapers.

7.    All correspondence between Plaintiff and TBS concerning any work TBS did with respect to Plaintiff's 2000 tax return.

8.    Documents that show the scope and extent of Defendants' participation in Son of BOSS generally.

9.    Documents that identify all employees of Defendants who participated in the creation, marketing, or implementation of Son of BOSS generally.

10.    Documents that identify all employees of Defendants who participated in the creation, marketing, or implementation of the Son of BOSS strategy in which Plaintiff participated.

5

11.    Documents that identify all TBS employees who performed any work or participated with respect to any work TBS did on Plaintiff's 2000 tax returns.

12.    All documents relating to Son of BOSS that Defendants produced to any governmental committee, government agency, federal or state prosecutor, or private litigant since 2000.

13.    All transcripts since 2000 of trial testimony, hearing testimony, grand jury testimony, depositions, or interviews of any current or former employee of Defendants in which Son of BOSS was mentioned, referred to, described, or inquired about.

14.    All documents concerning the nature and amounts of compensation Defendants received as a result of Plaintiff's participation in Son of BOSS.

15.    All documents concerning the nature and amounts of compensation Defendants received from Son of BOSS generally.

## **INTERROGATORIES**

1.    Identify by bates number all written contracts between Plaintiff and Defendants concerning Son of BOSS.

2.    Describe in detail all oral contracts between Plaintiff and Defendants concerning Son of BOSS.

3.    Identify by bates number all written agreements that Defendants contend (or may contend) require the mediation and/or arbitration of any claims alleged in the Complaint.

4.    Identify all persons or entities (including governmental entities) to whom Defendants have produced documents concerning Son of BOSS.

5.      Identify all current or former employees of Defendants who have been interviewed or deposed or testified at trial, before a hearing, or before a grand jury in which Son of BOSS was mentioned, referred to, described, or inquired about. Please include the name of each witness, each date they testified, and the nature of each proceeding.

6.      Identify the nature and amounts of all compensation Defendants received as a result of Plaintiff's participation in Son of BOSS.

7.      Identify the nature and amounts of all compensation Defendants received from Son of BOSS generally.

8.      Identify all employees of Defendants who participated in a tax strategy, including Son of BOSS, and who attempted to or in fact participated in the Internal Revenue Service amnesty program described in IRS Announcement 2002-2.

Dated: July 8, 2008                KONSTANTINOS VADEVOULIS, JIM
                                   VADEVOULIS, and PAUL VADEVOULIS


                                   By:_____/s/ Adam P. Merrill_____
                                        One of their attorneys

Adam P. Merrill  (6229850)
Scott F. Hessell (6275119)
SPERLING & SLATER
55 West Monroe St., Suite 3200
Chicago, Illinois 60603
(312) 641-3200

7

## CERTIFICATE OF SERVICE

I, Adam P. Merrill, certify that on July 8, 2008, I caused a true and correct copy of

**Plaintiffs First Set of Document Requests and First Set of Interrogatories** to be

served upon all following parties via *email*:

> Seth C. Farber
> Dewey & LeBoeuf LLP
> 1301 Avenue of the Americas
> New York, New York 10019-6092
> sfarber@dl.com
>
> Erin Ziaja
> Dewey & LeBoeuf LLP
> 180 N. Stetson
> Chicago, IL 60601
> eziaja@dl.com
>
> Lynne Fischman Uniman
> Anju Achima
> Andrews Kurth LLP
> 450 Lexington Avenue
> New York, NY 10017
> luniman@andrewskurth.com
> anjuuchima@andrewskurth.com
>
> Thomas F. Falkenberg
> Williams Montgomery & John Ltd.
> 20 North Wacker Drive, Suite 2100
> Chicago, IL 60606
> tff@willmont.com

and also via *Messenger* to Erin Ziaja, and Thomas F. Falkenberg.

                    /s/ Adam P. Merrill
                      Adam P. Merrill

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

KONSTANTINOS VADEVOULIS, JIM        :
VADEVOULIS, and PAUL VADEVOULIS,    :
                                   :
               Plaintiffs,       :
                                   :    Case No. 08 C 1251
          v.                  :
                                   :    Hon. Joan H. Lefkow
DEUTSCHE BANK AG, DEUTSCHE BANK  :
SECURITIES, INC., D/B/A DEUTSCHE BANK :
ALEX. BROWN, and AMERICAN EXPRESS :
TAX AND BUSINESS SERVICES, INC., N/K/A :
RSM MCGLADREY LLC,            :
                                   :
             Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEUTSCHE BANK AG AND DEUTSCHE BANK SECURITIES INC.'S
RESPONSES AND OBJECTIONS TO PLAINTIFFS' FIRST SET OF
DOCUMENT REQUESTS AND FIRST SET OF INTERROGATORIES**

Erin L. Ziaja (ID # 6278775)        Seth C. Farber (admitted *pro hac vice*)
DEWEY & LeBOEUF LLP           DEWEY & LeBOEUF LLP
Two Prudential Plaza, Suite 3700    1301 Avenue of the Americas
180 North Stetson Avenue        New York, New York 10019-6092
Chicago, Illinois 60601           Telephone:  (212) 259-8000
Telephone:  (312) 794-8000      Facsimile:  (212) 259-6333
Facsimile:  (312) 794-8100

*Attorneys for Defendants Deutsche Bank AG and Deutsche Bank Securities Inc.*

Pursuant to Rules 26, 33 and 34 of the Federal Rules of Civil Procedure, Defendants Deutsche Bank AG and Deutsche Bank Securities, Inc., d/b/a/ Deutsche Bank Alex. Brown (collectively, "Deutsche Bank") hereby respond and object to Plaintiffs' First Set of Document Requests and First Set of Interrogatories ("Discovery Requests"), dated July 8, 2008, as follows:

## RESERVATION OF RIGHTS

1.    Deutsche Bank objects to the Discovery Requests on the ground that Deutsche Bank's Motion for a Stay Pursuant to Section 3 of the Federal Arbitration Act ("FAA") is pending before this Court and to proceed with discovery before the resolution of that motion would be contrary to the purposes of the FAA.

2.    Deutsche Bank provides these responses without waiving or intending to waive and, on the contrary, preserving and intending to preserve:

a.    The right to object on any ground to the use of any of said responses or the subject matter thereof in any subsequent proceeding in or at the trial of this or any other action;

b.    The right to object on any ground at any time to a demand for further responses to the Discovery Requests or any other discovery request involving or pertaining to the subject matter thereof; and

c.    The right at any time to supplement, revise, correct or clarify any of the objections and responses provided herein.

3.    In each and every instance in which Deutsche Bank interposes an objection, such objection shall be construed to preserve all of Deutsche Bank's rights to enter similar objections in any future supplemental response to the Discovery Requests.

Moreover, a failure to object herein shall not constitute a waiver of any objections that Deutsche Bank may interpose in future supplemental responses.

4.    Deutsche Bank responds to the Discovery Requests on the basis of the best information available to it at the time of searching for responsive documents, subject to the objections herein, and has limited its search to the most likely and reasonable repositories of responsive documents available to it.

5.    Any agreement by Deutsche Bank herein to produce any documents or categories of documents does not mean that any such documents exist or are in Deutsche Bank's possession, custody or control.   To the contrary, any such agreement is subject to the existence of such documents and the fact that they are in Deutsche Bank's possession, custody or control.

6.    The production of any documents by Deutsche Bank in response to the Discovery Requests is without waiver of any privilege, protection, claim of confidentiality or other objection.   In the event that Deutsche Bank produces any document that is the subject of any privilege, claim of confidentiality or other objection, such production is inadvertent and shall not constitute a waiver of any privilege, claim of confidentiality or other objection.   Deutsche Bank reserves the right to demand the return of any such documents or information and all copies thereof.

7.    Inadvertent production or disclosure of information or documents otherwise protected from discovery under any applicable privilege, immunity or protection from disclosure shall not waive Deutsche Bank's right to object to the use of any such documents or information at any time during this action or in any subsequent proceeding.

2

8.    The fact that Deutsche Bank is willing to produce any particular documents or group of documents does not constitute an admission or acknowledgement that the request is proper, that such documents are within the proper bounds of discovery, or that requests for similar documents will be treated in a similar fashion.

9.    Any documents provided to Plaintiffs in response to the Discovery Requests are being provided subject to the terms, conditions and protections of the Agreed Confidentiality Stipulation and Protective Order entered in this matter on July 1, 2008.

10.    Deutsche Bank reserves the right to produce documents and information on a rolling basis.

## GENERAL OBJECTIONS

The following general objections apply to each Discovery Request and shall have the same force and effect as if set forth in full in response to each individually numbered document request or interrogatory:

1.    Deutsche Bank objects to the Discovery Requests on the grounds and to the extent that the discovery sought is duplicative, overly broad, not relevant to the issues raised in the Amended Complaint, unduly burdensome, oppressive, harassing, ambiguous, vague or requires unreasonable investigation by Deutsche Bank.

2.    Deutsche Bank objects to the Discovery Requests on the ground and to the extent they seek information or documents that were prepared in anticipation of litigation or are protected by the attorney-client privilege, work product doctrine or any other applicable privileges or protections from discovery.

3

3.      Deutsche Bank objects to the Discovery Requests on the ground and to the extent they seek to impose obligations upon Deutsche Bank beyond those imposed by the Federal Rules of Civil Procedure and the Local Rules of this Court.

4.      Deutsche Bank objects to the Discovery Requests on the ground and to the extent they seek the production of documents or information containing confidential and/or proprietary information or trade secrets.

5.      Deutsche Bank objects to the Discovery Requests on the ground and to the extent they seek documents or information protected from disclosure by any confidentiality agreement with one or more third parties or by any confidentiality order or stipulation entered into in any past or present litigation or administrative proceeding.

6.      Deutsche Bank objects to the Discovery Requests on the ground and to the extent that they seek information not relating to transactions involving Plaintiffs on the ground that they exceed the bounds of permissible discovery under the Federal Rules of Civil Procedure or the Local Rules of this Court.

7.      Deutsche Bank objects to the Discovery Requests on the ground and to the extent they seek information or documents that are not in Deutsche Bank's possession, custody or control.

8.      Deutsche Bank objects to the Discovery Requests on the ground and to the extent they seek information or documents that are already in Plaintiffs' possession, custody, or control or that are equally available to Plaintiffs.

9.      Deutsche Bank objects to each Discovery Request that seeks the production of "all" documents of a particular type, or similar requests, to the extent that as written, such requests are so broad, vague and ambiguous as not to be susceptible of

4

reasoned interpretation. Compliance, if possible, would be unduly burdensome and oppressive and would place upon Deutsche Bank an unreasonable burden of inquiry.

10.    Deutsche Bank objects to each Discovery Request to the extent it purports to call for the production of documents that were located at Deutsche Bank's offices at 130 Liberty Street in Lower Manhattan. As a result of the terrorist attacks on September 11, 2001, documents contained in that building were contaminated with a number of toxic substances, necessitating destruction of all such documents.

11.    Deutsche Bank objects to each Discovery Request to the extent it seeks documents or information for periods of time in excess of the relevant time period encompassed by the subject matter and issues in these proceedings.

12.    Deutsche Bank objects to each Discovery Request to the extent it calls for the production of documents from Deutsche Bank that may be located outside the United States without first using the appropriate methods of international legal assistance to obtain the information, including the Hague Convention on the Taking of Evidence Abroad in Civil and Commercial Matters, 23 U.S.T. 2555; 28 U.S.C.A. § 1781 (the "Convention") with respect to documents that may be located in countries that are signatories to the Convention, and any other applicable convention or treaty.

13.    Deutsche Bank objects to each Discovery Request to the extent it calls for the production of documents located in any foreign country without allowing for time for proper application, if such application can be made under the laws of such foreign country, for permission to produce such documents. This failure renders the Discovery Requests improper, burdensome, oppressive and harassing, and violates principles of international comity.

14.    Deutsche Bank objects to each Discovery Request to the extent that it purports to seek to ascertain the existence of or to obtain the production of documents located in any foreign country to the extent that such disclosure or production would violate any foreign secrecy or other statutory prohibitions to which Deutsche Bank may be subject.

15.    Deutsche Bank objects to the Discovery Requests on the grounds and to the extent that they incorporate, include, or rely upon factual and legal assumptions and/or characterizations which are incorrect, speculative, or unsubstantiated. Any information provided or production or reference to documents by Deutsche Bank in response to any of the Discovery Requests shall not be deemed an admission, concession, or acquiescence to the accuracy of any assumption or characterization incorporated within, included in, or relied upon in any request.

16.    Deutsche Bank objects to each Document Request to the extent it calls for the production of electronic documents, files, or data that require Deutsche Bank to undertake an unreasonable burden of inquiry and/or incur excessive costs in locating, searching, and/or restoring such material.

17.    Deutsche Bank objects to the Discovery Requests to the extent they purport to require disclosure of information and/or documents that would be prohibited or arguably prohibited by law.

### OBJECTIONS TO DEFINITIONS AND INSTRUCTIONS

Deutsche Bank asserts the following objections with respect to the Definitions and Instructions:

6

1.     Deutsche Bank objects to each definition or instruction contained in the Discovery Requests to the extent that it exceeds the bounds of permissible discovery under the Federal Rules of Civil Procedure or the Local Rules of this Court.

2.     Deutsche Bank objects to the definitions of "Deutsche Bank AG," "DBSI," and "TBS" to the extent they purport to require the production of information or documents in the possession, custody or control of "attorneys" on the grounds that such information and documents are protected by the attorney-client privilege, work product doctrine or any other applicable privileges or protections from discovery. Deutsche Bank further objects to these definitions on the ground and to the extent that the terms "representatives" and "any and all persons acting on its behalf" is vague, ambiguous and overbroad and includes unauthorized agents. Additionally, Deutsche Bank objects to these definitions on the ground and to the extent that the use of the undefined terms "associated" and "affiliated" renders the definitions vague and/or ambiguous.

3.     Deutsche Bank objects to the definition of the term "Complaint" on the ground that the complaint identified in this definition has been superseded by an amended complaint.

4.     Deutsche Bank objects to the definition of the term "Son of BOSS" on the ground that it is vague and ambiguous. Deutsche Bank also objects to the definition on the ground and to the extent that it refers to transactions, entities and persons unrelated to the pending litigation and employs vague and ambiguous terms such as "developed," "marketed," and "implemented."

5.     Deutsche Bank objects to the definition of the terms "document," "communication," "concern," "relate to," and "concerning," as well as the instruction

7

pertaining to the word "identify," on the grounds and to the extent that such definitions and instructions would impose an expensive and time-consuming burden on Deutsche Bank, are overbroad, harassing, unduly burdensome and oppressive; call for the production of information or documents not within the custody, possession or control of Deutsche Bank; and call for the production of documents that are protected by the attorney-client, work-product doctrine or any other applicable privileges or protections from discovery.

6.     Deutsche Bank objects to the definition of the term "Person" as vague and overbroad and to the extent that it calls for the production of information or materials related to persons or entities unrelated to the transactions, claims, or defenses involved in the pending litigation.

## RESPONSES AND OBJECTIONS TO DOCUMENT REQUESTS

### REQUEST NO. 1:

All documents concerning Plaintiff's participation in Son of BOSS.

#### RESPONSE TO REQUEST NO. 1:

Subject to and without waiving any of the foregoing general objections, Deutsche Bank will produce non-privileged, responsive documents to the extent they exist and can be located following a reasonable search.

### REQUEST NO. 2:

All contracts or agreements between Plaintiff(s) and Defendants concerning the Son of BOSS strategy in which Plaintiffs participated.

#### RESPONSE TO REQUEST NO. 2:

Subject to and without waiving any of the foregoing general objections, Deutsche Bank will produce non-privileged, responsive documents to the extent they exist

and can be located following a reasonable search.

**REQUEST NO. 3:**

All correspondence between Plaintiff and Defendants concerning the creation, marketing, or implementation of the Son of BOSS strategy in which Plaintiff participated.

**RESPONSE TO REQUEST NO. 3:**

Subject to and without waiving any of the foregoing general objections, Deutsche Bank will produce non-privileged, responsive documents to the extent they exist and can be located following a reasonable search.

**REQUEST NO. 4:**

All documents concerning the creation, marketing, or implementation of Son of BOSS generally.

**RESPONSE TO REQUEST NO. 4:**

Deutsche Bank objects to this request on the grounds that it is overly broad and seeks documents that (i) relate to individuals, entities, and transactions that are not connected to the pending litigation; (ii) are irrelevant to the claims or defenses in the pending litigation; and (iii) are not reasonably likely to lead to the discovery of admissible evidence.

**REQUEST NO. 5:**

All documents that concern, show, or relate to any Defendants' participation in Son of BOSS generally.

**RESPONSE TO REQUEST NO. 5:**

Deutsche Bank objects to this request on the grounds that it is overly broad and seeks documents that (i) relate to individuals, entities, and transactions that are not connected to the pending litigation; (ii) are irrelevant to the claims or defenses in the

pending litigation; and (iii) are not reasonably likely to lead to the discovery of admissible evidence.

**REQUEST NO. 6:**

Plaintiff's 2000 tax returns and all supporting tax workpapers.

**RESPONSE TO REQUEST NO. 6:**

Deutsche Bank objects to this request on the ground that it seeks to impose an obligation on Deutsche Bank to identify, locate and produce documents that are in the possession, custody, or control of other parties to the pending litigation. Subject to and without waiving any of the foregoing general and specific objections, Deutsche Bank will produce non-privileged, responsive documents to the extent they exist and can be located following a reasonable search.

**REQUEST NO. 7:**

All correspondence between Plaintiff and TBS concerning any work TBS did with respect to Plaintiff's 2000 tax return.

**RESPONSE TO REQUEST NO. 7:**

Deutsche Bank objects to this request on the ground that it seeks to impose an obligation on Deutsche Bank to identify, locate and produce documents that are in the possession, custody, or control of other parties to the pending litigation. Subject to and without waiving any of the foregoing general and specific objections, Deutsche Bank will produce non-privileged, responsive documents to the extent they exist and can be located following a reasonable search.

**REQUEST NO. 8:**

Documents that show the scope and extent of Defendants' participation in Son of BOSS generally.

### RESPONSE TO REQUEST NO. 8:

Deutsche Bank objects to this request on the grounds that it is overly broad and seeks documents that (i) relate to individuals, entities, and transactions that are not connected to the pending litigation; (ii) are irrelevant to the claims or defenses in the pending litigation; and (iii) are not reasonably likely to lead to the discovery of admissible evidence.

### REQUEST NO. 9:

Documents that identify all employees of Defendants who participated in the creation, marketing, or implementation of Son of BOSS generally.

### RESPONSE TO REQUEST NO. 9:

Deutsche Bank objects to this request on the grounds that it is overly broad and seeks documents that (i) relate to individuals, entities, and transactions that are not connected to the pending litigation; (ii) are irrelevant to the claims or defenses in the pending litigation; and (iii) are not reasonably likely to lead to the discovery of admissible evidence.

### REQUEST NO. 10:

Documents that identify all employees of Defendants who participated in the creation, marketing, or implementation of the Son of BOSS strategy in which Plaintiff participated.

### RESPONSE TO REQUEST NO. 10:

Deutsche Bank objects to this request on the ground that it seeks to impose an obligation on Deutsche Bank to identify, locate and produce documents that are in the possession, custody, or control of other parties to the pending litigation. Subject to and without waiving any of the foregoing general and specific objections, Deutsche Bank will produce non-privileged documents identifying those Deutsche Bank employees that worked

on Plaintiffs' transaction to the extent they exist and can be located following a reasonable search.

**REQUEST NO. 11:**

Documents that identify all TBS employees who performed any work or participated with respect to any work TBS did on Plaintiff's 2000 tax returns.

### RESPONSE TO REQUEST NO. 11:

Deutsche Bank objects to this request on the ground that it seeks to impose an obligation on Deutsche Bank to identify, locate and produce documents that are in the possession, custody, or control of other parties to the pending litigation. Subject to and without waiving any of the foregoing general and specific objections, Deutsche Bank will produce non-privileged, responsive documents to the extent they exist and can be located following a reasonable search.

**REQUEST NO. 12:**

All documents relating to Son of BOSS that Defendants produced to any governmental committee, government agency, federal or state prosecutor, or private litigant since 2000.

### RESPONSE TO REQUEST NO. 12:

Deutsche Bank objects to this request to the extent that it seeks to impose an obligation on Deutsche Bank to identify, locate and produce documents that are in the possession, custody, or control of other parties to the pending litigation. Moreover, Deutsche Bank objects to this request on the grounds that it is overly broad and harassing and seeks documents that (i) relate to individuals, entities, and transactions that are not connected to the pending litigation; (ii) are irrelevant to the claims or defenses in the pending litigation; and (iii) are not reasonably likely to lead to the discovery of admissible evidence. Deutsche Bank also objects to this request on the grounds that it is

12

duplicative of other requests and, therefore, is unduly burdensome. Deutsche Bank

further objects to this request on the grounds and to the extent that documents produced

to other parties would be subject to confidentiality orders or rules. Finally, Deutsche

Bank objects to the request to the extent that it attempts to intrude on the confidentiality

of government investigations.

**REQUEST NO. 13:**

All transcripts since 2000 of trial testimony, hearing testimony, grand jury testimony, depositions, or interviews of any current or former employee of Defendants in which Son of BOSS was mentioned, referred to, described, or inquired about.

**RESPONSE TO REQUEST NO. 13:**

Deutsche Bank objects to this request on the grounds that it is overly broad

and seeks documents that (i) relate to individuals, entities, and transactions that are not

connected to the pending litigation; (ii) are irrelevant to the claims or defenses in the

pending litigation; and (iii) are not reasonably likely to lead to the discovery of

admissible evidence. Deutsche Bank also objects to this request on the grounds that it is

unduly burdensome and purports to impose an unreasonable duty of inquiry on Deutsche

Bank. Deutsche Bank further objects to this request on the grounds and to the extent that

it purports to call for the production of documents that would be subject to confidentiality

orders or rules. Finally, Deutsche Bank objects to the request to the extent that it

attempts to intrude on the confidentiality of government investigations.

**REQUEST NO. 14:**

All documents concerning the nature and amounts of compensation Defendants received as a result of Plaintiff's participation in Son of BOSS.

**RESPONSE TO REQUEST NO. 14:**

Deutsche Bank objects to the term "nature" on the ground that it is

13

undefined, vague and ambiguous. Subject to and without waiving any of the foregoing specific and general objections, Deutsche Bank will produce non-privileged, responsive documents to the extent they exist and can be located following a reasonable search.

**REQUEST NO. 15:**

All documents concerning the nature and amounts of compensation Defendants received from Son of BOSS generally.

### RESPONSE TO REQUEST NO. 15:

Deutsche Bank objects to the term "nature" on the ground that it is undefined, vague and ambiguous. Deutsche Bank further objects to this request to the extent that it seeks to impose an obligation on Deutsche Bank to identify, locate and produce documents that are in the possession, custody, or control of other parties to the pending litigation. Deutsche Bank also objects to this request on the grounds that it is overly broad and seeks documents that (i) relate to individuals, entities, and transactions that are not connected to the pending litigation; (ii) are irrelevant to the claims or defenses in the pending litigation; and (iii) are not reasonably likely to lead to the discovery of admissible evidence.

### RESPONSES AND OBJECTIONS TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Identify by bates number all written contracts between Plaintiff and Defendants concerning Son of BOSS.

### RESPONSE TO INTERROGATORY NO. 1:

Deutsche Bank identifies the following documents subject to, and without waiving, any of the foregoing general and specific objections:

- DB Vadevoulis 000288 to DB Vadevoulis 000290
- DB Vadevoulis 000291 to DB Vadevoulis 000293

14

- DB Vadevoulis 000294 to DB Vadevoulis 000296
- DB Vadevoulis 000297 to DB Vadevoulis 000299
- DB Vadevoulis 000300 to DB Vadevoulis 000302
- DB Vadevoulis 000303 to DB Vadevoulis 000305
- DB Vadevoulis 000317 to DB Vadevoulis 000318
- DB Vadevoulis 000319 to DB Vadevoulis 000323
- DB Vadevoulis 000327 to DB Vadevoulis 000330
- DB Vadevoulis 000333 to DB Vadevoulis 000336
- DB Vadevoulis 000339 to DB Vadevoulis 000342
- DB Vadevoulis 000345 to DB Vadevoulis 000346
- DB Vadevoulis 000349 to DB Vadevoulis 000350
- DB Vadevoulis 000351 to DB Vadevoulis 000354
- DB Vadevoulis 000356 to DB Vadevoulis 000359
- DB Vadevoulis 000361 to DB Vadevoulis 000362
- DB Vadevoulis 000365 to DB Vadevoulis 000368
- DB Vadevoulis 000369
- DB Vadevoulis 000392 to DB Vadevoulis 000395
- DB Vadevoulis 000398 to DB Vadevoulis 000399
- DB Vadevoulis 000400 to DB Vadevoulis 000403
- DB Vadevoulis 000406 to DB Vadevoulis 000407
- DB Vadevoulis 000408 to DB Vadevoulis 000411
- DB Vadevoulis 000413 to DB Vadevoulis 000416
- DB Vadevoulis 000418 to DB Vadevoulis 000419
- DB Vadevoulis 000422 to DB Vadevoulis 000425
- DB Vadevoulis 000426

**INTERROGATORY NO. 2:**

Describe in detail all oral contracts between Plaintiff and Defendants

15

concerning Son of BOSS.

**RESPONSE TO INTERROGATORY NO. 2:**

Deutsche Bank objects to this interrogatory on the grounds that it is vague and ambiguous and, to the extent it seeks information on any agreement between Plaintiffs and parties other than Deutsche Bank, it is overly broad and seeks information not reasonably calculated to lead to the discovery of admissible evidence.  Subject to and without waiving any of the foregoing general and specific objections, Deutsche Bank states that it is unaware at present of any oral contracts between Plaintiffs and Deutsche Bank.

**INTERROGATORY NO. 3:**

Identify by bates number all written agreements that Defendants contend (or may contend) require the mediation and/or arbitration of any claims alleged in the Complaint.

**RESPONSE TO INTERROGATORY NO. 3:**

Deutsche Bank objects to this request as speculative insofar as it asks for identification of documents that Deutsche Bank "may contend" require mediation and/or arbitration.  Based on its knowledge to date, Deutsche Bank identifies the following documents subject to, and without waiving, any of the foregoing general and specific objections:

- DB Vadevoulis 000319 to DB Vadevoulis 000323
- DB Vadevoulis 000327 to DB Vadevoulis 000330
- DB Vadevoulis 000333 to DB Vadevoulis 000336
- DB Vadevoulis 000339 to DB Vadevoulis 000342
- DB Vadevoulis 000351 to DB Vadevoulis 000354
- DB Vadevoulis 000356 to DB Vadevoulis 000359

- DB Vadevoulis 000365 to DB Vadevoulis 000368
- DB Vadevoulis 000392 to DB Vadevoulis 000395
- DB Vadevoulis 000400 to DB Vadevoulis 000403
- DB Vadevoulis 000408 to DB Vadevoulis 000411
- DB Vadevoulis 000413 to DB Vadevoulis 000416
- DB Vadevoulis 000422 to DB Vadevoulis 000425

**INTERROGATORY NO. 4:**

Identify all persons or entities (including governmental entities) to whom Defendants have produced documents concerning Son of BOSS.

**RESPONSE TO INTERROGATORY NO. 4:**

Deutsche Bank objects to the interrogatory on the ground that it seeks information that (i) relates to individuals, entities, and transactions that are not connected to the pending litigation; (ii) is irrelevant to the claims or defenses in the pending litigation; and (iii) is not reasonably likely to lead to the discovery of admissible evidence. Deutsche Bank also objects to this request on the grounds, and to the extent, that it attempts to intrude on the confidentiality of government investigations.

**INTERROGATORY NO. 5:**

Identify all current or former employees of Defendants who have been interviewed or deposed or testified at trial, before a hearing, or before a grand jury in which Son of BOSS was mentioned, referred to, described, or inquired about. Please include the name of each witness, each date they testified, and the nature of each proceeding.

**RESPONSE TO INTERROGATORY NO. 5:**

Deutsche Bank objects to this request on the ground that it is unduly burdensome and seeks to impose an unreasonable burden of inquiry on Deutsche Bank. Deutsche Bank also objects to the interrogatory on the ground that it seeks information that (i) relates to individuals, entities, and transactions that are not connected to the

17

pending litigation; (ii) is irrelevant to the claims or defenses in the pending litigation; and (iii) is not reasonably likely to lead to the discovery of admissible evidence. Deutsche Bank further objects to this request on the grounds, and to the extent, that it attempts to intrude on the confidentiality of government investigations.

**INTERROGATORY NO. 6:**

Identify the nature and amounts of all compensation Defendants received as a result of Plaintiff's participation in Son of BOSS.

### RESPONSE TO INTERROGATORY NO. 6:

Subject to and without waiving any of the foregoing general objections, Deutsche Bank answers that information responsive to this interrogatory is set forth in documents produced to plaintiffs.

**INTERROGATORY NO. 7:**

Identify the nature and amounts of all compensation Defendants received from Son of BOSS generally.

### RESPONSE TO INTERROGATORY NO. 7:

Deutsche Bank objects to the interrogatory on the ground that it seeks information that (i) relates to individuals, entities, and transactions that are not connected to the pending litigation; (ii) is irrelevant to the claims or defenses in the pending litigation; and (iii) is not reasonably likely to lead to the discovery of admissible evidence.

**INTERROGATORY NO. 8:**

Identify all employees of Defendants who participated in a tax strategy, including Son of BOSS, and who attempted to or in fact participated in the Internal Revenue Service amnesty program described in IRS Announcement 2002-2.

### RESPONSE TO INTERROGATORY NO. 8:

Deutsche Bank objects to the interrogatory on the ground that it seeks information that (i) relates to individuals, entities, and transactions that are not connected to the pending litigation; (ii) is irrelevant to the claims or defenses in the pending litigation; and (iii) is not reasonably likely to lead to the discovery of admissible evidence. Deutsche Bank also objects to this request on the grounds that it seeks confidential, private, personal information about individual, non-party Deutsche Bank employees. Deutsche Bank further objects to this request on the grounds that it is unduly burdensome and purports to impose an unreasonable duty of inquiry on Deutsche Bank.

Dated: August 14, 2008

DEWEY & LEBOEUF LLP

By: _____

   Seth C. Farber (admitted *pro hac vice*)
1301 Avenue of the Americas
New York, New York 10019-6092
Telephone: (212) 259-8000
Facsimile: (212) 259-6333

Erin Ziaja
DEWEY & LEBOEUF LLP
Two Prudential Plaza, Suite 3700
180 North Stetson Avenue
Chicago, Illinois 60601
Telephone: (312) 794-8000
Facsimile: (312) 794-8100

*Attorneys for Defendants Deutsche Bank AG and Deutsche Bank Securities Inc.*

19

# EXHIBIT C

S. Hrg. 108–473

# U.S. TAX SHELTER INDUSTRY: THE ROLE OF ACCOUNTANTS, LAWYERS, AND FINANCIAL PROFESSIONALS

# HEARINGS

BEFORE THE

## PERMANENT SUBCOMMITTEE ON INVESTIGATIONS

OF THE

## COMMITTEE ON GOVERNMENTAL AFFAIRS UNITED STATES SENATE

ONE HUNDRED EIGHTH CONGRESS

FIRST SESSION

NOVEMBER 18 AND 20, 2003

VOLUME 1 OF 4

Printed for the use of the Committee on Governmental Affairs



95

Mr. COHEN. That is not the case.

Senator LEVIN. It was a client of both of yours——

Mr. COHEN. Well——

Senator LEVIN. In different matters?

Mr. COHEN. That is true, Senator, and I will tell you that I have a lot of——

Senator LEVIN. I am just asking you if that is accurate.

Mr. COHEN. That is absolutely accurate. I have a lot of clients that are joint clients in that sense.

Senator LEVIN. I understand.

Mr. COHEN. In fact a number of major corporations in the country are clients of mine for tax matters and are joint clients in that they are clients of KPMG.

Senator LEVIN. Thank you.

Mr. COHEN. Certainly.

Chairman COLEMAN. Gentlemen, thank you for your testimony. Mr. Smith, I know that you were reading a statement that has not been submitted to the Subcommittee. Would you make that available to the Subcommittee?

Mr. SMITH. Yes.[1]

Chairman COLEMAN. Thank you. Your testimony has been very helpful. Thank you very much.

I would now like to welcome our second panel to today's important hearing: William Boyle, former Vice President of the Structured Finance Group of Deutsche Bank; and Domenick DeGiorgio, former Vice President of Structured Finance at HVB America. I thank each of you for your attendance at today's hearing and look forward to hearing your testimony.

Before we begin, pursuant to Rule 6, all witnesses who testify before the Subcommittee are required to be sworn. I would ask at this time that you please stand and raise your right hand.

Do you swear that the testimony you are about to give before the Subcommittee will be the truth, the whole truth, and nothing but the truth, so help you, God?

Mr. BOYLE. I do.

Mr. DEGIORGIO. I do.

Chairman COLEMAN. As I indicated, gentlemen, before the previous panel, we use a timing system here. Statements should be five minutes. If you have a more complete statement, your entire statement will be entered into the record.

Mr. Boyle, we will have you go first, followed by Mr. DeGiorgio. After we have heard all the testimony, we will turn to questions. Mr. Boyle, you may proceed.

**TESTIMONY OF WILLIAM BOYLE,[2] FORMER VICE PRESIDENT, STRUCTURED FINANCE GROUP, DEUTSCHE BANK AG, NEW YORK, NEW YORK**

Mr. BOYLE. Chairman Coleman, Ranking Member Senator Levin, and members of the Subcommittee, thank you for inviting me today. My name is William Boyle. I am a former employee of Bankers Trust. I joined Deutsche Bank when it acquired Bankers Trust.

[1]The prepared statement of Mr. Smith appears in the Appendix on page 312.
[2]The prepared statement of Mr. Boyle with an attachment appears in the Appendix on page 317.

96

I left Deutsche Bank 2 years ago and am now an independent consultant.

I welcome the opportunity to speak today about a transaction called BLIPS. The Subcommittee requested that I appear for an interview, which I was pleased to do so last week. The Subcommittee also requested that I appear today to testify, and I am pleased to do so voluntarily.

Mr. Chairman, I was not involved in BLIPS at its inception. The BLIPS transaction was first proposed to Deutsche Bank in early 1999. Deutsche Bank played a banking role in the BLIPS transactions. My personal involvement in BLIPS began around June 1999, when I became a Vice President in the Structured Transactions Group of Deutsche Bank.

BLIPS was developed for clients of KPMG. I understand it was designed for KPMG—I am sorry. I understand it was designed by KPMG or Presidio Advisors or both. BLIPS involved interest rate swaps and investments in foreign currency option contracts and foreign and domestic fixed-income securities.

As part of BLIPS, Deutsche Bank issued to investors approximately 56 loans from September 1999 through October 1999. The stated principal amount plus premium of these loans was approximately $7.8 billion. The average size of the loan issued to the BLIPS investor by the bank was approximately $139 million.

The bank lent money to investors and it executed transactions as directed by investors' investment advisors. As a major global bank, Deutsche Bank was able to provide financial services for such transactions. These services included providing large loans, custody services, foreign exchange option trading, and interest rate derivatives.

The transactions were not designed by Deutsche Bank. The bank did not present BLIPS to investors or in any other way market, sell, or promote it. Deutsche Bank did not provide any tax advice to any of the investors, nor did the bank discuss with any investor any potential tax benefits of the investment.

Deutsche Bank took several risk management steps to assure that its actions in the BLIPS transactions were limited to its role as the executor of the financial transactions. Let me summarize those actions.

First, before making the loans, Deutsche Bank conducted an internal review process. The internal groups that reviewed the bank's provision of services were Deutsche Bank Private Banking, Global Markets, Tax, Legal, Credit Risk Management, Treasury, and Compliance.

Second, each of the BLIPS investors agreed in writing that Deutsche Bank had not provided them with any tax, legal, investment, or other advice, and that they had, in fact, received such advice from expert professionals. One paragraph of that agreement read, "You have been independently advised by your legal counsel and will comply with all Internal Revenue laws of the United States."

Third, the bank received written representation letters from KPMG, Presidio, and each investor that described the limited scope of Deutsche Bank's involvement in the BLIPS transactions. This was done so that there would be no misunderstanding.

97

Fourth, Deutsche Bank consulted with a prominent outside independent law firm for its counsel. The law firm drafted and reviewed the transactional documents pertaining to the bank. It also provided Deutsche Bank with a legal opinion, which has been provided to the committee. This opinion concluded, among other things, that Deutsche Bank is not a promoter or organizer of the BLIPS transactions and that Deutsche Bank had no responsibility to register the transaction as tax shelters.

Regarding the tax treatment, Deutsche Bank understood that the BLIPS transactions involved potentially favorable income tax benefits that could be claimed by investors. In discussing the tax issues, it is important to describe the role of the bank. Deutsche Bank provides banking services for a transaction. As such, it is not customary or appropriate to provide legal or tax advice to its clients, nor is it customary or appropriate to determine in advance whether a client's tax position will later be sustained. Historically, that is not a role that banks are authorized to play.

Deutsche Bank's role as the executor of financial transactions meant that the determination of whether the investor's tax position would be sustained was outside of its banking role. Such a determination was the appropriate responsibility of the investor's lawyers and accountants. However, Deutsche Bank carefully considered its involvement in BLIPS and sought independent legal advice that it was complying with its responsibilities.

Mr. Chairman, that concludes my oral statement and I would be pleased to answer questions.

Chairman COLEMAN. Thank you very much, Mr. Boyle.

Mr. DeGiorgio, I notice you have a gentleman with you. Would he please identify himself for the record?

Mr. SKARLATOS. Yes, sir. My name is Brian Skarlatos.

Chairman COLEMAN. You may proceed, Mr. DeGiorgio.

## TESTIMONY OF DOMENICK DeGIORGIO,[1] FORMER VICE PRESIDENT, STRUCTURED FINANCE, HVB AMERICA, INC., NEW YORK, NEW YORK, ACCOMPANIED BY BRIAN SKARLATOS

Mr. DeGIORGIO. Thank you, Mr. Chairman. Chairman Coleman, Ranking Member Senator Levin, and members of the Subcommittee, my name is Domenick DeGiorgio and I am a Managing Director in the New York City office of Bayerische Hypo-und Vereinsbank, otherwise known as HVB. I appreciate the Subcommittee's invitation to come before you to discuss HVB's limited involvement with tax-oriented transactions in the late 1990's.

We agree with the Subcommittee that there are important public policy issues raised by the tax shelter phenomenon and we support the Subcommittee's investigation into it. We look forward to discussing with you in the future the issues it raises.

My written testimony addresses the specific questions asked by the staff about HVB's role in any tax-oriented transactions. As I point out in that submission, we were only involved in one particular series of transactions that the Subcommittee is investigating, the so-called BLIPS transactions, and our role there was

---

[1]The prepared statement of Mr. DeGiorgio appears in the Appendix on page 326.

98

limited to providing traditional banking services, such as lending, foreign currency trading, and some interest rate derivative trading.

We did not organize, promote, or market any tax shelter transactions and we certainly did not offer tax advice or tax opinions or any other kind of financial or investment advice to any of the customers. We did not refer any customers to KPMG or Presidio and we did not accept, or, for that matter, were offered any referral fees. To reiterate, our role was strictly as bankers in these transactions.

The Subcommittee staff has assured us that they agree HVB's activities in connection with the BLIPS transactions were legal and appropriate. We complied with applicable statutory and regulatory obligations. We followed our own cautious and conservative internal lending policies and the "know your customer" requirements.

However, we recognize that the mass marketing of abusive tax shelters is a serious problem and we agree that financial institutions should not facilitate these types of products. Indeed, we discontinued our participation in the BLIPS transactions as soon as the IRS announced its position that they were improper. Since then, we have addressed our concerns about tax structured transactions by exiting the business entirely. We have concluded that tax structured transactions require extensive outside expert advice and go beyond our expertise as banking professionals.

The staff has also told us that they appreciate HVB's candor and openness in providing information during the Subcommittee's investigation. Senator Levin's Minority Report released Tuesday makes a note of that fact.

We have fully cooperated with your inquiries. We have produced thousands of pages of documents and have given several hours of interviews with the staff, even before my appearance here today. We even requested a friendly subpoena before my appearance here today so that I would be able under the financial privacy laws to discuss any questions or respond to any questions you may have.

As I said, my written testimony addresses the specific issues you have asked me to discuss and I will be happy to discuss them now.

Chairman COLEMAN. Thank you, Mr. DeGiorgio. I apologize. Having lived in Brooklyn, New York, and my neighbors were Keratanuito, Kalavido, and Camparelli, I should have been able to handle DeGiorgio, so—— [Laughter.]

Mr. DEGIORGIO. Mr. Chairman, it happens all the time.

Chairman COLEMAN. I apologize for that, and thank you for your cooperation.

Did KPMG, in your discussions with KPMG—first of all, how many of these BLIPS transactions was HVB involved in?

Mr. DEGIORGIO. Over the 2-year period, approximately 30 transactions.

Chairman COLEMAN. Did KPMG ever indicate to you this was a tax mitigation strategy versus an investment strategy?

Mr. DEGIORGIO. We certainly were aware, as opposed to being ignorant, regarding the inherent tax benefits associated with the investment strategy.

Chairman COLEMAN. Did it ever become clear to you that this was not going to be a 7-year collateral premium loan as originally laid out, that this was going to be a 60-day deal?

99

Mr. DeGiorgio. We certainly recognized soon after the funding date that the likelihood of going beyond a 60-day period was less probable than the probability of this transaction remaining through maturity.

Chairman Coleman. If I can direct your attention to Exhibit 111.[1] This, I believe, is a Presidio credit request, and if you look at the second page, I think it is, under background, counterparty purpose of transaction, it reads as follows. "HVB will earn a very"—again, let me just back up. If you go to page 1, under comments, it says, "We are seeking an approval to fund four 7-year collateralized premium loans." That is in the box labeled comment. That is on the No. 1 relationship.

If you then go to box three, it notes that "HVB will earn a very attractive return if the deals run to term. If, however, the advances are prepaid within 60 days, and there is a reasonable prospect they will be, HVB will earn a return of two-point"—I can't read that—a certain percent "on the average balance of the funds advanced, and given the fact that our collateral will most likely be cash deposits, at least for the early stage of the transaction, we enjoy the possibility of earning an infinite ROE," presumably return on investment, "on these loans."

So at what point did somebody tell you these things are going to be 60-day deals and not 7-year premium high-risk loans?

Mr. DeGiorgio. The communication regarding the likelihood of these transactions or the investors terminating their positions prior to the 7-year maturity rate came to the bank through the Presidio investment firm. I don't recall the exact verbiage used, but it went along the lines of it is likely that if the investors do not earn a substantial return on their investment during phase one of the investment strategy, they are likely to terminate their positions before the end of the year.

Chairman Coleman. I have trouble with—well, let me back it up. Out of the 30 BLIPS transactions, how many got out after 60 days?

Mr. DeGiorgio. Eleven were funded in 1999 and all 11 terminated their positions in 1999.

Chairman Coleman. In 60 days?

Mr. DeGiorgio. Yes.

Chairman Coleman. Did that raise any question in your mind about whether these were 7-year premium deals or 60-day deals?

Mr. DeGiorgio. Well, it certainly turned out to be 60-day transactions, but I still believe that there was some rational explanation and basis for entering into a 7-year facility.

Chairman Coleman. How did you come to the interest rates on these? Do you recall what the interest rate was for these loans?

Mr. DeGiorgio. I thought I would have that information on the front page of this exhibit, but I don't seem to see it there.

Chairman Coleman. Well, how do you arrive at something generating a premium? What is the basis for that?

Mr. DeGiorgio. I am sorry, generating a premium?

---

[1] See Exhibit No. 111 which appears in the Appendix on page 2660.

100

Chairman COLEMAN. Yes. In these loans, you have a base loan, right, then you have a premium, how does that happen? What kind of conditions do you need for that to happen?

Mr. DEGIORGIO. The rate on the premium, is that what you are asking me?

Chairman COLEMAN. Yes.

Mr. DEGIORGIO. That is——

Chairman COLEMAN. I was told, I believe, by staff that it was right around 17 percent.

Mr. DEGIORGIO. Correct.

Chairman COLEMAN. Is that a high rate?

Mr. DEGIORGIO. I think it was closer to 18 percent, and that is strictly a function of the net present value derived between the difference of the loans or the funds advanced and—over a 7-year term—and the stated or face amount of the loan.

Chairman COLEMAN. But again, based on a 7-year term?

Mr. DEGIORGIO. Correct.

Chairman COLEMAN. But early on, you are noting that the reasonable prospects that this is going to be 60 days.

Mr. DEGIORGIO. Well, we certainly had some questions as to whether or not the investors could make a substantial return on their investment.

Chairman COLEMAN. What kind of credit risk was there with these loans?

Mr. DEGIORGIO. The credit risk was nominal.

Chairman COLEMAN. And that is——

Mr. DEGIORGIO. As I am sure you see, most of the transactions were over-collateralized.

Chairman COLEMAN. Is that unusual?

Mr. DEGIORGIO. Not necessarily. In many situations where trading activities or underlying investments are the motives or basis for taking down a loan, the collateral coverage is rather high.

Chairman COLEMAN. Did you have any knowledge whatsoever that by getting out after 60 days, with the premiums that these generated, that you were generating a tax loss for an investor?

Mr. DEGIORGIO. Again, we certainly were not ignorant of the resultant tax benefits. It is part of our due diligence.

Chairman COLEMAN. And you realize our concern that these resulting tax benefits couldn't have come about unless you participate in this.

Mr. DEGIORGIO. Well, we certainly also recognized that a loan needed to be funded and you needed banks to fund those loans. But I think with permission, I would like to just elaborate on that for a moment and make it clear to the Subcommittee that for the tax advice and the tax analysis and the tax aspects of this transaction, our due diligence included understanding what support or level of support firms such as KPMG could and was willing to provide to its client base. And having received a copy of the draft of the opinion that was authored by KPMG, we certainly felt comfortable that based on the letter of the law and the analysis, that the opinion was well reasoned and it was supported by case study and we had no expertise or ability to challenge the conclusions reached in that opinion.

101

Chairman COLEMAN. Mr. Boyle, let me get back to this issue about getting out in 60 days. Did Deutsche Bank expect that the taxpayers would likely terminate the BLIPS after only 60 days, even though the stated term of the loan was 7 years?

Mr. BOYLE. I think that Deutsche Bank understood there was a strong likelihood of that happening, and, in fact, it did happen.

Chairman COLEMAN. I think strong likelihood may be an understatement. Will you turn to Exhibit 69,[1] please. By the way, how many BLIPS transactions did Deutsche Bank process?

Mr. BOYLE. I believe approximately 56.

Chairman COLEMAN. How many is that?

Mr. BOYLE. I believe 56.

Chairman COLEMAN. Fifty-six. Exhibit 69 is from Presidio Advisors.

Mr. BOYLE. OK.

Chairman COLEMAN. And it is to John Rolfes at Deutsche Bank. Can you identify who John Rolfes is?

Mr. BOYLE. John Rolfes, I believe, is a Managing Director in the Private Bank.

Chairman COLEMAN. And this says, "John, further to our Friday phone conversation, I would like to describe the necessary financing steps the BLIPS program will require," and it lays it out. Day one, investor borrows a certain amount for 7 years, 16 percent annual rate. On day two, and I'm going to go now to the fourth paragraph, excuse me, day 7. On day 60, investor exits partnership and unwinds all trades in partnership. So Deutsche Bank up front knew that even though you were issuing what was a 7-year loan with an interest rate predicated on that, in fact, this was a 60-day deal.

Mr. BOYLE. Well, clearly, the credit agreement was 7 years, but you can see everyone got out of the loans we were involved in in a 60-day period, yes.

Chairman COLEMAN. And again with Deutsche Bank, as with HVB, collateral here was more than the amount of the loan and the premium combined, is that correct?

Mr. BOYLE. Yes.

Chairman COLEMAN. Deutsche Bank didn't have much risk in this.

Mr. BOYLE. Deutsche Bank had risk depending upon what the underlying assets were. I believe in the first stage, as you had seen, they elected to invest them in kind of short-term money market fund-type investments, so those were fairly very low risk, yes.

Chairman COLEMAN. And didn't Deutsche Bank insist that if collateral ever dipped below the 100 percent—101 percent figure, Deutsche Bank would be entitled to get its money back immediately?

Mr. BOYLE. Yes. Well, I think that is a normal provision. I don't think that provision itself is unusual because your recourse is to the assets that are there, so you want to ensure that you can dispose of the assets and repay the loan, yes.

Chairman COLEMAN. So tell me again the reason for the 16 percent interest. How do you arrive at that figure?

---

[1] See Exhibit No. 69 which appears in the Appendix on page 644.

102

Mr. BOYLE. My understanding is the client requested a premium loan, and once again, you determine the 16 percent rate would—you would basically discount that back and ensure that you received all the payments——

Chairman COLEMAN. So the client requests a premium loan and it is a premium loan that feeds into the tax consequences, the opportunity to get a tax loss, is that correct?

Mr. BOYLE. That is my understanding, yes.

Chairman COLEMAN. And that is what happened in all of these situations?

Mr. BOYLE. Yes.

Chairman COLEMAN. Senator Levin.

Senator LEVIN. Mr. DeGiorgio, looking at this straight, would you not agree that this was basically intended to be a tax deal for the taxpayer? Just to cut through all this stuff before—I am going to go through all of it with you anyway——

Mr. DEGIORGIO. OK.

Senator LEVIN [continuing]. To prove it, but—— [Laughter.]

In your heart of hearts, is this not clearly intended to be a tax deal?

Mr. DEGIORGIO. I think to dispute the notion that there were inherent and significant tax benefits is ridiculous. However, the investment strategy was described to us as a significant motive for these investors to enter into this transaction.

Senator LEVIN. Could there be any profit in this transaction? I mean, is there any way? Just take a look at it. The only thing which was at risk was 7 percent of the premium, correct?

Mr. DEGIORGIO. During phase one, which is the first 60-day period?

Senator LEVIN. Right.

Mr. DEGIORGIO. Correct.

Senator LEVIN. The only thing that was at risk, and they all bailed out after 60 days——

Mr. DEGIORGIO. Right.

Senator LEVIN [continuing]. And we will go through that just to show that is what the intention was. That is what the plan was, to finish at 60 days and then collect your tax loss. So assuming that is what happened, the only possible money that had any risk attached to it was that 7 percent that the taxpayer put up to pay all the fees, is that correct?

Mr. DEGIORGIO. Again, at least initially during phase one——

Senator LEVIN. During the 60 days.

Mr. DEGIORGIO. Yes.

Senator LEVIN. OK. Is that correct?

Mr. DEGIORGIO. Yes.

Senator LEVIN. All right. Now, within 1 week after this loan was taken out by the taxpayer, the loan was assigned to an investment fund, right?

Mr. DEGIORGIO. Correct.

Senator LEVIN. And you were aware of that fact?

Mr. DEGIORGIO. Yes.

Senator LEVIN. Why wasn't the loan just made to the investment fund?

103

Mr. DeGIORGIO. That, I don't know. I am not sure why there was a two-tiered fund.

Senator LEVIN. Why there was an assignment?

Mr. DeGIORGIO. Correct.

Senator LEVIN. You don't know why these loans were just not made to the investment fund? Would there have been a tax advantage if it had been made to the investment fund?

Mr. DeGIORGIO. There probably was, if I recall some of the aspects of the KPMG opinion, it did refer to a shifting of liability from one entity to another.

Senator LEVIN. Assignment of——

Mr. DeGIORGIO. Being correlated with the tax benefit.

Senator LEVIN. Of course. From what you now know, would you agree the only way that the tax benefit, the tax loss, would be created is if the loan originally went to the taxpayer and then was almost immediately assigned to that so-called investment fund? Is that what you now are aware of?

Mr. DeGIORGIO. I am—the only way is a strong statement and I probably couldn't make that. But I can certainly ascertain that it is one way of creating a tax loss.

Senator LEVIN. All right. If you could think of the other reason for doing that, let the Subcommittee know, will you, for the record?

Mr. DeGIORGIO. Sure.

Senator LEVIN. We haven't been able to find one yet, but if you can find one, let us know.

Now, did you eventually come to understand, at least, that BLIPS was primarily a tax avoidance scheme?

Mr. DeGIORGIO. No, I did not.

Senator LEVIN. Let us go to Exhibit 107.[1] Is it Alex Nouvakhov— am I pronouncing his name correctly?

Mr. DeGIORGIO. Very close.

Senator LEVIN. All right. He is with your bank?

Mr. DeGIORGIO. Yes, he is.

Senator LEVIN. Now, he acknowledged to us that he knew that BLIPS was a tax shelter and here is what his notes read, if you could take a look at his notes. They are a little bit hard to read, but you will see on the right-hand side, right in the middle where there is a 7 percent and then there is an arrow up. Do you see that?

Mr. DeGIORGIO. I am with you.

Senator LEVIN. OK. It says, "Seven percent fee equity paid by the investor for tax sheltering." Do you see that?

Mr. DeGIORGIO. Yes, I do.

Senator LEVIN. Well, he was aware of it, then, right?

Mr. DeGIORGIO. Well, certainly—I certainly was present at the meeting where this presentation was made.

Senator LEVIN. Is that an accurate note?

Mr. DeGIORGIO. The note reflects the cost and how Presidio had intended on charging its investors for participating in the investment structure.

Senator LEVIN. He didn't say investment structure. He says tax sheltering. Was that an accurate note or wasn't it?

---

[1] See Exhibit No. 107 which appears in the Appendix on page 2646.

104

Mr. DeGIORGIO. Actually, what Alex Nouvakhov thought at the point in time, I don't recall Presidio mentioning or referring to this as a tax shelter, but they certainly described to us how the calculation of the cost to the investor was being made.

Senator LEVIN. Did you understand it basically to be a tax sheltering effort?

Mr. DeGIORGIO. I am sorry, can you repeat that, Senator?

Senator LEVIN. Did you understand this at that point, then, to be basically a tax sheltering effort?

Mr. DeGIORGIO. No. I still referred to this——

Senator LEVIN. I know you referred to it. I am talking about what you understand as a knowledgeable business person. Mr. Nouvakhov referred to it as a tax shelter and that the 7 percent fee was for that purpose. Now I am asking you, under oath, did you understand this to be and believe it to be basically a tax sheltering effort?

Mr. DeGIORGIO. No, I did not. I still viewed it as an investment strategy with inherent tax benefits.

Senator LEVIN. Now take a look at Exhibit 124.[1] This is an HVB document. This begins on day 48. And then if you look at the second line on page one, it says, "Day 48, ten business days prior to the withdrawal date." That is your document, right?

Mr. DeGIORGIO. Yes, it is.

Senator LEVIN. So it was obvious to you when you prepared this document that the withdrawal was going to occur on day 60, was it not?

Mr. DeGIORGIO. Not exactly.

Senator LEVIN. What does it mean, ten business days prior to withdrawal date? It doesn't say possible withdrawal date. It says withdrawal date, right? Are you familiar with this document?

Mr. DeGIORGIO. Absolutely.

Senator LEVIN. Does it say prior to withdrawal date? Am I reading it right, or is this something subject to interpretation like Mr. Nouvakhov's notes?

Mr. DeGIORGIO. No, not at all. I can explain it fully.

Senator LEVIN. All right.

Mr. DeGIORGIO. Given the time of year, obviously it was fourth quarter 1999 going into a Y2K event, we as an institution—since we had reasonable expectations that the transactions would terminate within a 60-day period—prepared our back office and operations teams for the reasonable expectation of an unwind.

Senator LEVIN. Within 60 days?

Mr. DeGIORGIO. Within 60 days. But I have to say, Senator, if this were a different time of the year, in other words, if these transactions were funded in January and the 60-day period occurred within the first quarter of that year, this process would never have been put in place. It was simply a function of year-end constraints in addition to the Y2K events.

Senator LEVIN. To summarize your testimony, you had the reasonable expectation that the withdrawal would occur by day 60 and then that happened in every case?

Mr. DeGIORGIO. Correct.

---

[1] See Exhibit No. 124 which appears in the Appendix on page 2705.

105

Senator LEVIN. There was a theoretical possibility that it wouldn't occur within 60 days, is that correct?

Mr. DEGIORGIO. Theoretical possibility.

Senator LEVIN. And your bank could force it to end at 60 days, couldn't it?

Mr. DEGIORGIO. No.

Senator LEVIN. You didn't have the power to end it at 60 days?

Mr. DEGIORGIO. No, unless there were violations in the collateral ratio.

Senator LEVIN. And the collateral ratio was 100 percent-plus, right?

Mr. DEGIORGIO. Hundred-and-one-point-two-five.

Senator LEVIN. Pretty solid collateral there?

Mr. DEGIORGIO. Absolutely.

Senator LEVIN. No risk for the bank?

Mr. DEGIORGIO. No credit risk. Plenty of execution and operational and administrative risks.

Senator LEVIN. There were operational risks. Didn't you control the fund? Wasn't it in your custody?

Mr. DEGIORGIO. The funds were not necessarily at risk because you are absolutely correct. The funds remained in an account under the customer's name at the bank.

Senator LEVIN. At your bank?

Mr. DEGIORGIO. Correct. The risks I am referring to, again, are operational regarding the trading activities——

Senator LEVIN. Which was limited to the 7 percent that the customer put up, right?

Mr. DEGIORGIO. During the first 60 days, correct.

Senator LEVIN. And you had the reasonable expectation when it would end, right?

Mr. DEGIORGIO. Yes. I said that.

Senator LEVIN. I now want you to say it, though, in connection with this point, which is that since there was an expectation that it would end within 60 days and there was no risk to the bank of its funds at all within that 60 days, because you were more than fully collateralized, that therefore the reasonable expectation was there would never be a risk to the bank.

Mr. DEGIORGIO. Certainly the likelihood of there being credit risk to the bank was low, as we have ensured to protect ourselves with the over-collateralization measures.

Senator LEVIN. And if you look at Exhibit 125,[1] you have a chart showing that all the loan proceeds—not the equity, not that 7 percent, the taxpayer's equity—is converted into Euros and will be converted back 30 days later. So this is a Euro account. This is not the loan, the premium loan or the basic loan. This is just the 7 percent, is that correct, or is this the whole loan?

Mr. DEGIORGIO. This is the whole loan proceeds.

Senator LEVIN. This is the loan proceeds?

Mr. DEGIORGIO. Right.

Senator LEVIN. So the so-called loan, and there is a great question as to whether there was a loan here at all since, for all the reasons that have been given the other day, but basically it was in

---

[1] See Exhibit No. 125 which appears in the Appendix on page 2711.

106

your control, fully collateralized, and expected to be terminated at
60 days during which there was no risk, but in any event, during
that period, there was a deposit into a Euro account, is that basi-
cally correct?

Mr. DeGIORGIO. That is correct.

Senator LEVIN. Were any of the loan proceeds during that period
put at risk during the investment scheme, as part of the invest-
ment scheme?

Mr. DeGIORGIO. Not during the first 60-day period.

Senator LEVIN. That is the period we are talking about, right?

Mr. DeGIORGIO. Yes.

Senator LEVIN. My time is up. Thank you.

Chairman COLEMAN. We will come back to a second round, Sen-
ator Levin.

Senator LEVIN. Thank you.

Chairman COLEMAN. Mr. Boyle, on the issue about whether the
loan was at risk in terms of the Deutsche Bank transactions, did
Deutsche Bank lay out some requirement that the loan had to be
invested in certain types of securities?

Mr. BOYLE. There was a list of permitted investments, yes.

Chairman COLEMAN. And these, it is my understanding, they
generate a lower rate of return than the interest that the Deutsche
Bank was charging?

Mr. BOYLE. I believe that the investment that they chose for the
first days was an investment that——

Chairman COLEMAN. So Deutsche Bank knew up front there was
going to be no profit generated within this 60-day period.

Mr. BOYLE. To the——you mean with——after——

Chairman COLEMAN. Investor.

Mr. BOYLE. After he made the investment, yes.

Chairman COLEMAN. And again, at least the Deutsche Bank
clearly got from Presidio a memo saying this is a 60-day deal.

Mr. BOYLE. Like I said before, there was an expectation that it
may very well wind up at 60 days, and in fact, did unwind.

Chairman COLEMAN. I mean, again, expectation. On day 60, in-
vestor exits partnership and unwinds all trades in partnership.
That is Exhibit 69. That is not an equivocal expectation, is it?

Mr. BOYLE. That language is clearly not, no, sir.

Chairman COLEMAN. Exhibit 113.[1] This is a memo, Deutsche
Bank Private Bank management committee meeting talking about
the BLIPS product, is that correct?

Mr. BOYLE. Yes.

Chairman COLEMAN. And on page two, it indicates that KGT
suggests that 25 customers be selected from different geographic
areas. PKS will ensure that written agreements be prepared. Can
you help me understand why you would want to select 25 cus-
tomers from different geographic areas?

Mr. BOYLE. I don't know precisely. That was a Private Bank rec-
ommendation, I guess, to John Rolfes. I don't believe that applied
to us per se in the Structured Transactions Group.

Chairman COLEMAN. Is that unusual, to put those kinds of geo-
graphic limitations on this?

---

[1] See Exhibit No. 113 which appears in the Appendix on page 2679.

107

Mr. BOYLE. I don't know, to be honest with you, sir. No.

Chairman COLEMAN. Our concern here, is this an effort to keep this under the radar screen?

Mr. BOYLE. I don't know.

Chairman COLEMAN. Have you heard of any other similar restrictions being placed in any other Deutsche Bank transactions?

Mr. BOYLE. Not that I am aware of, no.

Chairman COLEMAN. And Deutsche Bank ultimately engaged in 56 of these deals. Senior management said 25. What is the reason for the difference?

Mr. BOYLE. The reason for the difference. A different—originally, we were focusing on the amount that we may potentially loan and we wanted to do things in different stages to make sure we were comfortable executing the transactions, and I believe the initial stage, we were approached with the idea of doing up to 25 investors.

Chairman COLEMAN. Again, I go back to this question that Senator Levin asked of Mr. DeGiorgio. Looking at this, is there any question in your mind that these were tax shelters that were going to be used to provide opportunities for taxpayers to generate loss and write it off?

Mr. BOYLE. Well, it is very clear from the opinions and everything that there were significant tax benefits that the investor may report on its return, yes.

Chairman COLEMAN. Were you concerned? Is Deutsche Bank concerned at all about the reputational risk for being involved in this stuff?

Mr. BOYLE. You know, like all investments, we are very concerned in terms of reviewing, going through a very thorough internal review.

Chairman COLEMAN. Have you changed your practices today?

Mr. BOYLE. I am no longer an employee, so—I am certain they adjusted everything accordingly, but I am not there anymore.

Chairman COLEMAN. And Mr. DeGiorgio, you have indicated that HVB has, in fact, changed its practices?

Mr. DEGIORGIO. That is correct, and it is DeGiorgio. [Laughter.]

Chairman COLEMAN. And it changed its practices because these are abusive tax shelters?

Mr. DEGIORGIO. Well, when it became abundantly clear to the bank that the IRS had issues with the strategy, as was reflected, I believe, in a notice in August 2000, we immediately discontinued our participation in the transaction.

Chairman COLEMAN. And again, it is your testimony here today that in spite of the fact that you had—how many BLIPS accounts did you have?

Mr. DEGIORGIO. Approximately 30.

Chairman COLEMAN. Thirty, that you had 30 BLIPS accounts, that all of these were purported to be 7-year loans at 16 percent interest rate, even though it was clear they were going to be exiting in 60 days and they were all exited on 60 days, and at the time, you weren't aware that these were abusive tax shelters?

Mr. DEGIORGIO. That is correct.

Chairman COLEMAN. Senator Levin.

108

Senator LEVIN. Mr. Boyle, take a look at Exhibit 70,[1] if you would. This is a bank document relative to BLIPS. It is called a new product committee overview memo. Take a look at page three, if you would, and it is point 12. "It is imperative that the transaction be wound up after 45 to 60 days and the loan repaid due to the fact that the HNW individual will not receive his or her capital loss or tax benefit until the transaction is wound up and the loan repaid." Is that correct?

Mr. BOYLE. Excuse me?

Senator LEVIN. Is that—did I read that correctly?

Mr. BOYLE. Well, you read it correctly, yes.

Senator LEVIN. So it was imperative that this be wound up in 45 to 60 days in order that the person get their tax benefit? Am I reading it right?

Mr. BOYLE. Well, like I said before, the loan itself was a 7-year loan that people had the option of repaying at any time within that particular 7 years. And based upon the tax opinion, if they wanted to potentially take that tax benefit in the current year——

Senator LEVIN. Not potentially. Forget the potentially.

Mr. BOYLE. OK.

Senator LEVIN. If they wanted to get the tax benefit.

Mr. BOYLE. If they wanted to get the tax benefit, they would have had to unwind it in the current year, yes.

Senator LEVIN. And that was 60 days?

Mr. BOYLE. Yes, sir.

Senator LEVIN. OK. Now, in Exhibit 106,[2] this is your PowerPoint presentation about this transaction. This is your Structured Transaction Group. That is the group that implemented BLIPS. You were part of that group, were you not?

Mr. BOYLE. Yes, sir.

Senator LEVIN. Page 7 of the exhibit describes the client environment for the group. It says that your group was doing "tax driven deals."

Mr. BOYLE. Those are the words, yes.

Senator LEVIN. Is that a lie? Is your own PowerPoint presentation a lie?

Mr. BOYLE. No. I mean, the group was involved in complex financial transactions in which there were significant tax benefits, yes.

Senator LEVIN. No. Not significant tax benefits. Let us put that aside. We have heard that rhetoric two or three times. We are talking about your own PowerPoint that says these were "tax driven deals." Were those words a lie?

Mr. BOYLE. I did not prepare the document.

Senator LEVIN. Were they accurate?

Mr. BOYLE. That there were significant tax benefits?

Senator LEVIN. No, that they were tax driven.

Mr. BOYLE. I don't know the precise context that they are using tax driven, but clearly, if you believe that——

Senator LEVIN. Give me a context for that. These are three words, tax driven deals.

Mr. BOYLE. Yes. If you——

---

[1] See Exhibit No. 70 which appears in the Appendix on page 646.
[2] See Exhibit No. 106 which appears in the Appendix on page 2622.

Senator LEVIN. That doesn't mean some tax benefits. That means these were tax driven deals. That is your document. That is your bank's document.

Mr. BOYLE. Yes.

Senator LEVIN. Was that accurate or not, that these were tax driven deals?

Mr. BOYLE. If they are referring to the fact that there were significant tax benefits, yes.

Senator LEVIN. Otherwise, if they were driven by those benefits—driven?

Mr. BOYLE. Well, you have to look at——

Senator LEVIN. Driven means that is the principal point. That is the driver. You know what the word means.

Mr. BOYLE. Yes, sir.

Senator LEVIN. Let us not fiddle around with words. Were these tax driven deals?

Mr. BOYLE. I don't know which ones—I don't know which deals they were referring to in that——

Senator LEVIN. BLIPS.

Mr. BOYLE. BLIPS?

Senator LEVIN. Was BLIPS a tax driven deal?

Mr. BOYLE. I am not sure they are referring to BLIPS in that transaction.

Senator LEVIN. Well, was BLIPS a tax driven deal?

Mr. BOYLE. BLIPS had a very significant tax benefit, yes, sir.

Senator LEVIN. Yes. And so you are denying it was a tax driven deal?

Mr. BOYLE. No, I am saying if tax driven means significant tax benefits, yes.

Senator LEVIN. And if it means that the principal purpose of it was tax benefits, it was not?

Mr. BOYLE. That is something we weren't involved in deciding or reviewing.

Senator LEVIN. You weren't involved in reviewing? I am asking you, you are saying that there were tax benefits. You knew that much.

Mr. BOYLE. Yes. We understood that——

Senator LEVIN. But you can't say that it was driven by tax benefits, is that correct?

Mr. BOYLE. Yes.

Senator LEVIN. You are not saying that?

Mr. BOYLE. No. I mean, you are asking me what the investors' intentions were. We did not talk to the investors, no, sir.

Senator LEVIN. I am talking about your chart at your bank, your PowerPoint presentation.

Mr. BOYLE. Right.

Senator LEVIN. You were part of the committee that prepared it. I am asking you, are those words accurate, that you were looking at tax driven deals. You are not going to—you are going to basically tell me today that if it means something that it doesn't mean, then yes. Now I am asking you, if it means what it says, is the answer yes or no? Was your bank engaged in tax driven deals?

Mr. BOYLE. Like I said before, if it means transactions that may have significant tax benefits, yes. And I did not prepare this——

110

Senator LEVIN. If it means that the principal purpose was tax benefits, then yes or no?

Mr. BOYLE. I don't—I am not aware of that.

Senator LEVIN. The other word is "gain mitigation strategies," by the way. Take a look now at page 17 of that same exhibit. You will see that BLIPS is listed as one of the deals implemented by the group.

Mr. BOYLE. Yes.

Senator LEVIN. Were you aware of the fact, Mr. Boyle, that the premium part of the so-called loan when it was repaid would generate a tax loss for the taxpayer?

Mr. BOYLE. I was aware that may be the position they took, yes, I was.

Senator LEVIN. Thank you. Now, it was designed as a 7-year investment program, but I think you indicated that the reasonable likelihood was that the taxpayer would get out after 60 days. Is it not true that it was anticipated that taxpayers would get out at 60 days?

Mr. BOYLE. We understood that they made that choice, yes.

Senator LEVIN. Was it anticipated the taxpayers would get out, not possibly get out, but was it anticipated that they would get out at 60 days?

Mr. BOYLE. I would say it was anticipated that they would get out, yes.

Senator LEVIN. Thank you. You said anticipated they get out, yes, you meant, I assume, that they would get out in 60 days?

Mr. BOYLE. In 60 days, yes, sir.

Senator LEVIN. Thank you. Now, was the amount of funds that were at risk limited to the funds contributed by the taxpayer, that 7 percent?

Mr. BOYLE. No. They had a series of permitted investments that they could choose from. In the first stage, my understanding is they all invested in what you would refer to as low-risk investments.

Senator LEVIN. So that if the 60-day period was the limit of the loan, then the risk in the foreign currency transactions would be limited to the funds contributed by the taxpayer, that 7 percent?

Mr. BOYLE. I believe so, yes.

Senator LEVIN. Was the 7 percent approximately that was contributed by the taxpayer in Presidio that was held in your bank until the investment fund was closed, is that also true?

Mr. BOYLE. I am sorry?

Senator LEVIN. Your bank held the funds?

Mr. BOYLE. I believe so, yes. Well, yes. It went into a custody account in the Private Bank.

Senator LEVIN. So the funds were held in your custody?

Mr. BOYLE. For the benefit of the client, yes.

Senator LEVIN. Yes. And the 7.7 percent was intended to cover market risks, transaction costs, and Deutsche Bank fees, is that correct?

Mr. BOYLE. Yes.

Senator LEVIN. Now, there was an Exhibit 103,[1] if you take a look at that. It is from Mick Wood. He worked at the bank?

---

[1] See Exhibit No. 103 which appears in the Appendix on page 2615.

111

Mr. BOYLE. Yes.

Senator LEVIN. In response to a memo that you wrote to him about BLIPS, this is, I think, similar to the question that our Chairman raised, and if I am duplicating it exactly, then forgive me. I may have missed your exhibit reference here, Mr. Chairman. But Exhibit 103 is a reply to a memo that you wrote about BLIPS, and he said, "I would have thought you could still ensure that the issues are highlighted by ensuring that the papers are prepared and all discussion held in a way which makes them legally privileged." It sounds like he is suggesting that Deutsche Bank should hide the program behind the claim of privilege, is that correct?

Mr. BOYLE. You may possibly interpret it that way. My understanding—I don't know—I don't recall much of what was hidden. I think the only things I recall was trying to limit the tax discussion with our attorneys to the appropriate professionals in the bank to review that. I think everything else is fairly well laid out, including any potential tax benefits that the investor may receive from the transaction.

Senator LEVIN. You are saying that the purpose for the privilege was not to hide this program behind such a claim?

Mr. BOYLE. I think the purpose—I don't remember precisely, but I think generally my recollection is that the reference to privilege was more to—as you recall, we were advised—not advised, but we were counseled by an outside law firm and they were preparing a tax opinion with respect to our role in the transaction and it was, I believe, to limit the access people had internally to that document to the appropriate professionals that should be reviewing it.

Senator LEVIN. And the purpose of limiting access to the document?

Mr. BOYLE. To the tax opinion, yes.

Senator LEVIN. The tax opinion?

Mr. BOYLE. Yes.

Senator LEVIN. Take a look at Exhibit 104.[1] This is an e-mail from Ivor Dunbar——

Mr. BOYLE. Yes.

Senator LEVIN. Co-head of your Structured Transaction Group who implemented BLIPS, and that again was your group, I gather, and here is what he says under point two, privilege.

Mr. BOYLE. Yes.

Senator LEVIN. "This is not easy to achieve, and therefore a more detailed description of the tax issues is not advisable." Don't describe the tax issues.

Mr. BOYLE. Yes.

Senator LEVIN. Keep those out of any paper trail.

Mr. BOYLE. Right.

Senator LEVIN. Is that right?

Mr. BOYLE. That is clearly what he said there, yes.

Senator LEVIN. Yes. Now look at point three in that same e-mail, reputation risk. "In this transaction, reputation risk is tax related and we have been asked by the tax department not to create an audit trail." The tax department, don't create an audit trail in respect to the bank's tax affairs. "The tax department assumes pri-

---

[1] See Exhibit No. 104 which appears in the Appendix on page 2618.

112

mary responsibility for controlling tax related risks, including reputation risk, and will brief senior management accordingly. We are therefore not asking risk and resources committee to approve the reputation risk." Boy, isn't that unusual?

Mr. BOYLE. I don't——

Senator LEVIN. Not to approve a reputation risk because we want to do this orally?

Mr. BOYLE. I don't believe that is what he was getting at. I think what they were doing is in terms of reviewing the tax—the transaction, they were restricting that to the tax professionals, the attorneys, and senior management. I don't believe that—when you go through the internal documents in terms of the approvals and that, I mean, it was always clear that there were tax benefits that may arise to the investor in the transaction. I don't believe that was hidden or kept low profile at any point in time.

Senator LEVIN. No, but it was hidden. Not the tax benefits. What was hidden is what you are so unwilling to say but which is so obviously true, which is that was the principal purpose of the transaction. That is what the effort was. Obviously, there are tax impacts of every transaction. But this, the fact that this was intended to be a tax shelter, and that was its principal purpose, which is obvious from everything, is what they didn't want to say there, because there would be a reputational risk at that point.

And let me go on to that reputational risk. By the way, would there not be a reputational risk if, in fact, your papers—every time your papers say that the principal purpose of this was a tax deal, does that not create a reputational risk?

Mr. BOYLE. If that is, in fact, true. I don't recall anything——

Senator LEVIN. Yes, it would create a reputational risk every time you would say, this is a tax deal primarily, right? You would agree that creates a reputational risk?

Mr. BOYLE. Yes, I would—yes, but I don't recall those words out there anywhere in terms of——

Senator LEVIN. Well, we have gone through a lot of documents which quite clearly talk about this being a tax deal.

Mr. BOYLE. Yes, sir.

Senator LEVIN. Having to be wound up in a certain number of days and so forth. So what we see here is the tax department at Deutsche Bank saying that the reputational risk here was so great that it pulled the review of the BLIPS program out of your risk and resources committee because there would have been a paper trail, as you just indicated, and it instead personally briefed Mr. John Ross, who is the CEO of Deutsche Bank Americas.

Now, how many times do you think that that would have happened, where there were these kind of tax deals that were pulled away from that committee and orally discussed with the CEO instead because of a statement that there is a reputational risk in having this reviewed by your committee? Do you think that happened frequently or would this be unusual?

Mr. BOYLE. No. My understanding is that it was not pulled away from that committee because of BLIPS. I think that was a general policy that the bank was going through, that the tax aspects would be reviewed by the tax professionals and senior management.

113

Senator LEVIN. But it says here, though, in Exhibit 104 again that we are, therefore, not asking risk and resources committee to approve reputational risk on BLIPS. This will be dealt with directly by the tax department and John Ross. I am asking you, was that common?

Mr. BOYLE. With respect to any tax related transaction, yes.

Senator LEVIN. It was?

Mr. BOYLE. I believe so.

Senator LEVIN. OK. I believe that the chairman is covered in Exhibit 113,[1] where that same type of issue was raised—where it says, John Ross approved the product, however, insisted that any customer found to be in litigation be excluded from the product, the product be limited to 25 customers, and that a low profile be kept on these transactions. Again, try me on this one. Why a low profile? Why limit it to 25?

Mr. BOYLE. My recollection of the conversations, we were sitting down and taking Mr. Ross through the transaction, particularly our role in the transaction, and because it involved a more likely than not opinion for the potential tax benefit to the investor, we wanted to make very clear what our role was just in terms of banking, that we are not out there marketing or providing tax advice and that type of thing. So I am—my guess is he was referring to that conversation.

Senator LEVIN. My final line of questions, if I ask the indulgence of the Chair, who has been very generous in many ways. Exhibit 105,[2] if you take a look at that, is an e-mail from you, Mr. Boyle, to John Wadsworth, and this is going to take a couple of minutes to work through this.

Mr. BOYLE. Actually, I don't have Exhibit 105. Oh, here it is.

Senator LEVIN. You have it? OK. Here is what you wrote. "During 1999, we executed $2.8 billion of loan premium deals as part of BLIPS approval process. At that time, NetWest and HVB Bank had executed approximately a half-billion dollars of loan premium deals. I understand that we based our limitations on concerns regarding reputational risk which were heightened in part on the proportion of deals we have executed relative to the other banks." You had done a lot of this, compared to the other banks, and here is what you proposed.

"In addition to the execution of the underlying FX transactions, we would like to lend an amount of money to HVB Bank equal to the amount of money HVB Bank lends to the client. We could potentially make a market interest rate loan secured by HVB high coupon loan to the client which would be secured by the underlying FX transactions. The loan we fund HVB Bank with could be differentiated from the underlying loan to the client because of the market coupon versus high coupon, the date the loans are made, and the fact that we do not face the client as HVB Bank does."

So in other words, Mr. Boyle, the reputational risk to Deutsche Bank for doing additional BLIPS deals was so great that the bank is not permitting any additional transactions, and in response to that situation, your solution is not to halt BLIPS transactions.

---

[1] See Exhibit No. 113 which appears in the Appendix on page 2679.
[2] See Exhibit No. 105 which appears in the Appendix on page 2619.

114

Rather, you propose to fund and execute additional BLIPS transactions through the front of another bank, HVB.

Now, if the reputational risk is that great, shouldn't Deutsche Bank stop its participation rather than try to hide its involvement in more of these transactions?

Mr. BOYLE. I think we have to put this note in context from what I remember. The bank itself had reached the conclusion back in November or October 1999 they didn't want to participate anymore with these particular transactions. My understanding is that there may have been other opportunities to do some more. We approached Mr. Wadsworth with respect to revisiting this, and he clearly was not interested in doing any more of these deals, and it stopped at that point.

Senator LEVIN. Mr. DeGiorgio, did Deutsche Bank approach HVB about this idea?

Mr. DEGIORGIO. Yes, it did.

Senator LEVIN. And did you or HVB accept the idea?

Mr. DEGIORGIO. No, we did not.

Senator LEVIN. You rejected it?

Mr. DEGIORGIO. Yes, we did.

Senator LEVIN. And why?

Mr. DEGIORGIO. Because we were concerned with the operational and execution risks associated with the transaction that would not have been alleviated in the structure that had been proposed, as you see in this e-mail.

Senator LEVIN. Thank you. Thank you, Mr. Chairman.

Chairman COLEMAN. Thank you. Mr. DeGiorgio and Mr. Boyle, you are excused.

I would now like to welcome our third panel to today's hearing: John Larson, Managing Director of Presidio Advisory Services; and Jeffrey Greenstein, Chief Executive Officer of Quellos Group, formerly known as Quadra Advisors. I thank each of you for your attendance at today's hearing and look forward to your testimony.

Before we begin, pursuant to Rule 6, all witnesses who testify before the Subcommittee are required to be sworn. At this time, I would ask you to please stand and raise your right hand.

Do you swear that the testimony you are about to give before this Subcommittee is the truth, the whole truth, and nothing but the truth, so help you, God?

Mr. LARSON. I do.

Mr. GREENSTEIN. I do.

Chairman COLEMAN. Again, as you have seen with the earlier panels, I would like testimony to be 5 minutes. Your written testimony will be entered into the record in its entirety.

Mr. Larson, we will have you go first this morning, followed by Mr. Greenstein. After we have heard all the testimony, we will then turn to questions. Mr. Larson.

**TESTIMONY OF JOHN LARSON, MANAGING DIRECTOR, PRESIDIO ADVISORY SERVICES, SAN FRANCISCO, CALIFORNIA**

Mr. LARSON. I have no advance statement.

Chairman COLEMAN. Mr. Greenstein.

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| KOSTANTINOS VADEVOULIS, JIM VADEVOULIS, AND PAUL VADEVOULIS, | |
| Plaintiffs, | No. 08-C-1251 (LEFKOW) |
| v. | |
| DEUTSCHE BANK AG; DEUTSCHE BANK SECURITIES, INC., d/b/a DEUTSCHE BANK ALEX. BROWN, AND AMERICAN EXPRESS TAX AND BUSINESS SERVICES, INC., n/k/a RSM MCGLADREY LLC, | |
| Defendants. | |

**AMENDED RESPONSES AND OBJECTIONS BY DEFENDANT RSM McGLADREY, INC. (f/k/a AMERICAN EXPRESS TAX AND BUSINESS SERVICES INC.) TO PLAINTIFFS' FIRST SET OF DOCUMENT REQUESTS AND FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 33 and 34, Defendant RSM McGladrey, Inc. (f/k/a American Express Tax and Business Services Inc.) ("TBS") hereby amends its Responses and Objections to Plaintiffs' First Set of Document Requests and First Set of Interrogatories (the "Requests"):

## GENERAL OBJECTIONS

1.    TBS objects to the Requests on the ground and to the extent they seek information or materials protected by the attorney-client privilege, work product privilege and/or any other privilege or immunities from disclosure.

2.    TBS objects to the Requests on the ground and to the extent they pertain to matters neither relevant to the issues involved in this proceeding nor reasonably calculated to lead to the discovery of admissible evidence.

3.    TBS objects to the Requests on the ground and to the extent they are vague, overly broad, unduly burdensome and harassing.

4.    TBS objects to the Requests on the ground and to the extent they seek information or materials TBS is prohibited from disclosing pursuant to 26 U.S.C. §7216.

5.    TBS objects to the Requests on the ground and to the extent they seek information or materials protected from disclosure by any confidentiality agreement with one or more third parties or by any confidentiality order or stipulation entered into in any past or present litigation or administrative proceeding.

6.    TBS objects to the Requests on the ground and to the extent they seek information or materials not relating to transactions involving Plaintiffs on the ground that they exceed the scope of permissible discovery under the Federal Rules of Civil Procedure or the Local Rules of this Court.

7.    TBS objects to the Requests on the ground and to the extent they seek information or materials not in TBS's possession, custody or control.

8.    TBS objects to the Requests to the extent they seek production of electronic documents, files, or data that require TBS to undertake and unreasonable burden of inquiry and/or incur excessive costs in locating, searching, and/or restoring such material.

9.    TBS objects to the "Definitions and Instructions" set forth in the Requests on the ground that they are not limited in time.

2

10.    TBS objects to the "Definitions and Instructions" set forth in the Requests to the extent that they are vague, ambiguous, overly broad and unduly burdensome.

11.    TBS objects to Definition No. 8 in the Requests on the ground that the term "Son of Boss," defined in such a manner as to encompass "Son of Boss generally and not just the Son of Boss transaction in which plaintiffs participated," is overly broad, unduly burdensome and seeks information and materials not reasonably calculated to lead to the discovery of admissible evidence.  TBS further objects to such definition on the ground and to the extent it refers to transactions, entities and persons unrelated to the pending litigation and employs vague and ambiguous terms such as "developed," "marketed" and "implemented."

12.    TBS objects to the Requests to the extent they are redundant or duplicative.

13.    TBS reserves the right to amend and/or supplement this Response as and when additional relevant information or materials become available.

14.    TBS reserves all objections that may be available to it at any hearing or on any motion to the use or admissibility of any material produced.  The response to any Request does not constitute an admission by TBS that the Request or the response thereto is relevant to this proceeding or admissible in evidence.

15.    Inadvertent disclosure of any material subject to the attorney-client privilege, prepared in anticipation of litigation, or otherwise protected or immune from discovery shall not constitute a waiver of any privilege or of any other ground for objecting to discovery of such materials, its subject matter or information contained therein or of TBS's right to object to the use of such material during any later proceeding or otherwise seek return of the material.

3

16.    TBS responds to the Requests pursuant to the Order of the Court dated July 31, 2008 and without waiving its right to arbitration of Plaintiffs' claims in this action.

## SPECIFIC RESPONSES AND OBJECTIONS

**Document Request No. 1**:

All documents concerning Plaintiff's participation in Son of Boss.

**Response**:

Subject to and without waiving the General Objections set forth above, TBS will produce non-privileged documents, to the extent not already produced, responsive to this Request.

**Document Request No. 2**:

All contracts or agreements between Plaintiff(s) and Defendants concerning the Son of Boss strategy in which Plaintiffs participated.

**Response**:

Subject to and without waiving the General Objections set forth above, TBS will produce non-privileged documents, if any, to the extent not already produced, responsive to this Request.

**Document Request No. 3**:

All correspondence between Plaintiff and Defendants concerning the creation, marketing, or implementation of the son of BOSS strategy in which Plaintiff participated.

**Response**:

Subject to and without waiving the General Objections set forth above, TBS will produce non-privileged documents, if any, to the extent not already produced, responsive to this Request.

4

NYC:180462.1

**Document Request No. 4**:

        All documents concerning the creation, marketing, or implementation of Son of Boss generally.

**Response**:

        TBS objects to this Request on the grounds and to the extent that it is overly broad and seeks materials which TBS is prohibited from disclosing under 26 U.S.C. §7216 and which are neither relevant to the issues in this action nor reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving such objections or the General Objections set forth above, TBS states that it will produce non-privileged documents, if any, not relating to a particular taxpayer, responsive to this Request.

**Document Request No. 5**:

        All documents that concern, show, or relate to any Defendants' participation in Son of BOSS generally.

**Response**:

        TBS objects to this Request on the grounds and to the extent that it is vague, ambiguous, overly broad and seeks materials which TBS is prohibited from disclosing under 26 U.S.C. §7216 and which are neither relevant to the issues in this action nor reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 6**:

        Plaintiff's 2000 tax returns and all supporting tax workpapers.

**Response**:

        Subject to and without waiving the General Objections set forth above, TBS will produce non-privileged documents, to the extent not already produced, responsive to this Request.

**Document Request No. 7**:

All correspondence between Plaintiff and TBS concerning any work TBS did with respect to Plaintiff's 2000 tax return.

**Response**:

Subject to and without waiving the General Objections set forth above, TBS will produce non-privileged documents, to the extent not already produced, responsive to this Request.

**Document Request No. 8**:

Documents that show the scope and extent of Defendants' participation in Son of BOSS generally.

**Response**:

TBS objects to this Request on the grounds and to the extent that it is vague, ambiguous, overly broad and seeks materials which TBS is prohibited from disclosing under 26 U.S.C. §7216 and which are neither relevant to the issues in this action nor reasonably calculated to lead to the discovery of admissible evidence.

**Document Request No. 9**:

Documents that identify all employees of Defendants who participated in the creation, marketing, or implementation of Son of BOSS generally.

**Response**:

TBS objects to this Request on the grounds and to the extent that it is overly broad and seeks materials which TBS is prohibited from disclosing under 26 U.S.C. §7216 and which are neither relevant to the issues in this action nor reasonably calculated to lead to the discovery of admissible evidence.

6

**Document Request No. 10**:

> Documents that identify all employees of Defendants who participated in the creation, marketing, or implementation of the Son of BOSS strategy in which Plaintiff participated.

**Response**:

Subject to and without waiving the General Objections set forth above, TBS will produce non-privileged documents, if any, responsive to this Request.

**Document Request No. 11**:

> Documents that identify all TBS employees who performed any work or participated with respect to any work TBS did on Plaintiff's 2000 tax returns.

**Response**:

Subject to and without waiving the General Objections set forth above, TBS will produce non-privileged documents, to the extent not already produced, responsive to this Request.

**Document Request No. 12**:

> All documents relating to Son of Boss that Defendants produced to any governmental committee, government agency, federal or state prosecutor, or private litigant since 2000.

**Response**:

TBS objects to this Request on the grounds and to the extent that it is overly broad, harassing and seeks materials neither relevant to the issues in this action nor reasonably calculated to lead to the discovery of admissible evidence. TBS further objects to this Request on the grounds and to the extent it seeks materials TBS is prohibited from disclosing under 26 U.S.C. §7216 or subject to confidentiality orders or rules in other proceedings. TBS further objects to this Request on the grounds and to the extent that documents produced to other parties would be subject to

7

confidentiality orders or rules and that the Request attempts to intrude on the confidentiality of

governmental investigations.

**Document Request No. 13**:

> All transcripts since 2000 of trial testimony, hearing testimony, grand jury testimony,
> depositions, or interviews of any current or former employee of Defendants in which
> Son of Boss was mentioned, referred to, described, or inquired about.

**Response**:

TBS objects to this Request on the grounds and to the extent that it is overly broad

and seeks materials neither relevant to this action nor reasonably calculated to lead to the discovery

of admissible evidence or protected from disclosure by the attorney-client or work product privileges.

TBS further objects to this Request on the ground and to the extent it seeks materials that would be

subject to confidentiality orders or rules. TBS further objects to this Request to the extent that it

attempts to intrude on the confidentiality of government investigations. Subject to and without

waiving such objections or the General Objections set forth above, TBS states that there is one

responsive document that is covered by the attorney-client and work product privileges and is

reflected in the privilege log attached hereto.

**Document Request No. 14**:

> All documents concerning the nature and amounts of compensation Defendants
> received as a result of Plaintiff's participation in Son of Boss.

**Response**:

TBS objects to this Request on the grounds that it is vague and ambiguous. Subject to

and without waiving such objection or the General Objections set forth above, TBS will produce

non-privileged documents, if any, responsive to this Request.

8

**Document Request No. 15**:

All documents concerning the nature and amounts of compensation Defendants received from Son of BOSS generally.

**Response**:

TBS objects to this Request on the grounds and to the extent that it is overly broad, unduly burdensome and seeks materials that are neither relevant to the issues in this action nor reasonably calculated to lead to the discovery of admissible evidence.

**Interrogatory No. 1**:

Identify by bates number all written contracts between Plaintiff and Defendants concerning Son of BOSS.

**Response**:

TBS objects to this Interrogatory on the grounds that it is vague and ambiguous and, to the extent it seeks information concerning any agreement between Plaintiffs and any party other than TBS, it is overly broad and seeks information not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving such objections or the General Objections set forth above, TBS is not presently aware of any written contracts, if any, between Plaintiffs and TBS concerning Son of BOSS.

**Interrogatory No. 2**:

Describe in detail all oral contracts between Plaintiff and Defendants concerning Son of BOSS.

**Response**:

TBS objects to this Interrogatory on the grounds that it is vague and ambiguous and, to the extent it seeks information on any agreement between Plaintiffs and parties other than TBS, it is overly broad and seeks information not reasonably calculated to lead to the discovery of

9

admissible evidence. Subject to and without waiving such objections or the General Objections set

forth above, TBS states that it is unaware at present of any oral contracts between Plaintiffs and TBS

concerning Son of BOSS.

**Interrogatory No. 3**:

> Identify by bates number all written agreements that Defendants contend (or may
> contend) require the mediation and/or arbitration of any claims alleged in the
> Complaint.

**Response**:

> Subject to and without waiving the General Objections set forth above, TBS identifies

the following documents by Bates number: DB Vadevoulis 000319-22; DB Vadevoulis 000327-30;

DB Vadevoulis 000333-36; DB Vadevoulis 000339-42; DB Vadevoulis 000351-54; DB Vadevoulis

000356-59; DB Vadevoulis 000365-68; DB Vadevoulis 000400-03; DB Vadevoulis 000408-411; DB

Vadevoulis 000413-16; DB Vadevoulis 000422-25.

**Interrogatory No. 4**:

> Identify all persons or entities (including governmental entities) to whom Defendants
> have produced documents concerning Son of BOSS.

**Response**:

> TBS objects to this Interrogatory on the grounds that it is overly broad and seeks

materials neither relevant to the issues in this action nor reasonably calculated to lead to the discovery

of admissible evidence. TBS further objects to this Interrogatory on the ground and to the extent that

it attempts to intrude on the confidentiality of government investigations.

**Interrogatory No. 5**:

> Identify all current or former employees of Defendants who have been interviewed or
> deposed or testified at trial, before a hearing, or before a grand jury in which Son of

10

BOSS was mentioned, referred to, described, or inquired about.  Please include the name of each witness, each date they testified, and the nature of each proceeding.

**Response**:

TBS objects to this Interrogatory on the grounds that it is overly broad and seeks materials neither relevant to the issues in this action nor reasonably calculated to lead to the discovery of admissible evidence.  TBS further objects to this Interrogatory on the ground and to the extent that it attempts to intrude on the confidentiality of government investigations.

**Interrogatory No. 6**:

Identify the nature and amounts of all compensation Defendants received as a result of Plaintiff's participation in Son of BOSS.

**Response**:

TBS objects to this Interrogatory on the grounds that it is vague and ambiguous. Subject to and without waiving such objection or the General Objections set forth above, TBS states that information responsive to this Interrogatory will be set forth in documents to be produced to Plaintiffs pursuant to their Document Request.

**Interrogatory No. 7**:

Identify the nature and amounts of all compensation Defendants received from Son of BOSS generally.

**Response**:

TBS objects to this Interrogatory on the grounds that it is vague and ambiguous, overly broad and seeks information neither relevant to the issues in this action nor reasonably calculated to lead to the discovery of admissible evidence.

11

**Interrogatory No. 8**:

Identify all employees of Defendants who participated in a tax strategy, including Son of Boss, and who attempted to or in fact participated in the Internal Revenue Services amnesty program described in IRS Announcement 2002-2.

**Response**:

TBS objects to this Interrogatory on the grounds that it is overly broad and seeks information neither relevant to the issues in this action nor reasonably calculated to lead to the discovery of admissible evidence.

Dated:  New York, New York
        September 4, 2008

                                        **ANDREWS KURTH LLP**

                                        By:    _Anju Uchima_
                                                Lynne M. Fischman Uniman
                                                Anju Uchima
                                                450 Lexington Avenue, 15th Floor
                                                New York, New York 10017
                                                Telephone: (212) 850-2800
                                                Facsimile: (212) 850-2929


                                                Thomas F. Falkenberg
                                                Williams Montgomery & John, Ltd.
                                                20 North Wacker Drive
                                                Chicago, Illinois 60606
                                                Telephone: (312) 443-3240
                                                Facsimile: (312) 630-8540

                                                *Attorneys for Defendant RSM*
                                                *McGladrey, Inc. (f/k/a American*
                                                *Express Tax andBusiness Services*
                                                *Inc.)*

NYC:180462.1

# EXHIBIT E

**Scott F. Hessell**

| | |
|---|---|
| **From:** | Scott F. Hessell |
| **Sent:** | Monday, August 18, 2008 3:15 PM |
| **To:** | 'Uniman, Lynne'; 'Uchima, Anju' |
| **Cc:** | Adam Merrill |
| **Subject:** | Vadevoulis et al v. Deutsche Bank AG et al: TBS's Responses to Pls' RFPs and Interrogs. |

Counsel:

This confirms our meet and confer conversation of August 15, 2008.

TBS will be producing additional responsive documents this week, before Friday.

No documents are currently being withheld on the grounds of attorney-client privilege. And TBS is not withholding documents on the basis of any general objections to the discovery requests.

Generally, TBS will not produce any documents or respond to interrogatory requests that ask for Son of Boss documents "generally."


<u>RFP Nos. 4-5, 8</u>

Although not stated in TBS's written responses/objections, counsel's primary objection discussed on the call was that TBS could not produce documents about Son of BOSS generally because doing so would violate IRC 7216 and the implementing regulations. I noted that there is a protective order in place, and that taxpayer private information could be redacted. TBS responded that such protections were insufficient.

Nonetheless, TBS agrees to search for and produce documents responsive to these requests, so long as the documents do not identify a specific taxpayer client of TBS, and are not prohibited by I.R.C. 7216.

I note that to the extent TBS is refusing to provide documents on the basis of a privilege asserted under the Internal Revenue Code, Plaintiff is entitled to privilege log of the documents being withheld. *See* FRCP 26(b)(5).

<u>RFP No. 9</u>

TBS stands on its objection and will not produce documents that identify employees of either defendant who participated in Son of BOSS generally.

<u>RFP No. 12</u>

TBS stands on its objections and will not produce documents responsive to RFP No. 12.

<u>RFP No. 13</u>

1

TBS stated that it has no documents responsive to request no. 13 in that no Amex/TBS employees have given transcribed testimony relating to Son of BOSS. In light of this statement, plaintiffs have no need to purse this request any further.

RFP No. 15

TBS stands on its objection.

Interrog. No. 1

TBS agrees to amend its answer to state that it is unaware of any written contracts between Plaintiffs and TBS concerning Son of BOSS.

Interrog. Nos. 4, 5, 7

TBS stands on objection as discussed in RFP responses.

Please advise if I have misstated anything from our conversation. This email confirms that the parties have, in good faith, attempted to resolve their differences concerning the above discovery disputes, consistent with their obligations under Local Rule 37.2.


Two followup points: We still have not received a certificate of service for the discovery requests or a verification of TBS's interrogatory responses. Please provide such documents. Also, I am following up on your request regarding additional documents from plaintiffs.

Scott


**Scott F. Hessell, Esq.**
Sperling & Slater, P.C.
55 West Monroe, Suite 3200
Chicago, IL 60603
T: (312) 641-4882
F: (312) 641-6492

---

**From:** Uchima, Anju [mailto:AnjuUchima@andrewskurth.com]
**Sent:** Friday, August 15, 2008 9:22 AM
**To:** Scott F. Hessell
**Cc:** Uniman, Lynne
**Subject:** RE: Vadevoulis et al v. Deutsche Bank AG et al: TBS's Responses to Pls' RFPs and Interrogs.

We'll call you.

---

**From:** Scott F. Hessell [mailto:SHessell@sperling-law.com]
**Sent:** Friday, August 15, 2008 10:10 AM
**To:** Uchima, Anju
**Subject:** RE: Vadevoulis et al v. Deutsche Bank AG et al: TBS's Responses to Pls' RFPs and Interrogs.

You want to call me?  312 641 4882

---

**From:** Uchima, Anju [mailto:AnjuUchima@andrewskurth.com]
**Sent:** Tuesday, August 12, 2008 4:03 PM
**To:** Scott F. Hessell; Uniman, Lynne; Adam Merrill; tff@willmont.com
**Subject:** RE: Vadevoulis et al v. Deutsche Bank AG et al: TBS's Responses to Pls' RFPs and Interrogs.

How about Friday at 11:00 am Eastern?

---

**From:** Scott F. Hessell [mailto:SHessell@sperling-law.com]
**Sent:** Tuesday, August 12, 2008 4:49 PM
**To:** Uniman, Lynne; Adam Merrill; Uchima, Anju; tff@willmont.com
**Subject:** Vadevoulis et al v. Deutsche Bank AG et al: TBS's Responses to Pls' RFPs and Interrogs.

Counsel:

We received TBS's responses to Plaintiffs' RFPs/Interrogs today, by mail.  In the future, as a courtesy, we propose serving non-ECF filed matters like discovery/discovery responses via email (or personal service); this way we can avoid the USPS delays.  I note that the responses were received without a certificate of service, and that the interrogatories lacked a verification; both oversights I'm sure.

In addition, please advise if you are available Thursday or Friday of this week for a meet and confer to address TBS's objections/responses to RFP Nos. 4, 5, 8, 9, 12, 13 and 15, and Interrog. Nos. 1, 4, 5, 7, and 8.  I suspect we may have already touched on these issues last time but consistent with Local Rules, we would like to see whether compromise is possible.

In advance of the meet and confer, I'd like to address a few preliminary matters to make the call more efficient:

1.  When will we receive additional responsive documents TBS agreed to provide in the written responses.

2.  Confirm that TBS is not withholding any documents/information on the basis of any privilege.  If so, please provide a privilege log supporting such assertions.

3.  Confirm that TBS is not otherwise withholding any documents/information on the basis of any of its general objections.

Thanks

Scott

**Scott F. Hessell, Esq.**
Sperling & Slater, P.C.
55 West Monroe, Suite 3200
Chicago, IL 60603
T: (312) 641-4882
F: (312) 641-6492

Treasury Circular 230 Disclosure - To comply with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this written communication (including any attachment) is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed on the person. If this written communication contains any tax advice that is used or referred to in connection with the promoting, marketing or recommending of any transaction(s) or matter(s), this written communication should be construed as written to support the promoting, marketing or recommending of the transaction(s) or matter(s) addressed by this written communication, and the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor. No limitation has been imposed by Andrews Kurth LLP on disclosure of the tax treatment or tax structure of the transaction(s) or matter(s).

--
This message has been scanned for viruses and
dangerous content by **MailScanner**, and is
believed to be clean.

Treasury Circular 230 Disclosure - To comply with requirements imposed by the Internal Revenue Service, we inform you that any tax advice contained in this written communication (including any attachment) is not intended or written to be used, and cannot be used, by any person for the purpose of avoiding tax penalties that may be imposed on the person. If this written communication contains any tax advice that is used or referred to in connection with the promoting, marketing or recommending of any transaction(s) or matter(s), this written communication should be construed as written to support the promoting, marketing or recommending of the transaction(s) or matter(s) addressed by this written communication, and the taxpayer should seek advice based on the taxpayer's particular circumstances from an independent tax advisor. No limitation has been imposed by Andrews Kurth LLP on disclosure of the tax treatment or tax structure of the transaction(s) or matter(s).

--
This message has been scanned for viruses and
dangerous content by **MailScanner**, and is
believed to be clean.

# EXHIBIT F

## Scott F. Hessell

| | |
|---|---|
| **From:** | Adam Merrill |
| **Sent:** | Tuesday, August 19, 2008 8:09 PM |
| **To:** | Seth C. Farber (sfarber@dl.com); Librera, Kelly; eziaja@dl.com |
| **Cc:** | Scott F. Hessell |
| **Subject:** | Vadevoulis v Deutsche Bank--Meet and Confer |

Seth,

This confirms the meet and confer we had this afternoon concerning Deutsche Bank's responses to the Vadevoulises first set of discovery.

1. You confirmed that DB is withholding a small number of documents on privilege grounds and that it will provide us with a privilege log.
2. You confirmed that otherwise, DB is not withholding any documents pursuant to its general objections or reservation of rights.
3. Although we discussed plaintiffs' and DB's views (and you are going to further ponder the issue), DB continues to be unwilling to produce documents responsive to document request nos. 4-5, 8-9, 12-13, and 15 and continues to be unwilling to answer interrogatory nos. 4-5 and 7-8. You agreed to get back to us by early next week if DB changes its views as to any of those requests.
4. Plaintiffs are preparing a motion to compel, which we will likely file sometime next week.

If I have mischaracterized our discussion or if you wish to discuss any of these issues further, please do not hesitate to call me.

Adam Merrill
312.368.5932